1  Patrick Gunn (*Pro Hac Vice* forthcoming)
   COOLEY LLP
2  101 California Street, 5th Floor
   San Francisco, California 94111-5800
3  Telephone:   +1 415 693 2070
   Facsimile:   +1 415 393 2222
4  pgunn@cooley.com

5  Mary O'Grady (No. 011434)
   Colin Proksel (No. 034133)
6  Payslie Bowman (No. 035418)
   OSBORN MALEDON, P.A.
7  2929 North Central Avenue, 21st Floor
   Phoenix, Arizona 85012-2793
8  Telephone:   +1 602 640 9000
   Facsimile:   +1 602 640 9050
9  mogrady@omlaw.com
   cproksel@omlaw.com
10 pbowman@omlaw.com

11 *Attorneys for Plaintiffs*
   (Additional counsel on following page)

12

13              **UNITED STATES DISTRICT COURT**
                **FOR THE DISTRICT OF ARIZONA**

14

15  D.T., a minor, by and through his parent        Case No. _____
    and next friend Lizette Trujillo; Jane Doe, a
16  minor, by and through her parent and next       **COMPLAINT**
    friend Susan Doe; and Helen Roe, a minor,
17  by and through her parent and next friend       **JURY TRIAL DEMANDED**
    Megan Roe,
18                                                  Date Action Filed:   _____
                       Plaintiffs,
19
             v.
20
    Dr. Cara M. Christ, in her official capacity
21  as State Registrar of Vital Records and
    Director of the Arizona Department of
22  Health Services; Thomas Salow, in his
    official capacity as Branch Chief of the
23  Division of Public Health Licensing
    Services at the Arizona Department of
24  Health Services; and Krystal Colburn, in
    her official capacity as Bureau Chief and
25  Assistant State Registrar of the Bureau of
    Vital Records at the Arizona Department of
26  Health Services,

27                     Defendants.

28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

1    Asaf Orr (*Pro Hac Vice* forthcoming)
     NATIONAL CENTER FOR LESBIAN RIGHTS
2    aorr@nclrights.org
     870 Market Street, Suite 370
3    San Francisco, California 94102
     Telephone: (415) 392-6257
4    Facsimile:  (415) 392-8442

5    Barrett J. Anderson (*Pro Hac Vice* forthcoming)
     COOLEY LLP
6    4401 Eastgate Mall
     San Diego, California 92121-1909
7    Telephone:    +1 858 550 6000
     Facsimile:    +1 858 550 6420
8    banderson@cooley.com

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs respectfully state and allege as follows:

## **INTRODUCTION**

1.     Plaintiffs are transgender children who were born in Arizona and seek to correct the sex listed on their birth certificates to protect their privacy and safety. They wish to have accurate birth certificates they can use without being forced to disclose their transgender status, which causes Plaintiffs significant emotional harm and puts them at risk of discrimination, harassment, and violence.

2.     Plaintiff D.T. is a transgender boy, but his Arizona birth certificate identifies him as female. Plaintiffs Jane Doe and Helen Roe are transgender girls, but their Arizona birth certificates identify them as male.

3.     Possessing identity documents that accurately reflect who they are is essential to Plaintiffs' well-being. A birth certificate is a critical and ubiquitous identity document used in many settings to verify an individual's identity. This is particularly true for children and adolescents for whom a birth certificate is often their only form of government-issued identification. School enrollment, recreational sports registrations, and camp signups, among many others, hinge on having proper identity documents. Not only are birth certificates themselves commonly used for such purposes, but they are often required for obtaining other essential identity documents.

4.     For transgender people, the sex listed on their initial birth certificate does not match who they are. For a young person who has undergone gender transition, having a birth certificate that fails to reflect who they are puts them at risk of exposure, discrimination, harassment, and even violence. Changing the sex marker on their birth certificate is thus critically important for transgender young people.

5.     Currently, Arizona prevents transgender minors from changing the sex listed on their birth certificates by requiring that transgender people must present evidence that they have undergone a "sex change operation" to obtain corrected birth certificates. A.R.S. § 36-337(A)(3); A.A.C. R9-19-208(O). Transgender young people cannot obtain this

critical protection because, in most cases, minors do not undergo surgery and may never require surgery as part of their gender transition.

6.     Unlike other youth, transgender youth in Arizona must navigate the world with a birth certificate that does not match their sex. By barring these youth from obtaining corrected certificates, Arizona law forces them to disclose their transgender status, which invades their privacy and exposes them to discrimination, harassment, and violence. Accordingly, the current law violates the United States Constitution's guarantees of equal protection of the laws and the fundamental rights to privacy, liberty, and autonomy.

7.     No compelling, important, or even legitimate governmental justification supports Arizona's current refusal to provide transgender young people with accurate birth certificates.

## JURISDICTION AND VENUE

8.     This action arises under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation, under color of state law, of rights secured by the United States Constitution.

9.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the laws and the Constitution of the United States.

10.     Venue is proper in the District of Arizona under 28 U.S.C. § 1391(b) because all Defendants reside within the district, Defendants reside and have offices within the district, and/or a substantial part of the events that gave rise to Plaintiffs' claims occurred, and will continue to occur, within the district.

11.     This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65, and 28 U.S.C. §§ 2201 and 2202.

12.     This Court has personal jurisdiction over Defendants because they are domiciled in Arizona and/or have otherwise made and established contacts with Arizona sufficient to permit the exercise of personal jurisdiction over them.

## PARTIES

### A. The Plaintiffs

13.     Plaintiff D.T. is a thirteen-year-old transgender boy who was born in Pima County, Arizona and currently resides in Arizona. Because D.T. is a minor, this action is brought on his behalf by and through his parent and next friend Lizette Trujillo.

14.     Plaintiff Jane Doe is a ten-year-old transgender girl who was born in Maricopa County, Arizona and currently resides in Arizona. Because Jane Doe is a minor, this action is brought on her behalf by and through her parent and next friend Susan Doe.

15.     Plaintiff Helen Roe is a six-year-old transgender girl who was born in Pima County, Arizona and currently resides in Arizona. Because Helen Roe is a minor, this action is brought on her behalf by and through her parent and next friend Megan Roe.

### B. The Defendants

16.     Defendant Dr. Cara M. Christ ("Director Christ") is sued in her official capacity as State Registrar of Vital Records and Director of the Department of Health Services for the State of Arizona. Director Christ has general supervision of vital statistics in the state and is charged with the execution of the vital statistics laws of Arizona, including the provision of the necessary instructions and forms for obtaining and preserving records of births. Director Christ also has supervisory authority over the assistant state registrars and deputy local registrars throughout Arizona. Director Christ has knowingly encouraged, condoned, and acquiesced in the acts barring Plaintiffs from correcting their birth certificates to be consistent with their gender identity. Director Christ's administration and enforcement of the vital statistics laws are actions under the color of state law. Director Christ is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state law at all times relevant to this Complaint.

17.     Defendant Thomas Salow ("Chief Salow") is sued in his official capacity as Branch Chief of the Division of Public Health Licensing Services within the Department of Health Services for the State of Arizona. As Branch Chief of the Division of Public Health Licensing Services, Chief Salow has supervisory authority over Chief Colburn and deputy

local registrars throughout Arizona. Chief Salow has knowingly encouraged, condoned, and acquiesced in the acts barring Plaintiffs from correcting their birth certificates to be consistent with their gender identity. Chief Salow's administration and enforcement of the vital statistics laws are actions under the color of state law. Chief Salow is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state law at all times relevant to this Complaint.

18.     Defendant Krystal Colburn ("Chief Colburn") is sued in her official capacity as Assistant State Registrar and Bureau Chief of the Bureau of Vital Records within the Department of Health Services for the State of Arizona. Chief Colburn has supervisory authority over deputy local registrars throughout Arizona. Chief Colburn has knowingly encouraged, condoned, and acquiesced in the acts barring Plaintiffs from correcting their birth certificates to be consistent with their gender identity. Chief Colburn's administration and enforcement of the vital statistics laws are actions under the color of state law. Chief Colburn is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state law at all times relevant to this Complaint.

## STATEMENT OF FACTS

**Gender Identity Development and Treatment for Gender Dysphoria**

19.     Each person's sex is comprised of multiple components, including internal reproductive organs, external genitalia, chromosomes, hormones, gender identity, and secondary-sex characteristics. For most people, each of these components align with one another as either male or female. That is not the case, however, for transgender people.

20.     Research indicates that being transgender has a biological component and cannot be changed. As such, efforts to change a transgender person's identity are unethical and harmful to a person's health and well-being.

21.     Children typically become aware of their gender identity between the ages of two and five years old. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 455 (5th ed. 2013) ("DSM-5"). Around this age, transgender children often begin to express their cross-gender identification to their family members and caregivers through

statements and actions.  Transgender children exhibit a strong cross-gender identification that is insistent, persistent, and consistent.  Research has found the gender identities of transgender and nontransgender children to be indistinguishable—that is, a transgender boy identifies himself as male just as strongly and consistently as a non-transgender boy identifies himself as male, and a transgender girl identifies herself as female just as strongly and consistently as a non-transgender girl identifies herself as female.

22.　　Living in a manner consistent with one's gender identity is critical to the health and well-being of any person, including transgender people.

23.　　The incongruence between a transgender person's gender identity and assigned sex can cause significant psychological distress, which is referred to as gender dysphoria.

24.　　Gender dysphoria is a serious health condition recognized in the DSM-5, as well as by other leading medical and mental health professional groups, including the American Medical Association and the American Psychological Association.  If left untreated, gender dysphoria may result in severe psychological distress, anxiety, depression, suicidal ideation, and even self-harm.

25.　　Gender dysphoria is highly treatable.  As with other medical conditions, health care providers follow a well-established standard of care when working with patients with gender dysphoria.  The World Professional Association for Transgender Health ("WPATH") has set those standards for over four decades.

26.　　WPATH is an international, multidisciplinary, professional association of medical providers, mental health providers, researchers, and others, with a mission of promoting evidence-based care and research for transgender health, including the treatment of gender dysphoria.  WPATH published the seventh and most recent edition of the Standards of Care in 2011.

27.　　Building on those standards and incorporating the most current research and clinical experience, the Endocrine Society released the Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline

in September 2017. These guidelines reaffirm the WPATH Standards of Care and offer medical providers practical guidance on providing transition-related care to patients with gender dysphoria, including young people.

28. The WPATH and the Endocrine Society standards have been adopted by many major associations of healthcare professionals, including the American Medical Association, American Psychiatric Association, and American Psychological Association, as well as associations of healthcare professionals focused on youth and adolescents, such as the American Academy of Pediatrics, American Association of Child and Adolescent Psychiatrists, and the Pediatric Endocrine Society. Federal courts across the country have also recognized the standards of these medical societies as setting the prevailing standard of care for the treatment of gender dysphoria.

29. Treatment for gender dysphoria seeks to bring every aspect of a transgender person's life into closer alignment with their gender identity. The process of undertaking these treatments is often referred to as a gender transition or simply as transition. The typical components of gender transition consist of social transition, hormone-replacement therapy, and, for some transgender people, surgery. Surgery is not medically required to complete gender transition and is not medically necessary for every transgender person.

30. Typically, transgender people start their transition with a social transition, which includes changing their name, using different pronouns, wearing clothing and adopting grooming habits typically associated with their peers of the same gender identity, and using the corresponding sex-specific facilities such as restrooms. Making these changes enable a transgender person to live their life consistent with who they are and helps ensure that they are treated as such by family, peers, and others in the community.

31. Social transition can significantly alleviate a transgender person's gender dysphoria. Having identity documents that reflect a transgender person's assigned sex increases the likelihood that a person's transgender status will be disclosed to others, exposes them to a significant risk of mistreatment, and undermines the health benefits of their social transition.

Cooley LLP
Attorneys at Law
San Diego

32.     For transgender youth, research has shown that being accepted and supported as who they are is enormously beneficial to their health and well-being.  Conversely, being denied recognition and support can cause significant harm, in addition to exposing them to the risk of discrimination and harassment.

33.     At the onset of puberty, transgender young people may also start taking puberty-delaying medication to prevent their bodies from being flooded with the incorrect sex hormone and the attendant development of unwanted secondary-sex characteristics that conflict with their sex.  Without these medications, transgender young people would experience debilitating psychological distress because their changing bodies would be a constant reminder of the disjunction between their bodies and their sex.  The psychological distress is heightened by the reality that some of these physical changes may be irreversible, permanently constricting a transgender young person's future treatment options and negatively affecting their quality of life.

34.     In addition to puberty-delaying medications, transgender young people may also undergo hormone-replacement therapy.  That treatment causes their bodies to develop the secondary-sex characteristics associated with their gender identity, such as facial and body hair for transgender boys and breasts for transgender girls.

35.     The prevailing standards of care recognize that, under limited circumstances, it may be medically necessary for some transgender young people to undergo surgical treatment for their gender dysphoria while they are minors.  The most common surgical procedure that is medically necessary for transgender young people is male chest reconstruction surgery.  That procedure is specifically for transgender males.  However, because of the increasing availability of puberty-delaying medication, an increasing number of transgender boys never develop breasts and therefore never need that surgery.

36.     A transgender young person's ability to access any of those treatments—particularly surgery—may also be limited by financial resources, insurance coverage, and provider availability, in addition to many other barriers to health care access.

Cooley LLP
Attorneys at Law
San Diego

7

D.T., et al. v. Christ, et al.
Complaint

**The Need for Accurate Birth Certificates Matching One's Identity**

37.    The use of birth certificates is ubiquitous in our society.  A person's birth certificate is a trusted and essential government-issued document that serves as proof of a person's identity.  That document also reflects the government's recognition of a person's identity, including the person's sex.

38.    Birth certificates are commonly used in a wide variety of contexts, especially for young people who do not have any other form of government-issued identification, including enrolling in school and recreational sports, and obtaining other important identity documents (such as driver licenses, state identification cards, and passports).

39.    Depriving transgender young people of birth certificates that accurately reflect who they are forces them to disclose their transgender status—information that is private and sensitive—without their consent whenever they need to rely on birth certificates to establish their identity.  That disclosure causes several distinct and significant harms: it creates barriers to full participation in school and other activities that are critical to a young person's health and well-being, circumvents that young person's ability to control the disclosure of their transgender status, undermines the effectiveness of a transgender young person's treatment for gender dysphoria, and exposes a transgender young person to an increased risk of harassment, discrimination, and potentially bodily harm.

40.    A national survey conducted by the National Center for Transgender Equality in 2015 revealed that nearly one-third of respondents who had shown an identity document with a name or sex that did not match their gender presentation were verbally harassed, denied benefits or service, asked to leave, or assaulted.

41.    Barring transgender youth from obtaining corrected birth certificate places them in a disfavored class.  Unlike other youth, whose birth certificates match who they are, transgender youth are forced to use birth certificates that do not match their sex.

**The Process for Correcting the Sex Listed on an Arizona Birth Certificate**

42.    The Arizona Department of Health Services ("ADHS"), through the Bureau of Vital Records, exercises responsibility for the registration, issuance, correction, and

maintenance of Arizona birth certificates.  A.R.S. § 36-302.

43.     Recognizing birth certificates may be inaccurate or require updating, A.R.S. § 36-337 provides for the issuance of an updated birth certificate in a variety of circumstances, including to reflect a declaration of paternity or adoption or to correct the sex of a transgender or intersex person.

44.     Under that statute, a transgender person may correct the sex listed on a person's birth certificate by submitting "[a] written request for an amended birth certificate" accompanied by "a written statement by a physician that verifies the [applicant or applicant's child has undergone a] sex change operation." A.R.S. § 36-337(A)(3).  ADHS has promulgated a regulation that details the information, in addition to a letter from a physician, that a transgender person is required to provide in order to correct the sex listed on their birth certificate. *See* A.A.C. R9-19-208(O).

45.     These requirements—both statutory and regulatory—deny transgender young people the ability to correct their birth certificates because most transgender youth do not obtain or require surgery.  This ban deprives Plaintiffs of equal treatment, violates fundamental constitutional rights to privacy and liberty, and subjects Plaintiffs and other transgender young people to serious irreparable harm to their safety, health, and well-being.

***Plaintiff D.T.***

46.     Plaintiff D.T. is a thirteen-year-old transgender boy in Pima County, Arizona. Like many kids his age, he loves to skateboard, play basketball, draw, and play Minecraft. He also hopes to learn to play the drums.

47.     D.T. began expressing himself as a boy at around two years old.  As a toddler, D.T. gravitated to more masculine clothing options and actively resisted girls' clothing.  He would regularly wear his father's fedora and necktie around the house.

48.     His parents still sent him to school in girls' clothing.  But every afternoon D.T. immediately removed the clothes when he returned home, and then often spent hours crying in his room afterwards.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

49.     D.T. expressed he was a boy in other ways too.  On several occasions D.T. cut—increasingly larger—chunks of his long hair, leaving his parents to discover the newly missing bits of hair.  D.T. also tried to use the boys' restroom when he could and would not line up with the girls at school when teachers divided the class by sex.

50.     During that time, D.T. rarely smiled and was almost always quiet and anxious. He developed breathing tics and fidgeted nervously.  D.T. initially struggled to tell his parents how he felt and, on several occasions, told them he was afraid of dying and that he had a secret that he could not tell them.

51.     The day before D.T. began third grade, he and Lizette stopped by his classroom to drop off some supplies.  D.T.'s best friend was also there with her mother. His friend pointed to D.T. and asked her mother: "Can he and I go play?"  The mother replied: "No, that's a she."  Later, while driving D.T. home, Lizette asked D.T. about that moment.  "Your friend called you 'him.'  Is that what you are?"  D.T. was silent for a moment, then said: "I know my body is wrong.  But in my insides, I'm a boy.  My mind tells me I'm a boy."  He also shared that he was worried that his parents would stop loving him if he ever shared this piece of himself.

52.     After several long and difficult conversations, D.T.'s parents decided to treat him as their son and subsequently started using male pronouns when referring to him.  They also cut his hair short, like a boy, and bought him boys' clothing.  And over time, D.T.'s parents called D.T. by his chosen, traditionally male name.

53.     D.T. became a different person.  He transformed from a reserved child who rarely smiled and was constantly anxious to a gregarious child who was interested in music and sports.  His anxiety also decreased significantly, and his behavioral tics disappeared. In the years since, D.T. has continued to flourish in every aspect of his life.

54.     Last summer, D.T. began showing the first signs of puberty.  Consistent with the standards of care, D.T. began taking puberty-delaying medication.  Because that medication prevents D.T.'s body from undergoing physical changes associated with female puberty, he may never need surgical care to treat his gender dysphoria.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

55.     While D.T.'s parents and close friends have accepted and affirmed his identity, others have not.  Last year, D.T. was harassed and assaulted at school for being transgender.  A student bullied and threatened D.T., escalating from verbal harassment to physical aggression.  Being the target of bullying was very scary for D.T. and his parents.  D.T. is still recovering emotionally from the experience.  Although D.T. is currently planning to remain at that school, he and his parents may revisit that decision if the bullying continues, a decision that will be unduly influenced by the fact that D.T.'s birth certificate wrongly identifies him as female.

56.     Because of that experience, and other similar experiences, D.T. has significant anxiety and worry about not being accepted by others and being mistreated if he is forced to disclose that he is transgender.  The fact that D.T.'s current birth certificate does not match his sex exacerbates these fears; that fear is constraining.  For example, D.T. started playing basketball a few years ago and is currently playing on his school's boys' basketball team.  D.T. wants to play recreational basketball in the off-season, both because he loves the sport and wants to improve his skill and be good enough to play for the school team when he enters high school.  But he has not pursued this interest because he is worried that he will be required to play on the girls' team because of his birth certificate.

57.     D.T.'s parents started the process of correcting his identity documents.  They obtained a state court order changing D.T.'s name.  In their petition, they also requested an order correcting the sex listed on D.T.'s birth certificate.  The judge informed D.T.'s parents that ADHS would require proof that D.T. underwent surgical treatment for his gender dysphoria before complying with the court order.  Thus, the order issued by the judge including language noting that it was subject to ADHS's rules and regulations regarding the amendment of the sex listed on a transgender person's birth certificate.

58.     D.T.'s parents used the court order to correct his social security record and health insurance information.  His school also allowed his parents to use the court order to correct D.T.'s school records.  D.T.'s experience with bullying at school this past year and his hesitance to enroll in a recreational basketball league underscore that correcting the sex

listed on his birth certificate remains a critical need. Having an inaccurate birth certificate is causing D.T. to exclude himself from activities that are important to child development and putting him at risk of harassment by forcing him to reveal that he is transgender.

59. D.T.'s parents seek to change the sex listed on D.T.'s birth certificate through the administrative process, but are precluding from doing so because D.T. cannot meet the surgical requirement.

***Plaintiff Jane Doe***

60. Plaintiff Jane Doe is a transgender ten-year-old girl in Maricopa County, Arizona. Like many other girls of her age, Jane loves dressing up, playing with dolls, and reading books.

61. Jane began expressing herself as a girl when she was about two-and-a-half years old. She gravitated toward girls' clothing, wearing her mother's clothes and shoes. When her parents took her shopping, Jane attempted to pick clothes and shoes from the girls' section.

62. Initially, Jane's parents intentionally introduced her to boy-themed toys, which Jane categorically refused in favor of girls' toys. For example, for Jane's fourth birthday, her mother Susan baked her a Batman-themed cake, despite Jane previously asking for a Minnie Mouse cake. Jane appreciated the cake, but told her mother that she "just wanted Minnie Mouse."

63. Jane's parents initially thought this was a phase, but Jane persisted. Eventually, they brought her to a child psychologist specializing in care for young children with some prior experience with transgender youth, Dr. Beth Onufrak. Dr. Onufrak evaluated Jane over several sessions and concluded that Jane would meet the diagnostic criteria for gender dysphoria. Based on the recommendation of Dr. Onufrak, Jane's parents and siblings started treating her as a girl, including using her new feminine name and allowing her to wear girls' clothing.

64. At Dr. Onufrak's recommendation, Susan took Jane to Dr. Veenod Chulani, a physician specializing in treating transgender youth and the Medical Director of the

Gender Support Program at Phoenix Children's Hospital.  Dr. Chulani agreed with Dr. Onufrak's assessment and diagnosed Jane with gender dysphoria.  He has since provided Jane with primary care and supported Jane and her family through Jane's social transition.

65.     Before Jane started the second grade, her parents asked her school if she could start the year as a girl.  The school agreed and worked with Jane and her family to prepare for her transition at school.  However, several students in Jane's class recognized her from the prior year and repeatedly teased her for being transgender.  The incidents caused Jane significant psychological distress.

66.     Students continued to bully and harass Jane throughout the second and third grade.  In fourth grade the bullying intensified when a student found Jane's class roster in the cafeteria and saw Jane's name with the letter "M" next to it.  That student shared the class roster and the information he learned from it with many classmates before the school could intervene.  After that, the taunting and teasing became relentless.  In response, Jane's anxiety about attending school increased significantly.  She was unable to concentrate in class or focus on her schoolwork.  Jane's education was further disrupted by her frequent anxiety-induced stomachaches, which brought her to the school nurse nearly every day.  Jane's only respite has been distance-learning, which has deprived her classmates the opportunity to continue bullying and harassing her.

67.     Since moving to distance learning due to the novel Coronavirus Disease 2019 (COVID-19) pandemic, Jane's situation has improved dramatically.  Free from the bullying and anxiety she faced at school, Jane is much happier and eager to participate in class and attend to her schoolwork.  Noticing the positive change, Jane's parents decided to use this opportunity to enroll Jane in a different school where students do not know she is transgender.  The new school where they would like to enroll her, however, will not enroll Jane as female without a corrected birth certificate.

68.     That has left Jane's education in limbo.  Susan previously explored options for correcting the sex listed on Jane's birth certificate.  Through that research, Susan learned that ADHS required evidence of surgery prior to correcting the sex on a transgender

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

person's birth certificate and that she would need to present proof of surgery to obtain a court order as well. Due to Jane's age, it would be inappropriate and inconsistent with the standards of care for her to undergo any surgical treatment for gender dysphoria. The medical necessity of those treatments will be assessed by Jane and her team of healthcare providers at an appropriate time and consistent with the prevailing standards of care.

69. But, Jane cannot wait that long to get her corrected birth certificate. Her current school—and the school that she hopes to enroll in—are requiring all students to return to campus for in-person education in January 2021. Without a corrected birth certificate, Jane will be required to reveal that she is transgender to this new school. That will prevent her from safely moving to another school where she is free from pervasive harassment and bullying that prevent her from learning and cause her further significant emotional harm.

70. Jane's parents seek to correct the sex listed on Jane's birth certificate so that she can enroll in a new school before having to return in person to her current school, but are prevented from doing so because of Arizona's surgical requirement.

***Plaintiff Helen Roe***

71. Plaintiff Helen Roe is a six-year-old transgender girl in Pima County, Arizona. Helen enjoys time with her girlfriends, whether playing "princess" or "house," or with her girls' toys. She likes roller skating, singing, and dancing.

72. Helen began expressing that she is a girl at a young age. As early as one-and-a-half years old, Helen started playing with girls' toys (*e.g.*, baby dolls, toy strollers, toys for playing "house") while at friends' houses. During one of her playdates, Helen put on her friend's Disney princess costume, which was a purple dress. Helen refused to take the dress off and ended up taking it home with her that day.

73. Helen continued to play like other little girls, such as playing house with pink plates and cutlery, pushing a stroller, and playing with her many Barbie dolls. For her fourth birthday, Helen requested a party with unicorn decorations and permission to wear a Disney princess costume to the party. Her parents agreed. Most of Helen's friends were (and are)

girls, and they also wore brightly colored dresses and accessories. Helen was as happy as her parents had ever seen her that day. The party made them fully appreciate that Helen's behavior was not a phase. Their daughter expressed herself as, and indeed was, a girl.

74. Shortly thereafter, Helen's parents brought Helen to Alison VanDyke, a therapist specializing in working with transgender children. Ms. VanDyke evaluated Helen and diagnosed her with gender dysphoria. In addition to working with Helen to improve her self-confidence, Ms. VanDyke supported Helen's parents as they worked through their initial concerns about allowing Helen to live as a girl in every aspect of her life.

75. Helen has exhibited a marked improvement in her demeanor since her transition.

76. Although Helen's family has accepted her as female, Helen has still experienced prejudice because she is transgender. Towards the beginning of Helen's transition, her mother shared that Helen is transgender with several parents in Helen's small pre-school community. One family reacted negatively to this information, distancing themselves from Helen and called the director of Helen's pre-school to allege that Helen was a threat to their children's security.

77. Helen's parents also fear for Helen's safety because, as a transgender girl of color, she is in a particularly vulnerable population. Having an accurate birth certificate will not only give her control over who learns that she is transgender, but it will also reduce the risk that Helen will be singled out or targeted for violence because she is transgender. Currently, the information on Helen's birth certificate is used to generate many other records that are part of her life, including school and healthcare records, exacerbating her parents' fears.

78. Earlier this year, Helen's parents filed a petition to change Helen's name and the sex listed on her birth certificate. The court granted the requested name change, but did not rule on the request to change the listed on Helen's birth certificate from male to female. Instead, the court provided Helen's parents with a printout of A.R.S. § 36-337. The court also did not seal Helen's name-change petition, making that petition available to public.

Given their concerns for Helen's safety, Helen's parents seek to correct Helen's birth certificate administratively to protect her private medical information and prevent her from being forced to reveal that she is transgender.

## COUNT I
### (Violation of the Equal Protection Clause of the
### Fourteenth Amendment of the United States Constitution)

79.     Plaintiffs hereby reallege and incorporate by reference paragraphs 1 to 78 of this Complaint.

80.     The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

81.     Arizona's current statutory and regulatory scheme, which prevents transgender minors from obtaining corrected birth certificates, impermissibly discriminates against transgender young people on the basis of sex and transgender status, in violation of their right to equal protection of the laws under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  Unlike their nontransgender peers and other Arizonans who are able to have accurate birth certificates and to correct their birth certificates when necessary, transgender young people are denied accurate birth certificates.

82.     Arizona's laws prohibiting transgender minors from obtaining corrected birth certificates do serve any rational, legitimate, important, or compelling state interest.

## COUNT II
### (Violation of the Substantive Due Process Right to Privacy
### under the United States Constitution)

83.     Plaintiffs hereby incorporate by reference and reallege paragraphs 1 through 82 of this Complaint as though fully set forth herein.

84.     The Fourteenth Amendment to the United States Constitution, enforceable against Defendants pursuant to 42 U.S.C. § 1983, provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.

Cooley LLP
Attorneys at Law
San Diego

D.T., et al. v. Christ, et al.
Complaint

85.     The constitutional right to privacy protects information that is highly personal and intimate, including sensitive medical information and information that could lead to bodily harm upon disclosure.

86.     Involuntary disclosure of a person's transgender status violates that person's fundamental right to privacy.  A person's transgender status constitutes highly personal and intimate information, including private medical information.

87.     The involuntary disclosure of one's transgender status can also cause significant harm, including placing one's personal safety and bodily integrity at risk.

88.     A.R.S. § 36-337(A)(3) and A.A.C. R9-19-208(O) violate the right to privacy of transgender young people, including Plaintiffs, in that denying them a birth certificate that matches their sex requires them to disclose their transgender status and deprives them of significant control over the circumstances around such disclosure.

89.     There are no adequate safeguards to prevent the harm caused by the involuntary disclosure of one's transgender status through a birth certificate.  For example, a person may need to disclose their birth certificate directly to third parties, without any of the privacy safeguards that may exist where the government discloses information to third parties.

90.     The government has no compelling, important, or legitimate interest in disclosing a person's transgender status on state-issued birth certificates.

## COUNT III
### (Violation of the Substantive Due Process Right to Individual Liberty and Decisional Autonomy under the United States Constitution)

91.     Plaintiffs hereby incorporate by reference and reallege paragraphs 1 through 90 of this Complaint as though fully set forth herein.

92.     The substantive protections of the Due Process Clause also protect the right of every person to the possession and control of their own person, and to define and express their identity.  "The Constitution promises liberty to all within its reach, a liberty that includes certain specific rights that allow persons . . . to define and express their identity." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2593 (2015).

93.    The fundamental protections of an individual's autonomy include a right to live consistent with one's sex, which is a fundamental aspect of personal identity.  Arizona law impermissibly burdens that right by preventing transgender young people from obtaining corrected birth certificates that reflect who they are, thereby subjecting them to the risk of exposure, stigma, discrimination, harassment, and violence. That burden is amplified by the fact that the government itself, as well as many third parties, often requires the use of a birth certificate to demonstrate a person's sex.

94.    The government's refusal to permit transgender youth to obtain corrected birth certificates additionally burdens their right to autonomy by inviting and encouraging other public and private entities to similarly discriminate against them.

95.    Arizona has no compelling, important, or even legitimate government interest in burdening the ability of transgender youth people to live consistent with their sex.

## COUNT IV
**(Violation of the Substantive Due Process Right to choose whether to undergo a particular medical treatment under the United States Constitution)**

96.    Plaintiffs hereby incorporate by reference and reallege paragraphs 1 through 95 of this Complaint as though fully set forth herein.

97.    The substantive protections of the Due Process Clause safeguard the right of every person to bodily integrity.  Encompassed in that right is the right to choose whether to undergo a particular medical treatment.  *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997); *Washington v. Harper*, 494 U.S. 210, 221 (1990); *Parham v. J.R.*, 442 U.S. 584, 600 (1979).

98.    Arizona law interferes with this fundamental constitutional right by imposing a surgical requirement on transgender people to correct their birth certificate.  Decisions regarding medical treatment should be made based on the advice of medical and mental health professionals, and consistent with the prevailing standards of care.  However, the importance of the birth certificate as an identity document impermissibly pressures transgender young people into undergoing surgeries that may be medically unnecessary simply to correct their birth certificates.

Cooley LLP
Attorneys at Law
San Diego

18

D.T., et al. v. Christ, et al.
Complaint

99.     Denying transgender young people the ability to correct their birth certificate because they do not undergo surgery infringes on their right to choose whether to undergo a particular treatment.

100.    Arizona has no compelling, important, or even legitimate government interest to justify curtailing this fundamental constitutional right.

## **PRAYER FOR RELIEF**

*WHEREFORE*, Plaintiffs respectfully request that this Court:

A.     Enter a declaratory judgment that denying Plaintiffs the ability to change the sex markers on their birth certificates when they have taken all steps necessary to transition:

   1.     Violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by discriminating on the basis of sex and transgender status;

   2.     Violates the Due Process Right to Privacy under the United States Constitution;

   3.     Violates the Due Process Right to Individual Liberty and Decisional Autonomy under the United States Constitution;

   4.     Violates the Due Process Right to Choose Whether to Undergo a Particular Medical Treatment;

B.     Permanently enjoin Defendants, their agents, employees, representatives, and successors, and any other person acting directly or indirectly in concert with them, from denying corrected birth certificates to transgender minors who have undergone clinically appropriate treatment for the purpose of a gender transition;

C.     Order Defendants to issue corrected birth certificates to Plaintiffs;

D.     Award Plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and any other applicable laws; and

E.     Grant such other and further relief in favor of Plaintiffs as this Court deems just, equitable and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs respectfully demand a trial by jury of all issues triable by jury.

Respectfully submitted this 4th day of November, 2020.

OSBORN MALEDON, P.A.

By: s/Colin M. Proksel
Mary O'Grady (011434)
Colin Proksel (034133)
Payslie Bowman (035418)
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
Telephone: (602) 640-9000
Facsimile: (602) 640-9050
Email: mogrady@omlaw.com
Email: cproksel@omlaw.com
Email: pbowman@omlaw.com

Asaf Orr (*Pro Hac Vice* pending)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, California 94102
Telephone: (415) 392-6257
Facsimile: (415) 392-8442
Email: aorr@nclrights.org

Patrick Gunn (*Pro Hac Vice* pending)
COOLEY LLP
101 California Street, 5th Floor
San Francisco, California 94111-5800
Telephone: (415) 693-2070
Facsimile: (415) 693-2222
Email: pgunn@cooley.com

Barrett J. Anderson (*Pro Hac Vice* pending)
COOLEY LLP
4401 Eastgate Mall
San Diego, California 92121-1909
Telephone: (858) 550-6000
Facsimile: (858) 550-6420
Email: banderson@cooley.com

*Attorneys for Plaintiffs*

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

D.T., ET AL. V. CHRIST, ET AL.
COMPLAINT