1 Patrick Gunn (*Pro Hac Vice* pending)
COOLEY LLP
2 101 California Street, 5th Floor
San Francisco, California 94111-5800
3 Telephone: (415) 693-2070
Facsimile: (415) 693-2222
4 Email: pgunn@cooley.com

5 Mary O'Grady (011434)
Colin Proksel (034133)
6 Payslie Bowman (035418)
OSBORN MALEDON, P.A.
7 2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
8 Telephone: (602) 640-9000
Facsimile: (602) 640-9050
9 Email: mogrady@omlaw.com
Email: cproksel@omlaw.com
10 Email: pbowman@omlaw.com

11 *Attorneys for Plaintiffs*

12 *Additional counsel listed on following page*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| D.T., a minor, by and through his parent and next friend Lizette Trujillo; Jane Doe, a minor, by and through her parent and next friend Susan Doe; and Helen Roe, a minor, by and through her parent and next friend Megan Roe,<br><br>Plaintiffs,<br><br>v.<br><br>Dr. Cara M. Christ, in her official capacity as State Registrar of Vital Records and Director of the State of Arizona's Department of Health Services; Thomas Salow, in his official capacity as Branch Chief of the State of Arizona's Division of Public Health Licensing Services at the Department of Health Services; and Krystal Colburn, in her official capacity as Bureau Chief and Assistant State Registrar of the State of Arizona's Bureau of Vital Records,<br><br>Defendants. | Case No. _____<br><br>**DECLARATION OF DR. DANIEL SHUMER, MD, MPH, IN SUPPORT OF JANE DOE'S MOTION FOR PRELIMINARY INJUNCTION AND JANE DOE AND HELEN ROE'S MOTION TO PROCEED UNDER A PSEUDONYM** |

Barrett J. Anderson (*Pro Hac Vice* pending)
COOLEY LLP
4401 Eastgate Mall
San Diego, California 92121-1909
Telephone:     (858) 550-6000
Facsimile:      (858) 550-6420
Email:            banderson@cooley.com

Asaf Orr (*Pro Hac Vice* pending)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, California 94102
Telephone:     (415) 392-6257
Facsimile:      (415) 392-8442
Email:            aorr@nclrights.org

*Attorneys for Plaintiffs*

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

I, Daniel Shumer, declare as follows:

1. I submit this expert declaration based upon my personal knowledge.

2. If called to testify in this matter, I would testify truthfully based on my expert opinion.

**Qualifications and Experience**

3. I am a Pediatric Endocrinologist and Medical Director of the Comprehensive Gender Services Program at Michigan Medicine, University of Michigan. I also serve at the Clinic Director of Child and Adolescent Gender Services at C.S. Mott Children's Hospital, and as an Assistant Professor of Medicine at the University of Michigan, where the major focus of my clinical and research work pertains to transgender adolescents. A true and correct copy of my Curriculum Vitae is attached hereto as **Exhibit A**.

4. I received my medical degree from Northwestern University in 2008. After completing a residency in pediatrics, I began a clinical fellowship in pediatric endocrinology at Harvard University's Boston Children's Hospital. During that clinical fellowship, I completed a Masters of Public Health from Harvard University's T.H. Chan School of Public Health. I finished both the fellowship and my degree in 2015.

5. As a fellow at Harvard, I was mentored by Dr. Norman Spack, a pioneer in transgender medicine who established the Gender Management Services Clinic (GeMS), the first major program in the U.S. to focus on gender-diverse and transgender adolescents. GeMS is located at Boston Children's Hospital. Working at GeMS, I became a clinical expert in the field of transgender medicine within pediatric endocrinology and began conducting research on gender identity and the evaluation and management of transgender children and adolescents.

6. Based on my work at GeMS, I was recruited to establish a similar program focusing on gender-diverse and transgender adolescents at the C.S. Mott Children's Hospital. In October 2015, I founded the hospital's Child and Adolescent Gender Services Clinic.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

EXPERT DECL. OF DR. SHUMER ISO
MOTS. FOR PRELIMINARY INJUNCTION
& TO PROCEED UNDER PSEUDONYM

7. The Child and Adolescent Gender Services Clinic has treated over 400 patients since its founding. I have personally evaluated and treated over 300 patients for gender dysphoria. As the Clinical Director, I oversee the clinical practice, which includes two other physicians, a clinical social worker, nursing, and administrative staff. I also actively conduct research related to transgender medicine and mental health concerns specific to transgender youth.

8. In addition to my work with transgender children and adolescents, I also treat children and adolescents with differences of sex development ("DSD"), commonly referred to as intersex conditions. I participate in the DSD Clinic's monthly meetings and approximately 5% of my patients are children and adolescents with DSDs.

9. My academic duties as an assistant professor, include teaching lectures entitled "Puberty," "Transgender Medicine," and "Pediatric Growth and Development." I am also the Director of the Transgender Medicine elective for the University of Michigan Medical School.

10. My recent publications include *Health Disparities Facing Transgender and Gender Nonconforming Youth Are Not Inevitable*, Pediatrics, 141(3), 1–2 (2018); *Psychological Profile of the First Sample of Transgender Youth Presenting for Medical Intervention in a U.S. Pediatric Gender Center*, Psychology of Sexual Orientation and Gender Diversity, 4(3), 374–382 (2017); *The Effect of Lesbian, Gay, Bisexual, and Transgender-Related Legislation on Children*, J. of Pediatrics, 178(5-6.e1), 5–7 (2016); *Advances in the Care of Transgender Children and Adolescents*, Advances in Pediatrics, 63(1), 79-102 (2016); *The Role of Assent in the Treatment of Transgender Adolescents*, Int'l J. of Transgenderism, 16(2), 97-102 (2015); and *Serving Transgender Youth: Challenges, Dilemmas, and Clinical Examples*, Professional Psychology: Research and Practice, 46(1), 37–45 (2015). I have also co-authored chapters of textbooks, including "Medical Treatment of the Adolescent Transgender Patient" *in Gender Affirmation: Medical and Surgical Perspectives*, Eds Christopher J. Salgado et al., Taylor & Francis Group—CRC Press (2016). A listing of my publications is included in my Curriculum Vitae in **Exhibit A**.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

EXPERT DECL. OF DR. SHUMER ISO
MOTS. FOR PRELIMINARY INJUNCTION
& TO PROCEED UNDER PSEUDONYM

11. In the course of my career, I have been invited to speak at numerous hospitals, clinics, and conferences on topics related to clinical care and standards for treating transgender children and youth. For example, in December 2017 I spoke at the Nursing Unit (12-West) Annual Educational Retreat in Michigan on the topic of "Gender identity at the Children's Hospital," and in October 2017, I planned, hosted, and spoke at a conference in Michigan entitled "Transgender and Gender Non-Conforming Youth: Best Practices for Mental Health Clinicians, Educators, & School Staff."

12. In October 2019, I was invited by the Michigan Organization on Adolescent Sexual Health to speak to community groups across Southeast Michigan on the topic of "Gender Identity in Adolescents – Supporting Transgender Youth." A listing of my lectures is included in my Curriculum Vitae in **Exhibit A**.

13. I belong to a number of professional organizations and associations relating to (i) the health and well-being of children and adolescents, including those who are transgender; and (ii) to appropriate medical treatments for transgender individuals. For example, I am currently a member of the Pediatric Endocrine Society where I serve on the Gender Identity Special Interest Group's Education Committee, and the World Professional Association for Transgender Health ("WPATH"), an international multidisciplinary professional association to promote evidence-based care, education, research, advocacy, public policy and respect in transgender health. Both organizations are central in the development of the standards of care for the treatment of gender dysphoria. A complete list of my involvement in various professional associations is located in my Curriculum Vitae in **Exhibit A**.

14. My opinions contained in this declaration are based on: (i) my clinical experience as a pediatric endocrinologist treating transgender patients, including adolescents and young adults; (ii) my knowledge of the peer-reviewed research, including my own, regarding the treatment of gender dysphoria, which reflects the clinical advancements in the field of transgender health; and (iii) my review of the various declarations submitted in support of the motions. I generally rely on these types of materials

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

EXPERT DECL. OF DR. SHUMER ISO
MOTS. FOR PRELIMINARY INJUNCTION
& TO PROCEED UNDER PSEUDONYM

when I provide expert testimony, and they include the documents specifically cited as supportive examples in particular sections of this declaration. The materials I have relied on in preparing this declaration are the same type of materials that experts in my field of study regularly rely upon when forming opinions on the subject.

15. I was provided with and reviewed the following case-specific materials: (i) the declarations of Jane Doe, Susan Doe, and Megan Roe; (ii) a medical note written by Jane Doe's treating provider, Patrick Goodman; and (iii) the expert declaration of Dr. Linda Hawkins, PhD.

16. I have not met or spoken with the Plaintiffs or their parents for purposes of this declaration. My opinions are based solely on the information that I have been provided by Plaintiffs' attorneys as well as my extensive background and experience treating transgender patients.

17. In the past four years, I have been retained as an expert and provided testimony on behalf of transgender plaintiffs in the following cases: *Menefee v. City of Huntsville Bd. of Educ.*, No. 5:18-cv-01481 (N.D. Ala.); *Flack v. Wisc. Dep't of Health Serv.*, No. 3:18-cv-00309 (W.D. Wisc.); *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, No. 2:16-cv-00943 (W.D. Wisc.). I also provided expert witness testimony on behalf of a parent in a custody dispute involving a transgender child in the following case: *In the Interest of Younger*, No. DF-15-09887 (Dallas County, Texas).

18. I am being compensated at an hourly rate for the actual time that I devote to this case, at the rate of $300 per hour for any review of records, preparation of reports or declarations. I will be compensated with a day rate of $1920 for deposition and trial testimony. My compensation does not depend on the outcome of this litigation, the opinions that I express, or the testimony that I provide.

**Scientific and Medical Understanding of Sex**

19. By the beginning of the twentieth century, scientific research had established that external genitalia alone are not always an accurate indicator of a person's sex. Instead, a person's sex is comprised of a number of components, including, among others, internal

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

EXPERT DECL. OF DR. SHUMER ISO
MOTS. FOR PRELIMINARY INJUNCTION
& TO PROCEED UNDER PSEUDONYM

reproductive organs, external genitalia, chromosomes, hormones, gender identity, and secondary-sex characteristics. Diversity and incongruence in these components of sex are a naturally occurring source of human biological diversity.

20. Scientific research and medical literature across disciplines demonstrate each component of sex has strong biological ties, including gender identity. For example, there are numerous studies detailing the similarities in the brain structures of transgender and nontransgender people with the same gender identity. In one such study, the volume of the bed nucleus of the *stria terminalis* (a collection of cells in the central brain) in transgender women was equivalent to the volume found in nontransgender women. There are also studies highlighting the genetic components of gender identity. A study of identical twins found that if one twin was transgender that the other twin was far more likely to be transgender, as compared to the general population.

21. The above studies are representative examples of the growing body of scientific research and medical literature in this area of study. There is also ongoing research on the effects of the hormonal milieu in utero, and genetic sources for gender identity, among others.

22. Although the specific determinants of gender identity remain unknown, the significance of a person's gender identity as a determinant of that person's sex is widely accepted as the standard in medical practice.

**Determination of an Individual's Sex**

23. At birth, newborns are assigned a sex, either male or female, based solely on the appearance of their external genitalia. For most people, that assignment turns out to be accurate and their assigned sex matches that person's gender identity. However, for transgender people, their assigned sex does not align with their gender identity.

24. When there is a divergence between these factors, medical science and the well-established standards of care recognize that the person's gender identity is the most important and determinative factor of a person's sex.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

EXPERT DECL. OF DR. SHUMER ISO
MOTS. FOR PRELIMINARY INJUNCTION
& TO PROCEED UNDER PSEUDONYM

25. Gender identity is a person's inner sense of belonging to a particular gender, such as male or female. It is a deeply felt and core component of human identity. Everyone has a gender identity.

26. A person's gender identity is innate, cannot be voluntarily changed, and is not undermined by the existence of other sex-related characteristics that do not align with it. In fact, living in a manner consistent with one's gender identity is critical to the health and well-being of any person, including transgender people.

27. Any attempts "cure" transgender individuals by forcing their gender identity into alignment with their assigned sex are harmful, dangerous, and ineffective. Those practices have been denounced as unethical by all major professional associations of medical and mental health professionals, such as the American Medical Association, the American Psychiatric Association, the American Psychological Association, and WPATH.

28. For more than four decades, the goal of medical treatment for transgender patients has been to alleviate their distress by bringing their lives into closer alignment with their gender identity. The specific treatments prescribed are based on individualized assessment conducted by medical providers in consultation with the patient's treating mental health provider. As discussed in more detail in the following section, and in the expert declaration of Dr. Linda Hawkins, research and clinical experience have consistently shown those treatments to be safe, effective, and critical to the health and well-being of transgender patients.

**Standards of Care for the Treatment of Gender Dysphoria**

29. Due to the incongruence between their assigned sex and gender identity, transgender people experience varying degrees of gender dysphoria, a serious medical condition listed in both the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-5") and the World Health Organization's *International Classification of Diseases* ("ICD-10"). Gender dysphoria is highly treatable and can be effectively managed. If left untreated, however, it can result in severe anxiety and depression, self-harm, and suicidality.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

EXPERT DECL. OF DR. SHUMER ISO
MOTS. FOR PRELIMINARY INJUNCTION
& TO PROCEED UNDER PSEUDONYM

30. The prevailing standards of care for the treatment of gender dysphoria are developed by WPATH. The most recent WPATH Standards of Care ("SOC") represent expert consensus for clinicians related to medical care for transgender people, based on the best available science and clinical experience. The purpose of the WPATH SOC is to assist health providers in delivering necessary medical care to transgender people, in order to maximize their patients' overall health, psychological well-being, and self-fulfillment. The WPATH SOC has been recognized and adopted as the prevailing standard of care by the major professional association medical and mental health providers in the United States, including the American Medical Association, American Academy of Pediatrics, American Psychiatric Association, American Psychological Association, and Pediatric Endocrine Society.

31. The Endocrine Society is a 100-year-old global membership organization representing professionals in the field of adult and pediatric endocrinology. In 2017, the Endocrine Society published clinical practice guidelines on treatment recommendations for the medical management of gender dysphoria, in collaboration with Pediatric Endocrine Society, the European Societies for Endocrinology and Pediatric Endocrinology, and WPATH, among others. The guidelines are considered authoritative due to the respect given to these professional associations, the expertise of the authors, and the clarity with which the authors described what data was used in formulating recommendations.

32. Together, the WPATH SOC and the Endocrine Society's clinical practice guidelines constitute the prevailing standards governing the healthcare and treatment of gender dysphoria. Those treatments are safe, effective, and essential for the well-being of transgender young people.

33. Undergoing treatment to alleviate gender dysphoria is commonly referred to as a transition. The transition process typically includes one or more of the following three components: (i) social transition, including adopting a new name, pronouns, appearance, and clothing, and correcting identity documents; (ii) medical transition, including puberty-delaying medication and hormone-replacement therapy; and (iii) surgical transition,

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

EXPERT DECL. OF DR. SHUMER ISO
MOTS. FOR PRELIMINARY INJUNCTION
& TO PROCEED UNDER PSEUDONYM

including surgeries to alter the appearance and functioning primary- and secondary-sex characteristics. The steps that make up a person's transition will depend on that individual's medical and mental health needs.

34. Dr. Hawkins provides an extensive discussion of social transition in her expert declaration. (Declaration of Dr. Linda Hawkins at ¶¶ 29–48.) My declaration will discuss the medications and surgical care used to treat gender dysphoria.

35. There are no drug interventions or surgical treatments for gender dysphoria required or considered until after the onset of puberty. At the onset of puberty, adolescents diagnosed with gender dysphoria may be prescribed puberty-delaying medications to prevent the distress of developing permanent, unwanted physical characteristics that do not align with the adolescent's gender identity. The treatment works by pausing endogenous puberty at whatever stage it is at when the treatment begins, limiting the influence of a person's endogenous hormones on their body. For example, a transgender girl will experience no progression of physical changes caused by testosterone, including facial and body hair, an Adam's apple, or masculinized facial structures. And in a transgender boy, those medications would prevent progression of breast development, menstruation, and widening of the hips.

36. Thereafter, at an appropriate time and according to individual patient needs, the treating provider may prescribe cross-sex hormones to induce the puberty associated with the adolescent's gender identity. This treatment is referred to as hormone-replacement therapy. The result of this treatment is that a transgender boy has the same typical levels of circulating testosterone as his nontransgender male peers. Similarly, a transgender girl will have the same typical levels of circulating estrogen level as her nontransgender female peers. Those hormones cause transgender adolescents to undergo the same significant and permanent sex-specific physical changes as their nontransgender peers. For example, a transgender boy will develop a lower voice as well as facial and body hair, while a transgender girl will experience breast growth, female fat distribution, and softer skin.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

EXPERT DECL. OF DR. SHUMER ISO
MOTS. FOR PRELIMINARY INJUNCTION
& TO PROCEED UNDER PSEUDONYM

37. When these medications are initiated at the early onset of puberty, their effects can also obviate the need for future surgical treatments such as male chest reconstruction surgery in transgender males, and electrolysis of facial and body hair and feminizing facial surgeries in transgender females.

38. Puberty-delaying medication and hormone-replacement therapy—both individually and in combination—also significantly improve a transgender young person's mental health because those medications ensure their physical appearance more closely aligns with their gender identity. This also decreases the likelihood that a transgender young person will be incorrectly identified with their assigned sex, further alleviating their gender dysphoria and bolstering the effectiveness of their social transition.

39. Social transition and hormone therapy are sufficient to treat gender dysphoria for many transgender people. The 2015 U.S. Transgender Survey revealed that 12% of transgender women did not require vaginoplasty or labiaplasty, 19% did not require augmentation mammoplasty, and 21% did not require facial feminization surgery. The same survey showed that 3% of transgender men did not require chest surgery reduction or reconstruction and 6% did not require a hysterectomy. Based on my clinical experience, those percentages are likely increasing—especially among transgender boys—as transgender young people have greater and more timely access to puberty-delaying medications and hormone-replacement therapy obviating the need for surgical intervention later in life.

40. For transgender people who require surgery to treat their gender dysphoria, the WPATH SOC do not recommend surgical treatment until the age of majority, except for male chest reconstruction surgery. Because of the age requirement, most transgender young people will be unable to access that care, even if they meet all the other criteria for surgery. Turning eighteen years of age only eliminates one barrier; transgender young people are likely to encounter other significant barriers to accessing surgical care for gender dysphoria including, for example, insurance exclusions, expenses associated with recovery, and availability of competent and affirming providers and surgical centers.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9

EXPERT DECL. OF DR. SHUMER ISO
MOTS. FOR PRELIMINARY INJUNCTION
& TO PROCEED UNDER PSEUDONYM

**Recognition of a Person's Gender Identity as Their Sex**

41. From a medical and scientific perspective, there is no basis for requiring that a transgender person undergo surgical treatment before acknowledging a transgender person's gender identity as their sex in every aspect of their lives. That is particularly true with respect to identity documents that contain indications of a person's sex, given the social significance of a birth certificate and its influence on how a transgender person is treated in their daily lives.

42. Contrary to what many laypeople may assume, the medical treatments that transgender people may undergo do not make a transgender person more of a man or more of a woman than they were before. Rather, a person's gender identity is innate and already exists, just as it does for nontransgender people. The only purpose of medical treatments is to help a transgender person express their innate identity and help others recognize that identity; they do not change the person's identity. As such, there is no specific medical step, or series of medical steps, a person must undertake to be recognized as who they are.

43. This is a well-established practice for other medical diagnoses as well. For decades, doctors have recognized that gender identity is determinative of sex for people with DSDs. Like transgender people, the various components of sex do not align in people with DSDs. For example, patients with Congenital Adrenal Hyperplasia (CAH) could have female chromosomes, but be born with ambiguous genitalia due to exposure to high levels of testosterone in utero—a hallmark of CAH. Studies show that this population of CAH patients are considerably more likely than the general female population to have a male gender identity. CAH presents a simple and salient example, but there are DSDs with more complex clinical presentations, all of which further reinforce that gender identity is the only medically sound and reliable determinant of a person's sex. The focus of medical treatment is on providing whatever medical care is needed for an intersex or transgender individual to live consistent with their gender identity; it is never ethical or appropriate to try to change the person's gender identity, and doing so can cause severe harm.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

EXPERT DECL. OF DR. SHUMER ISO
MOTS. FOR PRELIMINARY INJUNCTION
& TO PROCEED UNDER PSEUDONYM

44. Recognizing that assigning a sex at birth for a newborn with a DSD is little more than an informed prediction, many states have created a streamlined process that allows people with DSDs to correct their birth certificate without requiring invasive, and potentially medically unnecessary, procedures.

**Conclusion**

45. Requiring a transgender person to undergo a specific treatment or procedure, which may be invasive and medically inappropriate, to correct their identity documents to reflect the person's gender identity has no basis in the prevailing standards of care, peer-reviewed medical literature, or clinical experience.

46. Such a restriction places a particularly onerous burden on transgender young people who are unable undergo such a surgery until late adolescence or early adulthood, at the earliest. Furthermore, many transgender young people who have timely access to medications may never need or want surgery and therefore never be eligible. Complying with the law at issue in this case would force transgender young people to make a difficult choice: submit to invasive and medically inappropriate or unnecessary procedures, or forever live with a birth certificate that contains an incorrect sex marker.

47. Delaying or denying transgender young people an accurate birth certificate also interferes with the effectiveness of treatments for gender dysphoria, including social transition and hormone-replacement therapy. A transgender young person will not get the full benefit—psychological and otherwise—because the sex marker on their birth certificate will prevent them from being treated consistently with their gender identity in every aspect of their life, including school and extracurricular activities. And it compounds that harm by exposing transgender young people to an increased likelihood of mistreatment by disclosing their transgender status. Those harms can have significant negative short- and long-term implications for their overall health and well-being.

This declaration was executed this 2nd day of November, 2020, in Washtenaw County, Michigan.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11

EXPERT DECL. OF DR. SHUMER ISO
MOTS. FOR PRELIMINARY INJUNCTION
& TO PROCEED UNDER PSEUDONYM

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

By: /s/ Daniel Shumer
Dr. Daniel Shumer, MD, MPH