1  Patrick Gunn (admitted *Pro Hac Vice*)
   COOLEY LLP
2  101 California Street, 5th Floor
   San Francisco, California 94111-5800
3  Telephone:     (415) 693-2070
   Facsimile:     (415) 693-2222
4  Email:         pgunn@cooley.com

5  Mary O'Grady (011434)
   Colin Proksel (034133)
6  Payslie Bowman (035418)
   OSBORN MALEDON, P.A.
7  2929 North Central Avenue, 21st Floor
   Phoenix, Arizona 85012-2793
8  Telephone:     (602) 640-9000
   Facsimile:     (602) 640-9050
9  Email:         mogrady@omlaw.com
   Email:         cproksel@omlaw.com
10 Email:         pbowman@omlaw.com

11 *Attorneys for Plaintiffs and Proposed Class*
   Additional counsel listed on following page

12

13              **UNITED STATES DISTRICT COURT**
                **FOR THE DISTRICT OF ARIZONA**
14

15 | D.T., a minor, by and through his parent and | Case No. 4:20-cv-484-JAS |
16 next friend Lizette Trujillo; Jane Doe, a
   minor, by and through her parent and next
17 friend Susan Doe; Helen Roe, a minor, by        **AMENDED COMPLAINT**
   and through her parent and next friend
   Megan Roe; James Poe, a minor by and          **JURY TRIAL DEMANDED**
18 though his parent and next friend Laura Poe;
   and Carl Voe, a minor by and though his        Judge:     Hon. James A. Soto
19 parent and next friend Rachel Voe,

20                    Plaintiffs,

21        v.

22 Dr. Cara M. Christ, in her official capacity
   as State Registrar of Vital Records and
23 Director of the Arizona Department of
   Health Services; Thomas Salow, in his
24 official capacity as Branch Chief of the
   Division of Public Health Licensing
25 Services at the Arizona Department of
   Health Services; and Krystal Colburn, in
26 her official capacity as Bureau Chief and
   Assistant State Registrar of the Bureau of
27 Vital Records at the Arizona Department of
   Health Services,
28
                    Defendants.

Asaf Orr (admitted *Pro Hac Vice*)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, California 94102
Telephone:    (415) 392-6257
Facsimile:    (415) 392-8442
Email:        aorr@nclrights.org

Barrett J. Anderson (admitted *Pro Hac Vice*)
COOLEY LLP
4401 Eastgate Mall
San Diego, California 92121-1909
Telephone:    (858) 550-6000
Facsimile:    (858) 550-6420
Email:        banderson@cooley.com

*Attorneys for Plaintiffs and Proposed Class*

Plaintiffs respectfully state and allege as follows:

## INTRODUCTION

1.      Plaintiffs are transgender children who were born in Arizona and seek to change the sex listed on their birth certificates to protect their privacy and safety.  They wish to have accurate birth certificates they can use without being forced to disclose their transgender status, which causes Plaintiffs significant emotional harm and puts them at risk of discrimination, harassment, and violence.

2.      Plaintiffs D.T., James Poe, and Carl Voe are transgender boys, but their Arizona birth certificates identify them as female.  Plaintiff Helen Roe is a transgender girl, but her Arizona birth certificate identifies her as male.  Plaintiff Jane Doe is a transgender girl whose Arizona birth certificate identified her as male until very recently when it was changed to female by order of this Court, (Doc. 41), following Jane Doe's motion for preliminary injunction filed in this lawsuit, (Doc. 3).

3.      Possessing identity documents that accurately reflect who they are is essential to Plaintiffs' well-being.  A birth certificate is a critical and ubiquitous identity document used in many settings to verify an individual's identity.  This is particularly true for children and adolescents for whom a birth certificate is often their only form of government-issued identification.   School enrollment, recreational sports registrations, and camp signups, among many others, hinge on having proper identity documents.   Not only are birth certificates themselves commonly required for such purposes, but they are often needed for obtaining other essential identity documents.

4.      For transgender people, the sex listed on their initial birth certificate does not match who they are.  For a young person who has undergone gender transition, having a birth certificate that fails to reflect who they are puts them at risk of exposure, discrimination, harassment, and even violence.  Changing the sex marker on their birth certificate is thus critically important for transgender young people.

5.      Arizona law allows for individuals born in Arizona to amend the sex marker on their birth certificates through a private administrative process codified at A.R.S. § 36-

**D.T., ET AL. V. CHRIST, ET AL.**
**AMENDED COMPLAINT**

337(A)(3).  Obtaining an amendment under Subsection (A)(3) requires filing an application, including a letter from a treating physician, with the Arizona Department of Health Services ("ADHS") and paying an administrative fee.  However, Arizona prevents transgender minors from changing their sex marker through that process because Subsection (A)(3) is limited to transgender people who have undergone a "sex change operation."  A.R.S. § 36-337(A)(3); *see also* A.A.C. R9-19-208(O).[1]  Transgender young people cannot use this direct and private administrative process because, in most cases, minors do not undergo any type of surgery to treat their gender dysphoria.  Further, many transgender people, especially those who transitioned at a young age, may never require surgery as part of their gender transition, rendering the private administrative process in Subsection (A)(3) entirely unavailable to them for their lifetimes.

6.   Unlike other youth, transgender youth in Arizona have only one option open to them that is more expensive, confusing, and time-consuming than the Subsection (A)(3) process, and does not guarantee that they will receive a corrected birth certificate at the end.  Specifically, they must incur additional fees and shoulder extra risk by filing a public petition in their local superior court seeking an order amending the sex on their birth certificate.  Because of the surgical requirement in Subsection (A)(3),  Arizona courts regularly deny that relief to transgender young people who have not undergone surgery as part of their transition.  Additionally, forcing transgender young people to seek a court order vastly increases the risk that their transgender status will be made public, denying them the very privacy they seek to safeguard by correcting their identity documents.  And Arizonans who move out of state and are no longer under the jurisdiction of Arizona courts face a patchwork of differing state laws, several of which deny them the ability to obtain a court order to change the sex listed on their birth certificates.  For many transgender people and their families, the court-order process is thus entirely unavailable or presents such

---

[1] The term "sex change operation" as used in Subsection (A)(3) is not widely recognized in the medical community, which instead refers to a surgical operation for the treatment of gender dysphoria as a "gender-confirmation surgery" or a "gender-affirming surgery." Plaintiffs use the term "sex change operation" in this Amended Complaint only to avoid any doubt about what part of Subsection (A)(3) they challenge as unconstitutional.

1    insurmountable hurdles that it is no option at all.

2        7.    As a result, transgender young people must too often navigate the world with

3    a birth certificate that does not match their sex.  By establishing a private administrative

4    process for applicants to change the sex listed on their Arizona birth certificates, and then

5    effectively barring transgender youth from using it, Arizona law forces them to disclose

6    their transgender status, which invades their privacy and exposes them to discrimination,

7    harassment, and violence.  Accordingly, the current law violates the United States

8    Constitution's guarantees of equal protection of the laws and the fundamental rights to

9    privacy, liberty, and autonomy.

10       8.    No compelling, important, or even legitimate governmental justification

11   supports Arizona's current refusal to provide transgender young people with the same

12   opportunity to obtain accurate birth certificates as any other person.

13                          **JURISDICTION AND VENUE**

14       9.    This action arises under 42 U.S.C. §§ 1983 and 1988 to redress the

15   deprivation, under color of state law, of rights secured by the United States Constitution.

16       10.   This Court has original jurisdiction over the subject matter of this action

17   pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the

18   laws and the Constitution of the United States.

19       11.   Venue is proper in the District of Arizona under 28 U.S.C. § 1391(b) because

20   all Defendants reside within the district, Defendants reside and have offices within the

21   district, and/or a substantial part of the events that gave rise to Plaintiffs' claims occurred,

22   and will continue to occur, within the district.

23       12.   This Court has the authority to enter a declaratory judgment and to provide

24   preliminary and permanent injunctive relief pursuant to Federal Rules of Civil Procedure 57

25   and 65, and 28 U.S.C. §§ 2201 and 2202.

26       13.   This Court has personal jurisdiction over Defendants because they are

27   domiciled in Arizona and/or have otherwise made and established contacts with Arizona

28   sufficient to permit the exercise of personal jurisdiction over them.

1

## **PARTIES**

2

### A.   **The Plaintiffs**

3
4
5

14.   Plaintiff D.T. is a thirteen-year-old transgender boy who was born in Pima County, Arizona and currently resides in Arizona.  Because D.T. is a minor, this action is brought on his behalf by and through his parent and next friend Lizette Trujillo.

6
7
8

15.   Plaintiff Jane Doe is a ten-year-old transgender girl who was born in Maricopa County, Arizona and currently resides in Arizona.  Because Jane Doe is a minor, this action is brought on her behalf by and through her parent and next friend Susan Doe.

9
10
11

16.   Plaintiff Helen Roe is a six-year-old transgender girl who was born in Pima County, Arizona and currently resides in Arizona.  Because Helen Roe is a minor, this action is brought on her behalf by and through her parent and next friend Megan Roe.

12
13
14

17.   Plaintiff James Poe is a five-year-old transgender boy who was born in Pima County, Arizona and currently resides in Arizona.  Because James Poe is a minor, this action is brought on his behalf by and through his parent and next friend Laura Poe.

15
16
17

18.   Plaintiff Carl Voe is a nine-year-old transgender boy who was born in Pima County, Arizona and currently resides in Maryland.  Because Carl Voe is a minor, this action is brought on his behalf by and through his parent and next friend Rachel Voe.

18

### B.   **The Defendants**

19
20
21
22
23
24
25
26
27
28

19.   Defendant Dr. Cara M. Christ ("Director Christ") is sued in her official capacity as State Registrar of Vital Records and Director of the Department of Health Services for the State of Arizona.  Director Christ has general supervision of vital statistics in the state and is charged with the execution of the vital statistics laws of Arizona, including the provision of the necessary instructions and forms for obtaining and preserving records of births.  Director Christ also has supervisory authority over the assistant state registrars and deputy local registrars throughout Arizona.  Director Christ has knowingly encouraged, condoned, and acquiesced in the acts barring Plaintiffs from correcting or amending their birth certificates to be consistent with their gender identity.  Director Christ's administration and enforcement of the vital statistics laws are actions under the color of state law.  Director

Christ is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state law at all times relevant to this Amended Complaint.

20.     Defendant Thomas Salow ("Chief Salow") is sued in his official capacity as Branch Chief of the Division of Public Health Licensing Services within the Department of Health Services for the State of Arizona.  As Branch Chief of the Division of Public Health Licensing Services, Chief Salow has supervisory authority over Chief Colburn and deputy local registrars throughout Arizona.  Chief Salow has knowingly encouraged, condoned, and acquiesced in the acts barring Plaintiffs from correcting or amending their birth certificates to be consistent with their gender identity.  Chief Salow's administration and enforcement of the vital statistics laws are actions under the color of state law.  Chief Salow is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state law at all times relevant to this Amended Complaint.

21.     Defendant Krystal Colburn ("Chief Colburn") is sued in her official capacity as Assistant State Registrar and Bureau Chief of the Bureau of Vital Records within the Department of Health Services for the State of Arizona.  Chief Colburn has supervisory authority over deputy local registrars throughout Arizona.  Chief Colburn has knowingly encouraged, condoned, and acquiesced in the acts barring Plaintiffs from correcting or amending their birth certificates to be consistent with their gender identity.  Chief Colburn's administration and enforcement of the vital statistics laws are actions under the color of state law.  Chief Colburn is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state law at all times relevant to this Amended Complaint.

## STATEMENT OF FACTS

**Gender identity development and treatment for gender dysphoria**

22.     Each person's sex is comprised of multiple components, including internal reproductive organs, external genitalia, chromosomes, hormones, gender identity, and secondary-sex characteristics.  For most people, each of these components align with one another as either male or female.  That is not the case, however, for transgender people.

23.     Research indicates that being transgender has a biological component and

cannot be changed.  As such, efforts to change a transgender person's identity are unethical and harmful to a person's health and well-being.

24.     Children typically become aware of their gender identity between the ages of two and five years old.  Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 455 (5th ed. 2013) ("DSM-5").  Around this age, transgender children often begin to express their cross-gender identification to their family members and caregivers through statements and actions.  Transgender children exhibit a strong cross-gender identification that is insistent, persistent, and consistent.  Research has found the gender identities of transgender and nontransgender children to be indistinguishable—that is, a transgender boy identifies himself as male just as strongly and consistently as a non-transgender boy, and a transgender girl identifies herself as female just as strongly and consistently as a non-transgender girl.

25.     Living in a manner consistent with one's gender identity is critical to the health and well-being of any person, including transgender people.

26.     The incongruence between a transgender person's gender identity and assigned sex can cause significant psychological distress.  That distress is commonly referred to as gender dysphoria.

27.     Gender dysphoria is a serious health condition recognized in the DSM-5, as well as by other leading medical and mental health professional groups, including the American Medical Association and the American Psychological Association.  If left untreated, gender dysphoria may result in severe psychological distress, anxiety, depression, suicidal ideation, and even self-harm.

28.     Gender dysphoria is highly treatable.  As with other health conditions, health care providers follow a well-established standard of care when working with patients with gender dysphoria.  The World Professional Association for Transgender Health ("WPATH") has set those standards for over four decades.

29.     WPATH is an international, multidisciplinary, professional association of medical providers, mental health providers, researchers, and others, with a mission of

promoting evidence-based care and research for transgender health, including the treatment of gender dysphoria.   WPATH published the seventh and most recent edition of the Standards of Care in 2011.

30.   Building on those standards and incorporating the most current research and clinical experience, the Endocrine Society released the *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline* in September 2017.   These guidelines reaffirm the WPATH Standards of Care and offer medical providers practical guidance on providing transition-related care to patients with gender dysphoria, including young people.

31.   The WPATH and the Endocrine Society standards have been adopted by many major associations of healthcare professionals, including the American Medical Association, American Psychiatric Association, and American Psychological Association, as well as associations of healthcare professionals focused on youth and adolescents, such as the American Academy of Pediatrics, American Association of Child and Adolescent Psychiatrists, and the Pediatric Endocrine Society.   Federal courts across the country have also recognized the standards of these medical societies as setting the prevailing standard of care for the treatment of gender dysphoria.

32.   Treatment for gender dysphoria seeks to bring a transgender person's life into alignment with their gender identity.   The process of undertaking these treatments is often referred to as a gender transition or simply as transition.   The typical components of gender transition consist of social transition, hormone-replacement therapy, and, for some transgender people, surgery.   Surgery is not medically required to complete gender transition and is not medically necessary for every transgender person.

33.   Typically, transgender people start their transition with a social transition, which includes changing their name, using different pronouns, wearing clothing and adopting grooming habits typically associated with their peers of the same gender identity, and using the corresponding sex-specific facilities such as restrooms.   Making these changes enable a transgender person to live their life consistent with who they are and helps ensure

that they are treated as such by family, peers, and others in the community.

34.    Social transition can significantly alleviate a transgender person's gender dysphoria.  Having identity documents that reflect a transgender person's assigned sex rather than their gender identity increases the likelihood that a person's transgender status will be disclosed to others, exposes them to a significant risk of mistreatment, and undermines the health benefits of their social transition.

35.    For transgender youth, research has shown that being accepted and supported as who they are is enormously beneficial to their health and well-being.  Conversely, being denied recognition and support can cause significant harm, in addition to exposing them to the risk of discrimination and harassment.

36.    At the onset of puberty, transgender young people may also start taking puberty-delaying medication to prevent their bodies from being flooded with the incorrect sex hormone and the attendant development of unwanted secondary-sex characteristics that conflict with their sex.  Without these medications, transgender young people would experience debilitating psychological distress because their changing bodies would be a constant reminder of the disjunction between their bodies and their sex.  The psychological distress is heightened by the reality that some of these physical changes may be irreversible, permanently constricting a transgender young person's future treatment options and negatively affecting their quality of life.

37.    In addition to puberty-delaying medications, transgender young people may also undergo hormone-replacement therapy.  That treatment causes their bodies to develop the secondary-sex characteristics associated with their gender identity, such as facial and body hair for transgender boys and breasts for transgender girls.

38.    The prevailing standards of care recognize that, under limited circumstances, it may be medically necessary for some transgender young people to undergo surgical treatment for their gender dysphoria while they are minors.  The most common surgical procedure that is medically necessary for transgender young people is male chest reconstruction surgery.  That procedure is specifically for transgender males.  However,

1   because of the increasing availability of puberty-delaying medication, an increasing number
2   of transgender boys never develop breasts and therefore never need that surgery.

3          39.    There are other surgical procedures that may be medically necessary to treat
4   a transgender person's gender dysphoria in adulthood.  Early treatment for gender dysphoria
5   may also obviate the need for those procedures as well.  For example, a transgender girl
6   who never experiences a male puberty is unlikely to need facial feminization surgery, a
7   series of procedures designed to improve the functionality of a transgender woman's facial
8   features by making them more typically feminine.  Whether surgery is medically necessary
9   is based on an individualized assessment conducted in consultation with qualified
10  healthcare providers.

11         40.    Even when medically necessary, a transgender person's ability to access any
12  of those treatments—particularly surgery—may also be limited by financial resources,
13  insurance coverage, and provider availability, in addition to many other barriers to health
14  care access.

15  **The need for accurate birth certificates matching one's identity**

16         41.    The use of birth certificates is ubiquitous in our society.  A person's birth
17  certificate is a trusted and essential government-issued document that serves as proof of a
18  person's identity.  That document also reflects the government's recognition of a person's
19  identity, including the person's sex.

20         42.    Birth certificates are commonly used in a wide variety of contexts, especially
21  for young people who do not have any other form of government-issued identification,
22  including enrolling in school and recreational sports, and obtaining other important identity
23  documents (such as driver licenses, state identification cards, and passports).

24         43.    Depriving transgender young people of birth certificates that accurately
25  reflect who they are forces them to disclose their transgender status—information that is
26  private and sensitive—without their consent whenever they need to rely on birth certificates
27  to establish their identity.  That disclosure causes several distinct and significant harms: it
28  creates barriers to full participation in school and other activities that are critical to a young

1   person's health and well-being, circumvents that young person's ability to control the

2   disclosure of their transgender status, undermines the effectiveness of a transgender young

3   person's treatment for gender dysphoria, and exposes a transgender young person to an

4   increased risk of harassment, discrimination, and potentially bodily harm.

5   44.     A national survey conducted by the National Center for Transgender Equality

6   in 2015 revealed that nearly one-third of respondents who had shown an identity document

7   with a name or sex that did not match their gender presentation were verbally harassed,

8   denied benefits or service, asked to leave, or assaulted.

9   45.     Barring transgender youth from obtaining corrected birth certificates places

10  them in a disfavored class.  Unlike other youth, whose birth certificates match who they are,

11  transgender youth are forced to use birth certificates that do not match their sex.

12  **The process for changing the sex listed on an Arizona birth certificate**

13  46.     ADHS, through the Bureau of Vital Records, exercises responsibility for the

14  registration, issuance, correction, and maintenance of Arizona birth certificates.  A.R.S.

15  § 36-302.

16  47.     Recognizing birth certificates may be inaccurate or require updating, A.R.S.

17  § 36-337 provides for the issuance of an updated birth certificate in a variety of

18  circumstances, including to reflect a declaration of paternity or adoption or to correct the

19  sex of a transgender or intersex person.

20  48.     Under Subsection (A)(3) of that statute, a transgender person may change the

21  sex listed on a person's birth certificate by submitting "[a] written request for an amended

22  birth certificate" accompanied by "a written statement by a physician that verifies the

23  [applicant or applicant's child has undergone a] sex change operation."  A.R.S. § 36-

24  337(A)(3).  ADHS has promulgated a regulation that details the information, in addition to

25  a letter from a physician, that a transgender person is required to provide in order to change

26  the sex listed on their birth certificate under Subsection (A)(3).  *See* A.A.C. R9-19-208(O).

27  49.     These requirements—both statutory and regulatory—deny transgender young

28  people the ability to correct their birth certificates under Subsection (A)(3) because most

10

**D.T., ET AL. V. CHRIST, ET AL.**
**AMENDED COMPLAINT**

transgender youth cannot undergo or may never require surgery. This ban deprives Plaintiffs of equal treatment, violates fundamental constitutional rights to privacy and liberty, and subjects Plaintiffs and other transgender young people to serious irreparable harm to their safety, health, and well-being.

50. The only other potential option available to transgender young people seeking to amend the sex listed on their birth certificate is to obtain a court order mandating that change pursuant to A.R.S. § 36-337(A)(4). Subsection (A)(4) is a catchall provision that requires ADHS to accept "[a] court order ordering an amendment to a birth certificate." The statute is silent beyond that.

51. Arizona courts interpreting Subsection (A)(4) have required families petitioning for amendments to the sex listed on a transgender minor's birth certificate to comply with the surgical requirement of Subsection (A)(3), which those families cannot do because their children are not eligible for surgery. Based on information and belief, courts have imposed that requirement due, at least in part, to the language of Subsection (A)(3) and ADHS's prior publicly-stated position that Arizona courts lack the authority under Subsection (A)(4) to issue orders amending the sex listed on an Arizona birth certificate.

52. Arizona courts are not available to transgender young people who were born in Arizona but have since moved to another state. Under Subsection (A)(4), those families must petition a court in their current state for an order correcting or amending their child's birth certificate. While some states have established court-order processes that allow their courts to grant such petitions, others do not allow for correcting or amending the birth certificates of transgender young people.

53. For those reasons, many transgender young people are prevented from obtaining court orders changing the sex listed on their birth certificates. Because these youth are also barred from the private administrative process under Subsection (A)(3), they are thus entirely prevented from changing the sex listed on their Arizona birth certificates.

54. That is not the only significant hurdle that transgender young people and their families face when petitioning a court for an order amending the sex listed on a birth

11

1   certificate.   The court-order process in Arizona requires additional fees, a significant

2   expenditure of time and thus further and unnecessary delay, filing a petition and therefore

3   creating an easily accessible public record about the requested change, and appearing at a

4   public hearing where they must persuade a court that they or their child needs a corrected

5   or amended birth certificate, all of which strip transgender young people of the very privacy

6   and rights they are trying to secure.   While petitioners in court may seek to protect their

7   privacy by filing other motions, such as motions to proceed under a pseudonym and to seal

8   the records, those are yet more documents that must be prepared and filed, again with an

9   uncertain outcome.   And these procedures vary from state to state, creating additional

10   expenses, uncertainties, risks, and burdens for families who have moved away from

11   Arizona.   To ensure that these multiple court submissions are completed correctly,

12   transgender people and their families would likely require the assistance of an attorney,

13   which is an additional and significant expense.   And, even if successful, transgender young

14   people must still apply to ADHS for the amended birth certificate, adding yet another step

15   to the process and imposing further expense and delay.

16        55.    These numerous and substantial barriers are often insurmountable for

17   transgender young people and their families, and render the court-order process unequal as

18   compared to the minimal requirements for amending the sex listed on a birth certificate

19   using the direct and private administrative process under Subsection (A)(3).   Under that

20   administrative process, a transgender person need only complete an application, attach a

21   letter from a physician, and pay the required fee.   Provided the application meets the

22   requirements of A.A.C. R9-19-208(O), the transgender person will receive an amended

23   birth certificate.   Furthermore, all the paperwork the applicant submitted to ADHS to

24   request the amendment, including the transgender person's prior birth certificate, will be

25   sealed and cannot be released without court order.   *See* A.R.S. § 36-322(A).

26        56.    Based on information and belief, ADHS does not impose the burdens of

27   seeking a court order on nontransgender people when correcting or amending an inaccurate

28   sex marker on a birth certificate.   Relying on its broad statutory authority, ADHS developed

**D.T., ET AL. V. CHRIST, ET AL.**
**AMENDED COMPLAINT**

a policy permitting it to change sex markers on Arizona birth certificates with a physician's letter attesting to the error.

57.     Despite the substantial and unjustified burdens imposed by the surgical requirement in Subsection (A)(3) and ADHS's authority to create an equitable process for transgender people to change the sex marker on their birth certificates, Defendants continue to enforce Subsection (A)(3) to the detriment of transgender people.

***Plaintiff D.T.***

58.     Plaintiff D.T. is a thirteen-year-old transgender boy in Pima County, Arizona. Like many kids his age, he loves to skateboard, play basketball, draw, and play Minecraft. He also hopes to learn to play the drums.

59.     D.T. began expressing himself as a boy at around two years old.  As a toddler, D.T. gravitated to more masculine clothing options and actively resisted girls' clothing.  He would regularly wear his father's fedora and necktie around the house.

60.     His parents still sent him to school in girls' clothing.  But every afternoon D.T. immediately removed the clothes when he returned home, and then often spent hours crying in his room afterwards.

61.     D.T. expressed he was a boy in other ways too.  On several occasions D.T. cut—increasingly larger—chunks of his long hair, leaving his parents to discover the newly missing bits of hair.  D.T. also tried to use the boys' restroom when he could and would not line up with the girls at school when teachers divided the class by sex.

62.     During that time, D.T. rarely smiled and was almost always quiet and anxious. He developed breathing tics and fidgeted nervously.  D.T. initially struggled to tell his parents how he felt and, on several occasions, told them he was afraid of dying and that he had a secret that he could not tell them.

63.     The day before D.T. began third grade, he and Lizette stopped by his classroom to drop off some supplies.  D.T.'s best friend was also there with her mother. His friend pointed to D.T. and asked her mother: "Can he and I go play?"  The mother replied: "No, that's a she."  Later, while driving D.T. home, Lizette asked D.T. about that

moment.  "Your friend called you 'him.'  Is that what you are?"  D.T. was silent for a moment, then said: "I know my body is wrong.  But in my insides, I'm a boy.  My mind tells me I'm a boy."  He also shared that he was worried that his parents would stop loving him if he ever shared this piece of himself.

64.     After several long and difficult conversations, D.T.'s parents decided to treat him as their son and subsequently started using male pronouns when referring to him.  They also cut his hair short, like a boy, and bought him boys' clothing.  And over time, D.T.'s parents called D.T. by his chosen, traditionally male name.

65.     D.T. became a different person.  He transformed from a reserved child who rarely smiled and was constantly anxious to a gregarious child who was interested in music and sports.  His anxiety also decreased significantly, and his behavioral tics disappeared.  In the years since, D.T. has continued to flourish in every aspect of his life.

66.     Last summer, D.T. began showing the first signs of puberty.  Consistent with the standards of care, D.T. began taking puberty-delaying medication.  More recently, he began taking testosterone as part of his medical treatment.  Those medications prevent D.T.'s body from undergoing physical changes associated with female puberty and instead induce male puberty.  As a result of these treatments, D.T. may never need surgical care to treat his gender dysphoria.

67.     While D.T.'s parents and close friends have accepted and affirmed his identity, others have not.  Last year, D.T. was harassed and assaulted at school for being transgender.  A student bullied and threatened D.T., escalating from verbal harassment to physical aggression.  Being the target of bullying was very scary for D.T. and his parents.  D.T. is still recovering emotionally from the experience.  Although D.T. is currently planning to remain at that school, he and his parents may revisit that decision if the bullying continues, a decision that will be unduly influenced by the fact that D.T.'s birth certificate wrongly identifies him as female.

68.     Because of that experience, and other similar experiences, D.T. has significant anxiety and worry about not being accepted by others and being mistreated if he

14

is forced to disclose that he is transgender.  The fact that D.T.'s current birth certificate does not match his sex exacerbates these fears; that fear is constraining.  For example, D.T. started playing basketball a few years ago and is currently playing on his school's boys' basketball team.  D.T. wants to play recreational basketball in the off-season, both because he loves the sport and wants to improve his skill and be good enough to play for the school team when he enters high school.  But he has not pursued this interest because he is worried that he will be required to play on the girls' team because of his birth certificate.

69.    D.T.'s parents started the process of correcting his identity documents.  They obtained a state court order changing D.T.'s name.  In their petition, they also requested an order changing the sex listed on D.T.'s birth certificate.  The judge informed D.T.'s parents that ADHS would require proof that D.T. underwent surgical treatment for his gender dysphoria before complying with the court order.  Thus, the judge's order included language noting that it was subject to ADHS's rules and regulations regarding the amendment of the sex listed on a transgender person's birth certificate.

70.    D.T.'s parents used the court order to correct his social security record and health insurance information.  His school also allowed his parents to use the court order to correct D.T.'s school records.  However, D.T.'s experience with bullying at school this past year and his hesitance to enroll in a recreational basketball league underscore that changing the sex listed on his birth certificate remains a critical need.  Having an inaccurate birth certificate is causing D.T. to exclude himself from activities that are important to child development and putting him at risk of harassment by forcing him to reveal that he is transgender.

71.    D.T.'s parents seek to change the sex listed on D.T.'s birth certificate through the administrative process but are precluded from doing so because D.T. cannot meet the surgical requirement.

72.    Despite the judge's statement in court to D.T.'s parents and the court order's language subjecting D.T. to the surgical requirement, Defendants represented to Plaintiffs that the court order that D.T. obtained is sufficient for him to apply for an amended birth

certificate.  In reliance on Defendants' representation, on or about December 21, 2020, Lizette submitted an application to ADHS to change the sex listed on D.T.'s birth certificate. However, even if D.T. obtains an amended birth certificate in this way, his ability to make that change has been significantly delayed due to Defendants' interpretation and enforcement of Subsection (A)(3).  That delay has required him to disclose his transgender status in situations that he would have preferred to keep that information private and caused him to forgo participating in certain activities to avoid disclosing his transgender status.

***Plaintiff Jane Doe***

73.    Plaintiff Jane Doe is a transgender ten-year-old girl in Maricopa County, Arizona.  Like many other girls of her age, Jane loves dressing up and trying on make-up.

74.    Jane began expressing herself as a girl when she was about two-and-a-half years old.  She gravitated toward girls' clothing, wearing her mother's clothes and shoes. When her parents took her shopping, Jane attempted to pick clothes and shoes from the girls' section.

75.    Initially, Jane's parents intentionally introduced her to boy-themed toys, which Jane categorically refused in favor of girls' toys.  For example, for Jane's fourth birthday, her mother, Susan, baked her a Batman-themed cake, despite Jane previously asking for a Minnie Mouse cake.  Jane appreciated the cake but told her mother that she "just wanted Minnie Mouse."

76.    Jane's parents initially thought this was a phase, but Jane persisted. Eventually, they brought her to a child psychologist specializing in care for young children with some prior experience with transgender youth, Dr. Beth Onufrak.  Dr. Onufrak evaluated Jane over several sessions and concluded that Jane would meet the diagnostic criteria for gender dysphoria.  Based on the recommendation of Dr. Onufrak, Jane's parents and siblings started treating her as a girl, including using her new feminine name and allowing her to wear girls' clothing.

77.    At Dr. Onufrak's recommendation, Susan took Jane to Dr. Veenod Chulani, a physician specializing in treating transgender youth and the Medical Director of the

**D.T., ET AL. V. CHRIST, ET AL.**
**AMENDED COMPLAINT**

Gender Support Program at Phoenix Children's Hospital.  Dr. Chulani agreed with Dr. Onufrak's assessment and diagnosed Jane with gender dysphoria.  He has since provided Jane with primary care and supported Jane and her family through Jane's social transition.

78.    Before Jane started the second grade, her parents asked her school if she could start the year as a girl.  The school agreed and worked with Jane and her family to prepare for her transition at school.  However, several students in Jane's class recognized her from the prior year and repeatedly teased her for being transgender.  The incidents caused Jane significant psychological distress.

79.    Students continued to bully and harass Jane throughout the second and third grade.  In fourth grade the bullying intensified when a student found Jane's class roster in the cafeteria and saw Jane's name with the letter "M" next to it.  That student shared the class roster and the information he learned from it with many classmates before the school could intervene.  After that, the taunting and teasing became relentless.  In response, Jane's anxiety about attending school increased significantly.  She was unable to concentrate in class or focus on her schoolwork.  Jane's education was further disrupted by her frequent anxiety-induced stomachaches, which brought her to the school nurse nearly every day.  Jane's only respite has been distance-learning, which has deprived her classmates the opportunity to continue bullying and harassing her.

80.    Since moving to distance learning due to the novel Coronavirus Disease 2019 (COVID-19) pandemic, Jane's situation has improved dramatically.  Free from the bullying and anxiety she faced at school, Jane is much happier and eager to participate in class and attend to her schoolwork.  But even distance learning has not been worry free for Jane or her family.  Because Jane's school records still list her as male, one of her teachers used male pronouns when e-mailing Susan about Jane's missing assignments in the class.  Jane's school records not only disclosed her transgender status to her teacher, they risked her being mistreated by her teacher for that reason.

81.    Nevertheless, given the significant improvement in Jane's well-being during

**D.T., ET AL. V. CHRIST, ET AL.**
**AMENDED COMPLAINT**

distance learning, her parents decided to use this opportunity to enroll Jane in a different school where students do not know she is transgender. The new school where they would like to enroll her, however, will not enroll Jane as female without a corrected birth certificate.

82.   Susan previously explored options for changing the sex listed on Jane's birth certificate. Through that research, Susan learned that ADHS required evidence of surgery prior to changing the sex on a transgender person's birth certificate and that she would need to present proof of surgery to obtain a court order as well. Susan visited ADHS to inquire about what she needed to provide to amend the sex listed on Jane's birth certificate and an ADHS employee confirmed to her that Jane would need to provide a letter from a doctor as required by Arizona law. Due to Jane's age, it would be inappropriate and inconsistent with the standards of care for her to undergo any surgical treatment for gender dysphoria. The medical necessity of those treatments will be assessed by Jane and her team of healthcare providers at an appropriate time and consistent with the prevailing standards of care.

83.   Without a corrected birth certificate, Jane would have been required to reveal that she is transgender to this new school. That would have prevented her from safely moving to another school where she is free from pervasive harassment and bullying that impede her learning and cause her further significant emotional harm.

84.   Given Jane's urgent need for an amended birth certificate, her parents filed a Motion for Preliminary Injunction concurrently with Plaintiffs' first Complaint. (Docs. 1, 3.) By joint stipulation, and in reliance on the extensive evidence, expert opinion, and legal authority filed by Jane in support of her Motion for Preliminary Injunction, Jane obtained an order from this Court instructing ADHS to amend the sex listed on her birth certificate to female, which ADHS processed under Subsection (A)(4). The significant expense and effort required for Jane to obtain that relief underscores the enormous and unnecessary hurdles, and therefore the inherent discrimination, in excluding transgender young people from utilizing the direct and private administrative process created in Subsection (A)(3).

85.     Jane is currently enrolled in her new school.  Although she is still adjusting to her new learning environment, she is excited to get to know her classmates and teachers and the relief she feels that none of them know she is transgender is incalculable.

***Plaintiff Helen Roe***

86.     Plaintiff Helen Roe is a six-year-old transgender girl in Pima County, Arizona.  Helen enjoys time with her girlfriends, whether playing "princess" or "house," or with her girls' toys.  She likes roller skating, singing, and dancing.

87.     Helen began expressing that she is a girl at a young age.  As early as one-and-a-half years old, Helen started playing with girls' toys (*e.g.*, baby dolls, toy strollers, toys for playing "house") while at friends' houses.  During one of her playdates, Helen put on her friend's Disney princess costume, which was a purple dress.  Helen refused to take the dress off and ended up taking it home with her that day.

88.     Helen continued to play like other little girls, such as playing house with pink plates and cutlery, pushing a stroller, and playing with her many Barbie dolls.  For her fourth birthday, Helen requested a party with unicorn decorations and permission to wear a Disney princess costume to the party.  Her parents agreed.  Most of Helen's friends were (and are) girls, and they also wore brightly colored dresses and accessories.  Helen was as happy as her parents had ever seen her that day.  The party made them fully appreciate that Helen's behavior was not a phase.  Their daughter expressed herself as, and indeed was, a girl.

89.     Shortly thereafter, Helen's parents brought Helen to Alison VanDyke, a therapist specializing in working with transgender children.  Ms. VanDyke evaluated Helen and diagnosed her with gender dysphoria.  In addition to working with Helen to improve her self-confidence, Ms. VanDyke supported Helen's parents as they worked through their initial concerns about allowing Helen to live as a girl in every aspect of her life.

90.     Helen has exhibited a marked improvement since her transition.

91.     Although Helen's family has accepted her as female, Helen has still experienced prejudice because she is transgender.  Towards the beginning of Helen's transition, her mother shared that Helen is transgender with several parents in Helen's small

**D.T., ET AL. V. CHRIST, ET AL.**
**AMENDED COMPLAINT**

pre-school community.  One family reacted negatively to this information, distancing themselves from Helen and called the director of Helen's pre-school to allege that Helen was a threat to their children's security.

92.    Helen's parents also fear for Helen's safety because, as a transgender girl of color, she is in a particularly vulnerable population.  Having an accurate birth certificate will not only give her control over who learns that she is transgender, but it will also reduce the risk that Helen will be singled out or targeted for violence because she is transgender.  Currently, the information on Helen's birth certificate is used to generate many other records that are part of her life, including school and healthcare records, exacerbating her parents' fears.

93.    Earlier this year, Helen's parents filed a petition to change Helen's name and the sex listed on her birth certificate.  The court granted the requested name change, but did not rule on the request to change the sex listed on Helen's birth certificate from male to female.  Instead, the court provided Helen's parents with a printout of A.R.S. § 36-337.  The court also deferred ruling on their request to seal Helen's name-change petition, making that petition available to public.  Given their concerns for Helen's safety, Helen's parents seek to correct Helen's birth certificate administratively to protect her private medical information and prevent her from being forced to reveal that she is transgender.

***Plaintiff James Poe***

94.    Plaintiff James Poe is a five-year-old transgender boy in Pima County, Arizona.  James likes to play with his Etch A Sketch, climb trees, ride his bike, and explore outdoors.  He also loves to wear bow ties of all different colors and designs.

95.    By the time that James was around a year-and-a-half old, he was expressing through his actions that he is a boy.  He resisted his parents' attempts to dress him in feminine dresses and other girls' clothing.  For example, at school one day, while playing dress-up, he put on a boys' blazer and used a discarded girls' hair bow as a bow tie.

96.    Around the time that he turned two, James began to refer to himself as a boy.  He would point at his mother, Laura, and say "girl," point at his father and say "boy," and

point to himself and say "boy." Faced with his continuing refusal to wear girls' clothing, James's parents started buying him boys' clothing in the summer of 2018. James has never switched back and, when offered a choice, James always selects boys' clothes.

97. James' parents grew increasingly convinced that this was more than just a phase for James. They sought guidance from James's pediatrician, who referred them to Dr. Tracey Kurtzman, a pediatrician with expertise working with transgender youth. Around that same time, James and his family started to see Dr. Richard Muszynski, a clinical psychologist. James sees Dr. Musznyski regularly for therapy sessions to treat his gender dysphoria.

98. Based in part on the counseling from these medical professionals, James's parents socially transitioned him from female to male. James immediately adopted male pronouns and the name "James." Days later, James's family went out to dinner, and his father asked Laura if she would like to try some lemonade. James mistakenly believed that his father was referring to him as "she" and immediately corrected his father to use the pronoun "he."

99. Although his family has accepted him for who he is, James has been mistreated by some of his peers. During fall break in 2019, James attended a program at his school with children of different class levels and ages. James reported that an older student repeatedly told him that he was a girl, not a boy. Laura sought to educate the program administrators, but realized that the only way to do that would have been to disclose that her son is transgender. To avoid disclosing that private information about James, Laura removed him from the remainder of the program in order to keep him safe and did not send him back in subsequent years.

100. Despite the fact that Laura works in a public school district, James' parents enrolled him in private school in order to avoid the public school's requirement that he provide a birth certificate to enroll. They do not want their son's transgender status disclosed publicly and view private school as a smaller and safer environment, even though that choice came at a significant additional cost. For example, James has a learning

1  disability that requires specialized services, which would have been provided by a public

2  school at no cost to his family.  Instead, James's parents have to cover those services through

3  their health insurance, paying the applicable co-pays, deductibles, and, in some cases,

4  covering the entire cost out-of-pocket.  They have even delayed starting those needed

5  services out of a concern that the service provider will mistreat James because he is

6  transgender, a fact that is obvious from his birth certificate.

7      101.   James has also expressed interest in joining sports programs, such as a youth

8  soccer league.  However, the local soccer league requires James' birth certificate to register

9  him.  Therefore, Laura has resisted signing him up, not wanting to disclose his transgender

10  status to the league, including the parents who are coaches and referees, and out of a concern

11  that he would be required to play on the girls' team.

12      102.   In March 2020, James's parents sought a court order to change his name,

13  which the court granted.  They also sought an order to correct the sex listed on James's birth

14  certificate, but the court did not rule on that request.  Instead, the judge informed them that,

15  while she would have been willing to order a change to the sex listed on James's school and

16  health records, ADHS would require more in order to change the sex listed on his birth

17  certificate.  She then handed them a printed copy of A.R.S. § 36-337.  Despite having

18  corrected some of James's identity documents, his parents have not corrected his birth

19  certificate because they could not change the sex listed on that document.  They seek to

20  change the sex listed on his birth certificate through the private administrative process in

21  order to maintain his privacy.

22  *Plaintiff Carl Voe*

23      103.   Plaintiff Carl Voe is a nine-year-old transgender boy who was born in Arizona

24  but currently lives in Maryland.  Carl loves to draw comics and 3-D doodle, and is always

25  inventing new things.  He also reads, writes, and assemble puzzles at every opportunity.

26      104.   Carl began expressing his gender identity just before he turned two years old.

27  For example, Carl would ask his parents when he was going to get a boy's body.  When

28  strangers would complement his long, curly hair, Carl told his parents that he hated his hair

and soon insisted that they cut it short like a boy's. When Carl was four, his mother, Rachel, cut his hair in a Mohawk. Following that haircut, strangers would say "what a cute boy," and Carl instructed his parents that he did not want them to correct the strangers.

105.   Around the same time, Carl's parents noticed that he was becoming increasingly angry and defiant at home for reasons they could not immediately determine. In addition to fits of rage, Carl would also attempt to harm himself, such as by shutting his hand in cabinets. He also informed his parents that he hated girls and wished he was a boy. Concerned for his health and safety, Carl's parents began taking him to Dr. Muszynksi for therapy in late 2017.

106.   When Carl was in kindergarten, his parents learned that other children were asking him whether he was a boy or a girl and would not believe him regardless of how he answered. With the support of his parents, Carl addressed his class to tell them that he did not like their questions. The environment improved for a few weeks, but then the questions returned. Carl's parents also later learned that Carl was not eating his lunch and refusing to use the restroom during the school day out of fear—a common behavior among transgender youth due to the distress they experience using a restroom that does not match their gender identity. At the end of kindergarten, Carl told his parents "I am a boy."

107.   Carl adopted male pronouns and the name "Carl." His anger eased during camp in the summer following kindergarten, but renewed when he entered first grade. In his new grade, he faced continued questions about his gender, and was constantly referred to as a girl by other students and even school staff. Despite many attempts to educate the school staff and administrators, Carl's parents were unsuccessful, and Carl's anger and defiance at home once again returned.

108.   Carl's parents moved him to a new school for second grade and Carl insisted that no one at his new school be told about his transgender status. Unfortunately, a few other students from Carl's old school moved to the new school as well, and Carl's anger was replaced by anxiety and fear that he would soon be outed and again face the questions and mistreatment by his peers and school staff.

109.   Mid-way through second grade, Carl moved to distance learning because of the COVID-19 pandemic.  Remote learning exacerbated Carl's gender dysphoria, resulting in him experiencing significant anxiety about this appearance and the sound of his voice. As result, Rachel has home-schooled him since October 2020.

110.   Carl expressed interest in participating in sports programs when he lived in Arizona, including a local cross-country running program and a swim team.  Both programs have boys' and girls' divisions and required Carl to provide his birth certificate to sign up. Carl also wanted to participate in a ballet program as a boy dancer.  Carl's parents did not enroll him in any of these activities because they understood from other parents that he would not be well received without corrected identity documents.

111.   Late last year, Carl's family moved to Maryland.  Prior to the move, Carl's parents petitioned an Arizona court for a name and gender-marker change, but due to delays associated with the COVID-19 pandemic, the Superior Court did not rule on the petition before they left the state.  Because he now lives in Maryland, Carl is no longer within the jurisdiction of Arizona courts.  Carl's parents have been advised that transgender young people in Maryland face many hurdles to obtaining court orders correcting or amending the sex listed on their birth certificates.  Instead, to protect Carl's privacy and health, his parents wish to use the private administrative process under Subsection (A)(3) to correct Carl's Arizona birth certificate.

**Class action allegations**

112.   Plaintiffs, on behalf of themselves and all similarly situated individuals, bring their claims for declaratory and injunctive relief as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(2).

113.   Plaintiffs request that the Court certify the following class ("Class") under Rule 23(b)(2):

> All transgender individuals born in Arizona, now and in the future, who seek to change the sex listed on their birth certificates but have not undergone a "sex change operation"

**D.T., ET AL. V. CHRIST, ET AL.
AMENDED COMPLAINT**

as treatment for their gender dysphoria.

114. Plaintiffs are adequate representatives of the Class. Plaintiffs are transgender individuals who seek to change the sex listed on their birth certificates and have not undergone surgical treatment to treat their gender dysphoria and may never require such treatment.

115. The Class satisfies the requirements of Rule 23(a)(1) because the class is so numerous that joinder of all members is impracticable. Studies estimate that the population of transgender adults in Arizona exceeds 30,000. Based on population studies, there are approximately 2,000-5,000 transgender young people under eighteen years old in Arizona. Of that population, approximately one-third will undergo surgery to treat their gender dysphoria. That percentage will be significantly smaller among transgender young people who, with limited exception, cannot undergo surgery due to their age. That leaves a large proportion of transgender young people and adults—whether surgery is not medically necessary for them or they face other barriers to accessing surgical care—who are denied the opportunity to amend the sex listed on their birth certificate through the private administrative process created by Subsection (A)(3) and it would be impractical to join all of them as named plaintiffs. In addition to the potential size of the class, it would also be impractical to join them all because there may be transgender people who were born in Arizona, but currently live in another state.

116. The Class satisfies the commonality requirements of Rule 23(a)(2) because there are questions of law and fact common to the Class. Pursuant to Subsection (A)(3), Defendants have acted or refused to act on grounds generally applicable to the Class. This action raises questions of law common to all members of the Class, including: (a) whether Subsection (A)(3), facially and as applied to members of the Class, violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution; (b) whether Subsection (A)(3), facially and as applied to members of the Class, violates the Substantive Due Process Right to Privacy secured by the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution; (c) whether Subsection (A)(3), facially and as applied

to members of the Class, violates the Substantive Due Process Right to Individual Liberty and Autonomy of the Fourteenth Amendment to the U.S. Constitution; and (d) whether Subsection (A)(3), facially and as applied to members of the Class, violates the Substantive Due Process Right to Choose whether to undergo a particular medical treatment secured by the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.   All members of the Class share at least one common question of fact: Whether the purported justification(s) for excluding transgender people who do not meet the surgical requirement for changing their birth certificate via the private administrative process created by Subsection (A)(3) are pretext(s) for impermissible discrimination?

117.   The Class satisfies the typicality requirements of Rule 23(a)(3) because the named Plaintiffs' claims are typical of the claims of the Class.  Plaintiffs are members of the Class, are individuals who have been unable and will be unable to amend the sex listed on their birth certificates through the private administrative process set forth in Subsection (A)(3).  Plaintiffs and members of the Class share the same legal claims under the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the U.S. Constitution.

118.   The Class satisfies the adequacy requirements of Rule 23(a)(4) because the class representatives will fairly and adequately represent the interests of the Class.  The named Plaintiffs seek the same declaratory and injunctive relief as the other members of the Class: (1) a declaratory judgment that A.R.S. § 36-337(A)(3) and A.A.C. R9-19-208(O) are unconstitutional; (2) permanent injunctions enjoining Defendants from enforcing that statute and regulation; and (3) an order for Defendants to create a constitutionally sound process for amending the sex listed on the birth certificates of transgender people born in Arizona.  The named Plaintiffs seek this relief to benefit themselves and to protect other transgender people born in Arizona.  In asserting their own rights, the named Plaintiffs will vindicate the rights of all members of the Class fairly and adequately.   The class representatives have no interests that are antagonistic to the interests of other members of the Class.

119.   The Class further satisfies the requirements of Rule 23(a)(4) because counsel

for the Class will fairly and adequately represent the interests of the Class. The Class is represented by counsel from Cooley LLP and Osborn Maledon, P.A., two large law firms, and the National Center for Lesbian Rights ("NCLR"), a non-profit legal organization dedicated to advancing the civil and human rights of the LGBTQ community. Collectively, counsel has significant experience litigating civil rights cases, including transgender rights cases and complex class actions in federal court.

120.    The Class also satisfies the requirements of Rule 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole. The Class exhibits sufficient cohesiveness because its members have suffered group, as opposed to individual, injuries; namely, the categorical exclusion of transgender people who have not undergone surgery to treat their gender dysphoria from amending their birth certificate through the private administrative process created by Subsection (A)(3). Members of the Class are bound together by the significant common traits that they are all transgender, they have gender dysphoria, they need to amend the sex listed on their birth certificates, and they have not undergone surgical treatment to alleviate their gender dysphoria.

### COUNT I
**(Violation of the Equal Protection Clause of the
Fourteenth Amendment of the United States Constitution)**

121.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 to 120 of this Amended Complaint.

122.    The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

123.    Defendants are persons for the purposes of § 1983.

124.    Defendants act under color of law in enforcing A.R.S. § 36-337(A)(3) and its implementing regulation A.A.C. R9-19-208(O).

125.    Arizona's current statutory and regulatory scheme, which prevents Plaintiffs

**D.T., ET AL. V. CHRIST, ET AL.
AMENDED COMPLAINT**

and the Class from obtaining amended birth certificates through the process created by Subsection (A)(3), impermissibly discriminates against transgender people on the basis of sex and transgender status, in violation of their right to equal protection of the laws under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Unlike their nontransgender peers and other Arizonans who can have accurate birth certificates and correct their birth certificates when necessary, transgender people are denied accurate birth certificates.

126.   Excluding transgender people who have not undergone surgery to treat their gender dysphoria from obtaining corrected or amended birth certificates using the private administrative process in Section 36-337(A)(3) does not serve any rational, legitimate, important, or compelling state interest.

## COUNT II
### (Violation of the Substantive Due Process Right to Privacy under the United States Constitution)

127.   Plaintiffs hereby incorporate by reference and reallege paragraphs 1 through 126 of this Amended Complaint as though fully set forth herein.

128.   The Fourteenth Amendment to the United States Constitution, enforceable against Defendants pursuant to 42 U.S.C. § 1983, provides that no state shall "deprive any person of life, liberty, or property, without due process of law."   U.S. Const. amend. XIV, § 1.

129.   The constitutional right to privacy protects information that is highly personal and intimate, including sensitive medical information and information that could lead to bodily harm upon disclosure.

130.   Involuntary disclosure of a person's transgender status violates that person's fundamental right to privacy.  A person's transgender status constitutes highly personal and intimate information, including private medical information.

131.   The involuntary disclosure of one's transgender status can also cause significant harm, including placing one's personal safety and bodily integrity at risk.

132.   Section 36-337(A)(3) and A.A.C. R9-19-208(O) violate the right to privacy

of transgender people, including Plaintiffs and the Class, in that denying them a birth certificate that matches their sex requires them to disclose their transgender status and deprives them of significant control over the circumstances around such disclosure.

133.   There are no adequate safeguards to prevent the harm caused by the involuntary disclosure of one's transgender status through a birth certificate. For example, a person may need to disclose their birth certificate directly to third parties, without any of the privacy safeguards that may exist where the government discloses information to third parties.

134.   The government has no compelling, important, or legitimate interest in disclosing a person's transgender status on state-issued birth certificates.

**<u>COUNT III</u>**
**(Violation of the Substantive Due Process Right to Individual Liberty and Autonomy under the United States Constitution)**

135.   Plaintiffs hereby incorporate by reference and reallege paragraphs 1 through 134 of this Amended Complaint as though fully set forth herein.

136.   The substantive protections of the Due Process Clause also protect the right of every person to the possession and control of their own person, and to define and express their identity. "The Constitution promises liberty to all within its reach, a liberty that includes certain specific rights that allow persons . . . to define and express their identity." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2593 (2015).

137.   The fundamental protections of an individual's autonomy include a right to live consistent with one's sex, which is a fundamental aspect of personal identity. Arizona law impermissibly burdens that right by preventing transgender people from obtaining amended birth certificates that reflect who they are, thereby subjecting them to the risk of exposure, stigma, discrimination, harassment, and violence. That burden is amplified by the fact that the government itself, as well as many third parties, often requires the use of a birth certificate to demonstrate a person's sex.

138.   The government's refusal to permit transgender people who have not undergone surgery to treat their gender dysphoria to obtain amended birth certificates

**D.T., ET AL. V. CHRIST, ET AL.**
**AMENDED COMPLAINT**

through the private administrative process created by Subsection (A)(3) additionally burdens their right to autonomy by inviting and encouraging other public and private entities to similarly discriminate against them.

139.   Arizona has no compelling, important, or even legitimate government interest in burdening the ability of transgender people to live consistent with their sex.

## COUNT IV

**(Violation of the Substantive Due Process Right to choose whether to undergo a particular medical treatment under the United States Constitution)**

140.   Plaintiffs hereby incorporate by reference and reallege paragraphs 1 through 139 of this Amended Complaint as though fully set forth herein.

141.   The substantive protections of the Due Process Clause safeguard the right of every person to bodily integrity.  Encompassed in that right is the right to choose whether to undergo a particular medical treatment.  *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997); *Washington v. Harper*, 494 U.S. 210, 221 (1990); *Parham v. J.R.*, 442 U.S. 584, 600 (1979).

142.   Arizona law interferes with this fundamental constitutional right by imposing a surgical requirement on transgender people to correct their birth certificate via the private administrative process created under Subsection (A)(3).  Decisions regarding medical treatment should be made based on the advice of medical and mental health professionals, and consistent with the prevailing standards of care.  However, the importance of the birth certificate as an identity document impermissibly pressures transgender people into undergoing surgeries that may be medically unnecessary simply to correct their birth certificates.

143.   Denying transgender people the ability to correct their birth certificate using the private administrative process in Section 36-337(A)(3) because they do not undergo surgery infringes on their right to choose whether to undergo a particular treatment.

144.   Arizona has no compelling, important, or even legitimate government interest to justify curtailing this fundamental constitutional right.

**PRAYER FOR RELIEF**

***WHEREFORE***, Plaintiffs respectfully request that this Court:

A.  Enter an order declaring that this action is a proper class action and certifying Plaintiffs D.T., Helen Roe, James Poe, and Carl Voe as class representatives under Rule 23 of the Federal Rules of Civil Procedure.

B.  Enter a declaratory judgment that continuing to enforce the surgical requirement in A.R.S. § 36-337(A)(3) and A.A.C. R9-19-208(O) to deny Plaintiffs D.T., Helen Roe, James Poe, and Carl Voe, and the Class, the ability to change the sex markers on their birth certificates:

    1.  Violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by discriminating on the basis of sex and transgender status;

    2.  Violates the Due Process Right to Privacy under the United States Constitution;

    3.  Violates the Due Process Right to Individual Liberty and Autonomy under the United States Constitution;

    4.  Violates the Due Process Right to Choose Whether to Undergo a Particular Medical Treatment;

C.  Permanently enjoin Defendants, their agents, employees, representatives, and successors, and any other person acting directly or indirectly in concert with them, from enforcing the surgical requirement in A.R.S. § 36-337(A)(3) and A.A.C. R9-19-208(O) to deny an amendment to the sex listed on the birth certificates of transgender people who have undergone clinically appropriate treatment for the purpose of a gender transition;

D.  Order Defendants to issue amended birth certificates to Plaintiffs D.T., Helen Roe, James Poe, and Carl Voe;

E.  Award Plaintiffs D.T. and Jane Doe nominal damages;

F.  Award Plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and any other applicable laws; and

1    G.    Grant such other and further relief in favor of Plaintiffs and the Class as this

2 Court deems just, equitable and proper.

3                          **DEMAND FOR JURY TRIAL**

4    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs respectfully

5 demand a trial by jury of all issues triable by jury.

6                                    Respectfully submitted,

7 Dated: January 8, 2021              OSBORN MALEDON, P.A.

8

9                                     s/Colin M. Proksel
                                      _____
10                                    Mary O'Grady (011434)
                                      Colin Proksel (034133)
11                                    Payslie Bowman (035418)
                                      OSBORN MALEDON, P.A.
12                                    2929 North Central Avenue, 21st Floor
                                      Phoenix, Arizona 85012-2793
13                                    Telephone:  (602) 640-9000
                                      Facsimile:   (602) 640-9050
14                                    Email:    mogrady@omlaw.com
                                      Email:    cproksel@omlaw.com
                                      Email:    pbowman@omlaw.com

15                                    Asaf Orr (Admitted *Pro Hac Vice*)
16                                    NATIONAL CENTER FOR LESBIAN
                                      RIGHTS
17                                    870 Market Street, Suite 370
                                      San Francisco, California 94102
18                                    Telephone:  (415) 392-6257
                                      Facsimile:   (415) 392-8442
19                                    Email:    aorr@nclrights.org

20                                    Patrick Gunn (Admitted *Pro Hac Vice*)
                                      COOLEY LLP
21                                    101 California Street, 5th Floor
                                      San Francisco, California 94111-5800
22                                    Telephone:  (415) 693-2070
                                      Facsimile:   (415) 693-2222
23                                    Email:    pgunn@cooley.com

24                                    Barrett J. Anderson (Admitted *Pro Hac Vice*)
                                      COOLEY LLP
25                                    4401 Eastgate Mall
                                      San Diego, California 92121-1909
26                                    Telephone:  (858) 550-6000
                                      Facsimile:   (858) 550-6420
27                                    Email:    banderson@cooley.com

28                                    *Attorneys for Plaintiffs and Proposed Class*

**D.T., ET AL. V. CHRIST, ET AL.**
**AMENDED COMPLAINT**