Patrick Gunn (admitted *Pro Hac Vice*)
COOLEY LLP
101 California Street, 5th Floor
San Francisco, California 94111-5800
Telephone:    (415) 693-2070
Facsimile:    (415) 693-2222
Email:        pgunn@cooley.com

Mary O'Grady (011434)
Colin Proksel (034133)
Payslie Bowman (035418)
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
Telephone:    (602) 640-9000
Facsimile:    (602) 640-9050
Email:        mogrady@omlaw.com
Email:        cproksel@omlaw.com
Email:        pbowman@omlaw.com

*Attorneys for Plaintiffs and Proposed Class*
Additional counsel listed on following page

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| D.T., a minor, by and through his parent and next friend Lizette Trujillo; Jane Doe, a minor, by and through her parent and next friend Susan Doe; Helen Roe, a minor, by and through her parent and next friend Megan Roe; James Poe, a minor by and though his parent and next friend Laura Poe; and Carl Voe, a minor by and though his parent and next friend Rachel Voe, <br><br> Plaintiffs, <br><br> v. <br><br> Dr. Cara M. Christ, in her official capacity as State Registrar of Vital Records and Director of the Arizona Department of Health Services; Thomas Salow, in his official capacity as Branch Chief of the Division of Public Health Licensing Services at the Arizona Department of Health Services; and Krystal Colburn, in her official capacity as Bureau Chief and Assistant State Registrar of the Bureau of Vital Records at the Arizona Department of Health Services, <br><br> Defendants. | Case No. 4:20-cv-484-JAS <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** <br><br><br> **\*ORAL ARGUMENT REQUESTED\*** |

Barrett J. Anderson (admitted *Pro Hac Vice*)
COOLEY LLP
4401 Eastgate Mall
San Diego, California 92121-1909
Telephone:     (858) 550-6000
Facsimile:     (858) 550-6420
Email:          banderson@cooley.com

Asaf Orr (admitted *Pro Hac Vice*)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, California 94102
Telephone:     (415) 392-6257
Facsimile:     (415) 392-8442
Email:          aorr@nclrights.org

*Attorneys for Plaintiffs and Proposed Class*

## I.     **INTRODUCTION**

Plaintiffs are transgender girls and boys who seek to amend their birth certificates through the state-created administrative process that is available to all other Arizonans. Plaintiffs' birth certificates either list—or, before this case began, did list—the wrong sex marker, disclosing to anyone who sees these critical and ubiquitous identity documents that they are transgender and, as a result, exposing them to discrimination, harassment, and violence.  Arizona law provides an administrative pathway to correct the sex listed on a birth certificate, but contrary to well-established medical standards of care, that process requires transgender applicants to have "undergone a sex change operation."  A.R.S. § 36-337(A)(3).  Surgery is not medically appropriate or available for transgender children and may never be necessary for transgender people who are able to transition as minors because of advances in non-surgical treatment techniques.  Because of the surgical requirement, Plaintiffs and other transgender minors are barred from using the administrative process in Subsection (A)(3).  Like all children, they need accurate birth certificates to participate in a wide range of activities that are critical to their growth and development.  By barring transgender minors from obtaining accurate birth certificates, the surgical requirement violates Plaintiffs' constitutional rights to equal protection and due process under the Fourteenth Amendment.

Defendants do not dispute that Plaintiffs have stated a valid claim that the surgical requirement in Subsection (A)(3) violates their right to privacy by preventing them from obtaining accurate birth certificates and thus depriving them of the right to determine when, whether, and to whom to disclose their transgender status.  Defendants also do not appear to dispute that transgender young people are harmed by inaccurate identity documents and that amending their birth certificates is "vital to their mental and physical well-being." (Order, Doc. 28, at 2–3.)  Nevertheless, Defendants move to dismiss several of Plaintiffs' claims based on a hodgepodge of inapt jurisdictional, abstention, and venue arguments. None of Defendants' scattershot arguments hit the mark.  The Court should deny the motion.

## II.     FACTUAL BACKGROUND

### A.     The medical standards of care for transgender minors are well-established and generally exclude surgery.

Arizona's surgery requirement conflicts with the medical standards of care for treating gender dysphoria in minors, which are well-established and supported by every leading medical professional organization, including the American Academy of Pediatrics and the American Medical Association.   (Compl. ¶ 31.)[1]   Those standards enable transgender minors to live in accord with their gender identity through social transition and, where medically appropriate, puberty blockers or hormone therapy.   (*Id.* ¶¶ 32–39.) "Surgery is not medically required to complete gender transition" and, under the prevailing standards of care and in light of modern treatments like hormone-replacement therapy, "most transgender youth cannot undergo or may never require surgery."   (*Id.* ¶¶ 32, 49.)

Correcting identity documents is an important step in a young person's gender transition and plays a critical role in their healthy development and well-being.   (*Id.* ¶¶ 34, 43.)   When transgender youth are barred from updating those documents, it "increases the likelihood that a person's transgender status will be disclosed to others, exposes them to a significant risk of mistreatment, and undermines the health benefits of their social transition."   (*Id.* ¶ 43; *see also id.* ¶¶ 41–45.)

### B.     The Parties.

Plaintiffs are five transgender people, all younger than age eighteen, who were born in Arizona.  (Compl. ¶¶ 14–18.)[2]   Plaintiffs Helen Roe, James Poe, and Carl Voe also bring their claims on behalf of a class of similarly situated transgender individuals.   (*Id.* ¶¶ 112–20.)   Defendants are officials at the Arizona Department of Health Services who administer and otherwise have authority over vital statistics records, including the process for correcting or amending birth certificates.   (*Id.* ¶¶ 19–21.)

---

[1] Citations to "Compl." refer to the amended complaint.  (Doc. 47.)

[2] Plaintiffs use the word "correct" to mean what it does in common language: to put right, or to rectify an error or inaccuracy.  It is immaterial for purposes of deciding this motion— or this case—whether, as Defendants insist, the terms "correct" and "amend" may have different meanings in some other contexts under Arizona law.

### C.   Arizona vital statistics records laws.

Arizona law creates an administrative process that permits transgender people to change the sex marker on their birth certificate by submitting a letter to ADHS from a physician attesting that they have undergone a "sex change operation."   A.R.S. § 36-337(A)(3).[3]   This process does not create a public record and, once approved, the documents are sealed, making them inaccessible without a court order.  (*Id.* ¶ 55.)

Arizonans can also petition a court for changes to their birth certificate.  This process, established in Subsection (A)(4), is not specifically designed for transgender persons seeking to update their birth certificates; instead, it is a general provision that authorizes Arizona courts to order ADHS to change *any* information on a birth certificate. Subsection (A)(4) does not contain specific standards for when a court may order such a change.  (*Id.* ¶ 50.)  In practice, when a transgender person seeks to use this provision to obtain a corrected sex marker, Arizona courts have imposed the same surgical requirement as in Subsection (A)(3), based in part on "ADHS's prior publicly-stated position that Arizona courts lack the authority under Subsection (A)(4) to issue orders amending the sex listed on an Arizona birth certificate."  (*Id.* ¶ 51.)

The judicial process in Subsection (A)(4) is much more burdensome and expensive than the administrative process, and it is impossible to use without publicly disclosing a person's transgender status.  Those burdens are compounded for transgender Arizonans who live in other states, who may be legally or practically unable to file a petition in Arizona state court.

### D.   Current proceedings.

On November 5, 2020, Plaintiffs filed a complaint challenging the constitutionality of the surgical requirement in Subsection (A)(3).  (Doc. 1.)  Along with the complaint, Plaintiff Jane Doe filed a motion for preliminary injunction. (Doc. 3.)  Defendants opposed but, as the Court observed, they did not "dispute that best medical and psychological

---

[3] Plaintiffs also challenge the surgical requirement in ADHS's implementing regulation, A.A.C. R9-19-208(O).  (Compl. ¶ 48.)  For simplicity, when this motion refers to the deficiencies in Subsection (A)(3), Plaintiffs also intend to refer to that regulation.

practices reflect":

> (1) gender reassignment surgery is not required or recommended for young transgender kids (i.e., 6, 10, and 13 in this case) diagnosed with gender dysphoria;

> (2) gender reassignment surgery may never be necessary or recommended for those with gender dysphoria (i.e., there are many factors that come into play that vary for each individual's circumstances);

> (3) amending important identity-related documents (such as birth certificates) to coincide with a transgender minor's gender identity (as opposed to their external genitalia) is vital to their mental and physical well-being; and

> (4) that failure to amend such documents (such as birth certificates) improperly reveals a transgender minor's transgender status to school officials and classmates, which results in discrimination and harassment based on their transgender status, and this is detrimental to a transgender minor's mental and physical health.

(Doc. 28 at 2–3.)  Defendants also did "not dispute that the ultimate relief Plaintiffs seek (amending their birth certificates) is warranted," instead arguing that it "is already available . . . under Arizona's current laws, regulations, and practices." (*Id.* at 3.)  The parties resolved that motion by joint stipulation on November 27, 2020, resulting in the Court issuing Jane Doe an order directing ADHS to amend the sex listed on her birth certificate. (Docs. 39 & 41.)  Thereafter, Plaintiffs filed an amended complaint on January 8, 2021, (Doc. 47), and Defendants moved to dismiss it on March 15, 2021. (Doc. 56.)

## III.   <u>ARGUMENT</u>

Plaintiffs have sufficiently pled standing and the elements of each claim in their amended complaint.  There is no basis for this Court to abstain or decline to preside over this case.  Accordingly, the Court should deny the motion to dismiss and permit Plaintiffs to remedy the one minor pleading issue identified in Defendants' motion.

### A.   **The Court has subject-matter jurisdiction over Plaintiffs' claims and there is no basis for the Court to decline to exercise it.**

Defendants' assertions that the Court lacks subject-matter jurisdiction or that the Court should abstain from exercising it are without merit.

### 1.      Plaintiffs have standing.

The allegations in the amended complaint demonstrate that all Plaintiffs satisfy Article III's standing requirements.  Plaintiffs Helen Roe, James Poe, and Carl Voe have standing because they seek to obtain birth certificates reflecting their correct gender markers through Arizona's administrative process, but are prevented from doing so because of Defendants' unlawful enforcement of the surgical requirement in Subsection (A)(3).  This violation may be redressed by this Court through appropriate injunctive and declaratory relief.  Plaintiffs D.T. and Jane Doe have standing because they were prevented from obtaining corrected birth certificates through the administrative process before filing this action and have received them now only as a result of filing suit to vindicate their constitutional rights.  Their entitlement to nominal damages for Defendants' constitutional violations is sufficient to establish standing, as the Supreme Court recently made clear. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801–02 (2021).

> i.      Helen Roe, James Poe, and Carl Voe have redressable injuries.

"A plaintiff's burden to demonstrate redressability is 'relatively modest.'"  *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018) (quoting *Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012)).  It is "easily" established in cases, like this one, where a plaintiff challenges a statute or regulation as discriminatory.  *Hassan v. City of New York*, 804 F.3d 277, 293 (3d Cir. 2015).

Plaintiffs' amended complaint alleges injuries that arise from Defendants' enforcement of the unlawful surgical requirement in Subsection (A)(3).  Excluding Helen, James, and Carl—and the putative class they represent—from the private administrative process created by Subsection (A)(3) discriminates against transgender people and violates their constitutional rights to privacy, individual liberty, and autonomy.  Plaintiffs seek permanent declaratory and injunctive relief barring Defendants from imposing a surgical requirement as part of their administrative process for changing a sex marker.  Such relief would remedy Plaintiffs' injuries by requiring Defendants to issue them birth certificates

that accurately reflect their sex without enforcing the discriminatory surgery requirement.

Defendants wrongly suggest that granting the relief Plaintiffs seek would require this Court to strike down the entirety of Subsection (A)(3).  Federal courts have "broad discretion to fashion injunctive relief."  *Melendres v. Maricopa Cty.*, 897 F.3d 1217, 1221 (9th Cir. 2018); *see also Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 558 (9th Cir. 1990) (same).  The injunction that Plaintiffs seek would enable transgender people in Arizona to use the administrative process to amend the sex listed on their birth certificate without enforcement of the discriminatory surgery requirement, thus redressing Plaintiffs' specific injury and that of the putative class.

Granting relief on Plaintiffs' claims would not require invalidation of Arizona's entire administrative procedure for correcting sex markers, just as granting relief to same-sex couples and interracial couples challenging unconstitutional restrictions on the requirements for civil marriage did not require invalidating marriage statutes in their entirety.  *See Obergefell v. Hodges,* 576 U.S. 644, 681 (2015); *Loving v. Virginia*, 388 U.S. 1, 12 (1967); *see also Heckler v. Mathews*, 465 U.S. 728, 738 (1984) (holding "a court sustaining" an equal-protection challenge "may either declare [the statute] a nullity . . . or it may extend the coverage of the statute"); *Nat'l Coalition for Men v. Selective Serv. Sys.*, 640 F. App'x 664, 666 (9th Cir. 2016) (same).  Nothing about the relief Plaintiffs seek is improper or even unusual in constitutional challenges to discriminatory state laws, and Defendants offer no authority to the contrary.

Nor do Defendants' questions about how the administrative process would operate in the absence of a surgical requirement demonstrate that the injury in this case is not redressable.  Similar questions about the need to amend marriage licenses and application forms, and about amending birth certificate forms to reflect the parentage of children born to same-sex married couples, did not prevent courts from providing effective relief in cases challenging those exclusions on constitutional grounds.  *See Obergefell,* 576 U.S. at 681; *Pavan v. Smith*, 137 S. Ct. 2075, 2078 (2017); *cf. In re Marriage of McLaughlin & Swanson,* 250 Ariz. 156, 476 P.3d 336, 339 (Ct. App. 2020) (holding that Arizona state courts have

1  authority to order amendment of birth certificates to reflect two parents of the same sex

2  even if such orders "require[] ADHS to alter its existing internal practices").

3  　　　In any event, the Court need not determine at this early stage "the exact nature of the

4  possible relief" it will award at the conclusion of the case in order to find that Plaintiffs'

5  allegations meet the modest redressability threshold. *Hassan*, 804 F.3d at 293. At this

6  stage, it is sufficient that the Court has the authority and practical ability to redress

7  Plaintiffs' injuries. There is no question that the Court has both.

8  　　　　　　　　　　ii.　　　D.T. and Jane Doe have standing.

9  　　　That D.T. and Jane Doe managed to obtain amended birth certificates as a result of

10  filing this litigation does not extinguish their standing or render their claims for nominal

11  damages moot. By enforcing the surgical requirement in Subsection (A)(3), Defendants

12  bar transgender minors from using the private administrative process. That surgical

13  requirement prevented D.T. and Jane Doe from changing the sex listed on their respective

14  birth certificates through that process, resulting in serious harms to their health and well-

15  being. Obtaining an accurate birth certificate as part of this litigation mitigated D.T. and

16  Jane's prospective injuries; it did not and could not cure the previously inflicted harms.

17  　　　D.T.'s and Jane Doe's damages claims satisfy the redressability element of standing.

18  "When a plaintiff alleges violation of a constitutional right . . . nominal damages are . . .

19  available in order to make the deprivation of such right actionable and to thereby

20  acknowledge the importance to organized society that the right be scrupulously observed."

21  *Jacobs v. Clark Cnty. Sch. Distr.*, 526 F.3d 419, 426 (9th Cir. 2008) (cleaned up). Nominal

22  damages preclude the dismissal of "a completed violation of a legal right." *Uzuegbunam*,

23  141 S. Ct. at 801–02; *Bernhardt v. Cnty. of Los Angeles*, 279 F.3d 862, 872 (9th Cir. 2002);

24  *Johnson v. Rancho Santiago Comm. College Dist.*, 623 F.3d 1011, 1018 (9th Cir. 2010).

25  Thus, the amended complaint more than adequately demonstrates that D.T. and Jane Doe

26  meet each of the elements for standing.

27  　　　Defendants' only other argument is a technical one that is easily cured by

28  amendment: "nominal damages are not recoverable against Defendants, who are sued only

in their official capacities." (Br. at 6.)  There is no doubt, however, that Plaintiffs can sue and recover nominal damages from Defendants in their *personal capacities*.  *Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 n.24 (1997).[4]  Accordingly, Plaintiffs D.T. and Jane Doe respectfully request leave to amend the complaint to clarify their intent to sue Dr. Cara M. Christ, Thomas Salow, and Krystal Colburn in both their official and personal capacities.  *See* Fed. R. Civ. P. 15(a) (providing leave to amend "shall be given freely when justice so requires"); *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 701 (9th Cir. 1988) (noting request for leave to amend can be considered when resolving a motion to dismiss).[5]

### 2. The Rooker-Feldman doctrine is inapplicable.

Defendants erroneously assert that the Court may not exercise jurisdiction over this lawsuit under *Rooker-Feldman*, a "narrow doctrine" confined to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Lance v. Dennis*, 546 U.S. 459, 464 (2006).  That doctrine is irrelevant here.  As alleged in the amended complaint, the harms to Plaintiffs and the putative class arise from Defendants' enforcement of the surgical requirement in Subsection (A)(3), not from any state-court decision.  The *Rooker-Feldman* doctrine was designed to prevent litigants from collaterally attacking state-court judgments.  No Plaintiff here is attacking any such judgment; they are challenging the surgery requirement imposed under Subsection (A)(3)'s administrative procedure.  The constitutionality of Subsection (A)(3) was not before the Arizona courts in any of the petitions filed by the Plaintiffs.  Thus, this case does not seek review or reversal of any order issued in any of those cases, and *Rooker-Feldman* is inapplicable.

*Rooker-Feldman* is inapt when there is no adverse state-court ruling to challenge.

---

[4] By suing Defendants in their individual and official capacities, Plaintiffs proposed amendments will also moot Defendants' claim that suing all three defendants is duplicative.

[5] Plaintiffs submit with this opposition brief their proposed second amended complaint, which adds allegations against Defendants in their individual capacities and updates certain factual allegations relevant to this motion.  For ease of reference, paragraph numbers in the second amended complaint remain consistent with those in the amended complaint.

*See Exxon Mobil Corp. v. Saudi Basic Industs. Corp.*, 544 U.S. 280, 292 (2005).  Jane Doe never petitioned the Arizona courts for an order correcting the sex listed on her birth certificate, so there is no state-court proceeding or order that could even arguably trigger application of *Rooker-Feldman*.  Similarly, although Helen Roe and James Poe filed court petitions to change their sex markers under Subsection (A)(4), the state courts never ruled on whether to order ADHS to correct the sex listed on their birth certificates and their petitions are now closed, leaving them with no order to appeal or collaterally attack.  Carl Voe's petition was dismissed because he moved out of the state, so there is similarly no state-court order to challenge.  And because Defendants issued D.T. a birth certificate after he filed this case, he seeks only nominal damages as a result of Defendants' denial of access to the administrative process under Subsection (A)(3); he is not seeking to challenge any adverse state-court order.

### 3.    The abstention doctrines asserted by Defendants do not apply.

Where federal-question jurisdiction exists, as it does here, "a federal court's 'obligation' to hear and decide a case is 'virtually unflagging.'"  *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) (citing *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).  None of the potpourri of additional abstention doctrines asserted by Defendants—the *Younger*, *Pullman*, *Colorado River*, and *Brillhart* doctrines—apply to this case, because there is no pending parallel litigation in state court that will, or even could, address the constitutional claims raised by Plaintiffs in this litigation, an essential requirement of each doctrine.

Jane Doe has never filed a state-court proceeding to change the sex listed on her birth certificate, and thus there is no proceeding to which this Court could even potentially defer resolution of her claims.  Similarly, the state-court petitions of the remaining named Plaintiffs have been dismissed or resolved and are no longer pending.  In short, there are no pending state-court proceedings, much less any that could obviate the need for the Court to resolve the central claims in this case.  Accordingly, the prudential considerations underlying abstention are entirely lacking, and the Court is neither required nor permitted

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9

1    to decline to exercise its jurisdiction.

2                            i.    *Younger* abstention does not apply.

3        *Younger* abstention has no application here because the Court is not being asked "to

4    enjoin ongoing state . . . proceedings.'" *Page v. King*, 932 F.3d 898, 901 (9th Cir. 2019)

5    (quoting *Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716, 727 (9th Cir. 2017)).

6        Even if *Younger* had any relevance here, under that doctrine, "only exceptional

7    circumstances justify a federal court's refusal to decide a case in deference to the States."

8    *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 368 (1989).

9    Those circumstances arise in three categories of cases: (1) federal intrusion into ongoing

10   state criminal prosecutions; (2) certain "civil enforcement proceedings;" and (3) "civil

11   proceedings involving certain orders uniquely in furtherance of the state courts' ability to

12   perform their judicial functions." *Sprint Commc'ns*, 571 U.S. at 78 (cleaned up); *see also*

13   *ReadyLink Healthcare, Inc. v. State Compensation Ins. Fund*, 754 F.3d 754, 758 (9th Cir.

14   2014) (same). The four-factor test analyzed in Defendants' motion is only applicable when

15   a case fits within one of these three "exceptional" categories. None of those categories is

16   relevant here. Plaintiffs' state-court petitions were never related to criminal or civil

17   enforcement proceedings. Nor do the claims before this Court implicate the ability of state

18   courts to carry out judicial functions. Plaintiffs challenge only the unlawful surgical

19   requirement in the Subsection (A)(3) administrative procedure to correct birth certificates;

20   they do not challenge any aspect of the Arizona courts' separate authority to order

21   amendments to the birth certificate.

22                            ii.   *Pullman* abstention does not apply.

23       *Pullman* likewise has no bearing on this case because there are no pending state-

24   court proceedings. *Pullman* abstention is reserved for "exceptional cases where principles

25   of comity and federalism justify postponing the exercise of jurisdiction" so that a state court

26   can render a decision under state law that would make resolution of the federal question

27   unnecessary. *Pearl Inv. Co. v. City and Cty. of San Francisco*, 774 F.2d 1460, 1462–63

28   (9th Cir. 1985). Here, there are no pending state-court proceedings and thus no possibility

1    that any state court order will affect, let alone allow this Court to avoid, the central question

2    in this case: does barring transgender minors from using the administrative process in

3    Subsection (A)(3) violate Plaintiffs' constitutional rights under the Equal Protection and

4    Due Process Clauses of the Fourteenth Amendment?

5        Moreover, even if there were any pending state-court cases seeking to obtain

6    corrected birth certificates without surgery for transgender minors under Subsection (A)(4),

7    the *Pullman* doctrine would not apply because no possible resolution of that issue would

8    resolve the entirely separate issue in this case.  Even if Arizona courts would permit

9    transgender minors to obtain corrected birth certificates, that would not cure the

10   unconstitutionality of excluding them from the far less burdensome, less expensive, and far

11   more private administrative process established by Subsection (A)(3).  *See San Francisco*

12   *Cty. Democratic Cent. Committee v. Eu*, 826 F.2d 814, 825 (9th Cir. 1987) (holding

13   *Pullman* abstention inapplicable when state-court case does not involve dispute that, if

14   decided, "would moot the constitutional questions raised by plaintiffs").  *Pullman* is inapt.

15               iii.   Neither *Colorado River* nor *Brillhart* abstentions apply.

16       Both the *Colorado River* and *Brillhart* doctrines "rest on considerations of wise

17   judicial administration" seeking a comprehensive disposition of litigation, *Colo. River*, 424

18   U.S. at 817, and involve a "careful balancing" of the relevant factors "with the balance

19   heavily weighted in favor of the *exercise* of jurisdiction," *Moses H. Cone Mem'l Hosp. v.*

20   *Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983) (emphasis added).  The Court must "ascertain

21   whether there exist 'exceptional' circumstances, the 'clearest of justifications,' that can

22   suffice under *Colorado River* to justify the *surrender* of that jurisdiction."  *Id.* at 25–26.

23   "Any doubt as to whether a factor exists should be resolved against a stay, not in favor of

24   one."  *Travelers Indem. Co. v. Madonna*, 914 F.2d 1364, 1369 (9th Cir. 1990).[6]

25       Defendants  fail  to  demonstrate  any  "exceptional  circumstances"  warranting

26

27   ───────────────────

[6] Defendants acknowledge that the *Brillhart* doctrine requires courts in a declaratory judgment action to examine three factors subsumed by the *Colorado River* analysis.  (Br. at 20).  Plaintiffs' *Colorado River* analysis thus accounts for them.  *See Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1225 (9th Cir. 1998) (listing *Brillhart* factors).

28

surrender of jurisdiction.  Plaintiffs are not involved in any parallel state-court litigation, and their prior state-court cases did not involve the constitutionality of Subsection (A)(3). In addition, because this case will resolve the claims of an entire class of transgender people harmed by the surgical requirement in Subsection (A)(3), permitting it to proceed would promote judicial efficiency and reduce, if not eliminate, the possibility of "conflicting results, piecemeal litigation, and . . . duplication of judicial effort." *Neuchatel Swiss Gen. Ins. Co. v. Lufthansa Airlines*, 925 F.2d 1193, 1195 (9th Cir. 1991).  Finally, contrary to Defendants' assertions that this case rests on construing Arizona law, Plaintiffs' claims in fact depend exclusively on the Equal Protection and Due Process Clauses of the Fourteenth Amendment.  The language of Subsection (A)(3) is unambiguous, as Defendants concede, ensuring that the Court will not be required to resolve any disputed issues of state law, let alone ones that are "complex and difficult issues better resolved by a state court." *Seneca Ins. Co.,* 862 F.3d at 844.  In short, *Colorado River* does not support abstention here.

**B.**     **This Court is the proper venue for this case.**

Plaintiffs appropriately filed this lawsuit in the Tucson Division of the District of Arizona.  Defendants' arguments to transfer venue lack merit.

***1.***     ***28 U.S.C. § 1406(a) does not apply.***

Local Rule 5.1(a) explicitly allows a plaintiff to choose between divisions where "the cause of action has arisen in more than one county."  Although Defendants are located in Maricopa County, several of the Plaintiffs reside in Pima County and the injuries caused by Defendants' enforcement of the surgical requirement in Subsection (A)(3) occurred in Pima County, making the Tucson Division a proper venue. *Bowling v. Westport Ins. Corp.*, 2015 WL 13203369, at *9 (D. Ariz. Oct. 19, 2015) (finding plaintiff's claim "arose" in both the Phoenix and Tucson Divisions when defendant's residence and actions occurred in Maricopa County, but plaintiff suffered harm in Pima County); *see also Bay Cnty. Democratic Party v. Land*, 340 F.Supp.2d 802, 809 (E.D. Mich. 2004).[7]

--------

[7] Defendants wrongly assert that the location of a law's enactment is relevant to where a cause of action challenging that law "arose."  (Br. at 13, 14 n.8.)  Numerous courts have rejected that argument, and this Court should as well. *See McClure v. Manchin,* 301 F.

Defendants offer no justification for departing from those well-established rules. The only case Defendants cite in support of their argument under 28 U.S.C. § 1406(a)—*Carranza v. Con-Way Incorporated*—involved plaintiffs who had no link to the Tucson Division.  2010 WL 4777624, at *1–2 (D. Ariz. Oct. 29, 2010).  Here, in contrast, three Plaintiffs reside in Pima County, where they were injured by Defendants' actions, and a fourth was born in Pima County before moving out of state.  (Compl. ¶¶ 18, 58, 86, 94.). Further, Defendants' cite to Local Rule 77.1 is unhelpful because it does not address the proper venue for causes of action arising in more than one county and, in any event, gives the Court discretion to order the trial occur anywhere within the District.  LRCiv. 77.1(c). Because venue is proper in the Tucson Division, 28 U.S.C. § 1406(a) does not apply and no transfer is warranted. *Brinkman v. Schriro*, 2009 WL 10635930, at *1 (D. Ariz. June 11, 2009) (denying motion to transfer under § 1406(a) when "it is beyond dispute that venue [is] appropriate in this District").[8]

### 2.      28 U.S.C. § 1404 does not warrant transfer here.

Defendants' alternative argument for transfer under 28 U.S.C. §§ 1404(a) or 1404(b) is equally baseless.  Defendants fail to meet their "burden to justify by particular circumstances" that the Tucson Division is so inconvenient, or otherwise inappropriate, as to upset the deference given to the Plaintiffs' choice of forum. *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 279 (9th Cir. 1979).  Defendants' argument reduces to one point: that the Phoenix Division is more convenient because that is where Defendants are located.  But "transfer should not be granted if the effect is simply to shift the inconvenience to the party resisting the transfer." *Bowling*, 2015 WL 13203369, at *8 (quoting *U.S. v. One Oil Painting Entitled Femme en Blanc by Pablo Picasso*, 362 F. Supp.

---

Supp. 2d 564, 569 (N.D. W. Va. 2003) (rejecting state official's claim that challenge to state law must be brought in district where state government sits); *Emison v. Catalano,* 951 F. Supp. 714, 721 (E.D. Pa. 1996) (finding suits challenging official acts may be brought in district where effects of challenged statute are felt despite statute's enactment in different district); *School Dist. of Phil. v. Penn. Milk Marketing Bd.,* 877 F. Supp. 245, 249 (E.D. Pa. 1995) (rejecting argument that venue is proper only where official decision was made).

[8] Defendants also request that the Court dismiss the case under § 1406(a), but offer no basis or authority supporting that extraordinary request.

2d 1175, 1185 (C.D. Cal. 2005) (cleaned up)).   For that reason alone, no transfer is warranted here.

The impropriety of transferring this case becomes even more apparent in light of the relevant factors outlined in *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498–99 (9th Cir. 2000): (1) the plaintiff's choice of forum; (2) the respective parties' contacts with the forum; (3) the contacts relating to the plaintiff's cause of action in the chosen forum; and (4) the differences in the costs of litigation in the two forums.[9]   Here, Plaintiffs have chosen this forum and have significant contacts within the Tucson Division, including that the injuries caused by Defendants' conduct occurred in Pima County.   Although residing and working in Maricopa County, Defendants have appeared in this Court for nearly six months in this case, including litigating a motion for preliminary injunction, without difficulty or complaint—and of course their official duties involve serving residents of the entire state. *See Bay County*, 340 F. Supp. 2d at 809 ("An argument premised on inconvenience is difficult to accept when the defendants routinely conduct business around the state and their advocate routinely appears in this Court.").[10]

Defendants' vague allusions to work disruptions and inconvenience are insufficient to warrant a transfer of this case.   None of those burdens exceed the ordinary burdens of litigation or provide a basis for overriding Plaintiffs' entirely reasonable decision to file in the Tucson Division.   Moreover, Plaintiffs are children, and holding the trial and other in-person proceedings as close as possible to their respective homes would reduce any disruptions to their schooling.   Further, appearances at occasional in-person hearings and the trial will not cost Defendants significantly more in Tucson than in Phoenix given their proximity.   *See Jarvis Christian College v. Exxon Corp.*, 845 F.2d 523 (5th Cir.1988) (denying motion to transfer in part because 203 miles is "minor inconvenience").   "Given the recent advances in electronic communication and document production, discovery costs

---

[9] Plaintiffs agree that only the four *Jones* factors raised in Defendants' motion—of the eight factors—are applicable in this case.

[10] Defendants also cite the locations of counsel, but that "is entitled to little consideration." *Cheval Farm LLC v. Chalon*, 2011 WL 13047301, at *2 (D. Ariz. Jan. 19, 2011).

1  should be about the same in either forum." *Magedson v. Whitney Info. Network, Inc.*, 2009

2  WL 113477, at *5 (D. Ariz. Jan. 16, 2009).  And depositions will not result in greater costs,

3  either, because they will occur at a mutually agreeable location, which will almost certainly

4  involve Plaintiffs' counsel deposing Defendants and their employees in Phoenix.

5      When taken together, all relevant factors weigh against transferring this case.  *See*

6  *Bowling*, 2015 WL 13203369, at *11 (citing *Gherebi v. Bush*, 352 F.3d 1278, 1303 (9th Cir.

7  2003), *cert. granted, judgment vacated on other grounds*, 542 U.S. 952 (2004); *Oil*

8  *Painting*, 362 F.Supp.2d at 1185).  Furthermore, the interests of judicial economy favor this

9  Court retaining the case, as it has presided over this matter for nearly six months during

10 which it acquainted itself with the facts and law of the case.  There is simply no basis in fact

11 or law for transferring this case; the Court should keep it.

12      **C.     The amended complaint adequately pleads counts one, three, and four.**

13      "The dispositive issue raised by a motion to dismiss for failure to state a claim is

14 whether the facts as pleaded, if established, support a valid claim for relief." *Ballinger v.*

15 *Liberty Ins. Corp.*, 2018 WL 5634128, at *1 (D. Ariz. Oct. 31, 2018) (Soto, J.).  Courts

16 considering a motion under Rule 12(b)(6) must "construe the complaint . . . in the light most

17 favorable to the non-moving party, and . . . take the allegations and reasonable inferences

18 as true." *Walter v. Drayson*, 538 F.3d 1244, 1247 (9th Cir. 2008).  Applying those well-

19 worn principles here demonstrates that counts one, three, and four should be sustained.

20      ***1.     Plaintiffs sufficiently allege an equal-protection claim.***

21      Count one alleges that Defendants' actions violate the Equal Protection Clause by

22 discriminating against transgender young people seeking to correct the sex listed on their

23 birth certificates.  (Compl. ¶¶ 121–26.)  Discrimination against transgender people is a form

24 of sex discrimination. *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1737 (2020).  Both

25 before and since the Supreme Court's decision in *Bostock,* courts have consistently applied

26 heightened scrutiny to equal-protection claims brought by transgender people. *Grimm v.*

27 *Gloucester Cnty. Sch. Bd.,* 972 F.3d 586, 607–08 (4th Cir. 2020); *Adams v. Sch. Bd. of St.*

28 *Johns Cty.*, 968 F.3d 1286, 1296 (11th Cir. 2020); *Whitaker v. Kenosha Unified Sch. Dist.*

*No. 1*, 858 F. 3d 1034, 1051 (7th Cir. 2017); *Glenn v. Brumby*, 663 F.3d 1312, 1320 (11th Cir. 2011); *Smith v. City of Salem*, 378 F.3d 566, 572 (6th Cir. 2004); *see also F.V. v. Barron*, 286 F. Supp. 3d 1131, 1144 (D. Idaho 2018).  Heightened scrutiny thus applies to the surgical requirement in Subsection (A)(3), and Plaintiffs have alleged sufficient facts to demonstrate that it fails the test.

Defendants identify only three claimed deficiencies in Plaintiffs' equal-protection claim.  First, they argue that Subsection (A)(3) does not create a classification based on transgender status because it "do[es] not target or even reference transgender persons" and "a nontransgender person who seeks to amend their birth certificate under Subsection (A)(3) must abide by the same criteria"—*i.e.,* they must show they have undergone what the statute refers to as a "sex change operation."  (Br. at 22.)  Defendants' argument closely resembles the contention—uniformly rejected by federal courts including the Ninth Circuit—that bans on marriage for same-sex couples did not discriminate based on sexual orientation because those restrictions did not reference sexual orientation explicitly and applied to any person of any sexual orientation seeking to marry a person of the same sex.  *See Latta v. Otter*, 771 F.3d 456, 467–68 (9th Cir. 2014).  Just as bans on marriage for same-sex couples facially discriminated against lesbian, gay, and bisexual people because they are the class of people who seek to marry a person of the same sex, Subsection (A)(3) facially discriminates against transgender people, who are, by definition, the class of people who seek to change the sex listed on their birth certificate as part of the process of gender transition.  Arizona's requirement that transgender people must undergo "sex change surgery" to correct the sex listed on their birth certificate impermissibly prevents transgender youth, such as the Plaintiffs and the putative class here, from obtaining a birth certificate that matches who they are.  While Arizona law ensures that other Arizonan youth have birth certificates that accurately reflect their sex, it excludes transgender Arizonan youth from that protection.

Defendants' second claimed deficiency is that "Plaintiffs do not allege that the statute and regulation *intentionally* discriminate against transgender persons." (Br. at 22.)  But when a statute creates a classification that facially discriminates against a class of

persons—as Subsection (A)(3) does here—there is no need for Plaintiffs to further allege or prove an additional subjective animus or hostility toward the affected group; the operation and effect of the classification itself is sufficient to demonstrate any required intent. *Grimm*, 972 F.3d at 609; *Whitaker*, 858 F.3d at 1051–52; *see also Latta,* 771 F.3d at 467 (holding that bans on marriage by same-sex couples expressly discriminated in violation of equal protection and rejecting argument that "differential treatment by sexual orientation is an incidental effect of, but not the reason for, those laws").

Third, Defendants erroneously assert that Subsection (A)(3) does not violate the Equal Protection or Due Process Clauses because Subsection (A)(4) purportedly allows individuals to amend their birth certificates by seeking a court order "without requiring any medical procedure."  (Br. at 22, 24.)  In fact, Arizona courts have imported the surgical requirement from Subsection (A)(3) into (A)(4) and, as a result, transgender minors are just as unable to obtain corrected birth certificates through the state courts as they are through the state administrative process.  But even if that were not the case, excluding transgender minors from the administrative process would still be unconstitutional.  A constitutional defect in one statute is not cured by the mere existence of a far more burdensome and intrusive avenue for obtaining the same legal benefit or protection.  Defendants offer no authority for that proposition, and Plaintiffs are aware of none.[11]

Construed in the light most favorable to Plaintiffs, the allegations in the amended complaint are more than adequate to state a claim that the administrative process targets transgender people for differential treatment without constitutionally sufficient justification.  Plaintiffs have sufficiently pleaded a violation of the Equal Protection Clause.

### 2.    *Plaintiffs sufficiently allege violations of the Due Process Clause.*

Counts three and four allege that Defendants' conduct deprives Plaintiffs of their Fourteenth Amendment due-process rights to decisional autonomy (count three) and bodily

---

[11] Tellingly, Defendants made this same argument in their opposition to Jane Doe's motion for a preliminary injunction, (Doc. 23 at 10–14), and in reply Plaintiffs noted the utter lack of supporting authority, (Doc. 30 at 7).  Despite an additional four months before filing their motion to dismiss, Defendants still cannot cite one case that supports their argument.

integrity (count four).   (Compl. ¶¶ 135–44.)   The Due Process Clause "includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.'" *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997)).   Defendants' conduct infringes upon Plaintiffs' fundamental rights to decisional autonomy and bodily integrity and is not justified by any legitimate, much less compelling, governmental interest. *See, e.g.*, *Glucksberg*, 521 U.S. at 721; *In re Crawford*, 194 F.3d 954, 959 (9th Cir. 1999).

i.    <u>Plaintiffs' amended complaint states a claim for a violation of their right to decisional autonomy.</u>

The Due Process Clause "promises liberty to all within its reach, a liberty that includes certain specific rights that allow persons . . . to define and express their identity." *Obergefell v. Hodges*, 576 U.S. 644, 651–52 (2015).  That includes the right of an individual to make "personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs." *Id.* at 663.  Over time, courts have defined the scope of the right to protect numerous personal choices including access to contraception, *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972), the freedom to enter into a consensual sexual relationship with another adult, *Lawrence v. Texas*, 539 U.S. 558, 578 (2003), the freedom to marry, *Obergefell*, 576 U.S. at 675, the freedom to raise one's own children, *Meyer v. Nebraska*, 262 U.S. 390, 399–400 (1923), and the freedom to pursue an occupation of one's choice, *Schware v. Bd. of Bar Exam.*, 353 U.S. 232, 238–39 (1957), among other personal liberties.  Federal courts have acknowledged the deeply personal nature of the decisions required of transgender persons for them to live in a manner consistent with their gender identity, an intimate set of decisions that run parallel to long-established liberty rights.  *See Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327, 333 (D.P.R. 2018) ("Much like matters relating to marriage, procreation, contraception, family relationships, and child rearing, 'there are few areas which more closely intimate facts of a personal nature' than one's transgender status.").

Arizona's surgical requirement unconstitutionally hinders the ability of transgender youth, such as Plaintiffs and those in the putative class, to live consistent with their gender identity by establishing unjustifiable hurdles for them to obtain birth certificates that match who they are, thus forcing them to endure the constant risk of exposure, rejection, and discrimination. (*Id.* ¶¶ 137–38.)   Currently, claims that state laws barring transgender people from correcting their birth certificates unconstitutionally infringe their fundamental right to decisional autonomy are being litigated in several courts across the country. *See, e.g.*, Amended Complaint, Dkt. 59, *Gore v. Lee*, Case No. 3:19-cv-00328, at ¶204–05 (M.D. Tenn., Mar. 3, 2020); Complaint, Dkt. 1, *Ray v. McCloud*, Case No. 2:18-cv-00272, ¶ 122 (S.D. Ohio, Mar. 29, 2018).   None of those courts has dismissed that claim.   Plaintiffs have pleaded sufficient facts to state a valid due-process claim asserting their right to decisional autonomy.

ii.   <u>Plaintiffs' amended complaint states a claim for a violation of their right to bodily integrity.</u>

The Due Process Clause also protects the fundamental right to make decisions regarding one's bodily integrity, including choices about medical treatment. *See Glucksberg*, 521 U.S. at 720 (acknowledging fundamental right to bodily integrity and to obtain an abortion, use contraception, and refuse unwanted medical treatment); *Washington v. Harper*, 494 U.S. 210, 221 (1990) (recognizing "significant liberty interest in avoiding the unwanted administration of antipsychotic drugs"); *Parham v. J.R.*, 442 U.S. 584, 600 (1979) (recognizing that minors have a protected liberty interest in avoiding unnecessary mental health treatment).   The surgical requirement in Subsection (A)(3) unjustifiably intrudes on Plaintiffs' right to bodily integrity and choices concerning medical treatment. For most transgender youth, surgery is not medically appropriate.   By requiring them to undergo an unwanted and medically unnecessary treatment in order to obtain a corrected birth certificate, Subsection (A)(3) impermissibly infringes upon their right to bodily integrity, while serving no legitimate, much less, compelling governmental interest.   The government has no legitimate interest in pushing minors to undergo medical surgeries that

they neither need nor want in order to obtain accurate identity documents that are necessary to protect their privacy and safety.  In effect, Subsection (A)(3) forces transgender minors to choose between undergoing medically inappropriate surgery or subjecting themselves to the constant risk of exposure due to having identity documents that disclose their transgender status, which puts them at risk of discrimination, harassment, and violence.

Defendants only response is to argue that Subsection (A)(3) does not violate the right to bodily integrity because surgical treatments for gender dysphoria are "purely voluntary medical procedure[s]."  (Br. at 23.)  But that argument disregards the importance of obtaining accurate identity documents and the coercive pressure of conditioning access to such documents on an intrusive medical procedure.  Arizona has a monopoly on the issuance of birth certificates; Plaintiffs have no choice but to use these official documents, which are required to prove their identity in a wide variety of situations.  As a result, the surgical requirement in Subsection (A)(3) subjects transgender minors to an impermissible burden on their right to bodily integrity.

Obtaining accurate identity documents is a critical part of a transgender person's ability to live safely and freely, just as non-transgender people do.  By conditioning the availability of those documents on whether a person has obtained surgery, the state injects itself into what should be a personalized and private medical assessment and treatment plan, and it does so wholly without justification.  *See Parham*, 442 U.S. at 602 (finding state's power to interfere is at its lowest ebb when medical decision is supported by child, child's parents, and "a physician's independent examination and medical judgment").  The Due Process Clause affords transgender young people the freedom to make treatment decisions based on the advice of medical and mental health professionals, and consistent with the prevailing standards of care, without governmental pressure to undergo surgeries that may be unnecessary for that individual.  Consequently, count four also states a claim.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss.

1

Respectfully submitted,

2

Dated: April 23, 2021

OSBORN MALEDON, P.A.

3

4

s/Colin M. Proksel

Mary O'Grady (011434)

5

Colin Proksel (034133)

Payslie Bowman (035418)

6

OSBORN MALEDON, P.A.

2929 North Central Avenue, 21st Floor

7

Phoenix, Arizona 85012-2793

Telephone:  (602) 640-9000

8

Facsimile:   (602) 640-9050

Email:        mogrady@omlaw.com

9

Email:        cproksel@omlaw.com

Email:        pbowman@omlaw.com

10

Asaf Orr (admitted *Pro Hac Vice*)

11

NATIONAL CENTER FOR LESBIAN RIGHTS

870 Market Street, Suite 370

12

San Francisco, California 94102

Telephone:  (415) 392-6257

13

Facsimile:   (415) 392-8442

Email:        aorr@nclrights.org

14

Patrick Gunn (admitted *Pro Hac Vice*)

15

COOLEY LLP

101 California Street, 5th Floor

16

San Francisco, California 94111-5800

Telephone:  (415) 693-2070

17

Facsimile:   (415) 693-2222

Email:        pgunn@cooley.com

18

Barrett J. Anderson (admitted *Pro Hac Vice*)

19

COOLEY LLP

4401 Eastgate Mall

20

San Diego, California 92121-1909

Telephone:  (858) 550-6000

21

Facsimile:   (858) 550-6420

Email:        banderson@cooley.com

22

*Attorneys for Plaintiffs and Proposed Class*

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

**PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**