IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| D.T., et al., | No. CV-20-00484-TUC-JAS |
| Plaintiffs, | **ORDER** |
| v. | |
| Dr. Cara M. Christ, et al., | |
| Defendants. | |

Pending before the Court is Defendants' motion to dismiss. For the reasons stated below, the motion is denied.[1]

**STANDARD OF REVIEW: FAILURE TO STATE A CLAIM**[2]

The dispositive issue raised by a motion to dismiss for failure to state a claim is whether the facts as pleaded, if established, support a valid claim for relief. *See Neitzke v. Williams*, 490 U.S. 319, 328-329 (1989).[3] In reviewing a motion to dismiss for failure to state a claim, a court's review is typically limited to the contents of the complaint. *See Clegg v. Cult Awareness Network*, 18 F.3d 752, 754 (9th Cir. 1994). Furthermore, a court must "construe the complaint . . . in the light most favorable to the non-moving party, and

---

[1] As the briefing is adequate and oral argument will not help in resolving this matter, oral argument has been denied. *See Mahon v. Credit Bureau of Placer County, Inc.*, 171 F.3d 1197, 1200-1201 (9th Cir. 1999). The Court previously informed the parties that the motion to dismiss was denied with a formal Order to follow; this is the formal Order.

[2] In addition to arguing that Plaintiffs fail to state a claim, Defendants also raise arguments related to standing, abstention, and venue; as the motion is denied in its entirety, the Court addresses the failure to state a claim issues first, and then proceeds to address the remaining matters.

[3] Unless otherwise noted by the Court, internal quotes and citations have been omitted when citing authority throughout this Order.

[a court must] take the allegations and reasonable inferences as true." *Walter v. Drayson*, 538 F.3d 1244, 1247 (9th Cir. 2008); *Morales v. City of Los Angeles*, 214 F.3d 1151, 1153 (9th Cir. 2000) (in reviewing a motion to dismiss for failure to state a claim, "we accept all factual allegations of the complaint as true and draw all reasonable inferences in favor of the non-moving party."); *Clegg*, 18 F.3d at 754 (same); *see also Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1964-65 (2007)("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all allegations in the complaint are true (even if doubtful in fact) . . . of course, a . . . complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."); *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (while Rule 8 does not demand detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation . . . Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

**BACKGROUND**[4]

### Introduction

Plaintiffs are three transgender children (ages 5, 6, and 9) who were born in Arizona and seek to change the gender marker listed on their birth certificates. The gender marker does not align with their gender identity, and therefore involuntarily outs them as transgender every time they must present their birth certificate to complete strangers such as school administrators. Likewise, their birth certificates are used to generate class rosters (which list their gender) for teachers and administrators to see, these class rosters may be available for other kids to see as well, and these school lists may be used to group kids for

---

[4] The background and discussion herein is drawn from Plaintiffs' Amended Complaint; as required in evaluating a motion to dismiss for failure to state a claim, the Court takes Plaintiffs' factual allegations as true and draws all reasonable inferences in their favor.

various school events and activities; this results in the continuous and involuntary outing of their transgender status throughout their school lives.  Plaintiffs argue that changing the gender marker on their birth certificates is necessary so they can be free from substantial emotional harm, discrimination, harassment, and violence stemming from their transgender status.  Plaintiffs further argue that amending their birth certificates to accurately reflect their gender identity is necessary to bring their life into alignment with their gender identity and enable them to socially transition, which is an important step in the treatment of gender dysphoria.  Plaintiffs argue that the Arizona Department of Health Services ("ADHS") denies them the right to correct their birth certificates to align with their gender identity, and this violates the Equal Protection and Due Process Clauses of the United States Constitution.

**Birth Certificates**

A birth certificate is a critical and ubiquitous identity document; this is especially true for children attending school.  Birth certificates are necessary to obtain other essential identity documents, and they are often a requirement for enrolling in school, joining recreational programs, camp signups, and many other activities.  A birth certificate that fails to accurately reflect the gender of these transgender children can cause multiple problems in enrolling in school and hinder their full participation in numerous school and extracurricular activities.  Plaintiffs argue that without amended birth certificates, their transgender status is exposed when registering for school or these other programs, and that this exposure leads to harassment, discrimination, and possible violence. According to a study by the National Center for Transgender Equality from 2015, nearly one-third of transgender respondents who had an identity document that did not match their gender presentation were harassed, discriminated against, or assaulted.

Plaintiffs argue that they have suffered numerous harms due to this mismatch between their birth certificates and their gender identities being exposed; bullying and harassment stemming from Plaintiffs' transgender status is reflected throughout the Amended Complaint.  For example, a ten-year-old's transgender status (i.e., Jane Doe – a

transgender girl)[5] was outed based on a class roster found in the cafeteria by a student. Jane Doe was continuously teased, taunted, and otherwise relentlessly bullied because she is transgender; she felt afraid, could not concentrate, continuously missed class to go to the nurse's office for anxiety-induced stomach aches, and suffered substantial psychological distress. The other transgender children in this matter have experienced similar issues and suffered from fear and anxiety related to their poor school experiences: D.T. (a thirteen-year-old transgender boy) was verbally harassed, threatened, and physically assaulted by other students for being transgender; James Poe (a five-year-old transgender boy) was repeatedly berated that he was a girl (not a boy) by an older student; Carl Voe (a nine-year-old transgender boy) was constantly asked whether he was a boy or girl, students would not believe any answer he gave, and repeatedly referred to him as a girl; and upon learning the transgender status of Helen Roe (a six-year-old transgender girl), other parents in Helen's pre-school class contacted the head of the school to convey their fear that Helen was a threat to their children's security.

**Gender Dysphoria**

According to medical and psychological experts, changing the sex marker on a transgender child's birth certificate is an important step in protecting the child's transgender status from being improperly exposed to others, and thus helps them avoid numerous harms caused by the disclosure of their private medical information.

Research indicates that children typically become aware of their gender identity between the ages of two and five years old. During this self-identifying process, transgender children begin to express their gender identification through their statements and actions. A transgender boy's self-identification as a boy is as strong and consistent as a non-transgender boy's self-identification, and the same is true for a transgender girl and a non-transgender girl. This gender identity in transgender people has a biological

---

[5] The Court notes that Plaintiffs Jane Doe (and D.T.) were voluntarily dismissed from this case as they were able to obtain relief in conjunction with proceedings before this Court; nevertheless, their experiences are illustrative of the challenges faced by transgender kids. The Court notes that all of the Plaintiffs are proceeding in this case under pseudonyms to protect them from harassment stemming from their transgender status.

component and cannot be changed.  Thus, efforts to change a transgender person's identity would be considered unethical and harmful to a person's health and well-being.

The incongruence between a transgender person's gender identity and assigned sex can cause significant psychological distress, which is commonly referred to as gender dysphoria.  Gender dysphoria is a serious health condition recognized in the Diagnostic and Statistical Manual of Mental Disorders 5th edition ("DSM-5"), and it is recognized by the American Psychiatric Association, the American Medical Association, and other professional medical organizations. Untreated gender dysphoria may result in severe psychological distress, anxiety, depression, suicidal ideation, and even self-harm. Plaintiffs have suffered such psychological distress due to gender dysphoria, including episodes of self-harm.  For example, Plaintiff Carl Voe, during fits of rage and frustration caused by gender dysphoria, would attempt to shut cabinet doors on his own hands and would refuse to eat meals.  Symptoms of depression and anxiety are common amongst transgender children who do not receive proper support from their community.

Gender dysphoria is highly treatable, and Plaintiffs are following the standards of care for this condition while under the supervision of doctors.  These standards of care were created by the World Professional Association for Transgender Health ("WPATH"), which is an international, multidisciplinary, professional association of medical providers who have set well-established standards for treating gender dysphoria for over four decades.  The goal of gender dysphoria treatment is to bring a transgender person's life into alignment with their gender identity.  Typical components of treatment may include social transitioning, hormone-replacement therapy, and, if necessary, surgery.  Surgery is not medically required for every transgender person to complete a gender transition, and if social transitioning and hormone replacement therapy is started early, surgery may never be necessary.  With puberty-delaying medication and hormone-replacement therapy, the prevailing standards of care recognize that most common surgical procedures may never be medically recommended or necessary for transgender youth.

As to the transgender children in this case, social transitioning, such as changing

their name, using different pronouns, wearing clothing, and adopting grooming habits consistent with their gender identity can significantly alleviate their gender dysphoria. Being accepted and supported as who they are is enormously beneficial to transgender children's health and well-being. Changing names and adoption of clothing and grooming to align with Plaintiffs' gender identities has already helped these children with their gender dysphoria, and Plaintiffs have seen a marked improvement in their emotional and mental well-being since beginning treatment. However, without the proper identification of an amended birth certificate, Plaintiffs argue that they are prevented from continuing their social transition, and they are still suffering harm therefrom.

**A.R.S. § 36-337(A)(3)**

The state of Arizona has exclusive authority and control over birth certificates for individuals born in Arizona, and there is no way for Plaintiffs to have this document changed other than to go through official state channels. The Arizona Department of Health Services, through the Bureau of Vital Records, is responsible for the registration, issuance, correction, and maintenance of Arizona birth certificates. *See* A.R.S. § 36-302. Arizona law provides two potential ways in which to change an Arizona birth certificate. *See* A.R.S. § 36-337(A). First, under A.R.S. § 36-337(A)(3):

> [t]he state registrar shall amend the birth certificate for a person born in this state when the state registrar receives . . . [f]or a person who has undergone a sex change operation . . . both of the following:
> (a) [a] written request for an amended birth certificate from the person or, if the person is a child, from the child's parent or legal guardian.
> (b) [a] written statement by a physician that verifies the sex change operation . . .

Second, A.R.S. § 36-337(A)(4) provides that ADHS shall accept "[a] court order ordering an amendment to a birth certificate." This section does not include further instruction to a court on how, or even whether, the state court should grant a petitioner's application to change their birth certificate pertaining to transgender people.

- 6 -

Plaintiffs have attempted to obtain court orders under Subsection (A)(4) to amend their birth certificates. However, Arizona courts have interpreted Subsection (A)(4) to mean that Plaintiffs must also comply with Subsection (A)(3), which would require Plaintiffs to get "a sex change operation" to change the sex marker on their birth certificates. Plaintiffs argue that this interpretation of Arizona statutes essentially bars them from the private administration process by requiring these children to undergo an invasive surgery that their doctors and other medical experts recognize is unnecessary.

Plaintiffs are representing transgender individuals born in Arizona who seek to change the sex listed on their birth certificates, but have not undergone a "sex change operation." Plaintiffs assert claims against the Arizona Department of Health Services whereby they allege that Subsection (A)(3) violates the Equal Protection Clause (Count 1), the Due Process Right to Privacy (Count 2), the Due Process Right to Individual Liberty and Autonomy (Count 3), and the Due Process Right to choose whether to undergo a particular medical treatment (Count 4).

**DISCUSSION**

**Equal Protection and Due Process**

Defendants argue that Plaintiffs' Equal Protection claim (Count 1) and Due Process claims (Counts 3 and 4) fail to state a claim. As to Equal Protection, Defendants primarily argue that the relevant statute and regulation (i.e., A.R.S. § 36-337(A)(3) and A.A.C. R9-19-208(O)) are facially neutral, and that the Amended Complaint does not reflect that A.R.S. § 36-337(A)(3) and A.A.C. R9-19-208(O) intentionally discriminate against transgender people. As to Due Process, Defendants primarily argue that Plaintiffs fail to identify any constitutionally protected rights, and that A.R.S. § 36-337(A)(3) and A.A.C. R9-19-208(O) do not interfere with any purported Due Process rights of transgender people.[6] The Court does not find Defendants' arguments persuasive.

---

[6] The Court notes that as to the Equal Protection and Due Process claims, Defendants also argue that all Arizonans can amend their birth certificates pursuant to A.R.S. § 36-337(A)(4) (i.e., via a court order); as referenced above, however, Arizona courts have imported the "sex change operation" requirement into (A)(4) and have denied relief. The Court will address this issue in more detail later in this Order.

- 7 -

As the Equal Protection and Due Process issues in this case are closely intermingled, they are addressed in tandem throughout this Order.

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr*. 473 U.S. 432, 439 (1985). The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty or property, without due process of law." U.S. Const. amend. XIV, § 1. It "includes a substantive component that provides heightened protection against government interference with certain fundamental rights and liberty interests." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). The Due Process Clause "promises liberty to all within its reach, a liberty that includes certain specific rights that allow persons . . . to define and express their identity." *Obergefell v. Hodges*, 576 U.S. 644, 651-52 (2015). This liberty includes the right to make "personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs." *Id*. The Supreme Court has repeatedly affirmed that the Due Process Clause protects against intrusions on highly intimate and personal decisions relating to issues such as marriage, procreation, contraception, family relationships, and child rearing. *See Obergefell*, 576 U.S. 644; *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972)*; Lawrence v. Texas*, 539 U.S. 558, 578 (2003)*, Meyer v. Nebraska*, 262 U.S. 390, 399–400 (1923). Much like the right to decisional autonomy, the Due Process Clause also protects against intrusions pertaining to personal decisions regarding one's bodily integrity, including choices about medical treatment and the right to refuse unwanted medical treatment. *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997); *Washington v. Harper*, 494 U.S. 210, 221 (1990); *Parham v. J.R.*, 442 U.S. 584, 600 (1979).

The statute at issue in this case states in relevant part: "The state registrar shall amend the birth certificate for a person born in this state when the registrar receives . . . [a] written statement by a physician that verifies the [person's] sex change operation . . ."

A.R.S. § 36-337(A)(3). The corresponding regulation essentially mirrors the statute and provides that the "State or local registrar" will amend a birth certificate upon receipt of "[a] written statement on a physician's letterhead paper, signed and dated by the physician, that the individual has . . . [u]ndergone a sex change operation." A.A.C. R9-19-208(O).

Based on the wording of the statute and regulation at issue, Defendants argue that "both the statute and the regulation are facially neutral; they do not target or even reference transgender persons. They apply to *all* persons seeking to amend their birth certificate. A nontransgender person who seeks to amend their birth certificate under Subsection (A)(3) must abide by the same criteria . . . In addition, Plaintiffs do not allege that the statute and regulation *intentionally* discriminate against transgender persons." Doc. 56 at p. 22 (emphasis in the original).

While the statute and regulation do not explicitly use the phrase "transgender" or explicitly state that these laws are aimed directly at "transgender" people, any logical reading of the statute and regulation reflects that it applies nearly exclusively to transgender people; who else is going to voluntarily seek out a "sex change operation"? *See Latta v. Otter*, 771 F.3d 456, 467-68 (9th Cir. 2014) ("Whether facial discrimination exists does not depend on why a policy discriminates, but rather on the explicit terms of the discrimination . . . [W]hile the distinction . . . that defendants seek to draw could in theory represent a *justification* for the discrimination worked by the law, it cannot overcome the inescapable conclusion that the [states' laws] discriminate on the basis of sexual orientation.") (emphasis in the original). Discrimination against transgender people is discrimination based on sex; as such, heightened scrutiny applies. *See Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1737 (2020); *Adams v. Sch. Bd. of St. Johns Cty.*, - F.4th - , 2021 WL 2944396, *4 (11th Cir. 2021); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 606–08 (4th Cir. 2020); *Whitaker v. Kenosha Unified Sch. Dist. No. 1*, 858 F. 3d 1034, 1050-52 (7th Cir. 2017).

The vast majority of people born in Arizona have completely accurate birth

certificates as their external genitalia[7] align with their gender identity; as to this vast majority, Arizona law provides for accurate birth certificates, and they would not have any logical need to voluntarily pursue an invasive, expensive "sex change operation" that entails complications. In contrast, only an extremely small minority of people born in Arizona (i.e., transgender people) would have an inaccurate birth certificate because their external genitalia does not align with their gender identity.

In contrast to the vast majority who have been provided accurate birth certificates pursuant to Arizona law, transgender people are required by Arizona law to get a "sex change operation" to obtain an accurate birth certificate that properly aligns with their gender identity. The three named Plaintiffs in this case are very young transgender children (two transgender boys-ages 5 and 9 and a transgender girl-age 6) who have been diagnosed with gender dysphoria by medical and psychological professionals. The best medical and psychological practices reflect that: (1) gender reassignment surgery (i.e., a "sex change operation") is not required or recommended for young transgender children diagnosed with gender dysphoria; (2) gender reassignment surgery may never be necessary or recommended for those with gender dysphoria (i.e., there are many factors that come into play that vary for each individual's circumstances); (3) amending important identity-related documents (such as birth certificates) to coincide with a transgender child's gender identity (as opposed to their external genitalia) is vital to their mental and physical well-being; and (4) that failure to amend such documents (such as birth certificates) improperly reveals a transgender child's transgender status to school officials and classmates, which results in discrimination and harassment based on their transgender status, and this is detrimental to a transgender child's mental and physical health.

Despite these circumstances facing transgender kids, Arizona law requires them to get a "sex change operation" to obtain a proper birth certificate; this requirement runs afoul

---

[7] The Court uses the term "external genitalia" throughout this Order as presumably when a baby is born, there is a cursory glance by hospital staff to determine the presence of a penis or vagina, the sex is accordingly marked as male or female, and this is incorporated into the birth certificate; there is not a chromosome test, examination of internal organs, brain scan, or some other sophisticated medical testing involved.

- 10 -

of all medical and psychological authority as to what is in the best interest of these transgender kids; it acts as an absolute bar to these transgender kids obtaining a proper birth certificate as no ethical medical professional would actually perform a "sex change operation" on these young kids.  Moreover, pursuant to the advice of their treating medical professionals, these kids go to great lengths to live consistent with their gender identity by adopting behavior consistent with their gender identity.  As referenced above, a transgender boy would use a typical male name, cut his hair short, and wear typical boy clothes; likewise, a transgender girl would use a typical girl name, grow her hair long, and wear typical girl clothes.  With these pre-pubescent kids, such typical names, hair styles and clothing are the primary factors in readily distinguishing between boys and girls.

The Court notes that a previous Plaintiff (i.e., Jane Doe – a 10-year-old transgender girl) submitted family photos (under seal) relating to a motion in this case; the Court viewed those photos (Docs. 15 and 18) and Jane Doe simply looks like a cute, happy, 10-year-old girl taking a vacation photo with her family.  But for this lawsuit where Jane Doe's transgender status was disclosed, the Court would have no idea that Jane Doe was not a girl.  These circumstances perfectly illustrate why these transgender kids are involuntarily outed every single time they are forced to present their birth certificate to a complete stranger (such as a school administrator when enrolling in school).  Likewise, they are involuntarily outed over and over throughout their school lives as these birth certificates are used to generate class rosters (which list their gender) for teachers and administrators to see, these class lists may be available for other kids to see (who can spread the word about one's transgender status), and these school lists (stemming from the birth certificate) may be used to group kids for various events and activities as well.  The ongoing involuntary exposure of a child's transgender status is akin to a death by a thousand cuts as being continuously outed unnecessarily exposes this child to stigma, bullying, fear, and violence.[8]  Based on the current record before the Court, Defendants do not have any

---

[8] The Court notes that other courts have recognized the harsh realities often facing transgender children.  *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 599 (4th Cir. 2020) (at a school meeting in the presence of a transgender youth and his parents, other adults at the meeting referred to the transgender youth as a "freak" and likened him to a

- 11 -

legitimate basis to require a "sex change operation" for these kids to obtain a proper birth certificate.[9]  Taking Plaintiffs' factual allegations as true and drawing all reasonable inferences in their favor, Plaintiffs' state Equal Protection and Due Process claims as to Counts 1, 3, and 4.

**Standing**

Defendants' arguments as to standing largely overlap with the issues the Court already discussed in relation to Plaintiffs' Due Process and Equal Protection claims; as such, the Court's discussion as to standing will be brief.  Defendants primarily argue that Plaintiffs lack standing as they can not meet the standing requirement of "redressability."  Defendants essentially argue that the Court can not grant relief as it would be improperly legislating from the bench by carving out an exception whereby a "sex change operation" would not be required to pursue the private administrative process encompassed by A.R.S.

---

"dog"; noting that for transgender "students who were known or perceived to be transgender: - 54% reported verbal harassment; - 52% reported that they were not allowed to dress in a way expressing their gender; - 24% reported being physically attacked because people thought they were transgender; - 20% believed they were disciplined more harshly because teachers or staff thought they were transgender; - 13% reported being sexually assaulted because people thought they were transgender; and - 17% reported having left a school due to severe mistreatment . . . Unsurprisingly, then, harassment of transgender students is also correlated with academic success: students who experienced greater harassment had significantly lower grade point averages . . . And harassment at school is similarly correlated with mental health outcomes for transgender students. The opposite is also true, though: transgender students have better mental health outcomes when their gender identity is affirmed.").

[9] As referenced earlier, as to both the Equal Protection and Due Process claims, Defendants argue that all Arizonans can amend their birth certificates pursuant to A.R.S. § 36-337(A)(4) which states that the "state registrar shall amend the birth certificate for a person born in this state . . . when the state registrar receives . . . [a] court order ordering the amendment to a birth certificate."  However, Plaintiffs' allegations reflect that state judges have imported the A.R.S. § 36-337(A)(3) requirement of a "sex change operation" and have denied relief.  Furthermore, even if judges had not imported the "sex change operation" requirement into (A)(4), (A)(4) is a much more burdensome process as it requires a transgender person to file a lawsuit against government entities to obtain a "court order" which entails much more cost, confusion and uncertainty than a private administrative process before a local registrar; navigating through the litigation process is often difficult and fraught with peril for trained attorneys, let alone a transgender person without the money, education and resources to properly navigate the litigation process.  Furthermore, (A)(4) does not provide any standards whatsoever as to when a transgender child, like the ones at issue in this case, could obtain a "court order" ordering an amendment to their birth certificate.  Thus, these kids and their parents are left alone under (A)(4) to file a lawsuit against government entities under a provision of a statute that provides no standard to obtain necessary relief.

§ 36-337(A)(3); they argue that such an exception could potentially cause confusion and problems in the private administrative process.

Plaintiffs have redressable injuries in this case. A plaintiff's burden to demonstrate redressability is "relatively modest." *Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012). To establish standing, Plaintiffs need only show that there would be a "change in a legal status," and that a "practical consequence of that change would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Utah v. Evans*, 536 U.S. 452, 464 (2002).

Plaintiffs seek injunctive relief barring Defendants from mandating a "sex change operation" as part of the private administrative process for changing the sex marker on their birth certificates; despite Defendants' objections to the contrary, the Court has broad authority to grant the relief requested by Plaintiffs, and this would redress their injuries. *See Melendres v. Maricopa Cty.*, 897 F.3d 1217, 1221 (9th Cir. 2018) ("[A] district court has broad discretion to fashion injunctive relief . . . The court exceeds that discretion only if [the injunctive relief] is aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation . . . [W]e give the court a great deal of flexibility and discretion in choosing the remedy best suited to curing the violation."); *Lemon v. Kurtzman*, 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973) ("In shaping equity decrees, the trial court is vested with broad discretionary power; appellate review is correspondingly narrow"); *Toussaint v. McCarthy*, 801 F.2d 1080, 1087 (9th Cir.1986), cert. denied, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987) (scope of injunctive relief is reviewed for an abuse of discretion); *Heckler v. Mathews*, 465 U.S. 728, 738 (1984) (a court sustaining an equal protection challenge to a statute "may either declare the statute a nullity . . . or it may extend the coverage of the statute.").[10]

As to potential confusion or problems in administering a private administrative change to a birth certificate (absent the "sex change operation" mandate), the Court need not address that issue at this early stage of the litigation; this is not a bar to granting relief

---

[10] If relief is granted, the Court is not required to invalidate the entire statutory and regulatory regime as incorrectly argued by Defendants.

in the future based on a more complete factual record in the case. *See id.*

In addition, as to Defendant's hypothesized administrative confusion and problems arising from excising the "sex change operation" mandate, the Court notes that the current form of A.R.S. § 36-337(A)(3) (and the regulation which mirrors it) is no model of clarity. The statute and regulation: do not define what a "sex change operation" is; what exact medical procedures are an "operation" that qualify as a sufficient "sex change operation"; do not state what a physician has to specifically address in their "written statement" regarding the "sex change operation"; do not state whether only the physician performing the "operation" is allowed to write the "sex change operation" note, or whether any physician based on second-hand information can write the "sex change operation" note; whether more than one physician's note is required if more than one "sex change operation" was performed; whether the physician writing the note (if they did not personally perform the "sex change operation") must physically examine an individual to verify that at least some unspecified "sex change operation" was performed (and whether an X-Ray, MRI, CT scan or the like is required to confirm whether internal organs were removed or added as part of a "sex change operation"). *See* A.R.S. § 36-337(A)(3) ("The state registrar shall amend the birth certificate for a person born in this state when the registrar receives . . . [a] written statement by a physician that verifies the [person's] sex change operation . . ."); A.A.C. R9-19-208(O) (the "State or local registrar" will amend a birth certificate upon receipt of "[a] written statement on a physician's letterhead paper, signed and dated by the physician, that the individual has . . . [u]ndergone a sex change operation.").

The current statutory and regulatory scheme does not require any investigation whatsoever such as reviewing medical records, contacting treating physicians, requiring an independent medical examination, or otherwise requiring a transgender person to disrobe before Arizona Department of Health Services officials to confirm the existence (or absence) of external genitalia stemming from some unspecified "sex change operation." *See id.* All that is required is a signed and dated one-sentence statement from any physician

stating that an individual had any unspecified "sex change operation" on any physician's letterhead. *See id.* In light of the foregoing, it would not be a herculean effort on the part of the Arizona Department of Health Services to accept a physician's certification that an individual is receiving clinically appropriate treatment for gender dysphoria, and that changing the sex marker on that individual's birth certificate is warranted based on best medical practices as applicable to this individual's unique circumstances. The Court notes that major forms of identity documentation issued by the federal government are already following established, modern medical standards in regards to updating sex markers to coincide with gender identification (without a "sex change operation" mandate) as to passports (i.e., the U.S. Department of State), social security cards (i.e., the Social Security Administration), and green cards (i.e., the U.S. Citizenship and Immigration Services). *See* 1 Sexual Orientation and the Law § 10:11 (2020-2021 ed.). Following this modern trend (which is based on current medical and psychological standards of care) would be no more confusing, problematic, or burdensome than the current regime under A.R.S. § 36-337(A)(3) and A.A.C. R9-19-208(O).

The record before the Court demonstrates that Plaintiffs' have standing; Defendant's motion to dismiss as to standing is denied.

**Miscellaneous Abstention Doctrines**

Defendants cite a panoply of closely related abstention doctrines to argue that the Court should not exercise jurisdiction over this case; these doctrines include *Rooker-Feldman*, *Younger*, *Pullman*, *Colorado River*, and *Brillhart*. *See Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Younger v. Harris*, 401 U.S. 37 (1971); *R.R. Comm'n of Texas v. Pullman Co.*, 312 U.S. 496 (1941); *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976); *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491 (1942). These doctrines largely reflect the idea of comity whereby a federal court should not interfere with related state court actions; Defendants argue that several Plaintiffs filed state court actions seeking a court order allowing Plaintiffs to correct their birth certificates without a "sex change

operation", that none of those state court judges granted relief, and now Plaintiffs seek relief in the instant case whereby this Court would act as a *de facto* court of appeals sitting in judgment of the state system. The Court disagrees. The miscellaneous abstention doctrines are inapplicable to this case as Plaintiffs' have no active cases pending before the state courts, and none of the Plaintiffs in the state cases raised the same issues that are in dispute in the case at bar – whether the statutory and administrative scheme encompassed by A.R.S. § 36-337(A)(3) and A.A.C. R9-19-208(O) violate the Equal Protection and Due Process Clauses of the United States Constitution. Defendants' motion pertaining to the various abstention doctrines is denied.

**Transferring Venue to Phoenix**

Although Defendants do not dispute that venue is proper within the Tucson Division of the District of Arizona, Defendants nonetheless argue that the Court should exercise its discretion to transfer this case to the Phoenix Division of the District of Arizona as they contend that it is a more appropriate venue. The Court disagrees and declines to transfer this case to the Phoenix Division.

Pursuant to 28 U.S.C. § 1391(b), "[a] civil action may be brought in (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; [or] (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." The "district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). For the "convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). Further, "[u]pon motion, consent or stipulation of all parties, any action, suit or proceeding of a civil nature or any motion or hearing thereof, may be transferred, in the discretion of the court, from the division in which pending to any other division in the same district." 28 U.S.C. § 1404(b). Lastly, pursuant to the Local

Rules of Civil Procedure, "all civil . . . cases founded on causes of action (1) arising in the Phoenix division shall be tried in Phoenix . . . and [those] arising in the Tucson division shall be tried in Tucson." LRCiv 77.1(c). "[I]n cases where the cause of action has arisen in more than one county, the plaintiff may elect any of the divisions appropriate to those counties for filing and trial purposes." LRCiv 5.1(a).

Defendants primarily argue that this case should be transferred to the Phoenix Division as the core government leaders and relevant documentation at the Arizona Department of Health Services are centered in Phoenix; therefore, they argue it would be burdensome for them to litigate this case in Tucson as it would take away from their important governmental duties. However, transferring this case from the Tucson Division to the Phoenix Division would simply shift the inconvenience from Defendants to Plaintiffs. The three Plaintiffs in this case were born in Pima County (which encompasses the Tucson Division) and suffered their injuries in the Tucson Division. Furthermore, the Plaintiffs are young children (ages 5, 6, and 9)[11] who are attending school and receive their treatment for gender dysphoria in their local community; as compared to Defendants, it would be more burdensome for these children and their families if they had to appear for an evidentiary hearing or trial in Phoenix (as opposed to Tucson). As such, Defendants' motion pertaining to the transfer of venue is denied.

**CONCLUSION**

Accordingly, IT IS HEREBY ORDERED as follows:

(1) Defendants' motion to dismiss (Doc. 56) is denied.

Dated this 5th day of August, 2021.

Honorable James A. Soto
United States District Judge

---

[11] The Court notes that the 9-year-old no longer lives in Arizona.