Patrick Gunn (*Pro Hac Vice*)
COOLEY LLP
101 California Street, 5th Floor
San Francisco, California 94111-5800
Telephone:     (415) 693-2070
Facsimile:      (415) 693-2222
Email:           pgunn@cooley.com

Mary O'Grady (011434)
Colin Proksel (034133)
Payslie Bowman (035418)
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
Telephone:     (602) 640-9000
Facsimile:      (602) 640-9050
Email:           mogrady@omlaw.com
Email:           cproksel@omlaw.com
Email:           pbowman@omlaw.com

*Attorneys for Plaintiffs and the Class*

Additional counsel listed on following page

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Helen Roe, a minor, by and through her parent and next friend Megan Roe; et al., | Case No. 4:20-cv-00484-JAS |
| Plaintiffs, | **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Jennie Cunico, in her official capacity as State Registrar of Vital Records and Director of the Arizona Department of Health Services, | **\*ORAL ARGUMENT REQUESTED\*** |
| Defendant. | |

Rachel Berg (*Pro Hac Vice*)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, California 94102
Telephone:    (415) 343-7679
Facsimile:    (415) 392-8442
Email:        rberg@nclrights.org

Barrett J. Anderson (*Pro Hac Vice*)
Jessica Taylor (*Pro Hac Vice*)
COOLEY LLP
10265 Science Center Drive
San Diego, California 92121-1117
Telephone:    (858) 550-6000
Facsimile:    (858) 550-6420
Email:        banderson@cooley.com
Email:        jtaylor@cooley.com

*Attorneys for Plaintiffs and the Class*

# TABLE OF CONTENTS

**Page**

I.   Introduction ................................................................................................... 1

II.  Factual Background ....................................................................................... 2

   A.   Gender identity and sex. ......................................................................... 2

   B.   The importance of accurate identity documents for transgender people. .............. 3

   C.   Arizona vital statistics records laws. ...................................................... 4

   D.   Plaintiffs. ................................................................................................. 7

III. Procedural Background ................................................................................. 8

IV.  Legal Standard .............................................................................................. 10

V.   Argument ....................................................................................................... 11

   A.   The Surgical Requirement Violates the Equal Protection Clause. ....................... 11

      1.   The Surgical Requirement discriminates based on transgender status.............. 11

      2.   Heightened scrutiny applies to classifications based on transgender status...... 12

      3.   The Surgical Requirement fails heightened scrutiny......................................... 13

      4.   The Surgical Requirement also fails rational basis review. ............................. 15

   B.   The Surgical Requirement Violates the Due Process Clause. .......................... 16

      1.   The Surgical Requirement infringes on Plaintiffs' right to privacy. ................ 17

      2.   The Surgical Requirement infringes on Plaintiffs' right to individual liberty and autonomy. ............................................................................................... 19

      3.   The Surgical Requirement infringes on Plaintiffs' right to choose whether to undergo a particular medical treatment. .................................................... 20

      4.   The Surgical Requirement cannot survive any level of scrutiny....................... 20

VI.  Conclusion..................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adkins v. City of New York*,
143 F. Supp. 3d 134 (S.D.N.Y. 2015).............................................................. 18

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)........................................................................................ 11

*Arroyo Gonzalez v. Rossello Nevares*,
305 F. Supp. 3d 327 (D.P.R. 2018)......................................................... 16, 17, 19

*Doe v. Horne*,
No. CV-23-00185-TUC-JGZ,
2023 WL 4661831 (D. Ariz. July 20, 2023) ................................................. 12

*F.V. v. Barron*,
286 F. Supp. 3d 1131 (D. Idaho 2018) ......................................... 13, 16, 18

*Hundley v. Aranas*,
No. 21-15757, 2023 WL 166421 (9th Cir. Jan. 12, 2023)........................... 12

*K.L. v. State, Dep't of Admin., Div. of Motor Vehicles*,
No. 3AN-11-05431-CI,
2012 WL 2685183 (Alaska Super. Ct. Mar. 12, 2012).............. 13, 15, 16, 17

*Karnoski v. Trump*,
926 F.3d 1180 (9th Cir. 2019) ................................................................. 12, 13

*Love v. Johnson*,
146 F. Supp. 3d 848 (E.D. Mich. 2015).............................................*passim*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)....................................................................................... 10

*Obergefell v. Hodges*,
576 U.S. 644 (2015)................................................................................... 16, 19

*Ostergren v. Cuccinelli*,
615 F.3d 263 (4th Cir. 2010) ....................................................................... 18

*Parham v. J.R.*,
442 U.S. 584 (1979)....................................................................................... 20

i

*Powell v. Schriver*,
　　175 F.3d 107 (2d Cir. 1999) ................................................................. 17

*Ray v. Himes*,
　　No. 2:18-cv-272, 2019 WL 11791719 (S.D. Ohio Sept. 12, 2019) ............................ 18

*Roberts v. U.S. Jaycees*,
　　468 U.S. 609 (1984) ................................................................. 19

*Romer v. Evans*,
　　517 U.S. 620 (1996) ................................................................. 15

*Estate of Tucker v. Interscope Records, Inc.*,
　　515 F.3d 1019 (9th Cir. 2008) ................................................................. 11

*Tucson Woman's Clinic v. Eden*,
　　379 F.3d 531 (9th Cir. 2004) ................................................................. 17

*United States v. Virginia*,
　　518 U.S. 515 (1996) ................................................................. 13

*Washington v. Glucksberg*,
　　521 U.S. 702 (1997) ................................................................. 17, 19, 20

*Washington v. Harper*,
　　494 U.S. 210 (1990) ................................................................. 17, 20

*Whalen v. Roe*,
　　429 U.S. 589 (1977) ................................................................. 17

**Other Authorities**

A.A.C. § R9-19-208(O) ................................................................. 1, 5

A.R.S.
　　§ 32-3230(A) ................................................................. 3
　　§ 36-337(A)(3) ................................................................. *passim*
　　§ 36-337(A)(4) ................................................................. *passim*

Fed. R. Civ. P.
　　23(b)(2) ................................................................. 10
　　56(c) ................................................................. 10

Fourteenth Amendment ................................................................. *passim*

## I.   INTRODUCTION

Birth certificates are critical identity documents in our world. Having identity documents that correctly reflect one's identity is essential to an individual's ability to participate in our society. For example, lacking documentation that accurately reflects an individual's identity can jeopardize access to employment, education, housing, health care, banking, travel, and government services. For transgender people in particular, inaccurate birth certificates can also impede their clinical treatment and disclose to others that they are transgender, thereby exposing them to discrimination, harassment, and even violence.

Arizona law provides a confidential administrative process for individuals to change the sex listed on their birth certificate. Non-transgender people may use this process to apply to change their sex marker with no more than a physician's letter attesting that they are a certain sex. However, for transgender applicants to use the process, Arizona Revised Statutes § 36-337(A)(3) and its implementing regulation Arizona Administrative Code § R9-19-208(O) require them to have first "undergone a sex change operation" (the "Surgical Requirement"). Plaintiffs Helen Roe, James Poe, and Carl Voe, and the class of people they represent (collectively, "Plaintiffs"), are transgender individuals born in Arizona, now and in the future, who seek to change the sex listed on their birth certificates but have not "undergone a sex change operation." The Surgical Requirement thus excludes Plaintiffs from using Arizona's private administrative process.

The undisputed evidence in this case demonstrates that not all transgender people undergo surgery. That is true for a variety of reasons, including when surgery is medically inappropriate or unnecessary, too expensive, or unlawful (such as all transgender individuals born in Arizona younger than 18 years of age). Indeed, well-established medical standards of care for treating gender dysphoria (the medical condition that results from the discordance between a transgender person's gender identity and sex assigned at birth) require individualized determinations as to the appropriateness of a specific treatment for a patient. Those standards of care thus run contrary to the Surgical Requirement, which mandates that *all* transgender people undergo a surgical operation before gaining access to

1

Arizona's private administrative process. Because surgery is unavailable for Plaintiffs, the Surgical Requirement excludes them from obtaining an accurate birth certificate via that process and thus precludes them from living authentic lives, while non-transgender people—the majority of whom are provided an accurate birth certificate at birth—are not required to undergo surgery to change the sex listed on their birth certificate.

The Surgical Requirement violates Plaintiffs' constitutional rights to equal protection and due process under the Fourteenth Amendment. The Court already determined, when denying Defendant's Motion to Dismiss, that "[d]iscrimination against transgender people is discrimination based on sex; as such, heightened scrutiny applies." (Dkt. 83 at 9.) And the Ninth Circuit in *Hecox v. Little* recently reiterated this Circuit's holding that heightened scrutiny applies to classifications based on transgender status. 79 F.4th 1009, 1026–28 (9th Cir. 2023) (citing *Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019)). This Court also held that the Surgical Requirement infringes on Plaintiffs' due process rights, which subjects it to strict scrutiny. (Dkt. 83 at 10–11.) And the undisputed material facts in this case show that Defendant cannot satisfy her burden of establishing any justification for the Surgical Requirement under rational basis review, much less a tailored governmental interest that could succeed under heightened or strict scrutiny. For these reasons, and those discussed below, the Court should grant summary judgment to Plaintiffs on each of their four claims.

## II. FACTUAL BACKGROUND

### A. Gender identity and sex.

When a child is born, a health care provider identifies the child's sex based on the child's observable anatomy. (Plaintiffs' Separate Statement of Facts in Support of Motion for Summary Judgment ("SOF") ¶ 1.) In medical terminology, this provider-identified sex is often referred to as the person's "assigned sex." (SOF ¶ 2.) "Gender identity" is the medical term for a person's internal, innate, and deeply held sense of their own gender. (SOF ¶ 3.) There is a medical consensus that a person's gender identity has a significant biological foundation and is not subject to voluntary change. (SOF ¶¶ 4, 5.) Most peoples'

gender identity matches their sex assigned at birth. (SOF ¶ 6.) For a transgender person, however, that initial designation does not match the person's gender identity. (SOF ¶ 7.)

The discordance between one's gender identity and birth-assigned sex can cause gender dysphoria. (SOF ¶ 8.) Gender dysphoria is a serious medical condition that, if left untreated, can cause serious health consequences, including anxiety, depression, eating disorders, substance abuse, self-harm, and suicide. (SOF ¶ 9.) However, when individuals with gender dysphoria receive appropriate medical care and support, they can and do thrive. (SOF ¶ 10.)

Major associations of medical and mental health providers in the United States, including the American Medical Association, the American Academy of Pediatrics, the American Psychiatric Association, the American Psychological Association, and the Pediatric Endocrine Society, have adopted or endorsed standards of care for treating gender dysphoria. (SOF ¶ 11.) The goal of treatment is to allow transgender people to live consistently with their gender identities in all aspects of their lives. (SOF ¶ 12.)

The process of undergoing treatment to alleviate gender dysphoria is commonly referred to as transition. (SOF ¶ 13.) The transition process typically includes one or more of the following three components: (i) social transition, including adopting a new name, pronouns, appearance, and clothing, and correcting identity documents; (ii) medical transition, including puberty-suppressing medication and hormone-replacement therapy; and, typically only for adults, (iii) surgeries to alter the appearance and functioning of primary and secondary-sex characteristics.[1] (SOF ¶ 14) Transition is highly individualized for each person. (SOF ¶ 15.)

**B.     The importance of accurate identity documents for transgender people.**

Birth certificates reflect the government's recognition of an individual's sex. (SOF ¶ 16.) They are government-issued documents that people use to prove their identities for a

---

[1] In Arizona, people younger than 18 years of age are not legally permitted to receive surgical treatment for gender dysphoria. A.R.S. § 32-3230(A) ("A physician may not provide irreversible gender reassignment surgery to any individual who is under eighteen years of age.").

wide variety of situations, including school registration and employment, as well as to obtain other identity documents, such as driver's licenses, social security cards, and passports. (SOF ¶ 17.)

Transgender people who cannot change the sex marker on their identity documents to accurately reflect their gender identity face myriad practical, social, and psychological consequences. (SOF ¶ 18.) First, transgender people may not be able to use their birth certificate to prove their identity. For example, a birth certificate containing a sex marker that visibly conflicts with a person's gender identity—as reflected by their physical appearance—may arouse suspicion as to whether they are the person identified by the document. (SOF ¶ 19.) Second, birth certificates that reflect an incongruency between a person's gender identity and assigned sex risk disclosing a person's transgender status, which is personal information they may not wish to disclose for fear of discrimination, harassment, or violence. (SOF ¶ 20.) Such disclosure also invades their privacy, which is crucial because it is the basis for the development of individuality and autonomy. (SOF ¶ 21.) According to the 2015 U.S. Transgender Survey, nearly one in three transgender respondents who showed an identity document with a name or gender that did not match their perceived gender were verbally harassed, denied benefits or service, or assaulted. (SOF ¶ 22.) Third, for transgender people, the inability to safely and privately change the sex listed on their birth certificate interferes with their treatment for gender dysphoria, thereby exacerbating their gender dysphoria and distress. (SOF ¶ 23.)

In sum, being deprived of birth certificates that accurately reflect who they are stigmatizes transgender people and invades their privacy, releases confidential medical information, and places them at risk for grave psychological and physical harm. (SOF ¶ 24.)

**C.      Arizona vital statistics records laws.**

Defendant is a state official who exercises responsibility for issuing and changing Arizona birth certificates. (SOF ¶ 25.) Under her direction, ADHS registers a birth certificate for every person born in the state that reflects, among other things, their sex. (SOF ¶ 26.) Arizona law provides three ways for applicants to change information on their

birth certificate: (1) applying to ADHS for a "correction"; (2) applying to ADHS for an "amendment"; or (3) petitioning a court for an order, then—if the court grants the petition—applying to ADHS for an "amendment." (SOF ¶ 27.) Once submitted, ADHS processes all applications for changes to the sex listed on an individual's birth certificate under the same "desk procedure," which is "the actual process that [ADHS] follows" and "applies to any requests to change a sex marker on a birth certificate." (SOF ¶ 28; Declaration of Colin M. Proksel ("Proksel Decl."), Ex. 5 at 77:11–78:10.)

*Corrections.* While the vast majority of non-transgender individuals born in Arizona will never need to change the sex markers on their birth certificates, Arizona law permits them to apply for a "correction" to their sex marker if it reflects a typographical error. (SOF ¶ 29.) ADHS provides a private administrative process for applicants seeking a "correction" that involves submitting a confidential request directly to either ADHS or the applicant's county vital records office. (SOF ¶ 30.) If such a request is made within 90 days of birth, ADHS does not require the applicant to provide an evidentiary document attesting to their correct sex. (SOF ¶ 31.) If such a request is made after 90 days of birth, the applicant must provide a medical record or a physician's letter that simply attests to their sex. (SOF ¶ 32.) If ADHS grants the requested "correction," it seals the record. (SOF ¶ 33.) Transgender individuals born in Arizona are not permitted to "correct" the sex listed on their birth certificates through this process. (SOF ¶ 34.)

*Amendments.* Transgender individuals born in Arizona seeking to apply to ADHS to change the sex listed on their birth certificate must satisfy the Surgical Requirement that governs applications for "amendments" under A.R.S. § 36-337(A)(3) ("Subsection (A)(3)"). (SOF ¶ 35.) Under Subsection (A)(3) and its implementing regulation, A.A.C. § R9-19-208(O), transgender individuals born in Arizona who have had a surgical operation may submit a confidential application directly to ADHS (but not their county vital records office) and a letter from a physician attesting that they have undergone a "sex change operation." (SOF ¶ 36.) If ADHS determines the application is complete, it is mandated to grant the "amendment." (SOF ¶ 37.) This private administrative process does not create a

public record and, if ADHS grants the amendment, the documents are sealed, making them inaccessible absent a court order. (SOF ¶ 38.) Transgender individuals born in Arizona who have not had surgery, including those younger than 18 years of age, may not apply for an amendment using this private administrative process. (SOF ¶ 39.)

Neither Arizona law nor ADHS policy define the term "sex change operation." (SOF ¶ 40.) Rather, when determining whether to grant an amendment requested by a transgender individual born in Arizona, ADHS assesses whether the physician's letter contains language that "matches" Subsection (A)(3) or otherwise "indicate[s] a sex change operation." (SOF ¶ 41.) To make that assessment, ADHS may seek advice from its "administrative counsel," but does not consult with medical professionals, medical organizations, or transgender people. (SOF ¶ 42.) As a result, ADHS has denied applications filed with physicians' letters attesting that an applicant is receiving "appropriate clinical treatment for transition to male/female" or is "irrevocably committed to the gender change process" because ADHS determined that these letters do not satisfy the Surgical Requirement. (SOF ¶ 43.)

***Court Orders.*** Individuals born in Arizona can also petition a court for changes to their birth certificate under A.R.S. § 36-337(A)(4) ("Subsection (A)(4)"). (SOF ¶ 44.) Subsection (A)(4)'s court-order process is not specifically designed for transgender people seeking to correct their birth certificates; instead, it is a general provision that authorizes Arizona courts to order ADHS to change *any* information on a birth certificate. (SOF ¶ 45.) To comply with Subsection (A)(4), transgender applicants seeking to change the sex listed on their birth certificate must prepare a court petition, pay a fee, file it with the court, and are often required to appear in person in open court, thereby publicly disclosing their transgender status. If they wish their case to be confidential, they must prepare and file a separate motion to seal the documents, which a court is not obligated to grant. (SOF ¶ 46.) For transgender people, invasions of privacy of this nature exacerbate gender dysphoria and lead to an erosion of coping mechanisms. Such experiences can precipitate the onset of major psychiatric disorders, including, but not limited to, posttraumatic stress disorder, major depressive disorder, and even suicidality. (SOF ¶ 47.) In order to navigate the

requirements of Subsection (A)(4), many applicants hire attorneys, adding further cost and burden. (SOF ¶ 48.) These burdens are compounded for transgender individuals born in Arizona who live in other states, who may be legally or practically unable to file a petition in Arizona state court. (SOF ¶ 49.)

Moreover, unlike the "correction" and "amendment" process under Subsection (A)(3), Subsection (A)(4) does not contain specific standards for when a court may or must grant a petition. (SOF ¶ 50.) In practice, when a transgender person seeks to use this provision to change the sex marker on their birth certificate, Arizona courts have imposed the same Surgical Requirement as in Subsection (A)(3), based in part on ADHS's prior publicly-stated position that Arizona courts lack the authority under Subsection (A)(4) to issue orders amending the sex listed on an Arizona birth certificate. (SOF ¶ 51.) Even if a court grants a petition, to obtain an amended birth certificate, applicants must still file the court order with an application to ADHS. (SOF ¶ 52.)

### D. Plaintiffs.

Plaintiffs Helen Roe, James Poe, and Carl Voe (together, the "Named Plaintiffs") are three transgender people, all younger than age eighteen, who were born in Arizona. (SOF ¶ 53.) Named Plaintiffs have been diagnosed with gender dysphoria. (SOF ¶ 54.) Each has undergone appropriate, necessary steps to better align their body, appearance, and lived experience with their gender identity. (SOF ¶ 55.) Due to their age, they are not permitted under Arizona law to undergo surgery to treat their gender dysphoria. (SOF ¶ 56.) And they may never need surgery to alleviate their gender dysphoria. (SOF ¶ 57.)

Named Plaintiffs' birth certificates are currently inaccurate because they list a sex different than their gender identities. Every time Named Plaintiffs attempt to use their birth certificates, they risk disclosing private medical information and intensely personal aspects of their identities. They are thus faced with an impossible choice: risk disclosure to participate in normal childhood activities—from in-person schooling to recreational sports—or forgo participation altogether. (SOF ¶ 58.) Either outcome negatively affects their overall health, development, and well-being and limits their interest and ability to

engage in those everyday activities. (SOF ¶ 58.)

Named Plaintiffs wished to change the sex markers on their Arizona birth certificates to accurately reflect their gender identity. (SOF ¶ 59.) Plaintiffs Helen Roe and James Poe, through their parents, petitioned for a court order under Subsection (A)(4), but the state court judges denied both Helen's and James's petitions because they found that the Surgical Requirement would also apply under Subsection (A)(4). (SOF ¶ 60.) Plaintiff Carl Voe's mother did not file a petition because she understood it would be denied without proof of a "sex change operation." (SOF ¶ 61.) As a result, each of the Named Plaintiffs desired to apply for an amended birth certificate through the ADHS's private administrative process, but each was prevented from doing so by Defendant's enforcement of the Surgical Requirement. (SOF ¶ 62.)

## III.   PROCEDURAL BACKGROUND

On November 4, 2020, Plaintiffs filed this case and a motion for preliminary injunction seeking an amended birth certificate for former Plaintiff Jane Doe ("PI Motion"). (Dkts. 1, 3.) The Court observed that Defendant, in opposing the PI Motion, did not:

> [D]ispute that best medical and psychological practices reflect: (1) gender reassignment surgery is not required or recommended for young transgender kids (i.e., 6, 10, and 13 in this case) diagnosed with gender dysphoria; (2) gender reassignment surgery may never be necessary or recommended for those with gender dysphoria (i.e., there are many factors that come into play that vary for each individual's circumstances); (3) amending important identity-related documents (such as birth certificates) to coincide with a transgender minor's gender identity (as opposed to their external genitalia) is vital to their mental and physical well-being; and (4) that failure to amend such documents (such as birth certificates) improperly reveals a transgender minor's transgender status to school officials and classmates, which results in discrimination and harassment based on their transgender status, and this is detrimental to a transgender minor's mental and physical health.

(Dkt. 28 at 2–3.) The parties resolved the PI Motion by joint stipulation on November 27, 2020, and the Court thereafter ordered ADHS to amend the sex listed on Jane Doe's birth certificate. (Dkts. 39 & 41.)

Plaintiffs filed the Amended Complaint on January 8, 2021. (Dkt. 47.) The Amended Complaint alleged four different violations of the Fourteenth Amendment: (1) equal protection; (2) due process right to privacy; (3) due process right to individual liberty and

autonomy; and (4) due process right to choose whether to undergo a particular medical treatment. (*Id.*.) On March 15, 2021, Defendant moved to dismiss count 1 (equal protection) and counts 3 and 4 (due process rights to individual liberty and autonomy and to choose whether to undergo a particular medical treatment). (Dkt. 56.) Plaintiffs opposed, and the Court denied Defendant's motion to dismiss on August 5, 2021. (Dkts. 61, 71, 77, 83.)

In its Order on the Motion to Dismiss, the Court held that the Surgical Requirement facially discriminates against transgender people and concluded that Plaintiffs sufficiently pled their Equal Protection and Due Process Clause claims. (Dkt. 83 at 7–12.) The Court further observed that Defendant lacked "any legitimate basis to require a 'sex change operation' for these kids to obtain a proper birth certificate," and that "it would not be a herculean effort on the part of [ADHS] to accept a physician's certification that an individual is receiving clinically appropriate treatment for gender dysphoria, and that changing the sex marker on that individual's birth certificate is warranted based on best medical practices as applicable to this individual's unique circumstances." (*Id.* at 11–12, 15.)[2] The Court also rejected Defendants' argument that the existence of Subsection (A)(4)'s court-order process cures the Surgical Requirement's constitutional defects, finding that "state judges have imported the [Surgical Requirement] and have denied relief," and that petitioning for a court order requires "a much more burdensome process [that] entails much more cost, confusion, and uncertainty . . . [as] navigating through the litigation process is often difficult and fraught with peril for trained attorneys, let alone a transgender person without the money, education and resources to properly navigate the litigation process." (*Id.* at 12 n.9.) The Court also noted that Subsection (A)(4) "does not provide any standards whatsoever" regarding when a transgender person could obtain a "court order" ordering an amendment to their birth certificate. (*Id.*)

On August 25, 2021, Plaintiffs filed a motion for class certification, which Defendant opposed. (Dkts. 89, 172, 181.) The Court granted Plaintiffs' motion, finding *inter alia* that

---

[2] The Court further held that Plaintiffs had standing under Article III to bring this case and declined to abstain from adjudicating the action under various federal abstention doctrines. (*Id.* at 13, 15–16.)

**PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT**

"[t]he inability of transgender individuals in Arizona to change the gender marker on their birth certificate through a private administrative process stems from the enforcement of the surgical requirement in A.R.S. §36-337(A)(3)" and "the 'sex change operation' requirement at issue invades Plaintiffs' rights under the Due Process and Equal Protection Clauses," causing "constitutional injuries" to both Named Plaintiffs and the proposed class. (Dkt. 214 at 4–6.) Further, the Court ruled that Named Plaintiffs' requests for declaratory and injunctive relief—namely, "an injunction against [ADHS] that bars enforcement of the 'sex operation' requirement under A.R.S. §36-337(A)(3)"—satisfied Rule 23(b)(2) because it "would protect all proposed class members' Due Process and Equal Protection rights, and otherwise make it less burdensome for transgender individuals to amend the gender marker on their birth certificates in Arizona through a private administrative process." (*Id.* at 7.) The Court certified the following class: "All transgender individuals born in Arizona, now and in the future, who seek to change the sex listed on their birth certificate, but have not undergone a 'sex change operation' as treatment for their gender dysphoria." (*Id.* at 2, 8.)

On November 3, 2023, following a joint stipulation, the Court directed the parties to "file cross-motions for summary judgment directed only to the merits of Plaintiffs' constitutional claims on or before November 17, 2023." (Dkt. 228 at 1.) Pursuant to that order, Plaintiffs move for summary judgment on the merits of all four counts in the Amended Complaint and seek an order declaring the Surgical Requirement unconstitutional under the Fourteenth Amendment's Equal Protection and Due Process Clauses.

## IV. LEGAL STANDARD

Summary judgment is warranted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). There is no genuine issue for trial if, based on the record as a whole, no reasonable trier of fact could find for the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party cannot "simply show that there is some metaphysical doubt as to the material facts," *id.* (citations omitted), but must instead come forward with "concrete evidence" from which a reasonable trier of fact could return a

1  verdict in his favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *see also*

2  *Estate of Tucker v. Interscope Records, Inc.*, 515 F.3d 1019, 1029–30 (9th Cir. 2008).

3  ## V.   ARGUMENT

4          Arizona's Surgical Requirement treats transgender and non-transgender people

5  differently, placing a far higher—and, for Plaintiffs, insurmountable—burden on

6  transgender people born in Arizona who seek to obtain accurate birth certificates: they must

7  undergo a surgical operation. The discriminatory classification created by the Surgical

8  Requirement is a textbook case of an Equal Protection Clause violation. The Surgical

9  Requirement also impermissibly intrudes on Plaintiffs' Fourteenth Amendment due process

10  rights to privacy, individual liberty and autonomy, and to choose whether to undergo a

11  particular medical treatment because it denies them access to an accurate birth certificate,

12  forcing them involuntarily to disclose their transgender status and denying them the ability

13  to live consistently with their sex, unless they undergo a surgical procedure that may not be

14  medically appropriate or permitted for them. Because Defendant has not proffered a

15  sufficient governmental justification under any level of scrutiny to sustain the Surgical

16  Requirement, the Court should rule it unconstitutional and grant summary judgment on all

17  four of Plaintiffs' claims.

18  **A.    The Surgical Requirement Violates the Equal Protection Clause.**

19  **1.    The Surgical Requirement discriminates based on transgender status.**

20

21          At the threshold, there can be no doubt that the Surgical Requirement discriminates

22  against transgender individuals on its face. As the Court already recognized in its Order

23  denying Defendant's Motion to Dismiss, Subsection (A)(3) and its implementing regulation

24  are "aimed directly at 'transgender' people" because these laws require "a 'sex change

25  operation' to obtain an accurate birth certificate that properly aligns with their gender

26  identity." (Dkt. 83 at 9–10.) As the Court recognized:

27          [T]he statute and regulation do not explicitly use the phrase 'transgender' or
           explicitly state that these laws are aimed directly at 'transgender' people, [but]
28         any logical reading of the statute and regulation reflects that it applies nearly
           exclusively to transgender people; who else is going to voluntarily seek out a

"sex change operation"? *See Latta v. Otter*, 771 F.3d 456, 467-68 (9th Cir. 2014) ("Whether facial discrimination exists does not depend on why a policy discriminates, but rather on the explicit terms of the discrimination . . . [W]hile the distinction . . . that defendants seek to draw could in theory represent a *justification* for the discrimination worked by the law, it cannot overcome the inescapable conclusion that the [states' laws] discriminate on the basis of sexual orientation.") (emphasis in the original).

(*Id.*) Nothing has changed since the Court's order; the same logic applies today.

Furthermore, the material facts are not in dispute. Defendant would not have accepted Plaintiffs' applications and would not have amended the sex listed on their birth certificates under Subsection (A)(3) because Plaintiffs are transgender people who have not undergone surgery. (SOF ¶ 62; *see also* ¶¶ 36, 39, 43.) In contrast, non-transgender people—the vast majority of whom ADHS has provided accurate birth certificates pursuant to Arizona law—either will never need to change their sex markers or, if they do, are entitled to apply for a "correction" through a private administrative process with no more than a physician's letter attesting to their birth-assigned sex. (SOF ¶ 63; *see also* Dkt. 83 at 9–10.) The Surgical Requirement is thus facially discriminatory based on transgender status. (Dkt. 83 at 12.)

### 2. Heightened scrutiny applies to classifications based on transgender status.

As this Court has already held, "[d]iscrimination against transgender people is discrimination based on sex; as such, heightened scrutiny applies." (*Id.* at 9.) The Ninth Circuit also recognizes that heightened scrutiny applies to classifications based on a person's transgender status. *See Hecox*, 79 F.4th at 1021–28 ("We conclude that while the Act certainly classifies on the basis of sex, it also classifies based on transgender status, triggering heightened scrutiny on both grounds."); *Hundley v. Aranas*, No. 21-15757, 2023 WL 166421, at *1 (9th Cir. Jan. 12, 2023) ("Discrimination against an individual based on a person's gender identity demands heightened scrutiny."); *Karnoski*, 926 F.3d at 1201 (ruling policy barring transgender individuals from military service is subject to heightened scrutiny); *Doe v. Horne*, No. CV-23-00185-TUC-JGZ, 2023 WL 4661831, at *16 (D. Ariz. July 20, 2023) ("Laws that discriminate against transgender people are sex-based

1   classifications and, as such, warrant heightened scrutiny.").

2       "[A] party seeking to uphold government action based on sex must establish an

3   'exceedingly persuasive justification' for the classification. *United States v. Virginia*, 518

4   U.S. 515, 524 (1996) (citation omitted). Similarly, a party defending a classification based

5   on transgender status must show that it is "substantially related to its stated goals." *Hecox*,

6   79 F.4th at 1030. Under either approach, Defendant "bear[s] the burden of establishing that

7   [she] reasonably determined the policy 'significantly furthers' the government's important

8   interests, and that is not a trivial burden." *Karnoski*, 926 F.3d at 1202; *see also Hecox*, 79

9   F.4th at 1028 (observing "[h]eightened scrutiny is a 'demanding standard'" (citation

10  omitted)). Defendant has not met her burden as a matter of law.

11          **3.     The Surgical Requirement fails heightened scrutiny.**

12      Defendant asserts the governmental interest for the Surgical Requirement is "in

13  maintaining and ensuring the truthfulness, completeness, and correctness of information in

14  vital records and statistics," (Proksel Decl., Ex. 23 at 24). However, Defendant has no

15  evidence to suggest the Surgical Requirement actually furthers these purposes. Rather, the

16  evidence shows just the opposite. The Surgical Requirement ensures that Plaintiffs do *not*

17  have truthful, complete, or correct birth certificates by conditioning access to the private

18  administrative process on a surgical procedure that they may not need or cannot get. The

19  Surgical Requirement thus fails the test. *See F.V. v. Barron*, 286 F. Supp. 3d 1131, 1141–

20  42 (D. Idaho 2018) (finding government defendants had "no justification" for state policy

21  preventing transgender people from correcting the sex listed on their birth certificates and

22  holding "there is no rational basis to support [the] policy"); *see also, e.g.*, *Love v. Johnson*,

23  146 F. Supp. 3d 848, 856 (E.D. Mich. 2015) (finding state policy that imposed additional

24  burden on transgender people to amend the sex listed on their driver's licenses

25  "undermine[d]" purported governmental interest in accurate identification because the

26  policy was the reason "the sex listed on [the plaintiffs' licenses] fails to match their

27  appearance and the sex associated with their names" (citation omitted)); *K.L. v. State, Dep't*

28  *of Admin., Div. of Motor Vehicles*, No. 3AN-11-05431-CI, 2012 WL 2685183, at *7 (Alaska

13

Super. Ct. Mar. 12, 2012) ("By not allowing transgender[] individuals to change their sex designation, their license will inaccurately describe the discernable appearance of the license holder by not reflecting the holder's lived gender expression of identity.").

Several federal and state agencies have implicitly recognized that the Surgical Requirement does not lead to truthful, correct, and complete identity documents. For example, the U.S. Department of State (for U.S. passports), the Social Security Administration (for social security cards), and the U.S. Citizenship and Immigration Services (for permanent resident cards) do not require proof of surgery for transgender people to change the sex marker on these identity documents, instead allowing applicants to self-attest to their sex. (SOF ¶ 64; *see also* Dkt. 83 at 15 (citing 1 Sexual Orientation and the Law § 10:11 (2020–21 ed.))).[3]

The Arizona Department of Transportation ("ADOT") also does not require individuals to submit proof of a surgery to apply to change the sex markers listed on their Arizona driver licenses, but rather allows applicants to submit a physician's letter that attests "that the customer is irrevocably committed to the gender-change process." (Proksel Decl. Ex. 34 at 4.) In fact, Subsection G of ADOT's Customer Records Policy 4.1.1 ("Subsection G") specifically provides that "[i]t is ***not*** necessary for the customer to have completed the surgical gender-change procedure" for that customer to "request that the gender noted on the individual customer record be changed." (Proksel Decl., Ex. 34 at 2 (emphasis in original); *see also* SOF ¶ 65; Proksel Decl., Ex. 35 at 3.)[4] Notably, when Plaintiffs subpoenaed ADOT in this case and asked about the governmental interest behind Subsection G, ADOT responded that its "interest is in ensuring that a customer using [ADOT's] identification credentials can accurately assert their identity and that a reliant party can validate an individual's identity" and "[Subsection G] and its revisions are

---

[3] In August 2021, when the Court denied Defendant's Motion to Dismiss, these federal agencies generally required individuals applying for a sex-marker change to submit proof "that the person has undergone 'appropriate clinical treatment for gender transition.'" 1 Sexual Orientation and the Law § 10:11 (2020–21 ed.). Since then, each of these agencies have adopted the more lenient self-attestation standard. (Proksel Decl. Exs. 31–33.)

[4] Prior to its amendment in 2020, Subsection G was formerly Subsection Q in ADOT Customer Records Policy 3.1.1. *See* Proksel Decl., Ex. 35 at 4.

1  beneficial in aiding [ADOT's] efforts to provide accurate credentials for the benefit of

2  customers and other stakeholders." (Proksel Decl. Ex. 35 at 5.)

3      For Plaintiffs who have successfully corrected identity documents from these

4  agencies, the Surgical Requirement creates another obstacle: these amended documents

5  now list a correct sex marker that does not match the incorrect sex marker on their birth

6  certificates, increasing the risk that they will be mis-identified or outed as transgender

7  against their will. *See, e.g.*, *K.L.*, 2012 WL 2685183, at *7 (observing that state policy "can

8  lead to discrepancies between an individual's Alaska driver's license and United States

9  passport"). And the Surgical Requirement is constitutionally deficient for yet another

10  reason: under Arizona's vital records laws, some transgender individuals born in Arizona

11  (those who have undergone surgery) may obtain corrected birth certificates reflecting their

12  lived gender identity, while other transgender people (those who have not had surgery) are

13  precluded from doing so. These "discrepancies" mean that some transgender people may

14  possess a birth certificate "reflecting their lived gender identity, while others may not," thus

15  demonstrating that the Surgical Requirement "does not bear a close and substantial

16  relationship to the furtherance of the state's interest in accurate documentation and

17  identification." *Id.* at *7.

18      On the undisputed facts before the Court, Defendant's single asserted justification

19  for the Surgical Requirement falls far short of the "demanding standard" she is required to

20  satisfy under heightened scrutiny. *Hecox*, 79 F.4th at 1028 (citation omitted). The Court

21  should thus grant summary judgment to Plaintiffs on their equal protection claim.

      **4.**    **The Surgical Requirement also fails rational basis review.**

23      Even under rational basis review, Defendant's asserted justifications fall short.

24  Defendant has not and cannot identify any rational relationship between a legitimate

25  government interest and the Surgical Requirement. *See Romer v. Evans*, 517 U.S. 620, 632–

26  33 (1996). And, as discussed above, Defendant has not produced evidence to show the

27  Surgical Requirement does anything other than *undermine* any goal it may have. Indeed,

28  courts in Alaska, Idaho, Michigan, and Puerto Rico have all held that policies barring

**PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT**

transgender people from obtaining identity documents with the correct sex marker lack adequate justification under any standard of review. *See Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327, 333 (D.P.R. 2018) (ruling state policy that resulted in "forced disclosure of a transgender person's most private information is not justified by any legitimate government interest"); *Barron*, 286 F. Supp. 3d at 1141–42 (holding "there is no rational basis to support [the state's] policy" of "denying transgender people, as a class, access to birth certificates that accurately reflect their gender identity," and the "policy similarly fails to withstand heightened scrutiny"); *Love*, 146 F. Supp. 3d at 856–57 (ruling state policy "requiring Plaintiffs to disclose their transgender status . . . bears little, if any, connection" to "state's [purported] interest in maintaining 'accurate' identification documents"); *K.L.*, 2012 WL 2685183, at *6–8 (finding state policy requiring "medical certification of a sex change" to change the sex listed on a driver license "can actually result in inaccurate and inconsistent identity documents")

As discussed above, the Surgical Requirement undermines any purported interest Defendant has in maintaining and ensuring the truthfulness, completeness, and correctness of information in vital records and statistics. Thus, the Surgical Requirement is unconstitutional as a matter of law regardless of the level of scrutiny applied.

## B.    The Surgical Requirement Violates the Due Process Clause.

The Surgical Requirement is also unconstitutional because it infringes on Plaintiffs' fundamental rights under the Fourteenth Amendment's Due Process Clause. As this Court held when denying Defendant's Motion to Dismiss, "[the Due Process Clause] 'includes a substantive component that provides heightened protection against government interference with certain fundamental rights and liberty interests.'" (Dkt. 83 at 8 (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)).) At core, "[it] promises liberty to all within its reach, a liberty that includes certain specific rights that allow persons . . . to define and express their identity." *Obergefell v. Hodges*, 576 U.S. 644, 651–52 (2015).

Plaintiffs assert three well-established due process rights in this case: (1) the right to privacy; (2) the right to individual liberty and autonomy; and (3) the right to choose whether

to undergo a particular medical treatment. The Surgical Requirement infringes on each of these rights. As this Court already recognized, the Due Process Clause guarantees the right to make personal choices central to individual dignity and decisional autonomy, including intimate choices that define personal identity and beliefs. (Dkt. 83 at 8.) The Court also ruled that the Due Process Clause protects against intrusions into personal decisions regarding one's bodily integrity, including choices about medical treatment and the right to refuse unwanted medical treatment. (*Id.* (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997); *Washington v. Harper*, 494 U.S. 210, 221 (1990); *Parham v. J.R.*, 442 U.S. 584, 600 (1979))). Because Defendant cannot meet her burden to demonstrate the Surgical Requirement satisfies strict scrutiny—*i.e.*, that it is "narrowly tailored to serve a compelling state interest," *Washington*, 521 U.S. at 721 (citation omitted)—the Court should find it unconstitutional under each of the three asserted due process rights here.

> **1.      The Surgical Requirement infringes on Plaintiffs' right to privacy.**

The Due Process Clause's right to privacy "protect[s] [the] individual interest in avoiding disclosure of personal matters." *Whalen v. Roe*, 429 U.S. 589, 598–600 (1977); *see also Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 551 (9th Cir. 2004) (finding Fourteenth Amendment's zone of privacy protects against "disclosure of personal matters" (internal quotation marks omitted)). Such personal matters include a person's transgender status and any related information, such as their psychological, medical, or surgical treatments. *See Love*, 146 F. Supp. 3d at 856 ("[B]y requiring Plaintiffs to disclose their transgender status, the [state] Policy directly implicates their fundamental right of privacy."); *see also K.L.*, 2012 WL 2685183, at *6 (ruling under Alaska constitution that "one's transgender[] status is private, sensitive personal information"). "The excruciatingly private and intimate nature of [being transgender], for persons who wish to preserve privacy in the matter, is really beyond debate." *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999); *see also Arroyo Gonzalez*, 305 F. Supp. 3d at 333 ("[T]here are few areas which more closely intimate facts of a personal nature than one's transgender status." (internal quotation marks and citation omitted)).

By foreclosing the opportunity to use ADHS's private administrative process to change the sex marker on their birth certificates, the Surgical Requirement obligates Plaintiffs to disclose their transgender status every time they present an inaccurate identity document. Such disclosure inherently reveals Plaintiffs' sensitive and intimate medical and personal information, which, once revealed puts them at great risk for bodily harm. As this Court already recognized, the ongoing involuntary disclosure of an individuals' transgender status is "akin to a death by a thousand cuts as being continuously outed unnecessarily exposes [that individual] to stigma, bullying, fear, and violence." (Dkt. 83 at 11.) Other courts throughout the country are in accord. *See, e.g.*, *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139–40 (S.D.N.Y. 2015) ("A mismatch between the gender indicated on the document and the gender of the holder calls down discrimination."); *Barron*, 286 F. Supp. 3d at 1137 ("Transgender people who present mismatched identification are verbally harassed, physically assaulted, denied service or benefits, or asked to leave the premises."); *Ray v. Himes*, No. 2:18-cv-272, 2019 WL 11791719, at \*12 (S.D. Ohio Sept. 12, 2019) (holding possibility that transgender plaintiffs "face being outed as transgender upon presentation of their birth certificates" qualifies as "specific, quantifiable, and particularized injur[y]" (citation omitted)). And Named Plaintiffs' own life experiences confirm this terrible truth. (*See, e.g.*, SOF ¶ 67.)

Moreover, after one's transgender status is disclosed to a third party through an identity document discordant with one's gender identity, there are no safeguards to prevent that third party from disclosing the information to others. (*See, e.g.*, SOF ¶ 67). Thus, in addition to revealing intimate information, the Surgical Requirement also takes away Plaintiffs' control over the circumstances in which their personal matters are disseminated, which is an essential aspect of privacy. *See Ostergren v. Cuccinelli*, 615 F.3d 263, 283 (4th Cir. 2010). Given these undisputed facts, there can be no doubt that the Surgical Requirement infringes on Plaintiffs' due process right to privacy.

**2.    The Surgical Requirement infringes on Plaintiffs' right to individual liberty and autonomy.**

The Due Process Clause affords every individual the fundamental right to make "personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs." *Obergefell*, 576 U.S. at 663. "The Supreme Court has repeatedly affirmed that the Due Process Clause protects against intrusions on highly intimate and personal decisions relating to issues such as marriage, procreation, contraception, family relationships, and child rearing." (Dkt. 83 at 8 (citing *Obergefell*, 576 U.S. 644; *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972); *Lawrence v. Texas*, 539 U.S. 558, 578 (2003), *Meyer v. Nebraska*, 262 U.S. 390, 399–400 (1923)).) Federal courts have acknowledged the deeply personal nature of the decisions required of transgender persons for them to live in a manner consistent with their gender identity, an intimate set of decisions that run parallel to long-established liberty rights. *See Arroyo Gonzalez*, 305 F. Supp. 3d at 333 ("Much like matters relating to marriage, procreation, contraception, family relationships, and child rearing, 'there are few areas which more closely intimate facts of a personal nature' than one's transgender status." (citation omitted)).

Requiring surgery to apply for a sex marker change infringes on Plaintiffs' right to define their identities and live as their authentic selves. The undisputed facts demonstrate that transgender people born in Arizona face unjustifiable hurdles to obtain accurate birth certificates, forcing them to endure the constant risk of exposure, rejection, discrimination, and bodily harm. (SOF ¶ 66, *see also* ¶¶ 46–47, 58, 62.) It also deprives them of the ability to define their own identifies, which is "fundamental to our concept of constitutionally ordered liberty." *Washington*, 521 U.S. at 727; *see Roberts v. U.S. Jaycees*, 468 U.S. 609, 619 (1984) (finding "ability independently to define one's identity . . . is central to any concept of liberty"). And because gender identity, like sexual orientation, is immutable (SOF ¶ 5), Plaintiffs' ability to participate as full members of society depends on their ability to amend the sex listed on their birth certificates to correctly identify who they are. *Obergefell*, 576 U.S. at 658. The Surgical Requirement thus violates Plaintiffs' right to

individual liberty and autonomy.

### 3. The Surgical Requirement infringes on Plaintiffs' right to choose whether to undergo a particular medical treatment.

The Due Process Clause protects the fundamental right to make decisions regarding one's bodily integrity, including choices about medical treatment and the right to refuse unwanted medical treatment. *See Washington*, 521 U.S. at 720 (acknowledging fundamental right to bodily integrity and to obtain an abortion, use contraception, and refuse unwanted medical treatment); *Washington*, 494 U.S. at 221 (recognizing "significant liberty interest in avoiding the unwanted administration of antipsychotic drugs"); *Parham*, 442 U.S at 600 (recognizing that minors have a protected liberty interest in avoiding unnecessary mental health treatment).

The Surgical Requirement interferes with Plaintiffs' "personal decisions regarding [their] bodily integrity, including choices about medical treatment," (Dkt. 83 at 8), because it forces Plaintiffs to choose between undergoing medically inappropriate unnecessary, unaffordable, or even illegal surgery or subjecting themselves to the constant risk of exposure due to having identity documents that disclose their transgender status, which puts them at risk of discrimination, harassment, and violence. By conditioning the availability of these documents on whether a person has obtained surgery, the Surgical Requirement injects government into what should be a personalized and private medical assessment and treatment plan. *See Parham*, 442 U.S. at 604 (finding state's power to interfere is at its lowest ebb when medical decision is supported by child, child's parents, and "a physician's independent examination and medical judgment").

### 4. The Surgical Requirement cannot survive any level of scrutiny.

Because the Surgical Requirement infringes on Plaintiffs' fundamental rights, strict scrutiny applies. *Washington*, 521 U.S. at 721. Under the Fourteenth Amendment's Due Process Clause, Defendant bears the burden of showing that the Surgical Requirement "furthers a compelling state interest, and is narrowly drawn to further that state interest." *Love*, 146 F. Supp. 3d at 856 (citation omitted). Defendant's only interest is the same she

proffered for the Equal Protection claim: a "governmental interest in maintaining and ensuring the truthfulness, completeness, and correctness of information in vital records and statistics." (Proksel Decl. Ex. 23 at 24.) But forcing Plaintiffs to maintain birth certificates that do not match who they are does not "further[]" an interest in truthful, complete, or accurate records. *See Love*, 146 F. Supp. 3d at 856. Thus, Defendant cannot meet her burden under *any* standard of review, let alone under strict scrutiny. Moreover, given that the ADOT and several federal agencies will amend the sex listed on transgender peoples' identity documents without proof of surgery, the Surgical Requirement is plainly not the "least restrictive and least harmful means of satisfying" Defendant's purported government interest. *Id.* (citation omitted). The Court should grant summary judgment in Plaintiffs' favor on all three of their Due Process Clause claims.

## VI. CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court grant this Motion for Summary Judgment and declare the Surgical Requirement violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment.

Dated: November 17, 2023                    OSBORN MALEDON, P.A.

/s/Colin M. Proksel
Mary O'Grady (011434)
Colin Proksel (034133)
Payslie Bowman (035418)
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
Telephone: (602) 640-9000
Facsimile: (602) 640-9050
Email:    mogrady@omlaw.com
Email:    cproksel@omlaw.com
Email:    pbowman@omlaw.com

Rachel Berg (*Pro Hac Vice*)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, California 94102
Telephone: (415) 343-7679

PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT

Facsimile:   (415) 392-8442
Email:        rberg@nclrights.org

Patrick Gunn (*Pro Hac Vice*)
COOLEY LLP
101 California Street, 5th Floor
San Francisco, California 94111-5800
Telephone:  (415) 693-2070
Facsimile:   (415) 693-2222
Email:        pgunn@cooley.com

Barrett J. Anderson (*Pro Hac Vice*)
Jessica L. Taylor (*Pro Hac Vice*)
COOLEY LLP
10265 Science Center Drive
San Diego, California 92121-1909
Telephone:  (858) 550-6000
Facsimile:   (858) 550-6420
Email:        banderson@cooley.com
Email:        jtaylor@cooley.com

*Attorneys for Plaintiffs and the Class*

**PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT**