Justin D. Smith, Mo. Bar No. 63253*
Michael Martinich-Sauter, Mo. Bar. No. 66065
James Otis Law Group, LLC
530 Maryville Centre Drive, Suite 230
St. Louis, Missouri 63141
(816) 678-2103
Justin.Smith@james-otis.com

*Attorneys for Amici Curiae President Petersen and Speaker Montenegro*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Helen Roe, a minor, by and through parent and next friend Megan Roe, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Sheila Sjolander, in her official capacity as State Registrar of Vital Records and Interim Director of the Arizona Department of Health Services,<br><br>Defendant. | Case No. 4:20-cv-00484-JAS<br><br>**Supplemental Brief of *Amici Curiae* Arizona State Senate President Warren Petersen and Speaker of the Arizona House of Representatives Steve Montenegro** |

**INTRODUCTION**

Plaintiffs have asked the Court to enjoin "operation" in A.R.S. § 36-337(A)(3) and A.A.C. § R9-19-208(O).  Plaintiffs did not propose this new remedy until their reply brief and at oral argument, and thus they have waived it.

In addition to having been waived, Plaintiffs' new proposed remedy is inconsistent with legislative intent.  "[T]he touchstone for any decision about remedy is legislative intent," *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 330 (2006) (citation omitted), which is determined by looking to state law, *see, e.g.*, *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam).  Applying the Arizona Supreme Court's approach to finding legislative intent, *see Wyatt v. Wehmueller*, 167 Ariz. 281, 284 (1991), the plain language of A.R.S. § 36-337(A)(3), its context, and its legislative history all weigh heavily against Plaintiffs' new proposed remedy.  Since 1967, Arizona has required a surgical procedure in order to amend a birth certificate under the "sex change operation" provision in A.R.S. § 36-337(A)(3).  Enjoining only "operation" would greatly disrupt the statutory scheme and contradicts the intense commitment that Arizona has demonstrated toward requiring objective evidence before amending birth certificates.  Plaintiffs have failed to identify legislative intent that supports their new proposed remedy.

Plaintiffs' new proposed remedy also fails to satisfy legal requirements.  The new proposed remedy is ambiguous, and State officials have argued that it is not definite enough for them to know how to implement it.  Plaintiffs' new proposed remedy also is outside the scope of their requested relief—they sought an injunction against the "surgical requirement," not against the individual word "operation."

In light of the Supreme Court's recent decision in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025), and other relevant developments, President of the Arizona State Senate Warren Petersen and Speaker of the Arizona House of Representatives Steve Montenegro (the "Legislative Leaders") respectfully request that the Court reconsider its summary judgment order.  If the Court enters a permanent injunction in favor of Plaintiffs, the Court should enjoin the "sex change operation" language challenged by Plaintiffs.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### I.    Plaintiffs waived their new proposed remedy.

Plaintiffs initially proposed a fatally flawed remedy.  In their proposed order, Plaintiffs asked the Court to award them the following relief: "Defendant is permanently enjoined from requiring that a transgender individual first undergo a sex change operation as a prerequisite to changing the sex on their birth certificate through the private administrative process under Arizona Revised Statutes § 36-337(A)(3) and its implementing regulation, Arizona Administrative Code § R9-19-208(O)."  Doc. 282-1, at 1.  This requested relief violated Rule 65 because it did not "state its terms specifically" or "describe in reasonable detail … the act or acts restrained or required."  *See* Doc. 287, at 1-3; Doc. 288-1, at 2 n.2 (citing cases).  In addition, the State observed that it "has never required, and will never require, any person to undergo any surgical procedure as a prerequisite for processing an amendment to a birth certificate because that is not a requirement under A.R.S. § 36-337(A)."  Doc. 287, at 2.

On reply, for the first time, Plaintiffs asked the Court "to enjoin enforcement of the word 'operation' in the statute."[1]  Doc. 290, at 2.  Plaintiffs did not raise this proposal in their opening brief.  *See* Doc. 282.  "Issues raised for the first time in the reply brief are waived."  *Bazuaye v. I.N.S.*, 79 F.3d 118, 120 (9th Cir. 1996).  This well-settled principle applies to briefing before the district court.  *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).  Because Plaintiffs did not raise their argument about enjoining enforcement of the word "operation" until their reply brief, Plaintiffs waived this argument.

### II.    Plaintiffs' new proposed remedy is inconsistent with legislative intent.

The Legislative Leaders observed that, in the Motion for Permanent Injunction, Plaintiffs presented no evidence of legislative intent to support their proposed remedy.  *See*

---

[1] At the August 7, 2025 oral argument, Plaintiffs asked the Court to "strike the word 'operation' from the statute in those two locations that you referenced in the statute and also the two locations in the regulation."  Aug. 7, 2025 Tr. of Proceedings ("Tr."), 7:8-10. But "courts do not have the power to 'excise' or 'strike down' statutes."  *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 489 (2018) (Thomas, J., concurring) (citation omitted).

1   Doc. 288-1, at 3.  Plaintiffs did not even use the word "intent" in their motion.  *See* Doc.

2   282.  Plaintiffs did no better in their subsequent briefing.  In defense of their new proposal

3   to enjoin the word "operation" from the statute, Plaintiffs summarily asserted that "this

4   proposed remedy follows the legislature's intent" because it was consistent with the

5   statutory purpose of non-discrimination asserted by the State.[2]  *See* Doc. 290, at 2; Doc.

6   295, at 3.  Plaintiffs still offered no specific evidence of legislative intent.  *See id.*

7         Legislative intent is critical to determining the appropriate remedy here.  When the

8   court confronts "a constitutional flaw in a statute," "the touchstone for any decision about

9   remedy is legislative intent, for a court cannot 'use its remedial powers to circumvent the

10  intent of the legislature.'"  *Ayotte*, 546 U.S. at 328, 330 (citation omitted).  The Supreme

11  Court has reiterated this principle in the equal protection context: because "'the right

12  invoked is that of equal treatment,' the appropriate remedy is a mandate of *equal*

13  treatment."  *Heckler v. Matthews*, 465 U.S. 728, 740 (1984) (citation omitted) (emphasis

14  in original).  Thus, "a court sustaining [an equal protection] claim faces 'two remedial

15  alternatives: [it] may either declare [the statute] a nullity and order that its benefits not

16  extend to the class that the legislature intended to benefit, or it may extend the coverage of

17  the statute to include those who are aggrieved by the exclusion.'"  *Id.* at 738 (citation

18  omitted).  "The choice between these outcomes is governed by the legislature's intent, as

19  revealed by the statute at hand."  *Sessions v. Morales-Santana*, 582 U.S. 47, 73 (2017).

20        Determining legislative intent requires the Court to conduct a severability analysis,

---

[2] Plaintiffs argued in their reply that the Legislative Leaders' views on legislative intent should be disregarded because "Defendant has already described" legislative intent.  Doc. 290, at 2 n.2.  But the State of Arizona has decided that, when a statute's constitutionality is challenged, the Speaker of the Arizona House of Representatives and the President of the Arizona State Senate "shall be entitled to be heard," including by "fil[ing] briefs in the matter."  A.R.S. § 12-1841(A), (D).  When faced with a similar state law, the Supreme Court recently rejected an attempt to silence a state legislature's perspectives because doing so would "evince disrespect for a State's chosen means of diffusing its sovereign powers among various branches and officials" and "risk turning a deaf federal ear to voices the State has deemed crucial to understanding the full range of its interests."  *Berger v. N. Carolina State Conf. of the NAACP*, 597 U.S. 179, 191 (2022).  For these reasons, "[p]ermitting the participation of lawfully authorized state agents promotes informed federal-court decisionmaking and avoids the risk of setting aside duly enacted state law based on an incomplete understanding of relevant state interests."  *Id.* at 192.  The Court thus should reject Plaintiffs' efforts to silence the Legislative Leaders here.

4

1    which "is of course a matter of state law."  *Leavitt*, 518 U.S. at 139; *see also Planned*

2    *Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 935 (9th Cir. 2004); *State v. Pandeli*,

3    215 Ariz. 514, 530 ¶ 62 (2007) ("[s]everability is a question of legislative intent").  Under

4    Arizona law, "[t]o find legislative intent, an appellate court may consider many different

5    factors," including "the context of the statute, the language used, the subject matter, its

6    historical background, its effects and consequences, and its spirit and purpose."  *Wyatt*, 167

7    Ariz. at 284; *see also Premier Physicians Grp., PLLC v. Navarro*, 240 Ariz. 193, 195 ¶ 9

8    (2016) (noting that "secondary factors" for determining legislative intent are reached only

9    if the statute is ambiguous).  To determine legislative intent in the equal protection context,

10    the Supreme Court also has instructed the court to "measure the intensity of commitment

11    to the residual policy—the main rule, not the exception—and consider the degree of

12    potential disruption of the statutory scheme that would occur by extension as opposed to

13    abrogation."  *Sessions*, 582 U.S. at 75 (internal quotation marks and citations omitted).

14    All these factors weigh heavily against Plaintiffs' new proposed remedy of

15    enjoining "operation" and in favor of enjoining "has undergone a sex change operation or"

16    from A.R.S. § 36-337(A)(3) and A.A.C. R9-19-208(O).  *See* Doc. 287, at 4-5.

17    **A.    Statutory language**

18    When determining legislative intent, "[w]e look first to the statute's words."  *Mail*

19    *Boxes v. Indus. Comm'n of Arizona*, 181 Ariz. 119, 121 (1995) (citation omitted).  The

20    Arizona Legislature did not define "sex change operation" in A.R.S. § 36-337.  "Because

21    it does not appear from the context that the drafters intended a special meaning, [the court

22    is] guided by the word's ordinary meaning."  *Vangilder v. Arizona Dep't of Revenue*, 252

23    Ariz. 481, 489 ¶ 28 (2022); *see also* A.R.S. § 1-213.  "A statute's plain language best

24    indicates legislative intent, and when the language is clear, we apply it unless an absurd or

25    unconstitutional result would follow."  *Premier Physicians Grp.*, 240 Ariz. at 195 ¶ 9.

26    The ordinary meaning of "operation" is a surgical procedure, according to

27    dictionary definitions in existence when the Arizona Legislature enacted A.R.S. § 36-337

28    and its predecessor statute.  *See, e.g.*, Webster's New World College Dictionary (4th Ed.)

(2004), at 1011 (defining "operation" as "any surgical procedure performed, usually with the aid of instruments, to remedy a physical ailment or defect"); Webster's Seventh New Collegiate Dictionary (1967), at 591 (defining "operation" as "a procedure on a living body usually with instruments for the repair of damage or the restoration of health"); *see also Vangilder*, 252 Ariz. at 489 ¶ 29 (using Webster's dictionaries to determine a word's ordinary meaning). Thus, the definition of "operation" is clear.

The ordinary meaning of "sex" when the Arizona Legislature enacted what is now A.R.S. § 36-337(A)(3) is also clear. In that era, almost all "[r]eputable dictionary definitions of 'sex' … meant biological sex." *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812 (11th Cir. 2022) (citing six dictionaries). Indeed, just a few years after Arizona first enacted what is now A.R.S. § 36-337(A)(3), the Supreme Court observed that "[s]ex, like race and national origin, is an immutable characteristic determined solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion).

Based on the ordinary meanings of "sex" and "operation," a "sex change operation" is a "surgical operation" in which "the sex of the person has been established as different from that in the original document," which is the exact language in the original statute. *See* Laws 1967, Ch. 77, § 2, eff. Jan. 1, 1968 (codifying A.R.S. § 36-326(A)(4)). Here, the "sex change operation" language is unambiguous and thus conclusively requires a surgical procedure changing a person's sex.

This unambiguous interpretation of "sex change operation" is also undisputed. In their operative Complaint, Plaintiffs explained that, instead of using "sex change operation," the medical community "refers to a surgical operation for the treatment of gender dysphoria as a 'gender-confirmation surgery' or a 'gender-affirming surgery.'" Doc. 47, at 2 n.1. Plaintiffs referred to the "sex change operation" provision in A.R.S. § 36-337(A)(3) as the "Surgical Requirement" in their summary judgment briefing, which refers to that term 140 times. *See* Doc. 232; Doc. 255. Thus, Plaintiffs agree that the current "sex change operation" text in A.R.S. § 36-337(A)(3) requires a surgical procedure.

1    That the statute contains "a pathway for transgender individuals to amend the sex

2    marker on their birth certificate already," Tr. 25:12-14, is not evidence that the Arizona

3    Legislature would pass the statute with a different, broader, and ambiguous amendment

4    option by omitting "operation."   To the contrary, "sex change" and "operation" are

5    "inextricably entwined and so connected and interdependent in subject matter, meaning

6    and purpose as to preclude the presumption that the legislature would have passed the one

7    without the other, but, on the contrary, justify the conclusion that the legislature intended

8    them as a whole and would not have enacted a part only." *Hudson v. Kelly*, 76 Ariz. 255,

9    274 (1953).   Plaintiffs offer no evidence to rebut the conclusion that the Legislature

10   intended "sex change operation" as a whole and would not have enacted only a part.

11   Rewriting A.R.S. § 36-337(A)(3) by enjoining the word "operation" and allowing

12   birth certificate amendments for "sex changes" would be inconsistent with legislative intent

13   as demonstrated through the statute's plain text.   Plaintiffs appear to recognize that their

14   new proposed remedy would result in rewriting the statute.  *See* Tr. 7:21-24 ("[S]ex change

15   is a term that was used, as you mentioned previously, in the past.  We would now refer to

16   it as a -- maybe a gender transition.").   However, "[r]ewriting the statute is a job for the

17   Arizona legislature, if it is so inclined, and not for this court." *Valle del Sol Inc. v. Whiting*,

18   732 F.3d 1006, 1021 (9th Cir. 2013); *see also* Doc. 288-1, at 5-7 (citing cases).  And the

19   Ninth Circuit has "expressed concern that federal courts ought not be redrafting state

20   statutes at the level of individual words." *Wasden*, 376 F.3d at 937 (citation omitted).

21   **B.    Statutory context**

22   "The best indicator of [legislative] intent is the statute's plain language, which we

23   read in context with other statutes relating to the same subject or having the same general

24   purpose, and when that language is unambiguous, we apply it without resorting to

25   secondary statutory interpretation principles."   *SolarCity Corp. v. Arizona Dep't of*

26   *Revenue*, 243 Ariz. 477, 480 ¶ 8 (2018).  As previously argued by the Legislative Leaders,

27   *see* Doc. 288-1, at 4, A.R.S. § 36-337 limits birth certificate amendments to only specific,

28   carefully delineated, and expressly enumerated circumstances: (1) "an adoption certificate

or a court order for adoption;" (2) "[a] voluntary acknowledgment of paternity;" (3) "a sex change operation or … a chromosomal count that establishes the sex of the person as different than in the registered birth certificate;" and (4) "[a] court order ordering an amendment to a birth certificate." *See* A.R.S. § 36-337(A). All four provisions, including the provision in A.R.S. § 36-337(A)(3) at issue here, limit birth certificate amendments to a narrow class of cases involving objectively verifiable circumstances that can be corroborated by independent documentation. *See id.*

Requiring documentation of a surgical procedure in A.R.S. § 36-337(A)(3) is consistent with this statutory context. Rewriting this statute to allow certificates to be amended after a "sex change" is not consistent with this context.

## C.    Legislative history

The Arizona Supreme Court has looked to legislative history to consider legislative intent. *See, e.g.*, *State of the Netherlands v. MD Helicopters, Inc.*, 250 Ariz. 235, 241 ¶ 21 (2020); *see also State ex rel. Arizona Dep't of Revenue v. Tunkey*, 254 Ariz. 432, 438 ¶ 27 (2023) (Bolick, J., concurring) ("as a *secondary* interpretative device, legislative history can often help illuminate statutory meaning[,] … [b]ut legislative intent properly understood is only a means to discern statutory meaning and never an object in itself" (citations omitted) (emphasis in original)). Here, the legislative history of A.R.S. § 36-337(A)(3) demonstrates that the Arizona Legislature intended to allow birth certificate amendments only after surgical procedures and not after "sex changes" that do not involve surgical procedures.

Arizona first allowed birth certificate amendments after surgical procedures in 1967 when it passed House Bill No. 137.[3] According to the 1967 statutory language, a birth certificate could be amended upon submission of "[a] sworn statement from a licensed physician in good standing that he has performed a *surgical operation* or a chromosomal count on a person and that by reason of *this operation* or count the sex of the person has

_____

[3] The State previously set forth the history for Arizona's vital records laws. *See* Doc. 230, at 1-7.

been established as different from that in the original document.  The state registrar may reserve the right to require further proof if deemed necessary, or to seek independent professional evaluation of the evidence offered before creating a new certificate."  Laws 1967, Ch. 77, § 2, eff. Jan. 1, 1968 (codifying A.R.S. § 36-326(A)(4)) (emphasis added). Arizona promulgated an implementing regulation the following year that contained a similar focus on surgery.  *See* A.A.C. R9-19-131(4) (1968) ("Surgical alteration or chromosomal count - A sworn statement from the physician setting forth the fact of the operation or determination plus such additional information as may be required.").  The relevant portions of A.R.S. § 36-326(A)(4) remained unchanged until 2004, when the Arizona Legislature rephrased and reorganized Arizona's vital records law, which resulted in the relevant statute moving to its current home in A.R.S. § 36-337(A)(3).

The relevant section heading in the 2004 legislation demonstrates that changing "surgical procedure" to "sex change operation" was not a substantive change.  The section heading for § 36-337 stated: "36-337 Amending birth certificates after adoption, *surgical alteration* and court order."[4]  Laws 2004, Ch. 117, § 8 (emphasis added).  "Although A.R.S. § 1–212 mandates that title and section headings in statutes are not part of the law, we may properly refer to titles and captions in legislative bills for indications of legislative intent."  *State ex rel. Ross v. Nance*, 165 Ariz. 286, 288 (1990).

Legislative summaries for the 2004 legislation also demonstrate that changing "surgical procedure" to "sex change operation" was not intended to be a substantive change.  According to the House Bill Summary, § 36-337 was part of the bill's "Rephrasing and Revising Current Law -- NO SUBSTANTIAL CHANGES."  House Summary Fact Sheet for HB2200 As Transmitted to the Governor, Apr. 14, 2004.[5]  The summary

---

[4] According to a 2004 note by the Reviser, "Pursuant to authority of § 41-1304.02, in the section heading 'after adoption, surgical alteration and court order' was removed."  Under A.R.S. § 41-1304.02, the director of the Arizona Legislative Council has authority to clean up statutes, but "shall not alter the sense, meaning or effect of any law" because "the director shall in no manner assume to exercise legislative power."  Thus, the section heading passed in 2004 is evidence of legislative intent, while the Reviser's removal of the heading has no bearing on legislative intent.
[5]  *Available    at*    https://www.azleg.gov/legtext/46leg/2r/summary/h.hb2200_04-13-04_astransmittedtogovernor.doc.htm.

1  specifically described the statute as continuing to require a "surgical alteration:"

2  "*Amending birth certificates after adoption, surgical alteration and court order* [New 36-

3  337] • Specifies the process for amending birth certificates after adoption, voluntary

4  acknowledgement of paternity, surgical alteration and court order. [currently in A.R.S.

5  §36-326]." *Id.* (emphasis in original).  The Arizona Supreme Court has relied on bill

6  summaries as evidence of legislative intent. *See State v. Patel*, 251 Ariz. 131, 139 ¶¶ 31-

7  32 (2021); *State ex rel. Polk v. Campbell*, 239 Ariz. 405, 408 ¶ 11 (2016).

8          Plaintiffs improperly claim that the non-discriminatory purpose for the law is proof

9  that the Arizona Legislature would have passed Plaintiffs' new proposed remedy. *See, e.g.*,

10  Doc. 290, at 2; Doc. 295, at 3; Tr. 25:15-26:4.  Plaintiffs point to no evidence to support

11  this theory.  *See id.*  Plaintiffs' theory lacks logical support—just because the Legislature

12  did not discriminate when it passed A.R.S. § 36-337(A)(3) does not inherently mean that

13  the Legislature would have passed Plaintiffs' different, broad, and ambiguous new

14  proposed remedy.  Plaintiffs' theory also lacks legal support.  "[T]he test is whether the

15  legislature would have enacted [the statute without the unconstitutional portion], if it had

16  known of the invalidity, or, as otherwise stated, if the valid or invalid parts are not so

17  intimately connected as to raise the presumption that the legislature would not have enacted

18  the one without the other." *Pandeli*, 215 Ariz. at 530 ¶ 62 (citation omitted).  "Sex change"

19  and "operation" are intimately connected in the statute—they are a single term, "sex change

20  operation"—which raises the presumption that the Arizona Legislature would not have

21  enacted "sex change" without "operation." *See id.*  Plaintiffs do not rebut this presumption.

22          This legislative history for A.R.S. § 36-337(A)(3) demonstrates that the Arizona

23  Legislature intended, in both 1967 and 2004, to only allow birth certificate amendments

24  after a surgical procedure.  Allowing amendments after "sex changes" that do not involve

25  operations would be inconsistent with this legislative history.

26          **D.    Intensity of commitment to the residual policy and potential**

27                 **disruption**

28          As Justice Harlan observed more than a half-century ago, "[i]n exercising the broad

1    discretion conferred by a severability clause it is, of course, necessary to measure the

2    intensity of commitment to the residual policy and consider the degree of potential

3    disruption of the statutory scheme that would occur by extension as opposed to

4    abrogation." *Welsh v. United States*, 398 U.S. 333, 365 (1970) (Harlan, J., concurring in

5    the result); *see also Sessions*, 582 U.S. at 75 (applying Harlan test). In this analysis, Justice

6    Harlan considered the "longstanding tradition in this country" and noted that a policy was

7    "deeply embedded in history." *Welsh*, 398 U.S. at 365-66 (Harlan, J., concurring in the

8    result).

9         For the entire time that Arizona has allowed amendments to birth certificates for

10    reasons other than technical corrections, Arizona has required a surgical procedure in order

11    to amend a birth certificate under what is now A.R.S. § 36-337(A)(3). This policy has been

12    in place for almost 60 years. Rewriting that policy by enjoining "operation" would disrupt

13    the statutory scheme of requiring objective evidence to amend a birth certificate and, for

14    the first time, allow subjective determinations by non-state actors to result in amendments

15    to vital State records. This would greatly disrupt the statutory scheme. Enjoining "sex

16    change operation" would be far less disruptive because objective evidence would still be

17    required to amend a birth certificate.

18         Arizona's policy is also consistent with the policy of many other states. Based on a

19    survey by the Sixth Circuit, "[t]welve States allow amendments to change one's listed sex

20    but only after surgery." *Gore v. Lee*, 107 F.4th 548, 553 (6th Cir. 2024) (citing statutes).

21    Other States allow, like Plaintiffs seek here, birth certificate amendments without a surgical

22    procedure. *See id.* Arizona could have revised its statute in that manner, but it chose to

23    not do so. *See* A.R.S. § 36-337(A)(3). Removing the word "operation" would rewrite the

24    statute and create ambiguity, which can be seen by examining the specific, detailed

25    requirements in State laws that allow transgender individuals to amend their birth

26    certificate without requiring a surgical procedure. *See, e.g.*, Conn. Gen. Stat. § 19a-42(i);

27    Haw. Rev. Stat. § 338-17.7(a)(4); Md. Code Ann., Health-Gen § 4-211(b).

28         The Arizona Legislature has demonstrated an intense commitment to the policy of

1    requiring objective criteria like surgeries before allowing birth certificate amendments.

2    The statutory scheme would be disrupted by enjoining only the word "operation" in A.R.S.

3    § 36-337(A)(3).

4                    **E.    Severability**

5            "An entire statute need not and should not be declared unconstitutional if the

6    constitutional portions can be separated." *Cohen v. State*, 121 Ariz. 6, 9 (1978). "The test

7    is whether or not the legislature would have passed the statute had it been presented with

8    the invalid features removed." *Millett v. Frohmiller*, 66 Ariz. 339, 343 (1948).

9            Plaintiffs have not challenged the constitutionality of any other portion of A.R.S.

10   § 36-337, nor have they challenged the constitutionality of the chromosomal provision in

11   A.R.S. § 36-337(A)(3). Because these are additional objective criteria for amending birth

12   certificates, the statutory text, context, and legislative history indicate that the Arizona

13   Legislature would have passed the other portions of A.R.S. § 36-337 even if they had

14   known that the "sex change operation" language would be removed. Accordingly, the

15   Court should not enjoin any other provisions in A.R.S. § 36-337.

16           The statutory text, context, and legislative history also make clear that the Arizona

17   Legislature would not have passed A.R.S. § 36-337(A)(3) without the word "operation."

18   *Cf. K. v. Health Div., Dep't of Hum. Res.*, 277 Or. 371, 375 (1977) ("it was the intent of

19   the legislature of Oregon that a 'birth certificate' is an historical record of the facts as they

20   existed at the time of birth, subject to the specific exceptions provided by statute"). For

21   almost 60 years, Arizona has consistently required a surgical procedure to amend a birth

22   certificate under A.R.S. § 36-337(A)(3). Enjoining "operation" thus would not be

23   "reasonable in light of the act as originally drafted." *Millett*, 66 Ariz. at 343.

24           Thus, to the extent that the Court enters a permanent injunction, it should enjoin

25   "has undergone a sex change operation or" from A.R.S. § 36-337(A)(3) and A.A.C. R9-

26   19-208(O). The Court can enter this remedy even though Plaintiffs did not request it. *See*

27   *Off. of United States Tr. v. John Q. Hammons Fall 2006, LLC*, 602 U.S. 487, 496 (2024)

28   ("And we must keep in mind that our ultimate aim is to remedy the constitutional wrong

1    consistent with congressional intent, not to provide the complaining parties' preferred form

2    of relief."); *Sessions*, 582 U.S. at 77 n.29 ("That Morales-Santana did not seek this outcome

3    does not restrain the Court's judgment.  The issue turns on what the legislature would have

4    willed.  'The relief the complaining party requests does not circumscribe this inquiry.'"

5    (citation omitted)).

6    **III.    Plaintiffs' new proposed remedy still fails to satisfy legal requirements.**

7         Plaintiffs' new proposed remedy of enjoining "operation" still fails Rule 65(d),

8    which requires "sufficiently precise terms" and "fair and precisely drawn notice of what

9    the injunction actually prohibits." *Union Pac. R. Co. v. Mower*, 219 F.3d 1069, 1077 (9th

10   Cir. 2000) (citation omitted).  Rule 65(d) was, after all, "designed to prevent uncertainty

11   and confusion on the part of those faced with injunctive orders."  *Id.* (citation omitted).

12   Here, the State officials that would be enjoined have argued that Plaintiffs' new proposed

13   remedy is not definite enough for them to know how to implement it.  *See, e.g.*, Tr. 10:23-

14   25, 12:15-18, 13:6-18.

15        Plaintiffs' new proposed remedy is indeed ambiguous.  At oral argument, Plaintiffs

16   claimed that "sex change" as used in this statute is the same as "gender transition."  Tr. at

17   7:21-24.  But in prior briefing, Plaintiffs argued that "[t]he transition process typically

18   includes one or more of" social transition, medical transition, and surgeries.  Doc. 232, at

19   3.  According to Plaintiffs, social transition "include[es] adopting a new name, pronouns,

20   appearance, and clothing, and correcting identity documents." *Id.*  Because "[t]ransition is

21   highly individualized for each person," *id.*, it is unclear under Plaintiffs' arguments what

22   level of transition—such as simply changing appearance or clothing as part of a social

23   transition—would qualify as a "sex change" for purposes of an amended birth certificate.

24        But as a matter of law, Plaintiffs' new proposed remedy would not provide the relief

25   that they seek.  Under statutory interpretation principles, "sex change" must still be

26   interpreted to mean a change in biological sex.  *See* Argument § II.A, *supra*.  Thus, even

27   under their new proposed remedy, Plaintiffs could not obtain an amended birth certificate

28   through a social or medical gender transition because their biological sex would not have

1    changed.

2          Finally, Plaintiffs' new proposed remedy is outside the scope of Plaintiffs' requested

3    relief.   In their operative Complaint, Plaintiffs sought a permanent injunction against

4    enforcement of the "surgical requirement."   Doc. 47, at Prayer for Relief, C.   "Surgical

5    requirement" referred to the statutory phrase "sex change operation" in A.R.S. § 36-

6    337(A)(3).  *See, e.g.*, *id.* at ¶ 6; Doc. 232, at 1.  Plaintiffs did not challenge only the word

7    "operation."  *See* Doc. 47.  Because Plaintiffs challenged the "surgical requirement" and

8    not the word "operation," enjoining only "operation" would be outside the scope of

9    Plaintiffs' requested relief.  *See Galvez v. Jaddou*, 52 F.4th 821, 836 (9th Cir. 2022) ("The

10   scope of the remedy must be no broader and no narrower than necessary to redress the

11   injury shown by the plaintiff[s]." (citation omitted)); *California v. Azar*, 911 F.3d 558, 584

12   (9th Cir. 2018) ("The injunction must be narrowed to redress only the injury shown as to

13   the plaintiff[s].").  Moreover, the Court has not made findings that "operation," by itself,

14   is unconstitutional.   *See, e.g.*, Doc. 279, at 13 (finding "the sex change operation

15   requirement" unconstitutional).  "*Once* a constitutional violation is found, a federal court

16   is required to tailor the scope of the remedy to fit the nature and extent of the constitutional

17   violation."  *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018)

18   (citation omitted) (emphasis added).  Enjoining "operation," when the Court has not found

19   that the word is unconstitutional on its own and Plaintiffs have not separately challenged

20   it, would exceed the appropriate bounds of an injunction.

21   **IV.    The Court should reconsider its summary judgment ruling.**

22          A district court may reconsider its summary judgment order if it "committed clear

23   error or the initial decision was manifestly unjust," or "if there is an intervening change in

24   controlling law." *Smith v. Clark Cnty. Sch. Dist.*, 727 F.3d 950, 955 (9th Cir. 2013).  It is

25   "common" and "routine" for "trial and appellate courts to reconsider and change positions

26   when they conclude that they made a mistake."  *Id.*  A summary judgment decision may

27   be reconsidered *sua sponte*.  *See Relevant Grp., LLC v. Nourmand*, 116 F.4th 917, 926 (9th

28   Cir. 2024).

14

1    The Court should reconsider its summary judgment order because of an intervening

2  change in controlling law.  *See Skrmetti*, 145 S. Ct. at 1837.  In *Skrmetti*, the Supreme Court

3  upheld, under rational basis review, a state law regulating medical procedures for minors.

4  *See id.*  The Court's analysis relating to the standard of review and the classification of the

5  statute is relevant to this case.  *See, e.g.*, *id.* at 1829-1834.

6    A decision arising out of the Tenth Circuit confirms that the Supreme Court's

7  analysis is an intervening change in controlling law relevant to this case.  Shortly before

8  this Court's summary judgment order, the Tenth Circuit reversed a district court's dismissal

9  of an equal protection challenge to Oklahoma's birth certificate law.  *Fowler v. Stitt*, 104

10  F.4th 770, 800 (10th Cir. 2024), *cert. granted, judgment vacated*, No. 24-801, 2025 WL

11  1787695 (U.S. June 30, 2025).  The Tenth Circuit's equal protection analysis of the state's

12  policy was similar to this Court's analysis.  *See id.* at 783-797.  However, following

13  *Skrmetti*, the Supreme Court granted a petition for a writ of certiorari of the Tenth Circuit's

14  decision, vacated the Tenth Circuit's judgment, and remanded "for further consideration in

15  light of *United States* v. *Skrmetti*."  *Stitt v. Fowler*, No. 24-801, 2025 WL 1787695, at *1

16  (U.S. June 30, 2025).  The Tenth Circuit has ordered supplemental briefing that is

17  scheduled to begin on September 2, 2025.  *See* Doc. 123, *Fowler v. Stitt*, No. 23-5080 (10th

18  Cir. Aug. 21, 2025).

19    In reconsidering its decision in light of *Skrmetti*, the Court also should consider

20  other relevant developments.  For example, the Sixth Circuit upheld a Tennessee birth

21  certificate law similar to Arizona's law.  *See Gore*, 107 F.4th at 566.  In the same decision

22  that the Supreme Court vacated, the Tenth Circuit rejected a substantive due process claim

23  based on the same alleged right to privacy raised in this case.  *See Fowler*, 104 F.4th at

24  797-800.  The Eleventh Circuit upheld an Alabama policy that prohibited changing sex

25  designations on drivers licenses.  *Corbitt v. Sec'y of the Alabama L. Enf't Agency*, 115

26  F.4th 1335, 1350 (11th Cir. 2024).  And the Ninth Circuit rejected an equal protection

27  challenge by transgender students against a state law requiring public school students to

28  only use the restroom and changing facilities corresponding to their biological sex.  *Roe v.*

15

1   *Critchfield*, 137 F.4th 912, 925 (9th Cir. 2025) (reasoning that it is not the court's "role to

2   decide whether the legislative action is substantively good policy").

3         Even the factual predicates underlying the Court's reasoning have changed.  For

4   example, the Court "note[d] that several federal agencies have recognized that a sex change

5   operation is not necessary to ensure the accuracy of identity documents."  Doc. 279, at 4

6   n.4.  On January 20, 2025, President Donald J. Trump issued an executive order directing

7   the Secretaries of State and Homeland Security, and the Director of the Office of Personnel

8   Management "to implement changes to require that government-issued identification

9   documents, including passports, visas, and Global Entry cards, accurately reflect the

10  holder's sex."  Executive Order 14168 of Jan. 20, 2025, *Defending Women From Gender

11  Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed.

12  Reg. 8615, 8616 (Jan. 30, 2025); *but see Orr v. Trump*, No. 1:25-CV-10313-JEK, 2025

13  WL 1695941, at *15 (D. Mass. June 17, 2025) (certifying class and granting injunction

14  against passport policy implemented pursuant to Executive Order 14168), *appeal filed*.

15  The Court cited to the World Professional Association for Transgender Health ("WPATH")

16  for the standards of care for gender dysphoria, Doc. 279, at 6, but "[r]ecent revelations

17  suggest that WPATH … bases its guidance on insufficient evidence and allows politics to

18  influence its medical conclusions."  *Skrmetti*, 145 S. Ct. at 1847 (Thomas, J., concurring).

19  In a recent comprehensive report, the U.S. Department of Health and Human Services

20  provided additional concerning details about WPATH and concluded that "[t]here is

21  currently no international consensus about best practices for the care of children and

22  adolescents with gender dysphoria."  *Treatment for Pediatric Gender Dysphoria: Review

23  of Evidence and Best Practices*, U.S. Dep't of Health and Human Services (May 1, 2025),

24  at 13.[6]

25         In light of the Supreme Court's decision in *Skrmetti* that resulted in its vacatur of a

26  Tenth Circuit decision containing similar equal protection analysis to this Court's order, as

27

28  _____

    [6] *Available at* https://opa.hhs.gov/sites/default/files/2025-05/gender-dysphoria-report.pdf.

well as other relevant developments that affect that analysis, the Court should reconsider its summary judgment order and grant judgment for the Defendant.

## CONCLUSION

For the reasons stated above, the Court should reconsider its summary judgment order and grant judgment for the Defendant.  If the Court enters a permanent injunction in favor of Plaintiffs, that injunction should simply and straightforwardly enjoin the "sex change operation" language challenged by Plaintiffs, which is presented in strikethrough to demonstrate how the statute would continue to be implemented after the injunction.

A.R.S. § 36-337(A)(3)

3. For a person who ~~has undergone a sex change operation or~~ has a chromosomal count that establishes the sex of the person as different than in the registered birth certificate, both of the following:

(a) A written request for an amended birth certificate from the person or, if the person is a child, from the child's parent or legal guardian.

(b) A written statement by a physician that verifies the ~~sex change operation or~~ chromosomal count.


A.A.C. R9-19-208(O):

**O.** To request an amendment to an individual's registered birth record when the individual ~~has undergone a sex change operation or~~ has had a chromosomal count that establishes the sex of the individual as different than in the individual's registered birth record, an individual, if the individual is of legal age or is married, or the individual's parent or guardian shall submit to the State Registrar or a local registrar: …

2. A written statement on a physician's letterhead paper, signed and dated by the physician, that the individual has:

a. ~~Undergone a sex change operation, or~~

b. Had a chromosomal count that establishes the sex of the individual as different from that in the individual's registered birth record.

Dated: August 29, 2025

Respectfully submitted,

JAMES OTIS LAW GROUP, LLC

*/s/ Justin D. Smith*_____
Justin D. Smith, Mo. Bar No. 63253*
Michael Martinich-Sauter, Mo. Bar No. 66065
530 Maryville Centre Drive, Suite 230
St. Louis, Missouri 63141
(816) 678-2103
Justin.Smith@james-otis.com
* *pro hac vice*

*Attorneys for Amici Curiae*
*President Petersen and Speaker Montenegro*

## CERTIFICATE OF SERVICE

I hereby certify that, on August 29, 2025, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ Justin D. Smith*