1  Kyle C. Wong (*Pro Hac Vice*)
   COOLEY LLP
2  3 Embarcadero Center, 20th floor
   San Francisco, California 94111-4004
3  Telephone:    (415) 693-2000
   Facsimile:    (415) 693-2222
4  Email:        kwong@cooley.com

5  Patrick J. Hayden (*Pro Hac Vice*)
   COOLEY LLP
6  55 Hudson Yards
   New York, New York 10001-2157
7  Telephone:    (212) 479-6000
   Facsimile:    (212) 479-6275
8  Email:        phayden@cooley.com

9  Mary O'Grady (011434)
   Colin Proksel (034133)
10 Payslie Bowman (035418)
   OSBORN MALEDON, P.A.
11 2929 North Central Avenue, 21st Floor
   Phoenix, Arizona 85012-2793
12 Telephone:    (602) 640-9000
   Facsimile:    (602) 640-9050
13 Email:        mogrady@omlaw.com
   Email:        cproksel@omlaw.com
14 Email:        pbowman@omlaw.com

15 *Attorneys for Plaintiffs and the Class*

16 Additional counsel listed on following page

17 **UNITED STATES DISTRICT COURT**
18 **FOR THE DISTRICT OF ARIZONA**

19 Helen Roe, a minor, by and through her
   parent and next friend Megan Roe; et al.,
20
                                              Case No. 4:20-cv-00484-JAS
21                Plaintiffs,
                                              **PLAINTIFFS' NOTICE OF DEFENDANT
22        v.                                  SHEILA SJOLANDER'S MOTION FOR
                                              STAY PENDING APPEAL AND MOTION
23 Sheila Sjolander, in her official capacity as   FOR AN ADMINISTRATIVE STAY
   State Registrar of Vital Records and       FILED IN THE NINTH CIRCUIT COURT
24 Director of the Arizona Department of       OF APPEALS**
   Health Services,
25
                  Defendant.
26

27

28

Rachel Berg (*Pro Hac Vice*)
NATIONAL CENTER FOR LGBTQ RIGHTS
870 Market Street, Suite 370
San Francisco, California 94102
Telephone:    (415) 343-7679
Facsimile:    (415) 392-8442
Email:        rberg@nclrights.org

Jessica Taylor (*Pro Hac Vice*)
COOLEY LLP
10265 Science Center Drive
San Diego, California 92121-1117
Telephone:    (858) 550-6000
Facsimile:    (858) 550-6420
Email:        jtaylor@cooley.com

*Attorneys for Plaintiffs and the Class*

1    Plaintiffs Helen Roe, James Poe, Carl Voe, and their parents and next friends
2  (collectively, "Plaintiffs") hereby notify the Court that on December 2, 2025, Defendant
3  Sheila Sjolander ("Defendant") filed a Motion for Stay Pending Appeal and Motion for an
4  Administrative Stay ("Motion for Stay") in connection with her appeal of this action to the
5  Ninth Circuit Court of Appeals, case number 25-6970. A true and correct copy of
6  Defendant's Motion for Stay is attached to this notice as Exhibit A.

7

8  Dated: December 8, 2025                  COOLEY LLP

9                                           /s/ *Kyle C. Wong*
                                            Kyle C. Wong (*Pro Hac Vice*)
10                                          COOLEY LLP
                                            3 Embarcadero Center, 20th Floor
11                                          San Francisco, California 94111-4004
                                            Telephone: (415) 693-2000
12                                          Facsimile:  (415) 693-2222
                                            Email:    kwong@cooley.com

13                                          Mary O'Grady (011434)
14                                          Colin M. Proksel (034133)
                                            Payslie M. Bowman (035418)
15                                          OSBORN MALEDON, P.A.
                                            2929 North Central Avenue, 21st Floor
16                                          Phoenix, Arizona 85012-2793
                                            Telephone:  (602) 640-9000
17                                          Facsimile:   (602) 640-9050
                                            Email:     mogrady@omlaw.com
18                                          Email:     cproksel@omlaw.com
                                            Email:     pbowman@omlaw.com
19
                                            Rachel Berg (*Pro Hac Vice*)
20                                          NATIONAL CENTER FOR LGBTQ
                                            RIGHTS
21                                          870 Market Street, Suite 370
                                            San Francisco, California 94102
22                                          Telephone:  (415) 343-7679
                                            Facsimile:   (415) 392-8442
23                                          Email:     rberg@nclrights.org

24                                          Patrick Hayden (*Pro Hac Vice*)
25                                          COOLEY LLP
                                            55 Hudson Yards
                                            New York, New York 10001-2157
26                                          Telephone: (212) 479-6000
                                            Facsimile:  (212) 479-6275
27                                          Email:     phayden@cooley.com

28                                          Jessica L. Taylor (*Pro Hac Vice*)
                                            10265 Science Center Drive

1

PLAINTIFFS' NOTICE OF DEFENDANT'S MOTION
FOR STAY FILED IN THE NINTH CIRCUIT
CASE NO. 4:20-CV-00484-JAS

San Diego, California 92121-1909
Telephone: (858) 550-6000
Facsimile:  (858) 550-6420
Email:      jtaylor@cooley.com
*Attorneys for Plaintiffs and the Class*

# EXHIBIT A

**Case No. 25-6970**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

HELEN ROE, a minor, by and through her parent and next friend Megan Roe; et al.,

*Plaintiffs-Appellees,*

*v.*

SHEILA SJOLANDER, in her official capacity as State Registrar of Vital Records and Interim Director of the Arizona Department of Health Services,

*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the District of Arizona

No. 4:20-cv-00484

---

### APPELLANT'S MOTION FOR STAY PENDING APPEAL AND MOTION FOR AN ADMINISTRATIVE STAY

Nathan T. Arrowsmith (No. 031165)
Lauren A. Watford (No. 037346)
OFFICE OF THE ARIZONA
ATTORNEY GENERAL
2005 N. Central Ave. Phoenix, AZ 85004
(602) 542-3333
Nathan.Arrowsmith@azag.gov
Lauren.Watford@azag.gov
ACL@azag.gov

*Counsel for Defendant-Appellant*
Dated: December 1, 2025

## INTRODUCTION

Plaintiffs brought a facial challenge to parts of an Arizona statute and rule related to the amendment of Arizona birth certificates. The district court misinterpreted those provisions and entered a permanent injunction that rewrites them. Because the injunction exceeds the district court's authority, Defendant Sheila Sjolander (the "Director") asks this Court to stay the permanent injunction pending appeal and administratively stay the same pending resolution of this motion.

## BACKGROUND

Plaintiffs are a class of transgender persons who were or will be born in Arizona and who have not undergone "a 'sex change operation' as treatment for their gender dysphoria." A40. Plaintiffs sued the Director under 42 U.S.C. § 1983, claiming that two parts of Arizona law—A.R.S. § 36-337(A)(3) and Arizona Administrative Code (A.A.C.) R9-19-208(O)—violate the Due Process and Equal Protection clauses of the Fourteenth Amendment. A29–32. Plaintiffs initially brought both facial and as-applied challenges, *see* A29–30, but they dropped their as-applied claim, A37 n.4.

Plaintiffs characterized § 36-337(A) and R9-19-208(O) as requiring transgender persons to undergo surgical procedures to amend their birth

certificates.  A57.  The district court adopted that (mis)characterization and granted summary judgment to Plaintiffs on their facial Equal Protection and Due Process claims as to § 36-337(A)(3).  A91.  The district court did not address R9-19-208(O).  *See id.*  After briefing on an appropriate remedy, the district court entered a permanent injunction enjoining the Director from enforcing the word "operation" in both the statute and rule.  A112.  The Director preemptively asked the district court to stay its injunction, A103, but the district court denied the request, A112 n.7.  The district court entered a permanent injunction and ordered the Director to comply by January 28, 2026.  A112.

## ARGUMENT

In deciding whether to grant a stay pending appeal, courts consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  *Nken v. Holder*, 556 U.S. 418, 426 (2009) (citation omitted).  The last two factors merge when the government is a

party.  *See California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018).  All four factors

support granting a stay pending appeal here.

## I.    The Director is likely to succeed on the merits of the appeal.

The Director is likely to succeed on appeal because the district court

misapplied the standard for a facial challenge and treated this case as if it

were an as-applied challenge to Arizona's vital records laws as a whole.

When properly interpreted, § 36-337(A)(3) and R9-19-208(O) are not facially

unconstitutional.

### A.    The district court misinterpreted Arizona's vital records laws.

The district court's errors all trace to its misinterpretation of § 36-

337(A)(3), which ignored the statute's plain language and context.  Without

analysis, the district court said that under § 36-337(A) "there are two

potential ways to amend an Arizona birth certificate."  A80.  The district

court then construed § 36-337(A)(3) as setting forth a "private administrative

process," wherein any person can request to amend a birth certificate but

only if they comply with a "surgical requirement."  A80–81.  That is quite

wrong.

When construing a statute, courts begin "with the language of the

statute."  *California v. Trump*, 963 F.3d 926, 944 (9th Cir. 2020).  Statutory

4

language "must always be read in its proper context" and "with a view to [its] place in the overall statutory scheme." *Id.* (citations omitted). "When terms are not defined within a statute, they are accorded their plain and ordinary meaning, which can be deduced through … general usage dictionaries." *Id.* (citation omitted).

First, the text: § 36-337(A)(3) says that the Director "shall amend the birth certificate for a person born in this state when [she] receives any of the following" documents:

　(1) "an adoption certificate or court order for adoption;"

　(2) a "voluntary acknowledgement of paternity;"

　(3) a written amendment request and a written physician's verification from "a person who has undergone a sex change operation or has a chromosomal count that establishes the sex of the person as different than in the registered birth certificate;"

　(4) a "court order ordering an amendment."

A.R.S. § 36-337(A)(1)-(4).

The phrase "undergone a sex change operation" is not defined in statute. "Undergo" means to "experience or be subjected to." *Undergo*, New Oxford American Dictionary (3rd ed. 2010). A "[s]ex change" is "a change

5

in a person's physical sexual characteristics, typically by surgery and hormone treatment." *Sex change*, New Oxford American Dictionary (3rd ed. 2010). "Operation" means "an act of surgery performed on a patient." *Operation*, New Oxford American Dictionary (3rd ed. 2010). Taken together, the plain and ordinary meaning of "a person who has undergone a sex change operation" is someone who has experienced an act of surgery to change their physical sexual characteristics.

Now, the context. Under Arizona law, the Director "shall prescribe by rule the information required to be submitted to create or amend a vital record." A.R.S. § 36-321(A). The Director also "shall amend a registered certificate pursuant to [A.R.S. Title 36, Chapter 3] and rules adopted pursuant to [the same]." A.R.S § 36-323(A). Based on this rulemaking authority, the Director has promulgated rules for the amendment of birth certificates. *See generally* A.A.C. R9-19-208.

Several fields on an Arizona birth certificate can be amended. *See id.* (C), (D) (providing for amendment to various fields due to hospital or provider error); (E)-(H) (name fields); (I) (month or day of birth); (J) (date or place of birth); (K)-(L) (paternity); (M)-(N) (adoption). Amendment requests generally require a written request, often including attestations, and some

form of evidentiary document.  *See generally* A.A.C. R9-19-208; R9-19-102.

The administrative process for all birth certificate amendment requests is the

same.  *See* A.A.C. R9-19-103.

Looking at its plain language and context, § 36-337(A)(3) does not say

anything about a "private administrative process."  Neither does it require

Plaintiffs to take any action.  Rather, § 36-337(A) commands the Director—it

requires her to amend an Arizona birth certificate when she receives certain

evidentiary documents, including a physician's verification from "a person

who has undergone a sex change operation."  The administrative process for

those circumstances is the same as all other amendment requests.  *See* A.A.C.

R9-19-103; R9-19-208.   There is no basis to conclude that § 36-337(A)(3)

imposes a "surgical requirement."

### B.    The district court's permanent injunction impermissibly rewrites the statute and does not comply with Rule 65.

As explained in section I(C) below, the district court erred in finding

that § 36-337(A)(3), on its face, violates the Equal Protection or Due Process

Clauses.  But even assuming a constitutional violation, the district court's

permanent injunction was error because it improperly rewrites the statute

and does not comply with Rule 65.

When crafting injunctive relief based on "a constitutional flaw in a statute," courts "try to limit the solution to the problem." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328 (2006). Courts refrain from "rewriting state law to conform it to constitutional requirements even as [they] strive to salvage it." *Id.* at 329 (citation and internal quotations omitted). Also, under Rule 65, an order granting an injunction must (1) "state the reasons why it issued," (2) "state its terms specifically; and," (3) "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(A)-(C).

The district court "permanently enjoined [Defendant] … from requiring that a transgender individual first undergo a sex change operation as a prerequisite to changing the sex on their birth certificate through the private administrative process under [A.R.S.] § 36-337(A)(3) and its implementing regulation [A.A.C.] R9-19-208(O)." A112. To accomplish this, the district court purported to strike "the word 'operation'" from the statute and rule. A112.

This was error for several reasons. First, as explained above, the district court erred by construing § 36-337(A)(3) as imposing a "surgical

8

requirement" because its plain text does not require anyone, other than the Director, to act.  And it does not create a "private administrative process." The administrative process for all amendment requests is the same.  *See* A.A.C. R9-19-103.

Second, the district court purported to enjoin a part of a rule, R9-19-208(O), but it never found that part of the rule unconstitutional.  *See* A79–91. Third, the district court acknowledged that its injunction effectively rewrote the statute and the rule.  As noted above, the district court did not analyze the meaning of "sex change operation," but its injunction outsources that responsibility, placing "the decision of what constitutes a 'sex change'" in the hands of "patients and their treating physicians."  A111.  What is more, the injunction appears to suggest that the district court believes that "sex change" should now be read to mean "pursuing treatment for gender dysphoria."  *Id.*  That is not how statutory construction works.  Nor is that how injunctions work.  Courts may not rewrite statutes via injunctive relief to "conform [them] to constitutional requirements."  *Ayotte*, 546 U.S. at 329 (citation omitted).

Fourth, the injunction does not comply with Rule 65 because it fails to advise the Director what acts she is required to take or restrained from

taking.  For example, the court failed to specify the language Defendant is required to accept in a physician's statement "verifying the sex change."  In its order on summary judgment, the court observed "it would not be a herculean effort" for the Director to accept physician's letters "attesting the applicant is receiving the 'appropriate clinical treatment' to transition or is 'irrevocably committed' to transitioning."  A91 n.11.  But under the court's permanent injunction order, it is not clear if the court expects the Director to accept such letters.  For these reasons, the Director is likely to succeed on the merits of her appeal, so the Court should stay the injunction pending appeal.

## C.    Section 36-337(A)(3) is not unconstitutional on its face.

The Director is also likely to prevail on appeal because the district court's conclusions as to the constitutionality of § 36-337(A)(3) are wrong.

To succeed in a facial challenge, Plaintiffs were required to "establish that no set of circumstances exists under which [§ 36-337(A)(3) and R9-19-208(O)] would be valid."  *United States v. Salerno*, 481 U.S. 739, 745 (1987).  In other words, they had to show that the statute and regulation are "unconstitutional in every conceivable application."  *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998) (citation omitted).

A "policy of general applicability is facially valid unless it can *never* be applied in a constitutional manner." *Lanier v. City of Woodburn*, 518 F.3d 1147, 1150 (9th Cir. 2008) (rejecting facial challenge because the plaintiff failed to show that the challenged policy could not be constitutionally applied). A defendant "need only demonstrate that" a challenged law "is constitutional in some of its applications to prevail" on a facial challenge. *United States v. Stennerson*, 150 F.4th 1276, 1281 (9th Cir. 2025).

### 1. A.R.S. § 36-337(A)(3) does not, on its face, classify on the basis of sex or transgender status.

The Fourteenth Amendment's Equal Protection Clause directs that "all persons similarly circumstanced should be treated alike." *Plyler v. Doe*, 457 U.S. 202, 216 (1982) (citation omitted). "The first step in equal protection analysis is to identify the state's classification of groups," and the next step is to "determine the level of scrutiny." *Country Classic Dairies, Inc. v. Milk Control Bureau*, 847 F.2d 593, 596 (9th Cir. 1988).

The district court said that "non-transgender people can apply to change their sex marker with no more than a physician's letter attesting that they are a certain sex in a confidential administrative process." A81. The district court did not cite any authority supporting this assertion, and there

is nothing in the text of § 36-337(A)(3) or in A.R.S. Title 36, Chapter 3 more broadly that says such a thing. Neither is there any support in the text of relevant regulations. *See* A.A.C. R9-19-207. In so holding, the district court read a classification into the text where none exists.

Section 36-337(A)(3) does not classify based on sex or transgender status.[1] The district court acknowledged as much when it concluded that § 36-337(A)(3) "do[es] not explicitly single out transgender individuals" and that most, but not *all*, individuals who undergo a sex change operation or those who seek to amend the sex field on their birth certificates are transgender. A87; *see also* A83 n.6.

Instead of finding a facial classification, the district court determined that § 36-337(A)(3) discriminates on the basis of transgender status because "*if* a transgender individual *were* unable to satisfy the surgical requirement and obtain an amended birth certificate," then § 36-337(A)(3) would deprive

---

[1] Facially neutral laws only violate the Equal Protection Clause if "a discriminatory purpose was a motivating factor for the legislation." *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1139 (9th Cir. 2023). The district court found the opposite here. *See* A111 (stating that by enacting A.R.S. § 36-337(a)(3), the legislature intended to offer a remedy for transgender individuals and the law "was not the result of anti-trans bias.").

that person of an accurate identity document. A87 (emphasis added). Meanwhile, "the vast majority" of non-transgender individuals "have an accurate birth certificate." *Id.* Thus, at most, the district court found § 36-337(A)(3) could be discriminatory *as applied* to certain transgender individuals. But a potentially unconstitutional application does not mean the law is facially discriminatory. *See Salerno*, 481 U.S. at 745; *Lanier*, 518 F.3d at 1150 (finding statute unconstitutional as applied but rejecting facial challenge). And, again, Plaintiffs only pursued a facial challenge here.

As discussed above, § 36-337(A) outlines circumstances in which the Director must amend a birth certificate. If § 36-337(A)(3) draws any classification, then it is not one based on gender or transgender status. It requires the Director to amend a birth certificate upon receipt of a written request and physician's verification from persons who have "undergone a sex change operation" or have a chromosomal count establishing their sex as different than in their registered birth certificate. A.R.S. § 36-337(A)(3). This group can include transgender and cisgender individuals. For example, it is undisputed that some intersex people may choose to undergo a sex change operation. A49.

Likewise, the class of people who are unable to submit the evidentiary documents described in § 36-337(A)(3), those who have *not* undergone that medical procedure or who have a chromosomal count that *is* consistent with their birth certificate, includes transgender and cisgender individuals. Thus, § 36-337(A)(3) does not classify based on sex or transgender status and therefore does not rely on any suspect classification. *Cf. United States v. Skrmetti,* 605 U.S. 495, 511 (2025) (holding state law that prohibited hormone therapy and puberty only as treatment for gender dysphoria did not facially discriminate based on sex or transgender status and instead classified based on "medical use"). It was error to conclude otherwise.

### 2. A.R.S. § 36-337(A)(3) does not facially deprive Plaintiffs of any substantive due process right.

The Due Process Clause forbids the government from depriving individuals of "certain 'fundamental' liberty interests … no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993).

The district court found that § 36-337(A)(3) on its face "obligates individuals either to present inaccurate identity documents, which in turn necessitates the involuntary disclosure of one's transgender status, or to

undergo surgery." A88. As a result, the court concluded § 36-337(A)(3) deprives Plaintiffs of the due process right to privacy, the right to individual liberty and autonomy, and the right to choose whether to undergo a particular medical treatment. *Id.*

As explained above, the district court's statutory interpretation is wrong. On its face, § 36-337(A)(3) does not deprive anyone of the ability to request an amendment to their birth certificate. Again, § 36-337(A)(3)'s plain text requires the Director to amend a birth certificate upon receipt of certain documents, but it does not textually limit the ability of any person to amend the sex field on their birth certificate. Indeed, as the district court correctly observed, § 36-337(A)(4) "permits an amendment to a gender marker if an individual has obtained a court order." A81.

The district court discussed its general concerns about the difficulties that transgender individuals face when obtaining identity documents that are consistent with their gender identity. Importantly, though, none of those concerns are traceable to the text of § 36-337(A)(3) or R9-19-208(O), the only provisions that Plaintiffs challenged. That is enough to withstand a facial constitutional challenge. *Salerno*, 481 U.S. at 745; *see also Prison Legal News v.*

15

*Ryan*, 39 F.4th 1121, 1131 (9th Cir. 2022) ("[T]he Court will construe [statutes] to avoid [constitutional] problems.") (citation omitted).

In finding a Due Process Clause violation, the district court went beyond the text of § 36-337(A)(3), relying on § 36-337(A)(4) and its application in particular circumstances, along with logistical challenges presented by the court order process. The district court said that "Arizona courts have interpreted [§ 36-337(A)(4)] to include the requirements of [§ 36-337(A)(3)], which mandates transgender individuals to get 'a sex change operation' to change the gender marker on their birth certificates." A81.

Plaintiffs did not challenge § 36-337(A)(4), but even so, any issues with its application cannot render § 36-337(A)(3) facially unconstitutional. Further, the application of a statute in particular circumstances may not be considered on a facial challenge. *See Calvary Chapel Bible Fellowship v. Cnty. of Riverside*, 948 F.3d 1172, 1176 (9th Cir. 2020). On the face of the statute, § 36-337(A)(3) and (A)(4) require the Director to amend a birth certificate upon receipt of two different types of evidentiary documents: for (A)(3), a physician's verification of a "sex change operation" or chromosomal count, and for (A)(4), a court order ordering an amendment. Nothing in the text of

16

§ 36-337(A)(3) suggests that it limits a court's authority to issue an order under (A)(4).

At most, § 36-337(A)(3)'s evidentiary documents could be read as an alternative to obtaining a court order under § 36-337(A)(4). But even if construed as an affirmative benefit for some persons who wish to change the sex marker on their birth certificate, § 36-337(A)(3) is not facially unconstitutional. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 37–40 (1973) (noting the "critical distinction" between laws that "deprive[],'infringe[], or interfere[] with the free exercise of some … fundamental personal right or liberty" and those that merely "extend" an "affirmative" "benefit[]," even if they "benefit[] some more than others") (citations and internal quotations omitted). Section 36-337(A)(3) is not unconstitutional because the Arizona legislature "might have gone farther than it did." *Id.* at 39 (citation omitted).

In any event, the district court erred in finding § 36-337(A)(3) facially invalid because some of its applications are undeniably constitutional. *See Salerno*, 481 U.S. at 745. For instance, it is undisputed that transgender and cisgender individuals who have undergone a sex change operation may submit the documents listed in § 36-337(A)(3) and request an amendment to

their birth certificate.  Thus, § 36-337(A)(3) is constitutional as applied to them.

Further, § 36-337(A)(3) is constitutional as applied to those transgender individuals who can and already have amended their birth certificates without evidence of a sex change operation by providing a court order under § 36-337(A)(4).  *See Foti*, 146 F.3d at 635.  Accordingly, § 36-337(A)(3) is not facially unconstitutional under the Due Process Clause.

### 3.    A.R.S. § 36-337(A)(3) withstands judicial review.

Laws that do not deprive a fundamental right or discriminate based on a suspect classification are subject only to the rational basis test.  *See Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1085 (9th Cir. 2015).  This test asks if there is "a rational relationship between the disparity of treatment and some legitimate governmental purpose."  *United States v. Ayala-Bello*, 995 F.3d 710, 715 (9th Cir. 2021) (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)).

Conversely, laws that deprive a "fundamental right" or draw a "suspect" or "quasi-suspect" classification are subject to heightened scrutiny, which asks if the law is "suitably tailored to serve a compelling state interest."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 437–40 (1985).  However, the Supreme Court has held that heightened scrutiny does

not apply to laws that merely fail to extend affirmative relief to a class. *See Rodriguez*, 411 U.S. at 37–40. Because § 36-337(A)(3) does not classify based on sex or transgender status or deprive Plaintiffs of a fundamental right, and simply declines to extend affirmative relief, the rational basis test applies. *See id.*; *City of Cleburne*, 473 U.S. at 440; *Stormans, Inc.*, 794 F.3d at 1085.

Read in context, there are several rational bases for § 36-337(A)(3). Arizona's vital records laws are designed to preserve historical facts, including information acquired at birth. *See* A.R.S. §§ 36-304(4), 333(B), (C); R9-19-201. Such preservation is "necessary for the legal, social, and sanitary purposes subserved by registration records" and for "public peace, health and safety." 1925 Ariz. Sess. Laws, ch. 37, §§ 14, 26. By requiring individuals seeking to amend their birth record to submit certain supporting documentation, Arizona's vital records laws are appropriately tailored to serve the state's significant interest in preserving the integrity and accuracy of birth records.

## II.    The Director would suffer irreparable harm absent a stay.

The Director will suffer irreparable harm absent an injunction because she is enjoined from applying A.R.S. § 36-337(A)(3) and R9-19-208(O) as written. *See Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997).

Further, because the district court rewrote § 36-337(A)(3) in crafting its injunction, compliance would require the Director to process amendment requests that she is not authorized to process under Arizona law. *See City & Cnty. of San Francisco v. United States Citizenship and Immigr. Servs.*, 944 F.3d 773, 806 (9th Cir. 2019) (granting stay pending appeal where preliminary injunction would force the Department of Homeland Security to grant immigration status to persons who were not eligible).

## III.    The balance of equities and the public interest support a stay.

In balancing the equities, the Court "consider[s] the hardships each party is likely to suffer if the other prevails." *San Francisco*, 944 F.3d at 806. For the reasons stated above, the Director would suffer irreparable harm were the district court's order to take effect.  Conversely, any harm to Plaintiffs is minimal because state law currently allows any individual to request an amended birth certificate, regardless of whether the person has undergone a sex change operation. *See* A.R.S. § 36-337(A)(3), (4).  Finally, it is in the public interest to ensure Arizona's administrative procedures and processes operate in accordance with decisions made by the state's democratically elected representatives and that valid state laws are enforced. *See Nken*, 556 U.S. at 435–36.

## CONCLUSION

This Court should stay the district court's permanent injunction order (A105–112) pending appeal and grant an administrative stay pending resolution of this Motion.

Respectfully submitted this 2nd day of December, 2025.

KRISTIN K. MAYES
  ARIZONA ATTORNEY GENERAL

By */s/ Nathan T. Arrowsmith*
Nathan Arrowsmith
Lauren Watford
OFFICE OF THE ARIZONA
  ATTORNEY GENERAL
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-3333
Nathan.Arrowsmith@azag.gov
Lauren.Watford@azag.gov
ACL@azag.gov

*Counsel for Defendant-Appellant*

**ADDENDUM**

# TABLE OF CONTENTS

Plaintiffs' Amended Complaint, Dkt. 47 ................................................................. A1–A34

Order re Cross-Motions to Compel, Dkt. 153 ........................................................ A35–A38

Order re Plaintiffs' Motion for Class Certification, Dkt. 214 ................................ A39–A46

Defendant's Statement of Facts in Support of MSJ, Dkt. 231 ................................ A47–A51

Plaintiffs' Motion for Summary Judgment, Dkt. 232 .............................................. A52–A78

Order re Cross-Motions for Summary Judgment, Dkt. 279 .................................... A79–A91

Defendant's Supplemental Brief in Response to Plaintiffs' PI Motion, Dkt. 308 ............. A92–A104

Order granting Permanent Injunction and Final Judgment, Dkt. 310............................. A105–A112

Patrick Gunn (admitted *Pro Hac Vice*)
COOLEY LLP
101 California Street, 5th Floor
San Francisco, California 94111-5800
Telephone:   (415) 693-2070
Facsimile:   (415) 693-2222
Email:       pgunn@cooley.com

Mary O'Grady (011434)
Colin Proksel (034133)
Payslie Bowman (035418)
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
Telephone:   (602) 640-9000
Facsimile:   (602) 640-9050
Email:       mogrady@omlaw.com
Email:       cproksel@omlaw.com
Email:       pbowman@omlaw.com

*Attorneys for Plaintiffs and Proposed Class*
Additional counsel listed on following page

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| D.T., a minor, by and through his parent and next friend Lizette Trujillo; Jane Doe, a minor, by and through her parent and next friend Susan Doe; Helen Roe, a minor, by and through her parent and next friend Megan Roe; James Poe, a minor by and though his parent and next friend Laura Poe; and Carl Voe, a minor, by and though his parent and next friend Rachel Voe,<br><br>Plaintiffs,<br><br>v.<br><br>Dr. Cara M. Christ, in her official capacity as State Registrar of Vital Records and Director of the Arizona Department of Health Services; Thomas Salow, in his official capacity as Branch Chief of the Division of Public Health Licensing Services at the Arizona Department of Health Services; and Krystal Colburn, in her official capacity as Bureau Chief and Assistant State Registrar of the Bureau of Vital Records at the Arizona Department of Health Services,<br><br>Defendants. | Case No. 4:20-cv-484-JAS<br><br>**AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Judge:       Hon. James A. Soto |

**A1**

Asaf Orr (admitted *Pro Hac Vice)*
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, California 94102
Telephone:    (415) 392-6257
Facsimile:    (415) 392-8442
Email:        aorr@nclrights.org

Barrett J. Anderson (admitted *Pro Hac Vice)*
COOLEY LLP
4401 Eastgate Mall
San Diego, California 92121-1909
Telephone:    (858) 550-6000
Facsimile:    (858) 550-6420
Email:        banderson@cooley.com

*Attorneys for Plaintiffs and Proposed Class*

**A2**

Plaintiffs respectfully state and allege as follows:

**<u>INTRODUCTION</u>**

1.    Plaintiffs are transgender children who were born in Arizona and seek to change the sex listed on their birth certificates to protect their privacy and safety.  They wish to have accurate birth certificates they can use without being forced to disclose their transgender status, which causes Plaintiffs significant emotional harm and puts them at risk of discrimination, harassment, and violence.

2.    Plaintiffs D.T., James Poe, and Carl Voe are transgender boys, but their Arizona birth certificates identify them as female.  Plaintiff Helen Roe is a transgender girl, but her Arizona birth certificate identifies her as male.  Plaintiff Jane Doe is a transgender girl whose Arizona birth certificate identified her as male until very recently when it was changed to female by order of this Court, (Doc. 41), following Jane Doe's motion for preliminary injunction filed in this lawsuit, (Doc. 3).

3.    Possessing identity documents that accurately reflect who they are is essential to Plaintiffs' well-being.  A birth certificate is a critical and ubiquitous identity document used in many settings to verify an individual's identity.  This is particularly true for children and adolescents for whom a birth certificate is often their only form of government-issued identification.  School enrollment, recreational sports registrations, and camp signups, among many others, hinge on having proper identity documents.  Not only are birth certificates themselves commonly required for such purposes, but they are often needed for obtaining other essential identity documents.

4.    For transgender people, the sex listed on their initial birth certificate does not match who they are.  For a young person who has undergone gender transition, having a birth certificate that fails to reflect who they are puts them at risk of exposure, discrimination, harassment, and even violence.  Changing the sex marker on their birth certificate is thus critically important for transgender young people.

5.    Arizona law allows for individuals born in Arizona to amend the sex marker on their birth certificates through a private administrative process codified at A.R.S. § 36-

**A3**

337(A)(3).  Obtaining an amendment under Subsection (A)(3) requires filing an application, including a letter from a treating physician, with the Arizona Department of Health Services ("ADHS") and paying an administrative fee.  However, Arizona prevents transgender minors from changing their sex marker through that process because Subsection (A)(3) is limited to transgender people who have undergone a "sex change operation."  A.R.S. § 36-337(A)(3); *see also* A.A.C. R9-19-208(O).[1]  Transgender young people cannot use this direct and private administrative process because, in most cases, minors do not undergo any type of surgery to treat their gender dysphoria.  Further, many transgender people, especially those who transitioned at a young age, may never require surgery as part of their gender transition, rendering the private administrative process in Subsection (A)(3) entirely unavailable to them for their lifetimes.

6.      Unlike other youth, transgender youth in Arizona have only one option open to them that is more expensive, confusing, and time-consuming than the Subsection (A)(3) process, and does not guarantee that they will receive a corrected birth certificate at the end.  Specifically, they must incur additional fees and shoulder extra risk by filing a public petition in their local superior court seeking an order amending the sex on their birth certificate.  Because of the surgical requirement in Subsection (A)(3),  Arizona courts regularly deny that relief to transgender young people who have not undergone surgery as part of their transition.  Additionally, forcing transgender young people to seek a court order vastly increases the risk that their transgender status will be made public, denying them the very privacy they seek to safeguard by correcting their identity documents.  And Arizonans who move out of state and are no longer under the jurisdiction of Arizona courts face a patchwork of differing state laws, several of which deny them the ability to obtain a court order to change the sex listed on their birth certificates.  For many transgender people and their families, the court-order process is thus entirely unavailable or presents such

---

[1] The term "sex change operation" as used in Subsection (A)(3) is not widely recognized in the medical community, which instead refers to a surgical operation for the treatment of gender dysphoria as a "gender-confirmation surgery" or a "gender-affirming surgery." Plaintiffs use the term "sex change operation" in this Amended Complaint only to avoid any doubt about what part of Subsection (A)(3) they challenge as unconstitutional.

A4

insurmountable hurdles that it is no option at all.

7.      As a result, transgender young people must too often navigate the world with a birth certificate that does not match their sex.  By establishing a private administrative process for applicants to change the sex listed on their Arizona birth certificates, and then effectively barring transgender youth from using it, Arizona law forces them to disclose their transgender status, which invades their privacy and exposes them to discrimination, harassment, and violence.  Accordingly, the current law violates the United States Constitution's guarantees of equal protection of the laws and the fundamental rights to privacy, liberty, and autonomy.

8.      No compelling, important, or even legitimate governmental justification supports Arizona's current refusal to provide transgender young people with the same opportunity to obtain accurate birth certificates as any other person.

### JURISDICTION AND VENUE

9.      This action arises under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation, under color of state law, of rights secured by the United States Constitution.

10.      This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the laws and the Constitution of the United States.

11.      Venue is proper in the District of Arizona under 28 U.S.C. § 1391(b) because all Defendants reside within the district, Defendants reside and have offices within the district, and/or a substantial part of the events that gave rise to Plaintiffs' claims occurred, and will continue to occur, within the district.

12.      This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65, and 28 U.S.C. §§ 2201 and 2202.

13.      This Court has personal jurisdiction over Defendants because they are domiciled in Arizona and/or have otherwise made and established contacts with Arizona sufficient to permit the exercise of personal jurisdiction over them.

**A5**

## PARTIES

### A.     The Plaintiffs

14.     Plaintiff D.T. is a thirteen-year-old transgender boy who was born in Pima County, Arizona and currently resides in Arizona.  Because D.T. is a minor, this action is brought on his behalf by and through his parent and next friend Lizette Trujillo.

15.     Plaintiff Jane Doe is a ten-year-old transgender girl who was born in Maricopa County, Arizona and currently resides in Arizona.  Because Jane Doe is a minor, this action is brought on her behalf by and through her parent and next friend Susan Doe.

16.     Plaintiff Helen Roe is a six-year-old transgender girl who was born in Pima County, Arizona and currently resides in Arizona.  Because Helen Roe is a minor, this action is brought on her behalf by and through her parent and next friend Megan Roe.

17.     Plaintiff James Poe is a five-year-old transgender boy who was born in Pima County, Arizona and currently resides in Arizona.  Because James Poe is a minor, this action is brought on his behalf by and through his parent and next friend Laura Poe.

18.     Plaintiff Carl Voe is a nine-year-old transgender boy who was born in Pima County, Arizona and currently resides in Maryland.  Because Carl Voe is a minor, this action is brought on his behalf by and through his parent and next friend Rachel Voe.

### B.     The Defendants

19.     Defendant Dr. Cara M. Christ ("Director Christ") is sued in her official capacity as State Registrar of Vital Records and Director of the Department of Health Services for the State of Arizona.  Director Christ has general supervision of vital statistics in the state and is charged with the execution of the vital statistics laws of Arizona, including the provision of the necessary instructions and forms for obtaining and preserving records of births.  Director Christ also has supervisory authority over the assistant state registrars and deputy local registrars throughout Arizona.  Director Christ has knowingly encouraged, condoned, and acquiesced in the acts barring Plaintiffs from correcting or amending their birth certificates to be consistent with their gender identity.  Director Christ's administration and enforcement of the vital statistics laws are actions under the color of state law.  Director

**A6**

Christ is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state law at all times relevant to this Amended Complaint.

20.      Defendant Thomas Salow ("Chief Salow") is sued in his official capacity as Branch Chief of the Division of Public Health Licensing Services within the Department of Health Services for the State of Arizona. As Branch Chief of the Division of Public Health Licensing Services, Chief Salow has supervisory authority over Chief Colburn and deputy local registrars throughout Arizona. Chief Salow has knowingly encouraged, condoned, and acquiesced in the acts barring Plaintiffs from correcting or amending their birth certificates to be consistent with their gender identity. Chief Salow's administration and enforcement of the vital statistics laws are actions under the color of state law. Chief Salow is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state law at all times relevant to this Amended Complaint.

21.      Defendant Krystal Colburn ("Chief Colburn") is sued in her official capacity as Assistant State Registrar and Bureau Chief of the Bureau of Vital Records within the Department of Health Services for the State of Arizona. Chief Colburn has supervisory authority over deputy local registrars throughout Arizona. Chief Colburn has knowingly encouraged, condoned, and acquiesced in the acts barring Plaintiffs from correcting or amending their birth certificates to be consistent with their gender identity. Chief Colburn's administration and enforcement of the vital statistics laws are actions under the color of state law. Chief Colburn is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state law at all times relevant to this Amended Complaint.

## STATEMENT OF FACTS

**Gender identity development and treatment for gender dysphoria**

22.      Each person's sex is comprised of multiple components, including internal reproductive organs, external genitalia, chromosomes, hormones, gender identity, and secondary-sex characteristics. For most people, each of these components align with one another as either male or female. That is not the case, however, for transgender people.

23.      Research indicates that being transgender has a biological component and

**A7**

cannot be changed. As such, efforts to change a transgender person's identity are unethical and harmful to a person's health and well-being.

24. Children typically become aware of their gender identity between the ages of two and five years old. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 455 (5th ed. 2013) ("DSM-5"). Around this age, transgender children often begin to express their cross-gender identification to their family members and caregivers through statements and actions. Transgender children exhibit a strong cross-gender identification that is insistent, persistent, and consistent. Research has found the gender identities of transgender and nontransgender children to be indistinguishable—that is, a transgender boy identifies himself as male just as strongly and consistently as a non-transgender boy, and a transgender girl identifies herself as female just as strongly and consistently as a non-transgender girl.

25. Living in a manner consistent with one's gender identity is critical to the health and well-being of any person, including transgender people.

26. The incongruence between a transgender person's gender identity and assigned sex can cause significant psychological distress. That distress is commonly referred to as gender dysphoria.

27. Gender dysphoria is a serious health condition recognized in the DSM-5, as well as by other leading medical and mental health professional groups, including the American Medical Association and the American Psychological Association. If left untreated, gender dysphoria may result in severe psychological distress, anxiety, depression, suicidal ideation, and even self-harm.

28. Gender dysphoria is highly treatable. As with other health conditions, health care providers follow a well-established standard of care when working with patients with gender dysphoria. The World Professional Association for Transgender Health ("WPATH") has set those standards for over four decades.

29. WPATH is an international, multidisciplinary, professional association of medical providers, mental health providers, researchers, and others, with a mission of

A8

promoting evidence-based care and research for transgender health, including the treatment of gender dysphoria. WPATH published the seventh and most recent edition of the Standards of Care in 2011.

30. Building on those standards and incorporating the most current research and clinical experience, the Endocrine Society released the *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline* in September 2017. These guidelines reaffirm the WPATH Standards of Care and offer medical providers practical guidance on providing transition-related care to patients with gender dysphoria, including young people.

31. The WPATH and the Endocrine Society standards have been adopted by many major associations of healthcare professionals, including the American Medical Association, American Psychiatric Association, and American Psychological Association, as well as associations of healthcare professionals focused on youth and adolescents, such as the American Academy of Pediatrics, American Association of Child and Adolescent Psychiatrists, and the Pediatric Endocrine Society. Federal courts across the country have also recognized the standards of these medical societies as setting the prevailing standard of care for the treatment of gender dysphoria.

32. Treatment for gender dysphoria seeks to bring a transgender person's life into alignment with their gender identity. The process of undertaking these treatments is often referred to as a gender transition or simply as transition. The typical components of gender transition consist of social transition, hormone-replacement therapy, and, for some transgender people, surgery. Surgery is not medically required to complete gender transition and is not medically necessary for every transgender person.

33. Typically, transgender people start their transition with a social transition, which includes changing their name, using different pronouns, wearing clothing and adopting grooming habits typically associated with their peers of the same gender identity, and using the corresponding sex-specific facilities such as restrooms. Making these changes enable a transgender person to live their life consistent with who they are and helps ensure

**A9**

that they are treated as such by family, peers, and others in the community.

34.    Social transition can significantly alleviate a transgender person's gender dysphoria.  Having identity documents that reflect a transgender person's assigned sex rather than their gender identity increases the likelihood that a person's transgender status will be disclosed to others, exposes them to a significant risk of mistreatment, and undermines the health benefits of their social transition.

35.    For transgender youth, research has shown that being accepted and supported as who they are is enormously beneficial to their health and well-being.  Conversely, being denied recognition and support can cause significant harm, in addition to exposing them to the risk of discrimination and harassment.

36.    At the onset of puberty, transgender young people may also start taking puberty-delaying medication to prevent their bodies from being flooded with the incorrect sex hormone and the attendant development of unwanted secondary-sex characteristics that conflict with their sex.  Without these medications, transgender young people would experience debilitating psychological distress because their changing bodies would be a constant reminder of the disjunction between their bodies and their sex.  The psychological distress is heightened by the reality that some of these physical changes may be irreversible, permanently constricting a transgender young person's future treatment options and negatively affecting their quality of life.

37.    In addition to puberty-delaying medications, transgender young people may also undergo hormone-replacement therapy.  That treatment causes their bodies to develop the secondary-sex characteristics associated with their gender identity, such as facial and body hair for transgender boys and breasts for transgender girls.

38.    The prevailing standards of care recognize that, under limited circumstances, it may be medically necessary for some transgender young people to undergo surgical treatment for their gender dysphoria while they are minors.  The most common surgical procedure that is medically necessary for transgender young people is male chest reconstruction surgery.  That procedure is specifically for transgender males.  However,

**A10**

because of the increasing availability of puberty-delaying medication, an increasing number of transgender boys never develop breasts and therefore never need that surgery.

39.     There are other surgical procedures that may be medically necessary to treat a transgender person's gender dysphoria in adulthood. Early treatment for gender dysphoria may also obviate the need for those procedures as well. For example, a transgender girl who never experiences a male puberty is unlikely to need facial feminization surgery, a series of procedures designed to improve the functionality of a transgender woman's facial features by making them more typically feminine. Whether surgery is medically necessary is based on an individualized assessment conducted in consultation with qualified healthcare providers.

40.     Even when medically necessary, a transgender person's ability to access any of those treatments—particularly surgery—may also be limited by financial resources, insurance coverage, and provider availability, in addition to many other barriers to health care access.

**The need for accurate birth certificates matching one's identity**

41.     The use of birth certificates is ubiquitous in our society. A person's birth certificate is a trusted and essential government-issued document that serves as proof of a person's identity. That document also reflects the government's recognition of a person's identity, including the person's sex.

42.     Birth certificates are commonly used in a wide variety of contexts, especially for young people who do not have any other form of government-issued identification, including enrolling in school and recreational sports, and obtaining other important identity documents (such as driver licenses, state identification cards, and passports).

43.     Depriving transgender young people of birth certificates that accurately reflect who they are forces them to disclose their transgender status—information that is private and sensitive—without their consent whenever they need to rely on birth certificates to establish their identity. That disclosure causes several distinct and significant harms: it creates barriers to full participation in school and other activities that are critical to a young

**A11**

person's health and well-being, circumvents that young person's ability to control the disclosure of their transgender status, undermines the effectiveness of a transgender young person's treatment for gender dysphoria, and exposes a transgender young person to an increased risk of harassment, discrimination, and potentially bodily harm.

44. A national survey conducted by the National Center for Transgender Equality in 2015 revealed that nearly one-third of respondents who had shown an identity document with a name or sex that did not match their gender presentation were verbally harassed, denied benefits or service, asked to leave, or assaulted.

45. Barring transgender youth from obtaining corrected birth certificates places them in a disfavored class. Unlike other youth, whose birth certificates match who they are, transgender youth are forced to use birth certificates that do not match their sex.

**The process for changing the sex listed on an Arizona birth certificate**

46. ADHS, through the Bureau of Vital Records, exercises responsibility for the registration, issuance, correction, and maintenance of Arizona birth certificates. A.R.S. § 36-302.

47. Recognizing birth certificates may be inaccurate or require updating, A.R.S. § 36-337 provides for the issuance of an updated birth certificate in a variety of circumstances, including to reflect a declaration of paternity or adoption or to correct the sex of a transgender or intersex person.

48. Under Subsection (A)(3) of that statute, a transgender person may change the sex listed on a person's birth certificate by submitting "[a] written request for an amended birth certificate" accompanied by "a written statement by a physician that verifies the [applicant or applicant's child has undergone a] sex change operation." A.R.S. § 36-337(A)(3). ADHS has promulgated a regulation that details the information, in addition to a letter from a physician, that a transgender person is required to provide in order to change the sex listed on their birth certificate under Subsection (A)(3). *See* A.A.C. R9-19-208(O).

49. These requirements—both statutory and regulatory—deny transgender young people the ability to correct their birth certificates under Subsection (A)(3) because most

**A12**

transgender youth cannot undergo or may never require surgery. This ban deprives Plaintiffs of equal treatment, violates fundamental constitutional rights to privacy and liberty, and subjects Plaintiffs and other transgender young people to serious irreparable harm to their safety, health, and well-being.

50.     The only other potential option available to transgender young people seeking to amend the sex listed on their birth certificate is to obtain a court order mandating that change pursuant to A.R.S. § 36-337(A)(4).  Subsection (A)(4) is a catchall provision that requires ADHS to accept "[a] court order ordering an amendment to a birth certificate." The statute is silent beyond that.

51.     Arizona courts interpreting Subsection (A)(4) have required families petitioning for amendments to the sex listed on a transgender minor's birth certificate to comply with the surgical requirement of Subsection (A)(3), which those families cannot do because their children are not eligible for surgery.  Based on information and belief, courts have imposed that requirement due, at least in part, to the language of Subsection (A)(3) and ADHS's prior publicly-stated position that Arizona courts lack the authority under Subsection (A)(4) to issue orders amending the sex listed on an Arizona birth certificate.

52.     Arizona courts are not available to transgender young people who were born in Arizona but have since moved to another state.  Under Subsection (A)(4), those families must petition a court in their current state for an order correcting or amending their child's birth certificate.  While some states have established court-order processes that allow their courts to grant such petitions, others do not allow for correcting or amending the birth certificates of transgender young people.

53.     For those reasons, many transgender young people are prevented from obtaining court orders changing the sex listed on their birth certificates.  Because these youth are also barred from the private administrative process under Subsection (A)(3), they are thus entirely prevented from changing the sex listed on their Arizona birth certificates.

54.     That is not the only significant hurdle that transgender young people and their families face when petitioning a court for an order amending the sex listed on a birth

**A13**

certificate. The court-order process in Arizona requires additional fees, a significant expenditure of time and thus further and unnecessary delay, filing a petition and therefore creating an easily accessible public record about the requested change, and appearing at a public hearing where they must persuade a court that they or their child needs a corrected or amended birth certificate, all of which strip transgender young people of the very privacy and rights they are trying to secure. While petitioners in court may seek to protect their privacy by filing other motions, such as motions to proceed under a pseudonym and to seal the records, those are yet more documents that must be prepared and filed, again with an uncertain outcome. And these procedures vary from state to state, creating additional expenses, uncertainties, risks, and burdens for families who have moved away from Arizona. To ensure that these multiple court submissions are completed correctly, transgender people and their families would likely require the assistance of an attorney, which is an additional and significant expense. And, even if successful, transgender young people must still apply to ADHS for the amended birth certificate, adding yet another step to the process and imposing further expense and delay.

55. These numerous and substantial barriers are often insurmountable for transgender young people and their families, and render the court-order process unequal as compared to the minimal requirements for amending the sex listed on a birth certificate using the direct and private administrative process under Subsection (A)(3). Under that administrative process, a transgender person need only complete an application, attach a letter from a physician, and pay the required fee. Provided the application meets the requirements of A.A.C. R9-19-208(O), the transgender person will receive an amended birth certificate. Furthermore, all the paperwork the applicant submitted to ADHS to request the amendment, including the transgender person's prior birth certificate, will be sealed and cannot be released without court order. *See* A.R.S. § 36-322(A).

56. Based on information and belief, ADHS does not impose the burdens of seeking a court order on nontransgender people when correcting or amending an inaccurate sex marker on a birth certificate. Relying on its broad statutory authority, ADHS developed

**A14**

a policy permitting it to change sex markers on Arizona birth certificates with a physician's letter attesting to the error.

57.     Despite the substantial and unjustified burdens imposed by the surgical requirement in Subsection (A)(3) and ADHS's authority to create an equitable process for transgender people to change the sex marker on their birth certificates, Defendants continue to enforce Subsection (A)(3) to the detriment of transgender people.

**Plaintiff D.T.**

58.     Plaintiff D.T. is a thirteen-year-old transgender boy in Pima County, Arizona. Like many kids his age, he loves to skateboard, play basketball, draw, and play Minecraft. He also hopes to learn to play the drums.

59.     D.T. began expressing himself as a boy at around two years old. As a toddler, D.T. gravitated to more masculine clothing options and actively resisted girls' clothing. He would regularly wear his father's fedora and necktie around the house.

60.     His parents still sent him to school in girls' clothing. But every afternoon D.T. immediately removed the clothes when he returned home, and then often spent hours crying in his room afterwards.

61.     D.T. expressed he was a boy in other ways too. On several occasions D.T. cut—increasingly larger—chunks of his long hair, leaving his parents to discover the newly missing bits of hair. D.T. also tried to use the boys' restroom when he could and would not line up with the girls at school when teachers divided the class by sex.

62.     During that time, D.T. rarely smiled and was almost always quiet and anxious. He developed breathing tics and fidgeted nervously. D.T. initially struggled to tell his parents how he felt and, on several occasions, told them he was afraid of dying and that he had a secret that he could not tell them.

63.     The day before D.T. began third grade, he and Lizette stopped by his classroom to drop off some supplies. D.T.'s best friend was also there with her mother. His friend pointed to D.T. and asked her mother: "Can he and I go play?" The mother replied: "No, that's a she." Later, while driving D.T. home, Lizette asked D.T. about that

**A15**

moment. "Your friend called you 'him.' Is that what you are?" D.T. was silent for a moment, then said: "I know my body is wrong. But in my insides, I'm a boy. My mind tells me I'm a boy." He also shared that he was worried that his parents would stop loving him if he ever shared this piece of himself.

64. After several long and difficult conversations, D.T.'s parents decided to treat him as their son and subsequently started using male pronouns when referring to him. They also cut his hair short, like a boy, and bought him boys' clothing. And over time, D.T.'s parents called D.T. by his chosen, traditionally male name.

65. D.T. became a different person. He transformed from a reserved child who rarely smiled and was constantly anxious to a gregarious child who was interested in music and sports. His anxiety also decreased significantly, and his behavioral tics disappeared. In the years since, D.T. has continued to flourish in every aspect of his life.

66. Last summer, D.T. began showing the first signs of puberty. Consistent with the standards of care, D.T. began taking puberty-delaying medication. More recently, he began taking testosterone as part of his medical treatment. Those medications prevent D.T.'s body from undergoing physical changes associated with female puberty and instead induce male puberty. As a result of these treatments, D.T. may never need surgical care to treat his gender dysphoria.

67. While D.T.'s parents and close friends have accepted and affirmed his identity, others have not. Last year, D.T. was harassed and assaulted at school for being transgender. A student bullied and threatened D.T., escalating from verbal harassment to physical aggression. Being the target of bullying was very scary for D.T. and his parents. D.T. is still recovering emotionally from the experience. Although D.T. is currently planning to remain at that school, he and his parents may revisit that decision if the bullying continues, a decision that will be unduly influenced by the fact that D.T.'s birth certificate wrongly identifies him as female.

68. Because of that experience, and other similar experiences, D.T. has significant anxiety and worry about not being accepted by others and being mistreated if he

**A16**

is forced to disclose that he is transgender. The fact that D.T.'s current birth certificate does not match his sex exacerbates these fears; that fear is constraining. For example, D.T. started playing basketball a few years ago and is currently playing on his school's boys' basketball team. D.T. wants to play recreational basketball in the off-season, both because he loves the sport and wants to improve his skill and be good enough to play for the school team when he enters high school. But he has not pursued this interest because he is worried that he will be required to play on the girls' team because of his birth certificate.

69.     D.T.'s parents started the process of correcting his identity documents. They obtained a state court order changing D.T.'s name. In their petition, they also requested an order changing the sex listed on D.T.'s birth certificate. The judge informed D.T.'s parents that ADHS would require proof that D.T. underwent surgical treatment for his gender dysphoria before complying with the court order. Thus, the judge's order included language noting that it was subject to ADHS's rules and regulations regarding the amendment of the sex listed on a transgender person's birth certificate.

70.     D.T.'s parents used the court order to correct his social security record and health insurance information. His school also allowed his parents to use the court order to correct D.T.'s school records. However, D.T.'s experience with bullying at school this past year and his hesitance to enroll in a recreational basketball league underscore that changing the sex listed on his birth certificate remains a critical need. Having an inaccurate birth certificate is causing D.T. to exclude himself from activities that are important to child development and putting him at risk of harassment by forcing him to reveal that he is transgender.

71.     D.T.'s parents seek to change the sex listed on D.T.'s birth certificate through the administrative process but are precluded from doing so because D.T. cannot meet the surgical requirement.

72.     Despite the judge's statement in court to D.T.'s parents and the court order's language subjecting D.T. to the surgical requirement, Defendants represented to Plaintiffs that the court order that D.T. obtained is sufficient for him to apply for an amended birth

**A17**

certificate. In reliance on Defendants' representation, on or about December 21, 2020, Lizette submitted an application to ADHS to change the sex listed on D.T.'s birth certificate. However, even if D.T. obtains an amended birth certificate in this way, his ability to make that change has been significantly delayed due to Defendants' interpretation and enforcement of Subsection (A)(3). That delay has required him to disclose his transgender status in situations that he would have preferred to keep that information private and caused him to forgo participating in certain activities to avoid disclosing his transgender status.

**Plaintiff Jane Doe**

73. Plaintiff Jane Doe is a transgender ten-year-old girl in Maricopa County, Arizona. Like many other girls of her age, Jane loves dressing up and trying on make-up.

74. Jane began expressing herself as a girl when she was about two-and-a-half years old. She gravitated toward girls' clothing, wearing her mother's clothes and shoes. When her parents took her shopping, Jane attempted to pick clothes and shoes from the girls' section.

75. Initially, Jane's parents intentionally introduced her to boy-themed toys, which Jane categorically refused in favor of girls' toys. For example, for Jane's fourth birthday, her mother, Susan, baked her a Batman-themed cake, despite Jane previously asking for a Minnie Mouse cake. Jane appreciated the cake but told her mother that she "just wanted Minnie Mouse."

76. Jane's parents initially thought this was a phase, but Jane persisted. Eventually, they brought her to a child psychologist specializing in care for young children with some prior experience with transgender youth, Dr. Beth Onufrak. Dr. Onufrak evaluated Jane over several sessions and concluded that Jane would meet the diagnostic criteria for gender dysphoria. Based on the recommendation of Dr. Onufrak, Jane's parents and siblings started treating her as a girl, including using her new feminine name and allowing her to wear girls' clothing.

77. At Dr. Onufrak's recommendation, Susan took Jane to Dr. Veenod Chulani, a physician specializing in treating transgender youth and the Medical Director of the

**A18**

Gender Support Program at Phoenix Children's Hospital.  Dr. Chulani agreed with Dr. Onufrak's assessment and diagnosed Jane with gender dysphoria.  He has since provided Jane with primary care and supported Jane and her family through Jane's social transition.

78.     Before Jane started the second grade, her parents asked her school if she could start the year as a girl.  The school agreed and worked with Jane and her family to prepare for her transition at school.  However, several students in Jane's class recognized her from the prior year and repeatedly teased her for being transgender.  The incidents caused Jane significant psychological distress.

79.     Students continued to bully and harass Jane throughout the second and third grade.  In fourth grade the bullying intensified when a student found Jane's class roster in the cafeteria and saw Jane's name with the letter "M" next to it.  That student shared the class roster and the information he learned from it with many classmates before the school could intervene.  After that, the taunting and teasing became relentless.  In response, Jane's anxiety about attending school increased significantly.  She was unable to concentrate in class or focus on her schoolwork.  Jane's education was further disrupted by her frequent anxiety-induced stomachaches, which brought her to the school nurse nearly every day.  Jane's only respite has been distance-learning, which has deprived her classmates the opportunity to continue bullying and harassing her.

80.     Since moving to distance learning due to the novel Coronavirus Disease 2019 (COVID-19) pandemic, Jane's situation has improved dramatically.  Free from the bullying and anxiety she faced at school, Jane is much happier and eager to participate in class and attend to her schoolwork.  But even distance learning has not been worry free for Jane or her family.  Because Jane's school records still list her as male, one of her teachers used male pronouns when e-mailing Susan about Jane's missing assignments in the class.  Jane's school records not only disclosed her transgender status to her teacher, they risked her being mistreated by her teacher for that reason.

81.     Nevertheless, given the significant improvement in Jane's well-being during

**A19**

distance learning, her parents decided to use this opportunity to enroll Jane in a different school where students do not know she is transgender. The new school where they would like to enroll her, however, will not enroll Jane as female without a corrected birth certificate.

82. Susan previously explored options for changing the sex listed on Jane's birth certificate. Through that research, Susan learned that ADHS required evidence of surgery prior to changing the sex on a transgender person's birth certificate and that she would need to present proof of surgery to obtain a court order as well. Susan visited ADHS to inquire about what she needed to provide to amend the sex listed on Jane's birth certificate and an ADHS employee confirmed to her that Jane would need to provide a letter from a doctor as required by Arizona law. Due to Jane's age, it would be inappropriate and inconsistent with the standards of care for her to undergo any surgical treatment for gender dysphoria. The medical necessity of those treatments will be assessed by Jane and her team of healthcare providers at an appropriate time and consistent with the prevailing standards of care.

83. Without a corrected birth certificate, Jane would have been required to reveal that she is transgender to this new school. That would have prevented her from safely moving to another school where she is free from pervasive harassment and bullying that impede her learning and cause her further significant emotional harm.

84. Given Jane's urgent need for an amended birth certificate, her parents filed a Motion for Preliminary Injunction concurrently with Plaintiffs' first Complaint. (Docs. 1, 3.) By joint stipulation, and in reliance on the extensive evidence, expert opinion, and legal authority filed by Jane in support of her Motion for Preliminary Injunction, Jane obtained an order from this Court instructing ADHS to amend the sex listed on her birth certificate to female, which ADHS processed under Subsection (A)(4). The significant expense and effort required for Jane to obtain that relief underscores the enormous and unnecessary hurdles, and therefore the inherent discrimination, in excluding transgender young people from utilizing the direct and private administrative process created in Subsection (A)(3).

**A20**

85. Jane is currently enrolled in her new school. Although she is still adjusting to her new learning environment, she is excited to get to know her classmates and teachers and the relief she feels that none of them know she is transgender is incalculable.

***Plaintiff Helen Roe***

86. Plaintiff Helen Roe is a six-year-old transgender girl in Pima County, Arizona. Helen enjoys time with her girlfriends, whether playing "princess" or "house," or with her girls' toys. She likes roller skating, singing, and dancing.

87. Helen began expressing that she is a girl at a young age. As early as one-and-a-half years old, Helen started playing with girls' toys (*e.g.*, baby dolls, toy strollers, toys for playing "house") while at friends' houses. During one of her playdates, Helen put on her friend's Disney princess costume, which was a purple dress. Helen refused to take the dress off and ended up taking it home with her that day.

88. Helen continued to play like other little girls, such as playing house with pink plates and cutlery, pushing a stroller, and playing with her many Barbie dolls. For her fourth birthday, Helen requested a party with unicorn decorations and permission to wear a Disney princess costume to the party. Her parents agreed. Most of Helen's friends were (and are) girls, and they also wore brightly colored dresses and accessories. Helen was as happy as her parents had ever seen her that day. The party made them fully appreciate that Helen's behavior was not a phase. Their daughter expressed herself as, and indeed was, a girl.

89. Shortly thereafter, Helen's parents brought Helen to Alison VanDyke, a therapist specializing in working with transgender children. Ms. VanDyke evaluated Helen and diagnosed her with gender dysphoria. In addition to working with Helen to improve her self-confidence, Ms. VanDyke supported Helen's parents as they worked through their initial concerns about allowing Helen to live as a girl in every aspect of her life.

90. Helen has exhibited a marked improvement since her transition.

91. Although Helen's family has accepted her as female, Helen has still experienced prejudice because she is transgender. Towards the beginning of Helen's transition, her mother shared that Helen is transgender with several parents in Helen's small

**A21**

pre-school community. One family reacted negatively to this information, distancing themselves from Helen and called the director of Helen's pre-school to allege that Helen was a threat to their children's security.

92. Helen's parents also fear for Helen's safety because, as a transgender girl of color, she is in a particularly vulnerable population. Having an accurate birth certificate will not only give her control over who learns that she is transgender, but it will also reduce the risk that Helen will be singled out or targeted for violence because she is transgender. Currently, the information on Helen's birth certificate is used to generate many other records that are part of her life, including school and healthcare records, exacerbating her parents' fears.

93. Earlier this year, Helen's parents filed a petition to change Helen's name and the sex listed on her birth certificate. The court granted the requested name change, but did not rule on the request to change the sex listed on Helen's birth certificate from male to female. Instead, the court provided Helen's parents with a printout of A.R.S. § 36-337. The court also deferred ruling on their request to seal Helen's name-change petition, making that petition available to public. Given their concerns for Helen's safety, Helen's parents seek to correct Helen's birth certificate administratively to protect her private medical information and prevent her from being forced to reveal that she is transgender.

***Plaintiff James Poe***

94. Plaintiff James Poe is a five-year-old transgender boy in Pima County, Arizona. James likes to play with his Etch A Sketch, climb trees, ride his bike, and explore outdoors. He also loves to wear bow ties of all different colors and designs.

95. By the time that James was around a year-and-a-half old, he was expressing through his actions that he is a boy. He resisted his parents' attempts to dress him in feminine dresses and other girls' clothing. For example, at school one day, while playing dress-up, he put on a boys' blazer and used a discarded girls' hair bow as a bow tie.

96. Around the time that he turned two, James began to refer to himself as a boy. He would point at his mother, Laura, and say "girl," point at his father and say "boy," and

**A22**

point to himself and say "boy." Faced with his continuing refusal to wear girls' clothing, James's parents started buying him boys' clothing in the summer of 2018. James has never switched back and, when offered a choice, James always selects boys' clothes.

97.     James' parents grew increasingly convinced that this was more than just a phase for James. They sought guidance from James's pediatrician, who referred them to Dr. Tracey Kurtzman, a pediatrician with expertise working with transgender youth. Around that same time, James and his family started to see Dr. Richard Muszynski, a clinical psychologist. James sees Dr. Musznyski regularly for therapy sessions to treat his gender dysphoria.

98.     Based in part on the counseling from these medical professionals, James's parents socially transitioned him from female to male. James immediately adopted male pronouns and the name "James." Days later, James's family went out to dinner, and his father asked Laura if she would like to try some lemonade. James mistakenly believed that his father was referring to him as "she" and immediately corrected his father to use the pronoun "he."

99.     Although his family has accepted him for who he is, James has been mistreated by some of his peers. During fall break in 2019, James attended a program at his school with children of different class levels and ages. James reported that an older student repeatedly told him that he was a girl, not a boy. Laura sought to educate the program administrators, but realized that the only way to do that would have been to disclose that her son is transgender. To avoid disclosing that private information about James, Laura removed him from the remainder of the program in order to keep him safe and did not send him back in subsequent years.

100.     Despite the fact that Laura works in a public school district, James' parents enrolled him in private school in order to avoid the public school's requirement that he provide a birth certificate to enroll. They do not want their son's transgender status disclosed publicly and view private school as a smaller and safer environment, even though that choice came at a significant additional cost. For example, James has a learning

**A23**

disability that requires specialized services, which would have been provided by a public school at no cost to his family. Instead, James's parents have to cover those services through their health insurance, paying the applicable co-pays, deductibles, and, in some cases, covering the entire cost out-of-pocket. They have even delayed starting those needed services out of a concern that the service provider will mistreat James because he is transgender, a fact that is obvious from his birth certificate.

101.    James has also expressed interest in joining sports programs, such as a youth soccer league. However, the local soccer league requires James' birth certificate to register him. Therefore, Laura has resisted signing him up, not wanting to disclose his transgender status to the league, including the parents who are coaches and referees, and out of a concern that he would be required to play on the girls' team.

102.    In March 2020, James's parents sought a court order to change his name, which the court granted. They also sought an order to correct the sex listed on James's birth certificate, but the court did not rule on that request. Instead, the judge informed them that, while she would have been willing to order a change to the sex listed on James's school and health records, ADHS would require more in order to change the sex listed on his birth certificate. She then handed them a printed copy of A.R.S. § 36-337. Despite having corrected some of James's identity documents, his parents have not corrected his birth certificate because they could not change the sex listed on that document. They seek to change the sex listed on his birth certificate through the private administrative process in order to maintain his privacy.

**_Plaintiff Carl Voe_**

103.    Plaintiff Carl Voe is a nine-year-old transgender boy who was born in Arizona but currently lives in Maryland. Carl loves to draw comics and 3-D doodle, and is always inventing new things. He also reads, writes, and assemble puzzles at every opportunity.

104.    Carl began expressing his gender identity just before he turned two years old. For example, Carl would ask his parents when he was going to get a boy's body. When strangers would complement his long, curly hair, Carl told his parents that he hated his hair

and soon insisted that they cut it short like a boy's. When Carl was four, his mother, Rachel, cut his hair in a Mohawk. Following that haircut, strangers would say "what a cute boy," and Carl instructed his parents that he did not want them to correct the strangers.

105. Around the same time, Carl's parents noticed that he was becoming increasingly angry and defiant at home for reasons they could not immediately determine. In addition to fits of rage, Carl would also attempt to harm himself, such as by shutting his hand in cabinets. He also informed his parents that he hated girls and wished he was a boy. Concerned for his health and safety, Carl's parents began taking him to Dr. Muszynksi for therapy in late 2017.

106. When Carl was in kindergarten, his parents learned that other children were asking him whether he was a boy or a girl and would not believe him regardless of how he answered. With the support of his parents, Carl addressed his class to tell them that he did not like their questions. The environment improved for a few weeks, but then the questions returned. Carl's parents also later learned that Carl was not eating his lunch and refusing to use the restroom during the school day out of fear—a common behavior among transgender youth due to the distress they experience using a restroom that does not match their gender identity. At the end of kindergarten, Carl told his parents "I am a boy."

107. Carl adopted male pronouns and the name "Carl." His anger eased during camp in the summer following kindergarten, but renewed when he entered first grade. In his new grade, he faced continued questions about his gender, and was constantly referred to as a girl by other students and even school staff. Despite many attempts to educate the school staff and administrators, Carl's parents were unsuccessful, and Carl's anger and defiance at home once again returned.

108. Carl's parents moved him to a new school for second grade and Carl insisted that no one at his new school be told about his transgender status. Unfortunately, a few other students from Carl's old school moved to the new school as well, and Carl's anger was replaced by anxiety and fear that he would soon be outed and again face the questions and mistreatment by his peers and school staff.

**A25**

109. Mid-way through second grade, Carl moved to distance learning because of the COVID-19 pandemic. Remote learning exacerbated Carl's gender dysphoria, resulting in him experiencing significant anxiety about this appearance and the sound of his voice. As result, Rachel has home-schooled him since October 2020.

110. Carl expressed interest in participating in sports programs when he lived in Arizona, including a local cross-country running program and a swim team. Both programs have boys' and girls' divisions and required Carl to provide his birth certificate to sign up. Carl also wanted to participate in a ballet program as a boy dancer. Carl's parents did not enroll him in any of these activities because they understood from other parents that he would not be well received without corrected identity documents.

111. Late last year, Carl's family moved to Maryland. Prior to the move, Carl's parents petitioned an Arizona court for a name and gender-marker change, but due to delays associated with the COVID-19 pandemic, the Superior Court did not rule on the petition before they left the state. Because he now lives in Maryland, Carl is no longer within the jurisdiction of Arizona courts. Carl's parents have been advised that transgender young people in Maryland face many hurdles to obtaining court orders correcting or amending the sex listed on their birth certificates. Instead, to protect Carl's privacy and health, his parents wish to use the private administrative process under Subsection (A)(3) to correct Carl's Arizona birth certificate.

**Class action allegations**

112. Plaintiffs, on behalf of themselves and all similarly situated individuals, bring their claims for declaratory and injunctive relief as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(2).

113. Plaintiffs request that the Court certify the following class ("Class") under Rule 23(b)(2):

> All transgender individuals born in Arizona, now and in the
> future, who seek to change the sex listed on their birth
> certificates but have not undergone a "sex change operation"

**A26**

as treatment for their gender dysphoria.

114.    Plaintiffs are adequate representatives of the Class.  Plaintiffs are transgender individuals who seek to change the sex listed on their birth certificates and have not undergone surgical treatment to treat their gender dysphoria and may never require such treatment.

115.    The Class satisfies the requirements of Rule 23(a)(1) because the class is so numerous that joinder of all members is impracticable.  Studies estimate that the population of transgender adults in Arizona exceeds 30,000.  Based on population studies, there are approximately 2,000-5,000 transgender young people under eighteen years old in Arizona.  Of that population, approximately one-third will undergo surgery to treat their gender dysphoria.  That percentage will be significantly smaller among transgender young people who, with limited exception, cannot undergo surgery due to their age.  That leaves a large proportion of transgender young people and adults—whether surgery is not medically necessary for them or they face other barriers to accessing surgical care—who are denied the opportunity to amend the sex listed on their birth certificate through the private administrative process created by Subsection (A)(3) and it would be impractical to join all of them as named plaintiffs.  In addition to the potential size of the class, it would also be impractical to join them all because there may be transgender people who were born in Arizona, but currently live in another state.

116.    The Class satisfies the commonality requirements of Rule 23(a)(2) because there are questions of law and fact common to the Class.  Pursuant to Subsection (A)(3), Defendants have acted or refused to act on grounds generally applicable to the Class.  This action raises questions of law common to all members of the Class, including: (a) whether Subsection (A)(3), facially and as applied to members of the Class, violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution; (b) whether Subsection (A)(3), facially and as applied to members of the Class, violates the Substantive Due Process Right to Privacy secured by the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution; (c) whether Subsection (A)(3), facially and as applied

**A27**

to members of the Class, violates the Substantive Due Process Right to Individual Liberty and Autonomy of the Fourteenth Amendment to the U.S. Constitution; and (d) whether Subsection (A)(3), facially and as applied to members of the Class, violates the Substantive Due Process Right to Choose whether to undergo a particular medical treatment secured by the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. All members of the Class share at least one common question of fact: Whether the purported justification(s) for excluding transgender people who do not meet the surgical requirement for changing their birth certificate via the private administrative process created by Subsection (A)(3) are pretext(s) for impermissible discrimination?

117. The Class satisfies the typicality requirements of Rule 23(a)(3) because the named Plaintiffs' claims are typical of the claims of the Class. Plaintiffs are members of the Class, are individuals who have been unable and will be unable to amend the sex listed on their birth certificates through the private administrative process set forth in Subsection (A)(3). Plaintiffs and members of the Class share the same legal claims under the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the U.S. Constitution.

118. The Class satisfies the adequacy requirements of Rule 23(a)(4) because the class representatives will fairly and adequately represent the interests of the Class. The named Plaintiffs seek the same declaratory and injunctive relief as the other members of the Class: (1) a declaratory judgment that A.R.S. § 36-337(A)(3) and A.A.C. R9-19-208(O) are unconstitutional; (2) permanent injunctions enjoining Defendants from enforcing that statute and regulation; and (3) an order for Defendants to create a constitutionally sound process for amending the sex listed on the birth certificates of transgender people born in Arizona. The named Plaintiffs seek this relief to benefit themselves and to protect other transgender people born in Arizona. In asserting their own rights, the named Plaintiffs will vindicate the rights of all members of the Class fairly and adequately. The class representatives have no interests that are antagonistic to the interests of other members of the Class.

119. The Class further satisfies the requirements of Rule 23(a)(4) because counsel

**A28**

for the Class will fairly and adequately represent the interests of the Class. The Class is represented by counsel from Cooley LLP and Osborn Maledon, P.A., two large law firms, and the National Center for Lesbian Rights ("NCLR"), a non-profit legal organization dedicated to advancing the civil and human rights of the LGBTQ community. Collectively, counsel has significant experience litigating civil rights cases, including transgender rights cases and complex class actions in federal court.

120. The Class also satisfies the requirements of Rule 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole. The Class exhibits sufficient cohesiveness because its members have suffered group, as opposed to individual, injuries; namely, the categorical exclusion of transgender people who have not undergone surgery to treat their gender dysphoria from amending their birth certificate through the private administrative process created by Subsection (A)(3). Members of the Class are bound together by the significant common traits that they are all transgender, they have gender dysphoria, they need to amend the sex listed on their birth certificates, and they have not undergone surgical treatment to alleviate their gender dysphoria.

### COUNT I
#### (Violation of the Equal Protection Clause of the
#### Fourteenth Amendment of the United States Constitution)

121. Plaintiffs hereby reallege and incorporate by reference paragraphs 1 to 120 of this Amended Complaint.

122. The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

123. Defendants are persons for the purposes of § 1983.

124. Defendants act under color of law in enforcing A.R.S. § 36-337(A)(3) and its implementing regulation A.A.C. R9-19-208(O).

125. Arizona's current statutory and regulatory scheme, which prevents Plaintiffs

**A29**

and the Class from obtaining amended birth certificates through the process created by Subsection (A)(3), impermissibly discriminates against transgender people on the basis of sex and transgender status, in violation of their right to equal protection of the laws under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Unlike their nontransgender peers and other Arizonans who can have accurate birth certificates and correct their birth certificates when necessary, transgender people are denied accurate birth certificates.

126.    Excluding transgender people who have not undergone surgery to treat their gender dysphoria from obtaining corrected or amended birth certificates using the private administrative process in Section 36-337(A)(3) does not serve any rational, legitimate, important, or compelling state interest.

**COUNT II**
**(Violation of the Substantive Due Process Right to Privacy**
**under the United States Constitution)**

127.    Plaintiffs hereby incorporate by reference and reallege paragraphs 1 through 126 of this Amended Complaint as though fully set forth herein.

128.    The Fourteenth Amendment to the United States Constitution, enforceable against Defendants pursuant to 42 U.S.C. § 1983, provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.

129.    The constitutional right to privacy protects information that is highly personal and intimate, including sensitive medical information and information that could lead to bodily harm upon disclosure.

130.    Involuntary disclosure of a person's transgender status violates that person's fundamental right to privacy.  A person's transgender status constitutes highly personal and intimate information, including private medical information.

131.    The involuntary disclosure of one's transgender status can also cause significant harm, including placing one's personal safety and bodily integrity at risk.

132.    Section 36-337(A)(3) and A.A.C. R9-19-208(O) violate the right to privacy

**A30**

of transgender people, including Plaintiffs and the Class, in that denying them a birth certificate that matches their sex requires them to disclose their transgender status and deprives them of significant control over the circumstances around such disclosure.

133. There are no adequate safeguards to prevent the harm caused by the involuntary disclosure of one's transgender status through a birth certificate. For example, a person may need to disclose their birth certificate directly to third parties, without any of the privacy safeguards that may exist where the government discloses information to third parties.

134. The government has no compelling, important, or legitimate interest in disclosing a person's transgender status on state-issued birth certificates.

## COUNT III
### (Violation of the Substantive Due Process Right to Individual Liberty and Autonomy under the United States Constitution)

135. Plaintiffs hereby incorporate by reference and reallege paragraphs 1 through 134 of this Amended Complaint as though fully set forth herein.

136. The substantive protections of the Due Process Clause also protect the right of every person to the possession and control of their own person, and to define and express their identity. "The Constitution promises liberty to all within its reach, a liberty that includes certain specific rights that allow persons . . . to define and express their identity." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2593 (2015).

137. The fundamental protections of an individual's autonomy include a right to live consistent with one's sex, which is a fundamental aspect of personal identity. Arizona law impermissibly burdens that right by preventing transgender people from obtaining amended birth certificates that reflect who they are, thereby subjecting them to the risk of exposure, stigma, discrimination, harassment, and violence. That burden is amplified by the fact that the government itself, as well as many third parties, often requires the use of a birth certificate to demonstrate a person's sex.

138. The government's refusal to permit transgender people who have not undergone surgery to treat their gender dysphoria to obtain amended birth certificates

**A31**

through the private administrative process created by Subsection (A)(3) additionally burdens their right to autonomy by inviting and encouraging other public and private entities to similarly discriminate against them.

139.    Arizona has no compelling, important, or even legitimate government interest in burdening the ability of transgender people to live consistent with their sex.

## COUNT IV
### (Violation of the Substantive Due Process Right to choose whether to undergo a particular medical treatment under the United States Constitution)

140.    Plaintiffs hereby incorporate by reference and reallege paragraphs 1 through 139 of this Amended Complaint as though fully set forth herein.

141.    The substantive protections of the Due Process Clause safeguard the right of every person to bodily integrity.  Encompassed in that right is the right to choose whether to undergo a particular medical treatment.  *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997); *Washington v. Harper*, 494 U.S. 210, 221 (1990); *Parham v. J.R.*, 442 U.S. 584, 600 (1979).

142.    Arizona law interferes with this fundamental constitutional right by imposing a surgical requirement on transgender people to correct their birth certificate via the private administrative process created under Subsection (A)(3).  Decisions regarding medical treatment should be made based on the advice of medical and mental health professionals, and consistent with the prevailing standards of care.  However, the importance of the birth certificate as an identity document impermissibly pressures transgender people into undergoing surgeries that may be medically unnecessary simply to correct their birth certificates.

143.    Denying transgender people the ability to correct their birth certificate using the private administrative process in Section 36-337(A)(3) because they do not undergo surgery infringes on their right to choose whether to undergo a particular treatment.

144.    Arizona has no compelling, important, or even legitimate government interest to justify curtailing this fundamental constitutional right.

**A32**

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Court:

A.      Enter an order declaring that this action is a proper class action and certifying Plaintiffs D.T., Helen Roe, James Poe, and Carl Voe as class representatives under Rule 23 of the Federal Rules of Civil Procedure.

B.      Enter a declaratory judgment that continuing to enforce the surgical requirement in A.R.S. § 36-337(A)(3) and A.A.C. R9-19-208(O) to deny Plaintiffs D.T., Helen Roe, James Poe, and Carl Voe, and the Class, the ability to change the sex markers on their birth certificates:

> 1.      Violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by discriminating on the basis of sex and transgender status;
>
> 2.      Violates the Due Process Right to Privacy under the United States Constitution;
>
> 3.      Violates the Due Process Right to Individual Liberty and Autonomy under the United States Constitution;
>
> 4.      Violates the Due Process Right to Choose Whether to Undergo a Particular Medical Treatment;

C.      Permanently enjoin Defendants, their agents, employees, representatives, and successors, and any other person acting directly or indirectly in concert with them, from enforcing the surgical requirement in A.R.S. § 36-337(A)(3) and A.A.C. R9-19-208(O) to deny an amendment to the sex listed on the birth certificates of transgender people who have undergone clinically appropriate treatment for the purpose of a gender transition;

D.      Order Defendants to issue amended birth certificates to Plaintiffs D.T., Helen Roe, James Poe, and Carl Voe;

E.      Award Plaintiffs D.T. and Jane Doe nominal damages;

F.      Award Plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and any other applicable laws; and

**A33**

G.    Grant such other and further relief in favor of Plaintiffs and the Class as this Court deems just, equitable and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs respectfully demand a trial by jury of all issues triable by jury.

Respectfully submitted,

Dated: January 8, 2021                    OSBORN MALEDON, P.A.


                                            s/Colin M. Proksel
                                          Mary O'Grady (011434)
                                          Colin Proksel (034133)
                                          Payslie Bowman (035418)
                                          OSBORN MALEDON, P.A.
                                          2929 North Central Avenue, 21st Floor
                                          Phoenix, Arizona 85012-2793
                                          Telephone:  (602) 640-9000
                                          Facsimile:  (602) 640-9050
                                          Email:    mogrady@omlaw.com
                                          Email:    cproksel@omlaw.com
                                          Email:    pbowman@omlaw.com

                                          Asaf Orr (Admitted *Pro Hac Vice*)
                                          NATIONAL CENTER FOR LESBIAN
                                          RIGHTS
                                          870 Market Street, Suite 370
                                          San Francisco, California 94102
                                          Telephone:  (415) 392-6257
                                          Facsimile:  (415) 392-8442
                                          Email:    aorr@nclrights.org

                                          Patrick Gunn (Admitted *Pro Hac Vice*)
                                          COOLEY LLP
                                          101 California Street, 5th Floor
                                          San Francisco, California 94111-5800
                                          Telephone:  (415) 693-2070
                                          Facsimile:  (415) 693-2222
                                          Email:    pgunn@cooley.com

                                          Barrett J. Anderson (Admitted *Pro Hac Vice*)
                                          COOLEY LLP
                                          4401 Eastgate Mall
                                          San Diego, California 92121-1909
                                          Telephone:  (858) 550-6000
                                          Facsimile:  (858) 550-6420
                                          Email:    banderson@cooley.com

                                          *Attorneys for Plaintiffs and Proposed Class*

**A34**

Case 4:20-cv-00484-JAS Document 153 Filed 10/18/22 Page 63 of 140

1

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                      **FOR THE DISTRICT OF ARIZONA**

8

9    Helen Roe, et al.,                          No. CV-20-00484-TUC-JAS

10                    Plaintiffs,                  **ORDER**

11   v.

12   Don Herrington,

13                    Defendant.

14

15         Pending before the Court is Plaintiffs' motion to compel (Doc. 121) and Defendant's

16   motion to compel (Doc. 122).  On 7/13/22, the Court held a hearing on the pending

17   motions; at the hearing, the Court also ordered the parties to continue to confer and to

18   submit a report by 8/15/22 addressing whether further consultation resolved any

19   continuing disputes.  Upon review of the parties' motions, responses, replies, attachments

20   and related discovery filings, legal authority, transcript of the hearing, and the parties'

21   8/15/22 reports, IT IS ORDERED as follows:

22         (1)  Plaintiffs' motion to compel is granted.  Defendant shall provide responses to

23              Plaintiffs' Interrogatory Nos. 1 and 9 through 16 and produce documents

24              responsive to Plaintiffs' Requests for Production Nos. 14 through 17[1]; Defendant

25   _____

     [1] The Court notes that the interrogatories and requests for production at issue seek
26   information as to whether the ADHS has any justification for implementing and enforcing
     the surgical requirement in A.R.S. § 36-337(A)(3) and related regulations, and ADHS
27   policies and processes about corrections to Arizona birth certificates; this information is
     relevant to both Defendant's potential defenses (such as justifications for the surgical
28   requirement) and Plaintiffs' claims pursuant to the Equal Protection and Due Process
     Clauses of the 14th Amendment.  In addition, information about ADHS policies and
     processes as to corrections is relevant to Plaintiffs' claims that Defendant treats transgender

**A35**

shall serve supplemental responses to the above listed interrogatories and requests for production within 60 days of the filing date of this Order. As to ESI, the Court finds that Plaintiff's proposed search parameters (reflected in the motion to compel briefing/attachments) are appropriate and will lead to relevant information; as such, Defendant shall apply Plaintiffs' proposed search parameters and disclose any responsive, nonprivileged ESI resulting from Plaintiffs' proposed search parameters. The Court is aware of the fact that Plaintiffs have continued to work with Defendant to attempt to narrow search terms due to the pure volume of information reflected in Defendant's hit reports, and this process has continued up until the filing of the parties 8/15/22 reports. Even based on Plaintiffs' most recently narrowed search parameters (with a time frame of 2017 to the present), Defendant states: "The total page number for all documents was estimated at approximately 740,000. It is estimated that there are at least 100,000+ pages of excel spreadsheets, which puts the total number of pages at well over 800,000 . . . There is a discrepancy between the 49,556 documents that were pulled, and the 43,174 documents with their families that contain applicable search terms. For unknown reasons, 6,382 documents did not contain any search term at all. The Litigation Support Group believes this is due to ADHS's imprecise collection tool but is analyzing this issue further. If those 6,382 documents are removed, it is estimated that the total number of pages will be approximately 436,202, although this still does not account for excel spreadsheet pages. The estimated total number of pages is in the 500,000 range." Doc. 135 at p. 9. To narrow the voluminous volume of ESI information that Defendant must review and disclose, Defendant shall only search for the most recently proposed ESI search parameters that Plaintiffs' proposed (that

---

individuals differently (i.e., a more burdensome process to change their birth certificate) than non-transgender individuals. Defendant's arguments for refusing to fully respond to this discoverable information (i.e., such as relevance as this is only a facial challenge case, the wrong defendant, attorney mental impressions/legal conclusions/privilege, conceding the surgical requirement is discriminatory, etc.) are unpersuasive and are rejected.

**A36**

Defendant incorporated into their 8/15/22 report), exclude the 6,382 documents that did not contain any search terms, and shall limit the time frame from only 5/1/19 to 5/1/22.[2]  All depositions shall occur within 30 days of the expiration of the discovery deadline set above.  Defendant's response to the motion for class certification is due within 30 days of the conclusion of the last deposition.  If the parties can reach agreements on different search parameters and time frames to further reduce the volume of ESI, they are free to submit a stipulation and proposed order memorializing their agreements.  Further, if the parties can reach agreements on different deadlines, they are free to submit a stipulation and proposed order.[3]

(2) Defendant's motion to compel is granted in part and denied in part.  To the extent Defendant's motion seeks school, medical, and social media records, Defendant's motion is denied.  Plaintiffs are only bringing a facial challenge in this case, and are not seeking any damages whatsoever (such as emotional distress damages); as such, the school, medical, and social media records at issue are not relevant.[4]  As to Lizette Trujillo, the Court would grant Defendant's motion to the extent Defendant wishes to discover the underlying basis for Trujillo's statements that are not based on her personal knowledge (i.e., where she is repeating statements or information relayed to her by someone else, or relaying the results of polls).  Trujillo does not appear to have any expertise in

---

[2] Given the volume of information, the Court finds that approximately three years (as opposed to Plaintiffs' approximate five year time frame – 2017 to present) of the ESI in question is an adequate time frame that balances Plaintiffs' need for relevant information versus reducing the burden on Defendant in reviewing and disclosing such a large volume of discoverable information.

[3] The Court notes that there appears to be some unproductive animosity between Plaintiffs and Defendant in this case.  *See* Doc. 151-1.  The Court encourages the parties to continue to confer and cooperate to hopefully avoid future discovery disputes.

[4] To the extent Defendant asserts that this information is relevant as to standing, the Court has already found that Plaintiffs have standing and has already rejected Defendant's arguments as to standing.  The Court notes that to the extent that there was any misunderstanding as to whether Plaintiffs were asserting an as-applied challenge, it is now clear that Plaintiffs are exclusively asserting a facial challenge; as all participants in this litigation must be able to rely on the fact that this is only a facial challenge case to properly proceed in this case, the Court will not allow any as-applied challenges in this case.

**A37**

polling, gathering demographic information, or have specialized medical or psychological expertise in regards to transgender children and their families. The Court, however, need not compel Plaintiffs to disclose this information because the issue is moot for at least two reasons. First, in evaluating the motion to certify the class in the future, the Court would not consider any information in Trujillo's declaration that is not based on her personal knowledge (i.e., the Court would not consider any polling information or information where she is repeating statements and information relayed to her by someone else). Furthermore, during the hearing on 7/13/22, Plaintiffs stated that if the Court was inclined to allow discovery into the identities of the people involved in AZTYPO, SAGA, and Families Transformed (which the Court would be inclined to allow if it was not moot), Plaintiffs would withdraw Trujillo's declaration. In light of the foregoing, the Court considers Trujillo's declaration withdrawn, and it will not be considered in relation to the motion to certify. In any event, the Court notes that Trujillo's declaration was submitted in support of only the numerosity issue, but Plaintiffs nevertheless appear to have demographic information (separate from Trujillo's declaration) to rely on to support numerosity in this case.

Dated this 18th day of August, 2022.

Honorable James A. Soto
United States District Judge

- 4 -

**A38**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Helen Roe, a minor, by and through her parent and next friend Megan Roe; James Poe, a minor, by and through his parent and next friend Laura Poe; and Carl Voe, a minor, by and through his parent and next friend Rachel Voe, | No. CV-20-00484-TUC-JAS |
| | **ORDER** |
| Plaintiffs, | |
| v. | |
| Don Herrington, in his official capacity as Interim State Registrar of Vital Records and Interim Director of the Arizona Department of Health Services, | |
| Defendant. | |

Pending before the Court is Plaintiffs' motion for class certification. For the reasons stated below, the motion is granted.[1]

**BACKGROUND**

Plaintiffs Helen Roe, James Poe, and Carl Voe are transgender individuals born in Arizona who have been diagnosed with gender dysphoria. Widely accepted medical and psychological treatment for gender dysphoria includes socially transitioning to live

---

[1] The Court notes that many of the factual and legal issues relevant to the motion for class certification overlap with factual and legal issues that were addressed in previous rulings of the Court. *See* Doc. 83 (Order denying motion to dismiss); Doc. 153 (Order addressing discovery disputes). For the sake of brevity, the Court incorporates those previous factual and legal discussions, and will not rehash those same issues in any detail in this Order addressing class certification.

1

**A39**

consistent with one's gender identity (as opposed to the gender identified on a birth certificate which is inconsistent for individuals with gender dysphoria). Consistent with medical and psychological treatment for gender dysphoria, transgender individuals seek to align their appearance and identification documents (such as birth certificates, driver's licenses, passports, etc.) with their gender identity. For many transgender individuals, surgical treatment may never be medically or psychologically appropriate or necessary to treat their gender dysphoria. However, Arizona law (A.R.S. § 36-337(A)(3)) requires Arizonans to get a "sex change operation" to be permitted to change the gender marker on their birth certificate (to align with their gender identity) through Arizona's private administrative process. Plaintiffs argue that Arizona law violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment by discriminating against transgender individuals and burdening their right to liberty, privacy, autonomy, and medical decision-making authority. Plaintiffs seek to certify a class of: "All transgender individuals born in Arizona, now and in the future, who seek to change the sex listed on their birth certificate, but have not undergone a 'sex change operation' as treatment for their gender dysphoria."

**STANDARD FOR CLASS CERTIFICATION**

Pursuant to Fed. R. Civ. Proc. 23 ("Rule 23"), the requirements for class certification include:

(a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.
(b) Types of Class Actions. A class action may be maintained if Rule 23(a) is satisfied and if . . . (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; . . .

2

**A40**

"Parties seeking class certification bear the burden of demonstrating that they have met each of the four requirements of [Rule] 23(a) and at least one of the requirements of Rule 23(b)." *Ellis v. Costco Wholesale Corporation*, 657 F.3d 970, 979-980 (9th Cir. 2011).[2] A rigorous analysis of the Rule 23 factors is required to ensure that class certification is warranted. *See id.* at 980.

## DISCUSSION

### Numerosity

Numerosity is satisfied if "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Generally, 40 or more members will satisfy the numerosity requirement . . . [and plaintiffs] need not identify the precise number of potential class members." *Toomey v. Arizona*, 2020 WL 2465707, at *2 (D. Ariz. May 12, 2020). "[A class may be] certified without determination of its size, so long as it's reasonable to believe it large enough to make joinder impracticable and thus justify a class action suit." *Arnold Chapman & Paldo Sign & Display Co. v. Wagener Equities, Inc.*, 747 F.3d 489, 492 (7th Cir. 2014).

To satisfy the numerosity requirement, Plaintiffs have submitted demographic studies reflecting that there are likely over 30,000 transgender individuals in Arizona, and there are likely thousands of transgender individuals who would amend their Arizona birth certificates through a private administrative process if it was available in Arizona. The Court notes that a number of these same studies were recently relied on in another District of Arizona case (i.e., *Toomey*) whereby the *Toomey* court found that there were sufficient transgender individuals in Arizona to satisfy the numerosity requirement for purposes of class certification. For example, in *Toomey*, the court found that the Williams Institute survey data was sufficiently reliable to estimate the number of transgender individuals in Arizona, and considering these numbers, found that the number of transgender individuals seeking medical transgender care in Arizona exceeded 40 individuals for purposes of numerosity. *See Toomey*, at *2-3. Like *Toomey*, this Court also finds the Williams Institute

---

[2] Unless otherwise noted by the Court, internal quotes and citations have been omitted when quoting and citing cases throughout this Order.

3

**A41**

1   survey and Plaintiffs' other demographic information to be sufficiently reliable for

2   purposes of numerosity.

3       In the case at bar, Plaintiffs' proposed class includes "[a]ll transgender individuals born

4   in Arizona, now and in the future, who seek to change the sex listed on their birth

5   certificates, but have not undergone a 'sex change operation' as treatment for their gender

6   dysphoria." Considering the thousands of transgender individuals in Arizona reflected in

7   Plaintiffs' demographic studies, common sense dictates that there are at least 40

8   transgender individuals in Arizona who would seek to change their gender marker (through

9   a private administrative process) as pursuing such a course of action is a widely accepted

10   medical and psychological practice in treating gender dysphoria. *See Chief Goes Out v.*

11   *Missoula Cnty.*, 2013 WL 139938, at *4 (D. Mont. Jan. 10, 2013) ("A court must rely on

12   simple common sense when determining whether a class size meets the numerosity

13   requirement."). The Court finds that numerosity is satisfied in this case.

14   **<u>Commonality</u>**

15       A proposed class satisfies the commonality requirement if "questions of law or fact are

16   common to the class." Fed. R. Civ. P. 23(a)(2). Commonality is met where class claims

17   "depend upon a common contention" that is "capable of class wide resolution[.]" *Vaquero*

18   *v. Ashley Furniture Indus., Inc*., 824 F.3d 1150, 1153 (9th Cir. 2016). "[E]ven a single

19   common question of law or fact that resolves a central issue will be sufficient." *Castillo v.*

20   *Bank of Am.*, NA, 980 F.3d 723, 728 (9th Cir. 2020). Numerous courts have found

21   commonality satisfied where a proposed class challenges government policies that

22   discriminate against transgender individuals. *See Toomey v. Arizona*, 2020 WL 3197647,

23   at *1 (D. Ariz. June 15, 2020); *Monroe v. Meeks*, 335 F.R.D. 201, 206 (S.D. Ill. 2020);

24   *Flack v. Wisc. Dep't of Health Servs.*, 331 F.R.D. 361, 370 (W.D. Wis. 2019). In this case,

25   Plaintiffs and members of the proposed class trace their injury to a common source: the

26   "sex change operation" requirement in A.R.S. §36-337(A)(3). The inability of transgender

27   individuals in Arizona to change the gender marker on their birth certificate through a

28   private administrative process stems from the enforcement of the surgical requirement in

A.R.S. §36-337(A)(3). Plaintiffs argue this violates the Equal Protection and Due Process Clauses; these legal issues and the resolution of those issues are common to the proposed class, and the commonality requirement is satisfied in this case. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

## **Typicality**

Typicality is satisfied where "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality is present "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010). The named Plaintiffs are transgender individuals who are unable to amend their birth certificates through a private administrative process. As referenced above, A.R.S. § 36-337(A)(3) requires transgender individuals to have a "sex change operation" in order to have the gender marker changed on their birth certificate through Arizona's private administrative process. Without this "sex change operation", Plaintiffs are barred from amending the gender marker on their birth certificates through Arizona's private administrative process. Thus, the claims of the named Plaintiffs and the proposed class arise from "the same course of events" as the class-wide claims (i.e., the surgical requirement imposed by Subsection (A)(3) which bars them from correcting the sex listed on their birth certificates through a private administrative process). *See Rodriguez*, 591 F.3d at 1124. In addition, as referenced above, Plaintiffs and members of the Proposed Class also share the same legal claims under the Equal Protection and Due Process Clauses. It is evident that the interests of the named Plaintiffs and the proposed class are in alignment, and if the Plaintiffs succeed in obtaining class-wide declaratory and injunctive relief in this case, each of the named plaintiffs and members of the proposed class will benefit from this injunctive relief.

The Court notes that Defendant's contention that Plaintiffs are unable to satisfy the typicality requirement rests on Article III standing arguments which this Court has already considered and rejected. In a previous Order, the Court held that the Plaintiffs have

**A43**

1    redressable injuries in this case and that standing was otherwise satisfied. Further, the
2    Court already concluded that the "sex change operation" requirement at issue invades
3    Plaintiffs' rights under the Due Process and Equal Protection Clauses. Plaintiffs' injuries
4    stem from Subsection (A)(3)'s invasion and violation of Plaintiffs' rights to Due Process
5    and Equal Protection. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (an
6    injury in fact is "an invasion of a legally protected interest"); *NE 5 Fla. Ch. of Assoc. Gen.*
7    *Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) ("[T]he 'injury in
8    fact' in an equal protection case . . . is the denial of equal treatment resulting from the
9    imposition of the barrier."); *Ruelas v. Cnty. of Alameda*, 519 F. Supp. 3d 636, 659 (N.D.
10   Cal. 2021) (injury for equal protection purposes was a constitutional violation, not the
11   underlying impacts stemming from the violation*); Hecox v. Little*, 479 F. Supp. 3d 930,
12   960 (D. Id. 2020) (holding that law preventing a transgender athlete from participating in
13   collegiate athletic teams injured her regardless of whether she would have ultimately made
14   the team). The Court also notes that the relevant injuries at issue in this case are not the
15   individualized emotional injuries of each Plaintiff as indicated by Defendant, but rather
16   constitutional injuries (via Arizona's "sex change operation" requirement) stemming from
17   the Equal Protection and Due Process Clause violations. The typicality requirement is
18   satisfied in this case.

19   **<u>Adequacy</u>**

20   The adequacy requirement implicates two primary issues: whether "the named
21   plaintiffs and their counsel have any conflicts of interest with other class members", and
22   whether the named plaintiffs and counsel will "prosecute the action vigorously on behalf
23   of the class." *Hanlon*, 150 F.3d at 1020; *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S.
24   338, 350 (2011) (commonality and typicality requirements "merge with the adequacy-of-
25   representation requirement"). The claims of the named Plaintiffs and the proposed class
26   hinge on whether class members should be able to amend the gender marker on their birth
27   certificates through a private administrative process. The named Plaintiffs and proposed
28   class members seek the same declaratory and injunctive relief: a declaratory judgment that

**A44**

A.R.S. §36-337(A)(3) and A.A.C. R9-19-208(O) are unconstitutional, permanent injunctions preventing enforcement of the statute and regulation, and an order for Defendant to create a constitutionally valid process for transgender individuals born in Arizona to amend the sex listed on their birth certificates through a private administrative process. There is no conflict of interest in this case. Furthermore, Plaintiffs are represented by experienced class action and civil rights attorneys from Cooley LLP and Osborn Maledon (two large law firms), and the National Center for Lesbian Rights. As there are no conflicts of interest and class counsel are experienced attorneys that would properly represent the class, the adequacy requirement is satisfied.

**Rule 23(b)(2)**

Lastly, the requirements of Rule 23(b)(2) "are unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." *Parsons v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014). Class certification under Rule 23(b)(2) is appropriate where, as here, "a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360.

In this case, Plaintiffs and the proposed members of the class seek an injunction against the Arizona Department of Health Services that bars enforcement of the "sex operation" requirement under A.R.S. §36-337(A)(3). Such an injunction in this matter would protect all proposed class members' Due Process and Equal Protection rights, and otherwise make it less burdensome for transgender individuals to amend the gender marker on their birth certificates in Arizona through a private administrative process. The requirements of Rule 23(b)(2) are satisfied in this case.[3]

---

[3] The Court notes that Defendant argues that class certification is unnecessary in this case because all transgender individuals in Arizona could benefit from the injunction Plaintiffs seek without being a member of a class action. However, Rule 23(b)(2) does not impose a necessity requirement on Plaintiffs, and the Court will not impose such a requirement that is not mandated by Rule 23(b)(2). Furthermore, even if there was such a requirement under Rule 23(b)(2), addressing the constitutional claims at issue in this case via a class action is warranted to ensure consistent results, provide notice to unnamed class members and to avoid mooting claims for class members that can otherwise reach amendable agreements with Defendant.

**A45**

1     **CONCLUSION**

2         Accordingly, for the foregoing reasons, IT IS HEREBY ORDERED that:

3     (1) Plaintiffs' motion for class certification (Doc. 89) is granted.

4     (2) The Court notes that two intertwined discovery motions (Docs. 206, 207) were very

5         recently filed; upon review of the briefs and pertinent record and authority related

6         thereto, Defendant's motion to extend remaining deadlines (Doc. 207) is granted

7         and Plaintiffs' motion to quash or for a protective order (Doc. 206) is denied.[4] The

8         deadlines and the parties' discovery obligations are reset as follows: (a) Plaintiffs

9         shall disclose the information requested in Defendant's subpoenas as to Plaintiffs'

10        experts (Doctors Shumer and Ettner) by no later than 8/18/23; (b) Based on the

11        newly disclosed information as to Doctors Shumer and Ettner, Defendant has leave

12        to conduct any supplemental depositions of Doctors Shumer and Ettner by no later

13        than 8/31/23; (c) Summary judgment motions are due no later than 9/29/23; (d) The

14        joint proposed pretrial order ("PTO") is due by no later than 10/31/23. If summary

15        judgment motions are filed, the PTO shall be due 30 days after any non-dispositive

16        summary judgment rulings. If the parties can agree to adjust these deadlines to

17        better suit their schedules and those of the experts, the parties are free to submit a

18        stipulation and proposed order adjusting the deadlines.

19         Dated this 10th day of August, 2023.

20

21

22                                    

23                         Honorable James A. Soto

24                         United States District Judge

25

---

26 [4] The Court notes that the motion to extend remaining deadlines is fully briefed. However, as to the closely related motion to quash or for a protective order, Defendant filed its response to the motion to quash on 8/8/23, and a reply would not be due until later next week. Given the rapidly approaching 8/18/23 dispositive motion deadline, the Court rules on the pending discovery motions without the reply mentioned herein.

27

28

**A46**

KRIS MAYES
ARIZONA ATTORNEY GENERAL
Firm State Bar #14000
Patricia Cracchiolo LaMagna, Bar #021880
Aubrey Joy Corcoran, Bar #025423
Assistant Attorneys General
Education and Health Section
2005 N. Central Avenue
Phoenix, Arizona 85004
Tel.: (602) 542-8854
Fax: (602) 542-8308
EducationHealth@azag.gov

STRUCK LOVE BOJANOWSKI &
ACEDO, PLC
Daniel P. Struck, Bar #012377
Nicholas D. Acedo, Bar #021644
Dana M. Keene, Bar #033619
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Tel.: (480) 420-1600
dstruck@strucklove.com
nacedo@strucklove.com
dkeene@strucklove.com

*Attorneys for Defendant*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Helen Roe, a minor, by and through her parent and next friend Megan Roe; James Poe, a minor, by and through his parent and next friend Laura Poe; and Carl Voe, a minor, by and through his parent and next friend, Rachel Voe,<br><br>Plaintiffs,<br><br>v.<br><br>Jennie Cunico, in her official capacity as State Registrar of Vital Records and Director of the Arizona Department of Health Services,<br><br>Defendant. | NO. 4:20-cv-00484-JAS<br><br>**DEFENDANT'S STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Local Rule of Civil Procedure 56.1(a), Defendant submits the following Statement of Facts ("DSOF"), Exhibits, and Appendix ("App.") in support of her Motion for Summary Judgment.

1.      Some transgender people do not pursue any form of surgery as part of their transition process.  (Exhibit 1, Report of Dr. Daniel Shumer, ¶ 37.)

2.      The "sex" field on an Arizona birth certificate can be reported as either "male," "female," or "not yet determined."  (Exhibit 2, Deposition of Krystal Colburn, R.T. 4/10/23, at 53.)

3.      That requirement comports with the U.S. Standard Certificate of Live Birth, issued by the Centers for Disease Control and Prevention, National Center for Health Statistics ("NCHS").  (Ex. 2 at 49–50, 54–55.)  *See* https://www.cdc.gov/nchs/data/dvs/birth-edit-specifications.pdf, at Item 3, Page 1 (instructions for completing "sex" of the child on birth certificate) (App. 11); https://www.cdc.gov/nchs/nvss/facility-worksheets-guide/31.htm (defining "[s]ex of child" on birth certificate as "[t]he sex of the infant based on physical characteristics presented at birth") (App. 12).

4.      The NCHS's Model State Vital Statistics Act and Regulations states that the state registrar shall change a person's name on a birth certificate upon receipt of a court order, and further states that a state registrar shall prescribe by regulation the fee to be paid for amending a vital record.  (Exhibit 3, ADHS000198, §§ 21(c), 25(a)(4).)

5.      The NCHS's Model State Vital Statistics Act and Regulations states that amendments to vital records may be made "in accordance with … regulations adopted by the State Agency."  (Ex. 3, § 21(a).)

6.      The NCHS's Model State Vital Statistics Act and Regulations states: "Upon receipt of a certified copy of an order of (a court of competent jurisdiction) indicating the sex of an individual born in this State has been changed by surgical procedure and whether such individual's name has been changed, the certificate of birth of such individual shall be amended as prescribed by regulation."  (Ex. 3, § 21(d).)

7.      The Department has assisted with procuring, received, and honored court

**A48**

orders to change the sex marker on a person's birth certificate. (Ex. 2 at 58–59, 89; Dkt. 23-1, ¶ 7.)

8.      In 2017, a state court Administrative Law Judge ruled that the documentation required by § 36-337(A)(3) and R9-19-208(O) is not required to secure a court order under § 36-337(A)(4) and R9-19-208(B), which the Director adopted. (Exhibit 4, ADHS000294–303.)

9.      The parties agree that the sex field on a birth certificate does not document a baby's gender identity. (Ex. 1, ¶¶ 22, 24; Ex. 2 at 52–53; Exhibit 5, Expert Report of Dr. Randi Ettner, ¶¶ 16, 18–19.)

10.     "Gender identity" is not anatomical, but rather "a person's inner sense of belonging to a particular sex, such as male or female," which is only "detectible by self-disclosure." (Ex. 5, ¶¶ 19–20.)

11.     For transgender persons, "there is a divergence between anatomy and identity," and the former "does not align with" the latter. (Ex. 5, ¶¶ 16–20.)

12.     "Like non-transgender people, transgender people do not simply … behave consistently with their gender identity." (Ex. 5, ¶ 21.)

13.     Not all transgender persons "align their physical characteristics, voice, mannerisms, and appearance to match their gender identity." (*See* Ex. 5, ¶ 50 [opining only that "[m]any" transgender individuals do]; *see also* Ex. 1, ¶ 32 [opining only that the transition process "typically" includes a "social transition"].)

14.     Individuals born with an intersex condition, such as "Congenital Adrenal Hyperplasia," which can result in "ambiguous genitalia," may seek out a "sex change operation." (Ex. 1, ¶¶ 8, 41–42; Ex. 2 at 125.)

15.     Eleanor Eisenberg, Executive Director of the Arizona Civil Liberties Union, supported the 2004 amendments to the vital records laws. (Exhibit 6, Feb. 5, 2004, Committee on Health, Minutes on Meeting (H.B. 2200).)

16.     The sex marker on a birth certificate is information that is used for Arizona vital statistics and related reports. *See*, *e.g.*, https://pub.azdhs.gov/health-stats/report/ahs/

ahs2020/pdf/ahs2020.pdf (Arizona Health Status and Vital Statistics Annual Report) (App. 13); https://pub.azdhs.gov/health-stats/menu/info/pop/index.php (population statistics) (App. 14); https://www.azdhs.gov/documents/prevention/womens-childrens-health/reports-fact-sheets/child-fatality-review-annual-reports/cfr-annual-report-2022.pdf (child fatality review report) (App. 15); https://www.azdhs.gov/documents/preparedness/public-health-statistics/cancer-registry/adhs-acr-arizona-cancer-report-2016-2020.pdf (Arizona cancer report) (App. 16); https://pub.azdhs.gov/health-stats/report/ahs/ahs2020/pdf/1b2.pdf (trends) (App. 17); https://pub.azdhs.gov/health-stats/menu/info/sources.php (source data) (App. 18).

17.     The sex marker on a birth certificate is information that is used to prepare national vital statistics and for other statistical or research purposes. *See*, *e.g.*, https://www.cdc.gov/nchs/data/nvsr/nvsr72/nvsr72-12.pdf (National Center for Health Statistics National Vital Statistics Report, Life Tables) (App. 19); https://www.cdc.gov/nchs/data/nvsr/nvsr72/nvsr72-11.pdf (National Center for Health Statistics National Vital Statistics Report, Infant Mortality) (App. 20).

18.     Identity theft is pervasive in the United States. *See* https://bjs.ojp.gov/document/vit21.pdf (U.S. Dept. of Justice, Bureau of Justice Statistics, Victims of Identity Theft, 2021) (App. 21); https://oig.hhs.gov/oei/reports/oei-07-99-00570.pdf (Dept. of Health and Human Services, Office of Inspector General, Birth Certificate Fraud, 2000) (App. 22).  In 1977, the U.S. Public Health Service revised its Model State Vital Statistics Act, in part, "to stregthen [sic] efforts to reduce birth certificate fraud."  *See* https://oig.hhs.gov/oei/reports/oai-02-86-00001.pdf (Dept. of Health and Human Services, Office of Inspector General, Birth Certificate Fraud, 1988), at 1 (App. 23). "Almost all perpetrators of birth certificate fraud go through a two-step process. … (1) to fraudulently use a birth certificate to obtain false ID documents and thus create a false identity; and (2) to use one or more of these false ID documents to obtain government benefits or privileges to which one is not entitled, or to commit other crimes under an assumed name.  The first step is to use a birth certificate as a 'breeder' document, and the

**A50**

second step is to use the resulting false identity as a modus operandi, or method of operating, to defraud business or Government, and/or avoid legal sanctions." *Id*. at 4.

     DATED this 17th day of November, 2023.

STRUCK LOVE BOJANOWSKI & ACEDO, PLC


By    /s/ Daniel P. Struck
    Daniel P. Struck
    Nicholas D. Acedo
    Dana M. Keene
    3100 West Ray Road, Suite 300
    Chandler, Arizona 85226

    KRIS MAYES
    ARIZONA ATTORNEY GENERAL
    Patricia Cracchiolo LaMagna
    Aubrey Joy Corcoran
    Assistant Attorneys General
    1275 West Washington Street
    Phoenix, AZ 85007

    *Attorneys for Defendant*

**A51**

Patrick Gunn (*Pro Hac Vice*)
COOLEY LLP
101 California Street, 5th Floor
San Francisco, California 94111-5800
Telephone:    (415) 693-2070
Facsimile:    (415) 693-2222
Email:        pgunn@cooley.com

Mary O'Grady (011434)
Colin Proksel (034133)
Payslie Bowman (035418)
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
Telephone:    (602) 640-9000
Facsimile:    (602) 640-9050
Email:        mogrady@omlaw.com
Email:        cproksel@omlaw.com
Email:        pbowman@omlaw.com

*Attorneys for Plaintiffs and the Class*

Additional counsel listed on following page

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Helen Roe, a minor, by and through her parent and next friend Megan Roe; et al., | Case No. 4:20-cv-00484-JAS |
| Plaintiffs, | **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Jennie Cunico, in her official capacity as State Registrar of Vital Records and Director of the Arizona Department of Health Services, | **\*ORAL ARGUMENT REQUESTED\*** |
| Defendant. | |

**A52**

Rachel Berg (*Pro Hac Vice*)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, California 94102
Telephone:    (415) 343-7679
Facsimile:    (415) 392-8442
Email:        rberg@nclrights.org

Barrett J. Anderson (*Pro Hac Vice*)
Jessica Taylor (*Pro Hac Vice*)
COOLEY LLP
10265 Science Center Drive
San Diego, California 92121-1117
Telephone:    (858) 550-6000
Facsimile:    (858) 550-6420
Email:        banderson@cooley.com
Email:        jtaylor@cooley.com

*Attorneys for Plaintiffs and the Class*

# TABLE OF CONTENTS

**Page**

I.  Introduction ..................................................................................................... 1

II. Factual Background .......................................................................................... 2

   A.  Gender identity and sex. ............................................................................. 2

   B.  The importance of accurate identity documents for transgender people. ............... 3

   C.  Arizona vital statistics records laws. ........................................................... 4

   D.  Plaintiffs. ................................................................................................. 7

III. Procedural Background .................................................................................... 8

IV. Legal Standard ................................................................................................ 10

V.  Argument ........................................................................................................ 11

   A.  The Surgical Requirement Violates the Equal Protection Clause. ...................... 11

      1.  The Surgical Requirement discriminates based on transgender status ............. 11

      2.  Heightened scrutiny applies to classifications based on transgender status. ..... 12

      3.  The Surgical Requirement fails heightened scrutiny. ................................... 13

      4.  The Surgical Requirement also fails rational basis review. ........................... 15

   B.  The Surgical Requirement Violates the Due Process Clause. ........................... 16

      1.  The Surgical Requirement infringes on Plaintiffs' right to privacy. ............... 17

      2.  The Surgical Requirement infringes on Plaintiffs' right to individual liberty and autonomy. ................................................................................................... 19

      3.  The Surgical Requirement infringes on Plaintiffs' right to choose whether to undergo a particular medical treatment. ....................................................... 20

      4.  The Surgical Requirement cannot survive any level of scrutiny. ................... 20

VI. Conclusion ...................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adkins v. City of New York*,
   143 F. Supp. 3d 134 (S.D.N.Y. 2015)....................................................... 18

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ......................................................................... 11

*Arroyo Gonzalez v. Rossello Nevares*,
   305 F. Supp. 3d 327 (D.P.R. 2018)............................................... 16, 17, 19

*Doe v. Horne*,
   No. CV-23-00185-TUC-JGZ,
   2023 WL 4661831 (D. Ariz. July 20, 2023) ..................................... 12

*F.V. v. Barron*,
   286 F. Supp. 3d 1131 (D. Idaho 2018) ..................................... 13, 16, 18

*Hundley v. Aranas*,
   No. 21-15757, 2023 WL 166421 (9th Cir. Jan. 12, 2023)......................... 12

*K.L. v. State, Dep't of Admin., Div. of Motor Vehicles*,
   No. 3AN-11-05431-CI,
   2012 WL 2685183 (Alaska Super. Ct. Mar. 12, 2012)............... 13, 15, 16, 17

*Karnoski v. Trump*,
   926 F.3d 1180 (9th Cir. 2019) ..................................................... 12, 13

*Love v. Johnson*,
   146 F. Supp. 3d 848 (E.D. Mich. 2015)...........................................*passim*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)......................................................................... 10

*Obergefell v. Hodges*,
   576 U.S. 644 (2015)..................................................................... 16, 19

*Ostergren v. Cuccinelli*,
   615 F.3d 263 (4th Cir. 2010) ........................................................... 18

*Parham v. J.R.*,
   442 U.S. 584 (1979)......................................................................... 20

**A55**

*Powell v. Schriver,*
   175 F.3d 107 (2d Cir. 1999) ................................................................ 17

*Ray v. Himes,*
   No. 2:18-cv-272, 2019 WL 11791719 (S.D. Ohio Sept. 12, 2019) ............ 18

*Roberts v. U.S. Jaycees,*
   468 U.S. 609 (1984) ........................................................................... 19

*Romer v. Evans,*
   517 U.S. 620 (1996) ........................................................................... 15

*Estate of Tucker v. Interscope Records, Inc.,*
   515 F.3d 1019 (9th Cir. 2008) ............................................................ 11

*Tucson Woman's Clinic v. Eden,*
   379 F.3d 531 (9th Cir. 2004) .............................................................. 17

*United States v. Virginia,*
   518 U.S. 515 (1996) ........................................................................... 13

*Washington v. Glucksberg,*
   521 U.S. 702 (1997) .................................................................. 17, 19, 20

*Washington v. Harper,*
   494 U.S. 210 (1990) .................................................................... 17, 20

*Whalen v. Roe,*
   429 U.S. 589 (1977) ........................................................................... 17

**Other Authorities**

A.A.C. § R9-19-208(O) ........................................................................... 1, 5

A.R.S.
   § 32-3230(A) ..................................................................................... 3
   § 36-337(A)(3) ......................................................................... *passim*
   § 36-337(A)(4) ......................................................................... *passim*

Fed. R. Civ. P.
   23(b)(2) ........................................................................................... 10
   56(c) ............................................................................................... 10

Fourteenth Amendment ................................................................. *passim*

**A56**

## I.    INTRODUCTION

Birth certificates are critical identity documents in our world. Having identity documents that correctly reflect one's identity is essential to an individual's ability to participate in our society. For example, lacking documentation that accurately reflects an individual's identity can jeopardize access to employment, education, housing, health care, banking, travel, and government services. For transgender people in particular, inaccurate birth certificates can also impede their clinical treatment and disclose to others that they are transgender, thereby exposing them to discrimination, harassment, and even violence.

Arizona law provides a confidential administrative process for individuals to change the sex listed on their birth certificate. Non-transgender people may use this process to apply to change their sex marker with no more than a physician's letter attesting that they are a certain sex. However, for transgender applicants to use the process, Arizona Revised Statutes § 36-337(A)(3) and its implementing regulation Arizona Administrative Code § R9-19-208(O) require them to have first "undergone a sex change operation" (the "Surgical Requirement"). Plaintiffs Helen Roe, James Poe, and Carl Voe, and the class of people they represent (collectively, "Plaintiffs"), are transgender individuals born in Arizona, now and in the future, who seek to change the sex listed on their birth certificates but have not "undergone a sex change operation." The Surgical Requirement thus excludes Plaintiffs from using Arizona's private administrative process.

The undisputed evidence in this case demonstrates that not all transgender people undergo surgery. That is true for a variety of reasons, including when surgery is medically inappropriate or unnecessary, too expensive, or unlawful (such as all transgender individuals born in Arizona younger than 18 years of age). Indeed, well-established medical standards of care for treating gender dysphoria (the medical condition that results from the discordance between a transgender person's gender identity and sex assigned at birth) require individualized determinations as to the appropriateness of a specific treatment for a patient. Those standards of care thus run contrary to the Surgical Requirement, which mandates that *all* transgender people undergo a surgical operation before gaining access to

**A57**

Arizona's private administrative process. Because surgery is unavailable for Plaintiffs, the Surgical Requirement excludes them from obtaining an accurate birth certificate via that process and thus precludes them from living authentic lives, while non-transgender people—the majority of whom are provided an accurate birth certificate at birth—are not required to undergo surgery to change the sex listed on their birth certificate.

The Surgical Requirement violates Plaintiffs' constitutional rights to equal protection and due process under the Fourteenth Amendment. The Court already determined, when denying Defendant's Motion to Dismiss, that "[d]iscrimination against transgender people is discrimination based on sex; as such, heightened scrutiny applies." (Dkt. 83 at 9.) And the Ninth Circuit in *Hecox v. Little* recently reiterated this Circuit's holding that heightened scrutiny applies to classifications based on transgender status. 79 F.4th 1009, 1026–28 (9th Cir. 2023) (citing *Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019)). This Court also held that the Surgical Requirement infringes on Plaintiffs' due process rights, which subjects it to strict scrutiny. (Dkt. 83 at 10–11.) And the undisputed material facts in this case show that Defendant cannot satisfy her burden of establishing any justification for the Surgical Requirement under rational basis review, much less a tailored governmental interest that could succeed under heightened or strict scrutiny. For these reasons, and those discussed below, the Court should grant summary judgment to Plaintiffs on each of their four claims.

## II. FACTUAL BACKGROUND

### A. Gender identity and sex.

When a child is born, a health care provider identifies the child's sex based on the child's observable anatomy. (Plaintiffs' Separate Statement of Facts in Support of Motion for Summary Judgment ("SOF") ¶ 1.) In medical terminology, this provider-identified sex is often referred to as the person's "assigned sex." (SOF ¶ 2.) "Gender identity" is the medical term for a person's internal, innate, and deeply held sense of their own gender. (SOF ¶ 3.) There is a medical consensus that a person's gender identity has a significant biological foundation and is not subject to voluntary change. (SOF ¶¶ 4, 5.) Most peoples'

**A58**

gender identity matches their sex assigned at birth. (SOF ¶ 6.) For a transgender person, however, that initial designation does not match the person's gender identity. (SOF ¶ 7.)

The discordance between one's gender identity and birth-assigned sex can cause gender dysphoria. (SOF ¶ 8.) Gender dysphoria is a serious medical condition that, if left untreated, can cause serious health consequences, including anxiety, depression, eating disorders, substance abuse, self-harm, and suicide. (SOF ¶ 9.) However, when individuals with gender dysphoria receive appropriate medical care and support, they can and do thrive. (SOF ¶ 10.)

Major associations of medical and mental health providers in the United States, including the American Medical Association, the American Academy of Pediatrics, the American Psychiatric Association, the American Psychological Association, and the Pediatric Endocrine Society, have adopted or endorsed standards of care for treating gender dysphoria. (SOF ¶ 11.) The goal of treatment is to allow transgender people to live consistently with their gender identities in all aspects of their lives. (SOF ¶ 12.)

The process of undergoing treatment to alleviate gender dysphoria is commonly referred to as transition. (SOF ¶ 13.) The transition process typically includes one or more of the following three components: (i) social transition, including adopting a new name, pronouns, appearance, and clothing, and correcting identity documents; (ii) medical transition, including puberty-suppressing medication and hormone-replacement therapy; and, typically only for adults, (iii) surgeries to alter the appearance and functioning of primary and secondary-sex characteristics.[1] (SOF ¶ 14) Transition is highly individualized for each person. (SOF ¶ 15.)

### B.    The importance of accurate identity documents for transgender people.

Birth certificates reflect the government's recognition of an individual's sex. (SOF ¶ 16.) They are government-issued documents that people use to prove their identities for a

---

[1] In Arizona, people younger than 18 years of age are not legally permitted to receive surgical treatment for gender dysphoria. A.R.S. § 32-3230(A) ("A physician may not provide irreversible gender reassignment surgery to any individual who is under eighteen years of age.").

wide variety of situations, including school registration and employment, as well as to obtain other identity documents, such as driver's licenses, social security cards, and passports. (SOF ¶ 17.)

Transgender people who cannot change the sex marker on their identity documents to accurately reflect their gender identity face myriad practical, social, and psychological consequences. (SOF ¶ 18.) First, transgender people may not be able to use their birth certificate to prove their identity. For example, a birth certificate containing a sex marker that visibly conflicts with a person's gender identity—as reflected by their physical appearance—may arouse suspicion as to whether they are the person identified by the document. (SOF ¶ 19.) Second, birth certificates that reflect an incongruency between a person's gender identity and assigned sex risk disclosing a person's transgender status, which is personal information they may not wish to disclose for fear of discrimination, harassment, or violence. (SOF ¶ 20.) Such disclosure also invades their privacy, which is crucial because it is the basis for the development of individuality and autonomy. (SOF ¶ 21.) According to the 2015 U.S. Transgender Survey, nearly one in three transgender respondents who showed an identity document with a name or gender that did not match their perceived gender were verbally harassed, denied benefits or service, or assaulted. (SOF ¶ 22.) Third, for transgender people, the inability to safely and privately change the sex listed on their birth certificate interferes with their treatment for gender dysphoria, thereby exacerbating their gender dysphoria and distress. (SOF ¶ 23.)

In sum, being deprived of birth certificates that accurately reflect who they are stigmatizes transgender people and invades their privacy, releases confidential medical information, and places them at risk for grave psychological and physical harm. (SOF ¶ 24.)

C.    **Arizona vital statistics records laws.**

Defendant is a state official who exercises responsibility for issuing and changing Arizona birth certificates. (SOF ¶ 25.) Under her direction, ADHS registers a birth certificate for every person born in the state that reflects, among other things, their sex. (SOF ¶ 26.) Arizona law provides three ways for applicants to change information on their

birth certificate: (1) applying to ADHS for a "correction"; (2) applying to ADHS for an "amendment"; or (3) petitioning a court for an order, then—if the court grants the petition—applying to ADHS for an "amendment." (SOF ¶ 27.) Once submitted, ADHS processes all applications for changes to the sex listed on an individual's birth certificate under the same "desk procedure," which is "the actual process that [ADHS] follows" and "applies to any requests to change a sex marker on a birth certificate." (SOF ¶ 28; Declaration of Colin M. Proksel ("Proksel Decl."), Ex. 5 at 77:11–78:10.)

*Corrections.* While the vast majority of non-transgender individuals born in Arizona will never need to change the sex markers on their birth certificates, Arizona law permits them to apply for a "correction" to their sex marker if it reflects a typographical error. (SOF ¶ 29.) ADHS provides a private administrative process for applicants seeking a "correction" that involves submitting a confidential request directly to either ADHS or the applicant's county vital records office. (SOF ¶ 30.) If such a request is made within 90 days of birth, ADHS does not require the applicant to provide an evidentiary document attesting to their correct sex. (SOF ¶ 31.) If such a request is made after 90 days of birth, the applicant must provide a medical record or a physician's letter that simply attests to their sex. (SOF ¶ 32.) If ADHS grants the requested "correction," it seals the record. (SOF ¶ 33.) Transgender individuals born in Arizona are not permitted to "correct" the sex listed on their birth certificates through this process. (SOF ¶ 34.)

*Amendments.* Transgender individuals born in Arizona seeking to apply to ADHS to change the sex listed on their birth certificate must satisfy the Surgical Requirement that governs applications for "amendments" under A.R.S. § 36-337(A)(3) ("Subsection (A)(3)"). (SOF ¶ 35.) Under Subsection (A)(3) and its implementing regulation, A.A.C. § R9-19-208(O), transgender individuals born in Arizona who have had a surgical operation may submit a confidential application directly to ADHS (but not their county vital records office) and a letter from a physician attesting that they have undergone a "sex change operation." (SOF ¶ 36.) If ADHS determines the application is complete, it is mandated to grant the "amendment." (SOF ¶ 37.) This private administrative process does not create a

**A61**

public record and, if ADHS grants the amendment, the documents are sealed, making them inaccessible absent a court order. (SOF ¶ 38.) Transgender individuals born in Arizona who have not had surgery, including those younger than 18 years of age, may not apply for an amendment using this private administrative process. (SOF ¶ 39.)

Neither Arizona law nor ADHS policy define the term "sex change operation." (SOF ¶ 40.) Rather, when determining whether to grant an amendment requested by a transgender individual born in Arizona, ADHS assesses whether the physician's letter contains language that "matches" Subsection (A)(3) or otherwise "indicate[s] a sex change operation." (SOF ¶ 41.) To make that assessment, ADHS may seek advice from its "administrative counsel," but does not consult with medical professionals, medical organizations, or transgender people. (SOF ¶ 42.) As a result, ADHS has denied applications filed with physicians' letters attesting that an applicant is receiving "appropriate clinical treatment for transition to male/female" or is "irrevocably committed to the gender change process" because ADHS determined that these letters do not satisfy the Surgical Requirement. (SOF ¶ 43.)

*Court Orders.* Individuals born in Arizona can also petition a court for changes to their birth certificate under A.R.S. § 36-337(A)(4) ("Subsection (A)(4)"). (SOF ¶ 44.) Subsection (A)(4)'s court-order process is not specifically designed for transgender people seeking to correct their birth certificates; instead, it is a general provision that authorizes Arizona courts to order ADHS to change *any* information on a birth certificate. (SOF ¶ 45.) To comply with Subsection (A)(4), transgender applicants seeking to change the sex listed on their birth certificate must prepare a court petition, pay a fee, file it with the court, and are often required to appear in person in open court, thereby publicly disclosing their transgender status. If they wish their case to be confidential, they must prepare and file a separate motion to seal the documents, which a court is not obligated to grant. (SOF ¶ 46.) For transgender people, invasions of privacy of this nature exacerbate gender dysphoria and lead to an erosion of coping mechanisms. Such experiences can precipitate the onset of major psychiatric disorders, including, but not limited to, posttraumatic stress disorder, major depressive disorder, and even suicidality. (SOF ¶ 47.) In order to navigate the

**A62**

requirements of Subsection (A)(4), many applicants hire attorneys, adding further cost and burden. (SOF ¶ 48.) These burdens are compounded for transgender individuals born in Arizona who live in other states, who may be legally or practically unable to file a petition in Arizona state court. (SOF ¶ 49.)

Moreover, unlike the "correction" and "amendment" process under Subsection (A)(3), Subsection (A)(4) does not contain specific standards for when a court may or must grant a petition. (SOF ¶ 50.) In practice, when a transgender person seeks to use this provision to change the sex marker on their birth certificate, Arizona courts have imposed the same Surgical Requirement as in Subsection (A)(3), based in part on ADHS's prior publicly-stated position that Arizona courts lack the authority under Subsection (A)(4) to issue orders amending the sex listed on an Arizona birth certificate. (SOF ¶ 51.) Even if a court grants a petition, to obtain an amended birth certificate, applicants must still file the court order with an application to ADHS. (SOF ¶ 52.)

### D. Plaintiffs.

Plaintiffs Helen Roe, James Poe, and Carl Voe (together, the "Named Plaintiffs") are three transgender people, all younger than age eighteen, who were born in Arizona. (SOF ¶ 53.) Named Plaintiffs have been diagnosed with gender dysphoria. (SOF ¶ 54.) Each has undergone appropriate, necessary steps to better align their body, appearance, and lived experience with their gender identity. (SOF ¶ 55.) Due to their age, they are not permitted under Arizona law to undergo surgery to treat their gender dysphoria. (SOF ¶ 56.) And they may never need surgery to alleviate their gender dysphoria. (SOF ¶ 57.)

Named Plaintiffs' birth certificates are currently inaccurate because they list a sex different than their gender identities. Every time Named Plaintiffs attempt to use their birth certificates, they risk disclosing private medical information and intensely personal aspects of their identities. They are thus faced with an impossible choice: risk disclosure to participate in normal childhood activities—from in-person schooling to recreational sports—or forgo participation altogether. (SOF ¶ 58.) Either outcome negatively affects their overall health, development, and well-being and limits their interest and ability to

**A63**

engage in those everyday activities. (SOF ¶ 58.)

Named Plaintiffs wished to change the sex markers on their Arizona birth certificates to accurately reflect their gender identity. (SOF ¶ 59.) Plaintiffs Helen Roe and James Poe, through their parents, petitioned for a court order under Subsection (A)(4), but the state court judges denied both Helen's and James's petitions because they found that the Surgical Requirement would also apply under Subsection (A)(4). (SOF ¶ 60.) Plaintiff Carl Voe's mother did not file a petition because she understood it would be denied without proof of a "sex change operation." (SOF ¶ 61.) As a result, each of the Named Plaintiffs desired to apply for an amended birth certificate through the ADHS's private administrative process, but each was prevented from doing so by Defendant's enforcement of the Surgical Requirement. (SOF ¶ 62.)

## III.   PROCEDURAL BACKGROUND

On November 4, 2020, Plaintiffs filed this case and a motion for preliminary injunction seeking an amended birth certificate for former Plaintiff Jane Doe ("PI Motion"). (Dkts. 1, 3.) The Court observed that Defendant, in opposing the PI Motion, did not:

> [D]ispute that best medical and psychological practices reflect: (1) gender reassignment surgery is not required or recommended for young transgender kids (i.e., 6, 10, and 13 in this case) diagnosed with gender dysphoria; (2) gender reassignment surgery may never be necessary or recommended for those with gender dysphoria (i.e., there are many factors that come into play that vary for each individual's circumstances); (3) amending important identity-related documents (such as birth certificates) to coincide with a transgender minor's gender identity (as opposed to their external genitalia) is vital to their mental and physical well-being; and (4) that failure to amend such documents (such as birth certificates) improperly reveals a transgender minor's transgender status to school officials and classmates, which results in discrimination and harassment based on their transgender status, and this is detrimental to a transgender minor's mental and physical health.

(Dkt. 28 at 2–3.) The parties resolved the PI Motion by joint stipulation on November 27, 2020, and the Court thereafter ordered ADHS to amend the sex listed on Jane Doe's birth certificate. (Dkts. 39 & 41.)

Plaintiffs filed the Amended Complaint on January 8, 2021. (Dkt. 47.) The Amended Complaint alleged four different violations of the Fourteenth Amendment: (1) equal protection; (2) due process right to privacy; (3) due process right to individual liberty and

autonomy; and (4) due process right to choose whether to undergo a particular medical treatment. (*Id..*) On March 15, 2021, Defendant moved to dismiss count 1 (equal protection) and counts 3 and 4 (due process rights to individual liberty and autonomy and to choose whether to undergo a particular medical treatment). (Dkt. 56.) Plaintiffs opposed, and the Court denied Defendant's motion to dismiss on August 5, 2021. (Dkts. 61, 71, 77, 83.)

In its Order on the Motion to Dismiss, the Court held that the Surgical Requirement facially discriminates against transgender people and concluded that Plaintiffs sufficiently pled their Equal Protection and Due Process Clause claims. (Dkt. 83 at 7–12.) The Court further observed that Defendant lacked "any legitimate basis to require a 'sex change operation' for these kids to obtain a proper birth certificate," and that "it would not be a herculean effort on the part of [ADHS] to accept a physician's certification that an individual is receiving clinically appropriate treatment for gender dysphoria, and that changing the sex marker on that individual's birth certificate is warranted based on best medical practices as applicable to this individual's unique circumstances." (*Id.* at 11–12, 15.)[2] The Court also rejected Defendants' argument that the existence of Subsection (A)(4)'s court-order process cures the Surgical Requirement's constitutional defects, finding that "state judges have imported the [Surgical Requirement] and have denied relief," and that petitioning for a court order requires "a much more burdensome process [that] entails much more cost, confusion, and uncertainty . . . [as] navigating through the litigation process is often difficult and fraught with peril for trained attorneys, let alone a transgender person without the money, education and resources to properly navigate the litigation process." (*Id.* at 12 n.9.) The Court also noted that Subsection (A)(4) "does not provide any standards whatsoever" regarding when a transgender person could obtain a "court order" ordering an amendment to their birth certificate. (*Id.*)

On August 25, 2021, Plaintiffs filed a motion for class certification, which Defendant opposed. (Dkts. 89, 172, 181.) The Court granted Plaintiffs' motion, finding *inter alia* that

---

[2] The Court further held that Plaintiffs had standing under Article III to bring this case and declined to abstain from adjudicating the action under various federal abstention doctrines. (*Id.* at 13, 15–16.)

"[t]he inability of transgender individuals in Arizona to change the gender marker on their birth certificate through a private administrative process stems from the enforcement of the surgical requirement in A.R.S. §36-337(A)(3)" and "the 'sex change operation' requirement at issue invades Plaintiffs' rights under the Due Process and Equal Protection Clauses," causing "constitutional injuries" to both Named Plaintiffs and the proposed class. (Dkt. 214 at 4–6.) Further, the Court ruled that Named Plaintiffs' requests for declaratory and injunctive relief—namely, "an injunction against [ADHS] that bars enforcement of the 'sex operation' requirement under A.R.S. §36-337(A)(3)"—satisfied Rule 23(b)(2) because it "would protect all proposed class members' Due Process and Equal Protection rights, and otherwise make it less burdensome for transgender individuals to amend the gender marker on their birth certificates in Arizona through a private administrative process." (*Id.* at 7.) The Court certified the following class: "All transgender individuals born in Arizona, now and in the future, who seek to change the sex listed on their birth certificate, but have not undergone a 'sex change operation' as treatment for their gender dysphoria." (*Id.* at 2, 8.)

On November 3, 2023, following a joint stipulation, the Court directed the parties to "file cross-motions for summary judgment directed only to the merits of Plaintiffs' constitutional claims on or before November 17, 2023." (Dkt. 228 at 1.) Pursuant to that order, Plaintiffs move for summary judgment on the merits of all four counts in the Amended Complaint and seek an order declaring the Surgical Requirement unconstitutional under the Fourteenth Amendment's Equal Protection and Due Process Clauses.

## IV.  LEGAL STANDARD

Summary judgment is warranted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). There is no genuine issue for trial if, based on the record as a whole, no reasonable trier of fact could find for the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party cannot "simply show that there is some metaphysical doubt as to the material facts," *id.* (citations omitted), but must instead come forward with "concrete evidence" from which a reasonable trier of fact could return a

verdict in his favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *see also Estate of Tucker v. Interscope Records, Inc.*, 515 F.3d 1019, 1029–30 (9th Cir. 2008).

## V.    ARGUMENT

Arizona's Surgical Requirement treats transgender and non-transgender people differently, placing a far higher—and, for Plaintiffs, insurmountable—burden on transgender people born in Arizona who seek to obtain accurate birth certificates: they must undergo a surgical operation. The discriminatory classification created by the Surgical Requirement is a textbook case of an Equal Protection Clause violation. The Surgical Requirement also impermissibly intrudes on Plaintiffs' Fourteenth Amendment due process rights to privacy, individual liberty and autonomy, and to choose whether to undergo a particular medical treatment because it denies them access to an accurate birth certificate, forcing them involuntarily to disclose their transgender status and denying them the ability to live consistently with their sex, unless they undergo a surgical procedure that may not be medically appropriate or permitted for them. Because Defendant has not proffered a sufficient governmental justification under any level of scrutiny to sustain the Surgical Requirement, the Court should rule it unconstitutional and grant summary judgment on all four of Plaintiffs' claims.

### A.    The Surgical Requirement Violates the Equal Protection Clause.

#### 1.    The Surgical Requirement discriminates based on transgender status.

At the threshold, there can be no doubt that the Surgical Requirement discriminates against transgender individuals on its face. As the Court already recognized in its Order denying Defendant's Motion to Dismiss, Subsection (A)(3) and its implementing regulation are "aimed directly at 'transgender' people" because these laws require "a 'sex change operation' to obtain an accurate birth certificate that properly aligns with their gender identity." (Dkt. 83 at 9–10.) As the Court recognized:

> [T]he statute and regulation do not explicitly use the phrase 'transgender' or explicitly state that these laws are aimed directly at 'transgender' people, [but] any logical reading of the statute and regulation reflects that it applies nearly exclusively to transgender people; who else is going to voluntarily seek out a

**A67**

"sex change operation"? *See Latta v. Otter*, 771 F.3d 456, 467-68 (9th Cir. 2014) ("Whether facial discrimination exists does not depend on why a policy discriminates, but rather on the explicit terms of the discrimination . . . [W]hile the distinction . . . that defendants seek to draw could in theory represent a *justification* for the discrimination worked by the law, it cannot overcome the inescapable conclusion that the [states' laws] discriminate on the basis of sexual orientation.") (emphasis in the original).

(*Id.*) Nothing has changed since the Court's order; the same logic applies today.

Furthermore, the material facts are not in dispute. Defendant would not have accepted Plaintiffs' applications and would not have amended the sex listed on their birth certificates under Subsection (A)(3) because Plaintiffs are transgender people who have not undergone surgery. (SOF ¶ 62; *see also* ¶¶ 36, 39, 43.) In contrast, non-transgender people—the vast majority of whom ADHS has provided accurate birth certificates pursuant to Arizona law—either will never need to change their sex markers or, if they do, are entitled to apply for a "correction" through a private administrative process with no more than a physician's letter attesting to their birth-assigned sex. (SOF ¶ 63; *see also* Dkt. 83 at 9–10.) The Surgical Requirement is thus facially discriminatory based on transgender status. (Dkt. 83 at 12.)

### 2. Heightened scrutiny applies to classifications based on transgender status.

As this Court has already held, "[d]iscrimination against transgender people is discrimination based on sex; as such, heightened scrutiny applies." (*Id.* at 9.) The Ninth Circuit also recognizes that heightened scrutiny applies to classifications based on a person's transgender status. *See Hecox*, 79 F.4th at 1021–28 ("We conclude that while the Act certainly classifies on the basis of sex, it also classifies based on transgender status, triggering heightened scrutiny on both grounds."); *Hundley v. Aranas*, No. 21-15757, 2023 WL 166421, at *1 (9th Cir. Jan. 12, 2023) ("Discrimination against an individual based on a person's gender identity demands heightened scrutiny."); *Karnoski*, 926 F.3d at 1201 (ruling policy barring transgender individuals from military service is subject to heightened scrutiny); *Doe v. Horne*, No. CV-23-00185-TUC-JGZ, 2023 WL 4661831, at *16 (D. Ariz. July 20, 2023) ("Laws that discriminate against transgender people are sex-based

A68

classifications and, as such, warrant heightened scrutiny.").

"[A] party seeking to uphold government action based on sex must establish an 'exceedingly persuasive justification' for the classification. *United States v. Virginia*, 518 U.S. 515, 524 (1996) (citation omitted). Similarly, a party defending a classification based on transgender status must show that it is "substantially related to its stated goals." *Hecox*, 79 F.4th at 1030. Under either approach, Defendant "bear[s] the burden of establishing that [she] reasonably determined the policy 'significantly furthers' the government's important interests, and that is not a trivial burden." *Karnoski*, 926 F.3d at 1202; *see also Hecox*, 79 F.4th at 1028 (observing "[h]eightened scrutiny is a 'demanding standard'" (citation omitted)). Defendant has not met her burden as a matter of law.

### 3. The Surgical Requirement fails heightened scrutiny.

Defendant asserts the governmental interest for the Surgical Requirement is "in maintaining and ensuring the truthfulness, completeness, and correctness of information in vital records and statistics," (Proksel Decl., Ex. 23 at 24). However, Defendant has no evidence to suggest the Surgical Requirement actually furthers these purposes. Rather, the evidence shows just the opposite. The Surgical Requirement ensures that Plaintiffs do *not* have truthful, complete, or correct birth certificates by conditioning access to the private administrative process on a surgical procedure that they may not need or cannot get. The Surgical Requirement thus fails the test. *See F.V. v. Barron*, 286 F. Supp. 3d 1131, 1141–42 (D. Idaho 2018) (finding government defendants had "no justification" for state policy preventing transgender people from correcting the sex listed on their birth certificates and holding "there is no rational basis to support [the] policy"); *see also, e.g.*, *Love v. Johnson*, 146 F. Supp. 3d 848, 856 (E.D. Mich. 2015) (finding state policy that imposed additional burden on transgender people to amend the sex listed on their driver's licenses "undermine[d]" purported governmental interest in accurate identification because the policy was the reason "the sex listed on [the plaintiffs' licenses] fails to match their appearance and the sex associated with their names" (citation omitted)); *K.L. v. State, Dep't of Admin., Div. of Motor Vehicles*, No. 3AN-11-05431-CI, 2012 WL 2685183, at *7 (Alaska

Super. Ct. Mar. 12, 2012) ("By not allowing transgender[] individuals to change their sex designation, their license will inaccurately describe the discernable appearance of the license holder by not reflecting the holder's lived gender expression of identity.").

Several federal and state agencies have implicitly recognized that the Surgical Requirement does not lead to truthful, correct, and complete identity documents. For example, the U.S. Department of State (for U.S. passports), the Social Security Administration (for social security cards), and the U.S. Citizenship and Immigration Services (for permanent resident cards) do not require proof of surgery for transgender people to change the sex marker on these identity documents, instead allowing applicants to self-attest to their sex. (SOF ¶ 64; *see also* Dkt. 83 at 15 (citing 1 Sexual Orientation and the Law § 10:11 (2020–21 ed.))).[3]

The Arizona Department of Transportation ("ADOT") also does not require individuals to submit proof of a surgery to apply to change the sex markers listed on their Arizona driver licenses, but rather allows applicants to submit a physician's letter that attests "that the customer is irrevocably committed to the gender-change process." (Proksel Decl. Ex. 34 at 4.) In fact, Subsection G of ADOT's Customer Records Policy 4.1.1 ("Subsection G") specifically provides that "[i]t is ***not*** necessary for the customer to have completed the surgical gender-change procedure" for that customer to "request that the gender noted on the individual customer record be changed." (Proksel Decl., Ex. 34 at 2 (emphasis in original); *see also* SOF ¶ 65; Proksel Decl., Ex. 35 at 3.)[4] Notably, when Plaintiffs subpoenaed ADOT in this case and asked about the governmental interest behind Subsection G, ADOT responded that its "interest is in ensuring that a customer using [ADOT's] identification credentials can accurately assert their identity and that a reliant party can validate an individual's identity" and "[Subsection G] and its revisions are

---

[3] In August 2021, when the Court denied Defendant's Motion to Dismiss, these federal agencies generally required individuals applying for a sex-marker change to submit proof "that the person has undergone 'appropriate clinical treatment for gender transition.'" 1 Sexual Orientation and the Law § 10:11 (2020–21 ed.). Since then, each of these agencies have adopted the more lenient self-attestation standard. (Proksel Decl. Exs. 31–33.)

[4] Prior to its amendment in 2020, Subsection G was formerly Subsection Q in ADOT Customer Records Policy 3.1.1. *See* Proksel Decl., Ex. 35 at 4.

beneficial in aiding [ADOT's] efforts to provide accurate credentials for the benefit of customers and other stakeholders." (Proksel Decl. Ex. 35 at 5.)

For Plaintiffs who have successfully corrected identity documents from these agencies, the Surgical Requirement creates another obstacle: these amended documents now list a correct sex marker that does not match the incorrect sex marker on their birth certificates, increasing the risk that they will be mis-identified or outed as transgender against their will. *See, e.g.*, *K.L.*, 2012 WL 2685183, at *7 (observing that state policy "can lead to discrepancies between an individual's Alaska driver's license and United States passport"). And the Surgical Requirement is constitutionally deficient for yet another reason: under Arizona's vital records laws, some transgender individuals born in Arizona (those who have undergone surgery) may obtain corrected birth certificates reflecting their lived gender identity, while other transgender people (those who have not had surgery) are precluded from doing so. These "discrepancies" mean that some transgender people may possess a birth certificate "reflecting their lived gender identity, while others may not," thus demonstrating that the Surgical Requirement "does not bear a close and substantial relationship to the furtherance of the state's interest in accurate documentation and identification." *Id.* at *7.

On the undisputed facts before the Court, Defendant's single asserted justification for the Surgical Requirement falls far short of the "demanding standard" she is required to satisfy under heightened scrutiny. *Hecox*, 79 F.4th at 1028 (citation omitted). The Court should thus grant summary judgment to Plaintiffs on their equal protection claim.

### 4. The Surgical Requirement also fails rational basis review.

Even under rational basis review, Defendant's asserted justifications fall short. Defendant has not and cannot identify any rational relationship between a legitimate government interest and the Surgical Requirement. *See Romer v. Evans*, 517 U.S. 620, 632–33 (1996). And, as discussed above, Defendant has not produced evidence to show the Surgical Requirement does anything other than *undermine* any goal it may have. Indeed, courts in Alaska, Idaho, Michigan, and Puerto Rico have all held that policies barring

transgender people from obtaining identity documents with the correct sex marker lack adequate justification under any standard of review. *See Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327, 333 (D.P.R. 2018) (ruling state policy that resulted in "forced disclosure of a transgender person's most private information is not justified by any legitimate government interest"); *Barron*, 286 F. Supp. 3d at 1141–42 (holding "there is no rational basis to support [the state's] policy" of "denying transgender people, as a class, access to birth certificates that accurately reflect their gender identity," and the "policy similarly fails to withstand heightened scrutiny"); *Love*, 146 F. Supp. 3d at 856–57 (ruling state policy "requiring Plaintiffs to disclose their transgender status . . . bears little, if any, connection" to "state's [purported] interest in maintaining 'accurate' identification documents"); *K.L.*, 2012 WL 2685183, at *6–8 (finding state policy requiring "medical certification of a sex change" to change the sex listed on a driver license "can actually result in inaccurate and inconsistent identity documents")

As discussed above, the Surgical Requirement undermines any purported interest Defendant has in maintaining and ensuring the truthfulness, completeness, and correctness of information in vital records and statistics. Thus, the Surgical Requirement is unconstitutional as a matter of law regardless of the level of scrutiny applied.

## B. The Surgical Requirement Violates the Due Process Clause.

The Surgical Requirement is also unconstitutional because it infringes on Plaintiffs' fundamental rights under the Fourteenth Amendment's Due Process Clause. As this Court held when denying Defendant's Motion to Dismiss, "[the Due Process Clause] 'includes a substantive component that provides heightened protection against government interference with certain fundamental rights and liberty interests.'" (Dkt. 83 at 8 (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)).) At core, "[it] promises liberty to all within its reach, a liberty that includes certain specific rights that allow persons . . . to define and express their identity." *Obergefell v. Hodges*, 576 U.S. 644, 651–52 (2015).

Plaintiffs assert three well-established due process rights in this case: (1) the right to privacy; (2) the right to individual liberty and autonomy; and (3) the right to choose whether

**A72**

to undergo a particular medical treatment. The Surgical Requirement infringes on each of these rights. As this Court already recognized, the Due Process Clause guarantees the right to make personal choices central to individual dignity and decisional autonomy, including intimate choices that define personal identity and beliefs. (Dkt. 83 at 8.) The Court also ruled that the Due Process Clause protects against intrusions into personal decisions regarding one's bodily integrity, including choices about medical treatment and the right to refuse unwanted medical treatment. (*Id.* (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997); *Washington v. Harper*, 494 U.S. 210, 221 (1990); *Parham v. J.R.*, 442 U.S. 584, 600 (1979))). Because Defendant cannot meet her burden to demonstrate the Surgical Requirement satisfies strict scrutiny—*i.e.*, that it is "narrowly tailored to serve a compelling state interest," *Washington*, 521 U.S. at 721 (citation omitted)—the Court should find it unconstitutional under each of the three asserted due process rights here.

1.      **The Surgical Requirement infringes on Plaintiffs' right to privacy.**

The Due Process Clause's right to privacy "protect[s] [the] individual interest in avoiding disclosure of personal matters." *Whalen v. Roe*, 429 U.S. 589, 598–600 (1977); *see also Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 551 (9th Cir. 2004) (finding Fourteenth Amendment's zone of privacy protects against "disclosure of personal matters" (internal quotation marks omitted)). Such personal matters include a person's transgender status and any related information, such as their psychological, medical, or surgical treatments. *See Love*, 146 F. Supp. 3d at 856 ("[B]y requiring Plaintiffs to disclose their transgender status, the [state] Policy directly implicates their fundamental right of privacy."); *see also K.L.*, 2012 WL 2685183, at *6 (ruling under Alaska constitution that "one's transgender[] status is private, sensitive personal information"). "The excruciatingly private and intimate nature of [being transgender], for persons who wish to preserve privacy in the matter, is really beyond debate." *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999); *see also Arroyo Gonzalez*, 305 F. Supp. 3d at 333 ("[T]here are few areas which more closely intimate facts of a personal nature than one's transgender status." (internal quotation marks and citation omitted)).

**A73**

By foreclosing the opportunity to use ADHS's private administrative process to change the sex marker on their birth certificates, the Surgical Requirement obligates Plaintiffs to disclose their transgender status every time they present an inaccurate identity document. Such disclosure inherently reveals Plaintiffs' sensitive and intimate medical and personal information, which, once revealed puts them at great risk for bodily harm. As this Court already recognized, the ongoing involuntary disclosure of an individuals' transgender status is "akin to a death by a thousand cuts as being continuously outed unnecessarily exposes [that individual] to stigma, bullying, fear, and violence." (Dkt. 83 at 11.) Other courts throughout the country are in accord. *See, e.g.*, *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139–40 (S.D.N.Y. 2015) ("A mismatch between the gender indicated on the document and the gender of the holder calls down discrimination."); *Barron*, 286 F. Supp. 3d at 1137 ("Transgender people who present mismatched identification are verbally harassed, physically assaulted, denied service or benefits, or asked to leave the premises."); *Ray v. Himes*, No. 2:18-cv-272, 2019 WL 11791719, at *12 (S.D. Ohio Sept. 12, 2019) (holding possibility that transgender plaintiffs "face being outed as transgender upon presentation of their birth certificates" qualifies as "specific, quantifiable, and particularized injur[y]" (citation omitted)). And Named Plaintiffs' own life experiences confirm this terrible truth. (*See, e.g.*, SOF ¶ 67.)

Moreover, after one's transgender status is disclosed to a third party through an identity document discordant with one's gender identity, there are no safeguards to prevent that third party from disclosing the information to others. (*See, e.g.*, SOF ¶ 67). Thus, in addition to revealing intimate information, the Surgical Requirement also takes away Plaintiffs' control over the circumstances in which their personal matters are disseminated, which is an essential aspect of privacy. *See Ostergren v. Cuccinelli*, 615 F.3d 263, 283 (4th Cir. 2010). Given these undisputed facts, there can be no doubt that the Surgical Requirement infringes on Plaintiffs' due process right to privacy.

**A74**

2.     **The Surgical Requirement infringes on Plaintiffs' right to individual liberty and autonomy.**

The Due Process Clause affords every individual the fundamental right to make "personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs." *Obergefell*, 576 U.S. at 663. "The Supreme Court has repeatedly affirmed that the Due Process Clause protects against intrusions on highly intimate and personal decisions relating to issues such as marriage, procreation, contraception, family relationships, and child rearing." (Dkt. 83 at 8 (citing *Obergefell*, 576 U.S. 644; *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972); *Lawrence v. Texas*, 539 U.S. 558, 578 (2003), *Meyer v. Nebraska*, 262 U.S. 390, 399–400 (1923)).) Federal courts have acknowledged the deeply personal nature of the decisions required of transgender persons for them to live in a manner consistent with their gender identity, an intimate set of decisions that run parallel to long-established liberty rights. *See Arroyo Gonzalez*, 305 F. Supp. 3d at 333 ("Much like matters relating to marriage, procreation, contraception, family relationships, and child rearing, 'there are few areas which more closely intimate facts of a personal nature' than one's transgender status." (citation omitted)).

Requiring surgery to apply for a sex marker change infringes on Plaintiffs' right to define their identities and live as their authentic selves. The undisputed facts demonstrate that transgender people born in Arizona face unjustifiable hurdles to obtain accurate birth certificates, forcing them to endure the constant risk of exposure, rejection, discrimination, and bodily harm. (SOF ¶ 66, *see also* ¶¶ 46–47, 58, 62.) It also deprives them of the ability to define their own identifies, which is "fundamental to our concept of constitutionally ordered liberty." *Washington*, 521 U.S. at 727; *see Roberts v. U.S. Jaycees*, 468 U.S. 609, 619 (1984) (finding "ability independently to define one's identity . . . is central to any concept of liberty"). And because gender identity, like sexual orientation, is immutable (SOF ¶ 5), Plaintiffs' ability to participate as full members of society depends on their ability to amend the sex listed on their birth certificates to correctly identify who they are. *Obergefell*, 576 U.S. at 658. The Surgical Requirement thus violates Plaintiffs' right to

**A75**

individual liberty and autonomy.

> 3.  **The Surgical Requirement infringes on Plaintiffs' right to choose whether to undergo a particular medical treatment.**

The Due Process Clause protects the fundamental right to make decisions regarding one's bodily integrity, including choices about medical treatment and the right to refuse unwanted medical treatment. *See Washington*, 521 U.S. at 720 (acknowledging fundamental right to bodily integrity and to obtain an abortion, use contraception, and refuse unwanted medical treatment); *Washington*, 494 U.S. at 221 (recognizing "significant liberty interest in avoiding the unwanted administration of antipsychotic drugs"); *Parham*, 442 U.S at 600 (recognizing that minors have a protected liberty interest in avoiding unnecessary mental health treatment).

The Surgical Requirement interferes with Plaintiffs' "personal decisions regarding [their] bodily integrity, including choices about medical treatment," (Dkt. 83 at 8), because it forces Plaintiffs to choose between undergoing medically inappropriate unnecessary, unaffordable, or even illegal surgery or subjecting themselves to the constant risk of exposure due to having identity documents that disclose their transgender status, which puts them at risk of discrimination, harassment, and violence. By conditioning the availability of these documents on whether a person has obtained surgery, the Surgical Requirement injects government into what should be a personalized and private medical assessment and treatment plan. *See Parham*, 442 U.S. at 604 (finding state's power to interfere is at its lowest ebb when medical decision is supported by child, child's parents, and "a physician's independent examination and medical judgment").

> 4.  **The Surgical Requirement cannot survive any level of scrutiny.**

Because the Surgical Requirement infringes on Plaintiffs' fundamental rights, strict scrutiny applies. *Washington*, 521 U.S. at 721. Under the Fourteenth Amendment's Due Process Clause, Defendant bears the burden of showing that the Surgical Requirement "furthers a compelling state interest, and is narrowly drawn to further that state interest." *Love*, 146 F. Supp. 3d at 856 (citation omitted). Defendant's only interest is the same she

**A76**

proffered for the Equal Protection claim: a "governmental interest in maintaining and ensuring the truthfulness, completeness, and correctness of information in vital records and statistics." (Proksel Decl. Ex. 23 at 24.) But forcing Plaintiffs to maintain birth certificates that do not match who they are does not "further[]" an interest in truthful, complete, or accurate records. *See Love*, 146 F. Supp. 3d at 856. Thus, Defendant cannot meet her burden under *any* standard of review, let alone under strict scrutiny. Moreover, given that the ADOT and several federal agencies will amend the sex listed on transgender peoples' identity documents without proof of surgery, the Surgical Requirement is plainly not the "least restrictive and least harmful means of satisfying" Defendant's purported government interest. *Id.* (citation omitted). The Court should grant summary judgment in Plaintiffs' favor on all three of their Due Process Clause claims.

## VI. CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court grant this Motion for Summary Judgment and declare the Surgical Requirement violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment.

Dated: November 17, 2023          OSBORN MALEDON, P.A.


                                   /s/Colin M. Proksel
                                  Mary O'Grady (011434)
                                  Colin Proksel (034133)
                                  Payslie Bowman (035418)
                                  OSBORN MALEDON, P.A.
                                  2929 North Central Avenue, 21st Floor
                                  Phoenix, Arizona 85012-2793
                                  Telephone:  (602) 640-9000
                                  Facsimile:  (602) 640-9050
                                  Email:      mogrady@omlaw.com
                                  Email:      cproksel@omlaw.com
                                  Email:      pbowman@omlaw.com

                                  Rachel Berg (*Pro Hac Vice*)
                                  NATIONAL CENTER FOR LESBIAN
                                  RIGHTS
                                  870 Market Street, Suite 370
                                  San Francisco, California 94102
                                  Telephone:  (415) 343-7679

**A77**

Facsimile:    (415) 392-8442
Email:         rberg@nclrights.org

Patrick Gunn (*Pro Hac Vice*)
COOLEY LLP
101 California Street, 5th Floor
San Francisco, California 94111-5800
Telephone:   (415) 693-2070
Facsimile:    (415) 693-2222
Email:         pgunn@cooley.com

Barrett J. Anderson (*Pro Hac Vice*)
Jessica L. Taylor (*Pro Hac Vice*)
COOLEY LLP
10265 Science Center Drive
San Diego, California 92121-1909
Telephone:   (858) 550-6000
Facsimile:    (858) 550-6420
Email:         banderson@cooley.com
Email:         jtaylor@cooley.com

*Attorneys for Plaintiffs and the Class*

A78

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Helen Roe, a minor, by and through her parent and next friend Megan Roe; et al.,

        Plaintiffs,

v.

Jennie Cunico, in her official capacity as State Registrar of Vital Records and Director of the Arizona Department of Health Services,

        Defendant.

No. CV-20-00484-TUC-JAS

**ORDER**

Pending before the Court are cross motions for summary judgment. Both parties agree that there are no genuine issues of material fact. Plaintiffs' Complaint contains four claims against the Arizona Department of Health Services ("ADHS") whereby they allege Subsection (A)(3) of Arizona Revised Statutes § 36-337(A) violates (1) the Equal Protection Clause, (2) The Due Process Right to Privacy, (3) The Due Process Right to Individual Liberty and Autonomy, and (4) The Due Process Right to choose to undergo a particular medical treatment. For the reasons stated below, Plaintiffs' motion for summary judgment on all claims is granted, and Defendant's motion for summary judgment is denied.

## I. STANDARD OF REVIEW

Summary Judgment is appropriate where "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(a). A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* Thus, the "mere scintilla of evidence" in support of the

1  nonmoving party's claim is insufficient to defeat summary judgment. *Id.* at 252. However,
2  in evaluating a motion for summary judgment, "the evidence of the nonmoving party is to
3  be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. The
4  Court will not weigh the evidence or determine its credibility at the summary judgment
5  stage, nor will the court decide what is true; the court will only assess whether there are
6  genuine issues for trial. *Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407, 410 (9th Cir.
7  1996); *Balint v. Carson City, Nevada*, 180 F.3d 1047, 1054 (9th Cir. 2000).

8  **II. <u>BACKGROUND</u>**

9  The Named Plaintiffs are three transgender children born in Arizona who sought to
10 change the gender marker on their birth certificates to reflect their gender identities, but
11 were denied because they did not satisfy the sex change operation requirement[1]. The
12 Named Plaintiffs are part of a certified class of transgender individuals born in Arizona
13 who seek to change the sex listed on their birth certificates, but have not undergone a "sex
14 change operation."

15 **<u>A.R.S. 36-337(A)</u>**

16 ADHS, through the Bureau of Vital Records, is solely responsible for registering,
17 issuing, correcting, and maintaining Arizona birth certificates. *See* A.R.S. § 36-302. Under
18 the Arizona Revised Statutes, there are two potential ways to amend an Arizona birth
19 certificate. *See* A.R.S. § 36-337(A). The first, A.R.S. § 36-337(A)(3), requires an
20 individual seeking an amendment to their birth certificate to undergo a sex change
21 operation as a prerequisite to changing the gender marker on their birth certificate.
22 Transgender individuals who undergo the statutorily mandated surgical operation may then
23 submit a confidential application to ADHS and a physician's letter attesting that the
24 surgical procedure took place. If accepted, ADHS is required to grant the amendment, and
25 the amendment's records are sealed and are not accessible to the public. Importantly, minor
26 children are not eligible to undergo surgery[2] and, thus, are ineligible for an amendment

---

27 [1] Plaintiffs Helen Roe, James Poe, and Carl Voe (together "Named Plaintiffs") are three
   minor transgender individuals born in Arizona. The Court will discuss the Named Plaintiffs
28 in further detail later in this Order.
   [2] The Court emphasizes that the prevailing medical and psychological consensus is that

**A80**

1  using this private administrative process,

2      The second avenue to amend an Arizona birth certificate, A.R.S. § 36-337(A)(4),

3  permits an amendment to a gender marker if an individual has obtained a court order.

4  However, Arizona courts have interpreted Subsection (A)(4) to include the requirements

5  of Subsection (A)(3), which mandates transgender individuals to get "a sex change

6  operation" to change the gender marker on their birth certificates[3]. Importantly, non-

7  transgender people can apply to change their sex marker with no more than a physician's

8  letter attesting that they are a certain sex in a confidential administrative process.

9      However, even with a court order, ADHS also requires (1) a written request for an

10  amended birth certificate in a department-approved format from a person or the person's

11  parent or legal guardian if the person is a minor and (2) the applicable fee payment.

12  Subsection (A)(4) forces transgender individuals to prepare and file legal documents, pay

13  a fee, and ultimately, risk publicly outing themselves. While there are means to request

14  confidentiality, these requests are sometimes denied as rulings on such requests are within

15  the court's discretion and risk the psychological well-being of individuals with gender

16  dysphoria.

17      Named Plaintiffs argue that Subsection (A)(3) and its implementing regulations

18  essentially bar them from the private administration process by requiring these children to

19  undergo an invasive surgery that their doctors and other medical experts recognize is

20  unnecessary. Further, they argue that Subsection (A)(3) is not cured by the alternative court

21  order process in Subsection (A)(4) because of the import of the surgical requirement and

22  _____

   minors should not have surgery and may never require surgery.
23  [3] While the Defendants argue that *McLaughlin v. Swanson,* 476 P.3d 336, 339 (Ariz. App.
24  2020), ended Arizona courts surgical requirement interpretation, the Court does not find
   this to be the case. There, the court recognized Arizona courts' broad authority over birth
25  certificate amendments, but it did not change any substantive interpretation of the statute.
   *Id.* Here, the recognition of Arizona courts' discretion does little to change the burden
26  placed on the Plaintiffs and other transgender individuals who seek to amend their birth
   certificates. Further, even if Arizona courts had not imported the sex change operation
27  requirement, forcing transgender individuals to sue the government is an incredibly
28  burdensome process fraught with expense, uncertainty and confusion.

- 3 -

**A81**

1   the undue burden that is required of transgender individuals to go to court to obtain a court
2   order. They assert that the statutory and regulatory scheme violates the Equal Protection
3   Clause, the Due Process Right to Privacy, the Due Process Right to Individual Liberty and
4   Autonomy, and the Due Process Right to choose whether to undergo a particular medical
5   treatment.

6          The Defendant contends that there is a compelling state interest in ensuring the
7   accuracy of vital records[4] and that the court order alternative is not overly burdensome and
8   facially permits a transgender individual to change their gender marker without a sex
9   change operation. The Court will address these claims in the succeeding parts of this Order.

10  **Birth Certificates**

11         A birth certificate is one of the most common and important identification
12  documents. It is necessary for a variety of essential services and activities; these include
13  school enrollment, after-school programs, and extracurricular activities. If a birth
14  certificate does not accurately reflect the gender of transgender children, it can create
15  numerous challenges in school enrollment and hinder their participation in school and
16  extracurricular activities. Named Plaintiffs argue that without amended birth certificates,
17  their transgender status is exposed during school registration and other programs, leading
18  to harassment, discrimination, and potential violence. There are studies to support these
19  fears[5], and different courts have reached similar conclusions. *See e.g.*, *Ray v. McCloud*,
20  507 F.Supp.3d 925, 931-32 (S.D. Ohio 2020). The Defendant argues that the State's

---

[4] The Court notes that several federal agencies have recognized that a sex change operation is not necessary to ensure the accuracy of identity documents. For example, the U.S. Department of State for passports, and the Social Security Administration for social security cards, allow applicants to self-attest to their sex and do not require proof of surgery to change a gender marker on these identification documents. *See* U.S. Department of State Passport "Selecting Your Gender Marker," attached as Exhibit 31 to Dkt. 233.; U.S. Social Security Administration "How do I change the sex identification on my Social Security record?" attached as Exhibit 32 to Dkt. 233. Moreover, the Arizona Department of Transportation ("ADOT") also does not require proof of a sex change operation to change the gender marker on driver licenses. *See* ADOT Customer Records Policy 4.1.1(G) at 2, attached as Exhibit 34 to Dkt. 233.

[5] The Court has previously cited to a 2015 study by the National Center for Transgender Equality from 2015, which found that nearly one-third of transgender respondents who had an identity document that did not match their gender presentation were harassed, discriminated against, or assaulted. (Dkt. 83 at 3).

**A82**

interest in maintaining vital records laws does not deprive "any transgender individuals of any rights to privacy, gender autonomy, or medical autonomy" because the amendment process does not single out transgender individuals. (Dkt. 230 at 10-17)[6]. Both parties agree, however, that without accurate identification documents, transgender individuals are exposed to emotional and physical harm.

**Named Plaintiffs**

The Named Plaintiffs Helen Roe, James Poe, and Carl Voe are a part of a certified class of all transgender people born in Arizona. The Named Plaintiffs are transgender individuals under the age of eighteen born in Arizona. All of them suffer from gender dysphoria and have attempted to follow medical treatment recommendations by adopting the characteristics of their gender identity.

The Named Plaintiffs possessed inaccurate identity documents as the gender marker on their birth certificate did not align with their gender identity. Every time they used these documents, they risked disclosing private medical information and exposing their transgender status, which in turn risked their well-being when participating in everyday activities. The Named Plaintiffs have shared episodes of violence, discrimination, and harassment due to involuntary outings of their transgender status [7].

**Gender Dysphoria**

Gender dysphoria is a medically recognized and diagnosable condition where there is an incongruence between a transgender person's gender identity and assigned sex[8]. Left untreated, gender dysphoria may result in severe psychological distress, anxiety, depression, suicidal ideation, and even self-harm.

---

[6] The Court will address this argument in more detail later in the Order. However, the Court notes that this argument is unpersuasive as it fails to address how the amendment process is not overly burdensome on transgender individuals inasmuch as they comprise the vast majority of individuals seeking to change the gender markers on their birth certificates.

[7] The Court has previously provided a more detailed account of the individual experience of the Plaintiffs. (Dkt. 83 at 5).

[8] Gender Dysphoria is in the Diagnostic and Statistical Manual of Mental Disorders 5th edition ("DSM-5"), and it is recognized by the American Psychiatric Association, the American Medical Association, and other professional medical organizations.

**A83**

1   According to current standards for treatment, changing the sex marker on a
2   transgender child's birth certificate is an important step in protecting the child's
3   transgender status from being improperly exposed to others. It helps them avoid numerous
4   harms caused by the disclosure of their private medical information. Studies show that
5   children between the ages of two and five years old become aware of their gender identity
6   and begin to express their gender identification through their behavior. There is a biological
7   component to a transgender individual's gender identity and attempts to forcibly change it
8   are harmful to a person's health and well-being.

9   Standards of care for gender dysphoria were developed by the World Professional
10  Association for Transgender Health ("WPATH"), an international, multidisciplinary
11  professional association of medical providers. Named Plaintiffs have all suffered
12  psychological distress due to gender dysphoria and are following the standards of care for
13  this condition while under the supervision of doctors. The goal of gender dysphoria
14  treatment is to align a transgender person's life with their gender identity. Not every
15  transgender person needs surgery to complete a gender transition. Starting social
16  transitioning and other recommended therapy may eliminate the need for any potential
17  surgical intervention.

18  In this case, Named Plaintiffs have begun to socially transition by changing their
19  names, using different pronouns, wearing clothing, and adopting grooming habits
20  consistent with their gender identity. These help the Named Plaintiffs find acceptance and
21  support in their lives, which, in turn, alleviates the psychological distress from their gender
22  dysphoria. However, without the proper gender marker on their birth certificate, the
23  Plaintiffs argue that they are prevented from continuing their social transition and are
24  exposed to grievous harm.

25  **III. DISCUSSION**

26  Plaintiffs move for summary judgment on their claims that A.R.S. § 36-337(A)(3) is
27  facially unconstitutional and violates their constitutional rights to Equal Protection and Due
28  Process. Defendant likewise moves for summary judgment, contending that Arizona's

**A84**

statutory scheme is constitutional.

### A. Facial Challenge

At the outset of the litigation, the challenge to the statutory provision was both an as-applied and facial challenge. However, through the course of the proceedings, the challenge has evolved solely into a facial challenge. (Dkt. 153 at 3 & n.4.).

To succeed with a facial challenge, a plaintiff must show that a statute, as written, "establishe[s] that no set of circumstances exists under which the Act would be valid." *United States v. Salerno,* 481 U.S. 739, 745 (1987). However, the Court must "be careful to not go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008).

### B. Equal Protection

Plaintiffs argue that the Defendant's amendment requirements discriminate against Plaintiffs in violation of the Equal Protection Clause by requiring transgender individuals to undergo surgery to secure a birth certificate that reflects their gender identity. In contrast, non-transgender individuals' birth certificates properly reflect their gender identity, which already aligns with their biological sex.

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This extends to protection against "intentional and arbitrary discrimination" by the State. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). The Ninth Circuit has held that heightened scrutiny applies to laws that discriminate based on transgender status. *Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019). Heightened scrutiny places a high burden upon the state to demonstrate an "exceedingly persuasive" justification for its differential treatment. *United States v. Virginia*, 518 U.S. 515, 533 (1996). To survive heightened scrutiny, the government must demonstrate that the discriminatory means are tailored to important governmental objectives. *Id.* at 516. As reflected in *SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d

- 7 -

**A85**

471, 483 (9th Cir. 2014), the Court's review under heightened scrutiny is extremely fact-bound, requiring us to "examine [a policy's] actual purposes and carefully consider the resulting inequality to ensure our most fundamental institutions neither send nor reinforce messages of stigma or second-class status."

Here, there is no dispute among the parties as to the case's material facts. Transgender individuals, if they seek to amend their birth certificate, have two options: Subsection (A)(3) and Subsection (A)(4). The disagreement rests in how these subsections, read together, are to be interpreted as they relate to the rights of transgender individuals born in Arizona.

The Defendant argues that when read in conjunction, there is no barrier to amending a birth certificate. Plaintiffs can either undergo surgery or petition an Arizona court for relief. The Defendant argues that under this statutory scheme, there is nothing unconstitutional regarding the sex change operation if transgender individuals are presented with the court order alternative. Further, the Defendant claims that the statute does not require a transgender individual to disclose their transgender status because it does not explicitly document gender identity.

The Court does not find the Defendant's arguments persuasive. The mere fact that Subsection (A)(4) provides an alternative court order process does not address the substantive requirements of the process[9]. Here, the Arizona courts have imported a requirement of surgery for amending an Arizona birth certificate, and if transgender individuals choose not to, or are unable to undergo surgery, they are barred from amending their birth certificate. The interpretation of the Subsections that the Defendant seeks the Court to adopt does not rationally exist. In the case of the Named Plaintiffs and other similarly situated transgender individuals, they are forced to undergo surgery against medical treatment recommendations and their individual choice to amend their birth

---

[9] While the court order process permits Arizona courts, at their discretion, to seal documents, the courts are not required to do so. Under Arizona's alternative court order process, transgender individuals must sue the government, navigate the litigation process and hope the courts seal the documents to protect their privacy. Arizona's alternative court order process does not alleviate the burden imposed on transgender individuals.

**A86**

certificate. The statute and supporting regulations do not explicitly single out transgender individuals; however, as the Court previously discussed in the Order denying the Defendant's Motion to Dismiss:

> [T]he statute and regulation do not explicitly use the phrase 'transgender' or explicitly state that these laws are aimed directly at 'transgender' people, [but] any logical reading of the statute and regulation reflects that it applies nearly exclusively to transgender people; who else is going to voluntarily seek out a "sex change operation"? *See Latta v. Otter*, 771 F.3d 456, 467-68 (9th Cir. 2014) ("Whether facial discrimination exists does not depend on why a policy discriminates, but rather on the explicit terms of the discrimination . . . [W]hile the distinction . . . that defendants seek to draw could in theory represent a justification for the discrimination worked by the law, it cannot overcome the inescapable conclusion that the [states' laws] discriminate on the basis of sexual orientation.")

(Dkt. 83 at 9–10). Similarly, it follows that if a transgender individual were unable to satisfy the surgical requirement and obtain an amended birth certificate, it forcibly requires an individual to disclose their transgender status when they present an inaccurate identity document. For non-transgender individuals—the vast majority of whom have an accurate birth certificate—they are not presented with the unlawful choice of being stripped of their bodily autonomy or face discrimination, harassment, and potential violence.

The Defendant contends that the government has a vital interest in accurate birth records, and thus, this is a tailored means of achieving its goals. These points will be addressed in further detail later in this Order. However, as a threshold matter, the Court finds this argument unpersuasive as the amendment process does not destroy the original birth certificate record, but simply maintains it under seal in the agency's records. The amendment process sought by the Plaintiffs would not impede the governmental interest in maintaining accurate vital records and if anything, improves the accuracy of governmental records regarding the gender identity of its citizens. The Court finds that the Defendant's requirements treat transgender individuals differently without a persuasive government interest and fails under a heightened scrutiny analysis. Accordingly, the Defendant's motion for summary judgment is denied, and Plaintiffs' motion for summary judgment regarding their Equal Protection claim is granted.

- 9 -

**A87**

The Court will discuss the Due Process claims before addressing the Defendant's justifications, as they overlap for the claims at issue in this case.

### C. Due Process

Plaintiffs request summary judgment on their claims that Subsection (A)(3) violates their Due Process Rights (Counts 2, 3, and 4). These claims are substantively related and will be addressed in tandem below.

The Due Process Clause "promises liberty to all within its reach, a liberty that includes certain specific rights that allow persons . . . to define and express their identity." *Obergefell v. Hodges*, 576 U.S. 644, 651-52 (2015). This liberty includes the right to make "personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs." *Id.* The Due Process Clause protects against intrusions pertaining to personal decisions regarding one's bodily integrity, including choices about medical treatment and the right to refuse unwanted medical treatment. *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997); *Washington v. Harper*, 494 U.S. 210, 221 (1990); *Parham v. J.R.*, 442 U.S. 584, 600 (1979). Infringement of an individual's due process rights is subject to strict scrutiny, which forbids any government restriction of due process unless the action is "narrowly tailored to serve a compelling state interest." *Glucksberg*, 521 U.S. at 721 (citation omitted).

The relevant issue before the Court is that both Subsection (A)(3) and its corresponding regulations require the state registrar to amend a birth certificate if the registrar receives "a written statement by a physician that verifies the [person's] sex change operation…" A.R.S. § 36-337(A). Notwithstanding the Defendant's assertion that this does not require a transgender person to reveal their transgender status, it is apparent that the Surgical Requirement obligates individuals either to present inaccurate identity documents, which in turn necessitates the involuntary disclosure of one's transgender status, or to undergo surgery. Both options implicate the core of Due Process protections.

For the first choice, the Plaintiffs argue this is a violation of their Due Process Right to Privacy; Defendant contends that the amendment process does not force disclosure of one's

**A88**

transgender status. The Court does not find the Defendant's argument persuasive. Named Plaintiffs have offered evidence showing that if they follow medical treatment recommendations, their outward physical appearance will not fit with the gender marker on their birth certificate; thus, if these documents are presented to others, they would, of course, be forced to involuntarily out themselves as transgender. These experiences have resulted in psychological distress and other harm to the children in this case.

If transgender individuals are uniquely faced with the decision to either undergo surgery, or involuntarily disclose their transgender status by presenting an inaccurate birth certificate, their right to privacy is implicated under the current statutory and regulatory regime. Facially, the statute targets transgender individuals with an impossible and unconstitutional decision to either give up their bodily autonomy or disclose highly intimate medical details when they present these documents. Moreover, this forced decision prevents individuals from following modern treatment recommendations for gender dysphoria.

For the second choice, the Plaintiffs have made two claims: the subsection and implementing regulations violate The Due Process Right to Individual Liberty and Autonomy (Count 3) and The Due Process Right to choose a particular medical treatment (Count 4). The Defendant claims there are no strictly textual requirements that transgender individuals undergo surgery, and thus, it survives a facial challenge under strict scrutiny. As previously discussed by the Court in this Order, the Defendant's argument that the word 'transgender' needs to be used for the statutory language to target transgender individuals is unpersuasive. The Defendant urges the Court to dismiss the Plaintiffs' claims because it argues that this discrimination is out of happenstance since transgender is never used in the provisions. However, it is readily apparent that the vast majority of individuals seeking to change the gender marker on their birth certificate are transgender, and the requirement of a sex change operation targets them. Named Plaintiffs have presented evidence that without a sex change operation, they were unable to amend their birth certificates. They were presented with a statutory and regulatory scheme that forces them to undergo surgery if

A89

1   they sought to amend their birth certificates, and this infringed on their right to define their

2   identities and follow medical treatment. This is further compounded by the stark reality

3   that by being unable to amend their birth certificate, the Plaintiffs are constantly subject to

4   the risk of exposure, discrimination, and violence.

5   ### D. Defendant's Justifications

6   The Court examines Defendant's justifications under heightened scrutiny for the equal

7   protection violation and strict scrutiny for the due process violations.

8   As discussed earlier in this Order, Defendant claims that the State has a compelling

9   interest in maintaining accurate identification documents, which includes documenting the

10  "external genitalia at the time of birth" and ensuring that amendments to that identification

11  document are accurate. The Court generally agrees with the Defendant that the accuracy of

12  vital records is important. However, Defendant's position in this case is without basis as

13  the Defendant has not demonstrated how an amendment process without a sex change

14  operation prevents the accuracy of birth certificates if the ADHS still nonetheless maintains

15  the original documents. Additionally, if transgender individuals follow medical

16  recommendations and adopt their gender identity, the current birth certificate would be

17  misleading and likely unhelpful in accurately verifying identity.

18  Further, the Defendant argues that this is a preventative measure for fraud. The evidence

19  presented by the Defendant to support this claim has relied on a generalized truism that

20  fraud could happen, and the sex change operation requirement deters this fraud. Notably,

21  the ADHS Fraud Manager admits that "she did not recall ever investigating or even seeing

22  documents related to alleged fraud related to sex markers."

23  Thus, the Court does not find the Defendant's argument persuasive. All that is required

24  for non-transgender individuals seeking to change a sex marker on their birth certificate is

25  a written letter from a physician. However, the Defendant would have the Court believe

26  that the same sort of deterrence for fraud would not work with transgender individuals

27  seeking an amendment to their birth certificates. There has been no showing of how

28  changing a gender marker without a sex change operation would lead to more fraud and

**A90**

prevent the State from maintaining the accuracy of vital records.

Therefore, without a compelling state interest, the Defendant's justifications fail both a heightened and strict scrutiny analysis[10]. The infringement of the Plaintiffs' Due Process and Equal Protection rights is found to be unconstitutional. The Plaintiffs' motion for summary judgment on all four counts is granted. The Defendant's motion for summary judgment is denied.

## IV. CONCLUSION

Plaintiffs' motion for summary judgment on all claims: (1) the Equal Protection Clause, (2) The Due Process Right to Privacy, (3) The Due Process Right to Individual Liberty and Autonomy, and (4) The Due Process Right to choose to undergo a particular medical treatment are granted. The Defendant's motion for summary judgment is denied. The Court hereby finds that the sex change operation requirement violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment[11].

Dated this 20th day of August, 2024.

Honorable James A. Soto
United States District Judge

---

[10] Defendant's positions in this case fail any level of scrutiny—including rational basis review.
[11] Regarding potential remedies, the Court notes that the Plaintiffs have taken issue with ADHS rejecting applications with physician's letters attesting the applicant is receiving the "appropriate clinical treatment" to transition or is "irrevocably committed" to transitioning. As the Court noted in the Order on the Defendant's Motions to Dismiss, it would "not be a herculean effort" by ADHS to accept a physician's certification to amend an individual's birth certificate.

A91

**KRISTIN K. MAYES**
**ATTORNEY GENERAL**
(Firm State Bar No. 14000)

Patricia Cracchiolo LaMagna (Bar No. 021880)
Kelly L. Soldati (Bar No. 036727)
Assistant Attorneys General
Education and Health Section
2005 N. Central Avenue
Phoenix, Arizona 85004
Tel.: (602) 542-1610
Fax: (602) 364-0700
EducationHealth@azag.gov

Nathan T. Arrowsmith (Bar No. 031165)
Lauren A. Watford (Bar No. 037346)
Office of the Arizona Attorney General
2005 N. Central Avenue
Phoenix, Arizona 85004-1592
Tel.: (602) 542-3333
Nathan.Arrowsmith@azag.gov
Lauren.Watford@azag.gov
ACL@azag.gov

*Attorneys for Defendant*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Helen Roe, a minor, by and through her parent and next friend Megan Roe; et al., | No. 4:20-cv-00484-JAS |
| Plaintiffs, | |
| v. | **DEFENDANT'S SUPPLEMENTAL BRIEF IN RESPONSE TO PLAINTIFFS' MOTION FOR A PERMANENT INJUNCTION** |
| Sheila Sjolander, in her official capacity as State Registrar of Vital Records and Interim Director of the Arizona Department of Health Services, | |
| Defendant. | |

**A92**

The purpose of this supplemental brief is to address issues raised during oral argument on Plaintiffs' Motion for a Permanent Injunction (Doc. 282). *See* Doc. 302 (authorizing parties and amici to file simultaneous supplemental briefs). To be clear, by filing this brief, Defendant does not concede any issue and preserves all issues and arguments for appeal.

As Defendant explained in her response to Plaintiffs' permanent injunction motion, any order granting an injunction must state its terms specifically and describe in detail the acts restrained or required. *See* Fed. R. Civ. P. 65. Plaintiffs' proposal (even as revised in their reply) does not meet this standard and asks the Court to effectively re-write the challenged statute and rule. During oral argument, the Court asked counsel for Defendant if the Defendant had a proposed alternative remedy. Although it is not Defendant's responsibility to craft Plaintiffs' remedy for them, Defendant explains below some additional considerations.

Finally, the President of the Arizona Senate and Speaker of the Arizona House (the "Legislative Leaders"), as amici, offer an alternative remedy and ask the Court to reconsider its summary judgment order. Defendant also responds to these issues below.

## BACKGROUND

On August 20, 2024, the Court found "the sex change operation requirement [in A.R.S. § 36-337(A)(3)] violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment" and granted summary judgment for Plaintiffs. Doc. 279 at 13. Accordingly, on January 15, 2025, Plaintiffs moved for a permanent injunction. Doc. 282. Plaintiffs requested the Court enjoin Defendant from "requiring that a transgender individual first undergo a sex change operation as a prerequisite to changing the sex on their birth certificate through the private administrative process" under A.R.S. § 36-337(A)(3) and A.A.C § R9-19-208(O). Doc. 282-1.

On January 29, 2025, Defendant filed a Response, arguing that Plaintiffs had failed to propose an injunction that complied with Rule 65. Doc. 287. On February 5, 2025, President of the Arizona State Senate Warren Petersen and Speaker of the Arizona House

of Representatives Steve Montenegro (collectively, "the Legislative Leaders") filed a brief as *amicus curiae* in support of Defendant's Response.  Docs. 288, 289.

In a reply filed February 12, 2025, Plaintiffs proposed, for the first time, that the Court enjoin Defendant from "applying the term 'operation.'"  Doc. 290 at 1.  In other words, "in processing an application for a change in the sex marker on a birth certificate under § 36-337(A) and R9-19-208(O) based on a gender transition (or what the statute terms a 'sex change'), Defendant may not apply the term 'operation' to require surgery as a condition of the requested change."  *Id.*  Defendant would be required to amend a birth certificate upon written request and a "written statement by a physician that *verifies the sex change.*" *Id.*  (emphasis added).  But Plaintiffs' proposed injunction order did not define the term "sex change" or include any specific language Defendant is required to accept from a physician's letter verifying the "sex change."

On August 7, 2025, the Court heard argument on Plaintiffs' motion for a permanent injunction and ordered supplemental briefing.

## LEGAL STANDARD

Under Rule 65, an order granting an injunction must (1) "state the reasons why it issued," (2) "state its terms specifically; and," (3) "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(A)-(C).  When crafting injunctive relief based on "a constitutional flaw in a statute," courts "try to limit the solution to the problem." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328 (2006).  Courts "try not to nullify more of a legislature's work than is necessary." *Id.* at 329 (citation omitted).  For example, a "statute may ... be declared invalid to the extent that it reaches too far, but otherwise left intact."  *Id.* (citations omitted).  In so doing, courts refrain from "'rewrit[ing] state law to conform it to constitutional requirements' even as [they] strive to salvage it." *Id.* (citation omitted).  Indeed, "making distinctions in a murky constitutional context, or where line-drawing is inherently complex, may call for a far more serious invasion of the legislative domain than we ought to undertake." *Id.* (cleaned

**A94**

up, citation omitted). Finally, because "the touchstone for any decision about remedy is legislative intent," a court "cannot 'use its remedial powers to circumvent the intent of the legislature.'" *Id.* at 330 (citation omitted).

## ARGUMENT

### I.    Plaintiffs' proposal asks the Court to rewrite the statute.

As explained in Defendant's Response (Doc. 287), Plaintiffs' proposed order asks the Court to enjoin Defendant from imposing a surgical requirement as a prerequisite to amendment of a birth certificate under A.R.S. § 36-337(A)(3), but Defendant has never imposed such a requirement. Rather, A.R.S. § 36-337(A)(3) requires Defendant to process amendments "for a person who has undergone a sex change operation" or has a chromosomal count establishing a sex different than in the registered birth certificate when Defendant receives a written request and a letter from a physician. The statute does require amendments to birth certificates in any other circumstances. *See id.* Plaintiffs initially seemed to be asking that Defendant be required to amend the sex field on a birth certificate for a person who has not "undergone a sex change operation" and also has not obtained a court order ordering an amendment. *See* Doc. 282. But A.R.S. § 36-337(A) does not authorize such action and Plaintiffs failed to identify any other statutory basis for the Court to order the Defendant to do so. *See* Doc. 282. As discussed during oral argument, Plaintiffs have changed their ask. They now want the Court to enjoin Defendant from enforcing the word "operation'' in A.R.S. § 36-337(A)(3). *See* Doc. 290 at 1. Here's what that would look like:

"The state registrar shall amend the birth certificate for a person born in this state when the state registrar receives any of the following:"

(1) proof of adoption,

(2) a voluntary acknowledgement of paternity,

(3) "For a person who has undergone a sex change ~~operation~~ or has a chromosomal count that establishes the sex of the person as different than in the registered birth certificate, both of the following:

**A95**

(a) A written request for an amended birth certificate from the person or, if the person is a child, from the child's parent or legal guardian.

(b) A written statement by a physician that verifies the sex change ~~operation~~ or chromosomal count."

(4) A court order ordering an amendment to a birth certificate.

*See* A.R.S. § 36-337. Plaintiffs did not suggest a definition of the phrase "undergone a sex change" in their briefing, but at argument, they suggested that "sex change" should be read as synonymous with "gender transition." Hearing Tr. at 7:21-25. Respectfully, that does not make sense.

Plaintiffs did not present any evidence from which the Court could conclude that "sex change" and "gender transition" are synonymous. *See* Docs. 282, 290. To the contrary, at the summary judgment phase, Plaintiffs presented an expert report which states that "[g]ender transition is the process through which a person begins bringing their outer appearance and lived experience into alignment with their core gender." Doc. 233-2 at ¶ 38. Plaintiffs' expert also opined that "[t]ransition may or may not include medical or legal aspects, such as taking hormones, having surgeries, or correcting the sex designation on identity documents." *Id.* The expert further opined that a "person's gender identity … is not determined by a particular medical treatment or procedure" and that "medical treatments provided to transgender people … do not 'change a woman into a man' or vice versa," but instead "affirm the authentic gender that an individual person is." *Id.* ¶ 41. According to this expert, treatments for gender dysphoria "do not change a transgender person's sex, which is already determined by their gender identity." *Id.* ¶ 42. That same expert also opined that a person's gender identity reflects that person's "actual sex," which may differ from a person's "birth-assigned sex," which is "based solely on the appearance of their external genitalia." *Id.* at ¶¶ 16, 44.

In light of this evidence, there is no basis to conclude that the medical community does understand or would understand the phrase "undergone a sex change" to mean the same thing as a "gender transition." Indeed, based on this evidence, there are likely some

**A96**

members of the Plaintiffs class whose "gender transitions" would not include any "medical … aspects." *Id.* ¶ 238.  It is not clear how these class members would be able to obtain a "written statement by a physician that verifies [a] sex change," which would still be required even under Plaintiffs' proposed injunction.

All of this illustrates that by asking the Court (and Defendant) to interpret "sex change" to mean "gender transition," Plaintiffs are asking the Court to rewrite the statute and rule, which the Court cannot do.  *See Ayotte*, 546 U.S. at 968.

## II. Even assuming the Court could direct the Defendant to interpret the phrase "undergone a sex change" to mean "undergone a gender transition," Rule 65 requires that the Court's order state that instruction specifically.

Absent some direction from the Court as to the effect of enjoining the word "operation," there would be no way for Defendant (or her successors) to know what, specifically, she is being ordered to do, as required by Rule 65.  *See* Fed. R. Civ. P 65(d)(1)(C) (requiring order granting injunction to "describe in reasonable detail … the act or acts restrained or required).

Under Plaintiffs' current proposal, if the Court were to say only that Defendant is enjoined from enforcing the word "operation," it is Defendant's understanding that pursuant to A.R.S. § 36-337(A)(3), as modified by the Court's injunction, Defendant would then be required to amend the birth certificate of a "person who has undergone a sex change" upon receipt of a written amendment request and "a written statement by a physician that verifies the sex change."  Accordingly, the only acceptable physician's statement is one that says the person requesting an amendment has "undergone a sex change."  To the extent Defendant were to receive a physician's letter using any other language, it is unclear to Defendant whether she would be able to process the amendment request because it would not comply with the plain language of A.R.S. § 36-337(A)(3).

But what Plaintiffs seem to want is for the Court to interpret "sex change" to mean "gender transition" and order Defendant to accept physician's letters verifying the individual's *gender transition*.  For example, the Court has previously observed that "Plaintiffs have taken issue with [Defendant] rejecting applications with physician's

**A97**

letters attesting the applicant is receiving the 'appropriate clinical treatment' to transition or is 'irrevocably committed' to transitioning" and "it would not be a herculean effort" by Defendant to accept such certifications. Doc. 279 at 13 n.11. Assuming for purposes of argument that the Court could order the Department to do that under A.R.S. § 36-337(A)(3), Rule 65 would require that the Court's order specifically state that "sex change" means "gender transition," specify the acceptable language for the physician's letters, and direct the Department to accept such physician letters.

In sum, at a minimum, the Court's order should explain how the Court interprets "undergone a sex change" for purposes of assessing Defendant's compliance with the order. If the Court intends to require Defendant (and her successors) to process amendment requests for individuals who have not "undergone a sex change operation" and cannot request amendment based on chromosomal count, then the Court's order should state specifically the language Defendant is required to accept to "verif[y] a sex change."

On a broader note, although Defendant did not dispute the general proposition that a permanent injunction is often an appropriate remedy for a constitutional violation, the problems Defendant has identified with Plaintiffs' proposed injunction illustrate that a permanent injunction may not be the right remedy here. The Court need not award a permanent injunction just because Plaintiffs have asked for one. It is rare, but not unprecedented, for a court to decline to award an injunction after finding a constitutional violation. *See, e.g.*, *Poder in Action v. City of Phoenix*, 506 F. Supp. 3d 725, 736-37 (D. Ariz. 2020) (declining to issue permanent injunction where court concluded that declaratory judgment was sufficient). It is also rare, but not unprecedented, for courts to acknowledge that a defendant may lack authority under state law to take all actions necessary to completely remedy a constitutional violation. *See, e.g.*, *Welsch v. Likins*, 550 F.2d 1122, 1129-1132 (8th Cir. 1977) (reversing district court order that effectively rewrote state law while acknowledging that the state agency would be unable to fully remedy constitutional violation as a result).

**A98**

## III.    The Legislature's proposed injunction is not the right remedy here.

The Legislative Leaders suggest that the only proper remedy is to enjoin the Department from processing amendment requests for transgender persons who have undergone surgical procedures.  Defendant understands that argument and has previously pointed out that such an injunction would be one way to avoid a substantial rewrite of the statute and rule.  Doc. 287 at 6.  But Defendant does not agree that the Court should enter such an injunction.   As Defendant explained in her summary judgment briefing, the Legislature's intent in enacting A.R.S. § 36-337(A)(3) was to provide a pathway for persons who had "undergone a sex change operation" to amend the sex marker on their Arizona birth certificate.  Doc. 230 at 4-7, 18-19 (noting that 2004 amendments to §36-337 "expanded [the] opportunity" for Arizonans to amend the sex marker on their birth certificates. Removing this pathway from the statute is inconsistent with that intent.  The Court should leave in place that plainly constitutional application of the statute.  *See Ayotte*, 546 U.S. at 329 (courts should only enjoin unconstitutional applications of a statute).

The Legislative Leaders rely on *Sessions v. Morales-Santana*, 582 U.S. 47, 74 (2017).  In that case, the Court addressed a statute establishing a one-year physical presence requirement for unwed U.S. citizen mothers to pass citizenship to their children born abroad, but five years of continuous U.S. citizenship for unwed fathers.  *Id.* at 51. The Court remedied the sex-based discrimination by invalidating the one-year residency exception offered only to unwed mothers and applying a five-year requirement to unwed mothers and fathers alike.  *Id.*  at 52.  Although "[t]he preferred rule in the typical case is to extend favorable treatment," the Court found this was "hardly the typical case" where extension would render the special treatment of a one-year physical presence requirement "the general rule, no longer an exception."  *Id.* at 77.

Respectfully, the Legislative Leaders overstate the applicability of that principle to this case.  The *Sessions* court applied a five-year residency requirement evenly to avoid conferral of a special exception to a broader class than intended by Congress.  *See id.*

**A99**

Quite the opposite, here, the Legislature proposes removing the benefit for nearly everyone, all but those who can provide evidence based on their chromosomal count.

This Court found that Arizona's vital records laws violate Plaintiffs' equal protection rights by requiring transgender individuals undergo surgery to obtain an accurate birth certificate. Thus, "if a transgender individual were unable to satisfy the surgical requirement and obtain an amended birth certificate, it forcibly requires an individual to disclose their transgender status when they present an inaccurate identity document." Doc. 279 at 9. Meanwhile, "non-transgender individuals—the vast majority of whom have an accurate birth certificate—they are not presented with the unlawful choice of being stripped of their bodily autonomy or face discrimination, harassment, and potential violence." *Id.* The Legislative Leaders' proposal, to remove the amendment option for most individuals, thereby forcing them to "disclose their transgender status when they present an inaccurate identity document," *id.*, would not remedy the Court's finding of a constitutional violation.

At oral argument, the Legislative Leaders suggested that the Legislature would have intended to prohibit all transgender individuals, including those who have undergone surgery, from amending their birth certificates, upon a finding of a constitutional violation. The Legislative Leaders cited the text of A.R.S. § 36-377(A)(3) and noted that the headings or titles of the 1967 bill adding the statute, as well as the 2004 bill amending the statute, included the term "surgical alterations." Hearing Tr. at 16-20. The Legislative Leaders also cited an equal protection case to argue that in 1967, "sex" meant "biological sex." *Id.*; *see also Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) ("since sex, like race and national origin, is an immutable characteristic determined solely by the accident of birth, the imposition of special disabilities upon the members of a particular sex because of their sex would seem to violate 'the basic concept of our system that legal burdens should bear some relationship to individual responsibility.'") (citation omitted).

With respect, the Legislative Leaders do not grapple with the fact that the Legislature, when it enacted and amended A.R.S. § 36-337(A)(3), plainly intended to

**A100**

provide a path for individuals who had "undergone a sex change" to amend the sex marker on their birth certificates. Blocking such individuals from amending the sex marker on their birth certificates seems squarely at odds with that intent. What is more, proposed legislation from the most recent legislative session suggests that the Legislative Leaders do not view A.R.S. § 36-337(A) as an *exhaustive* list of available amendments to birth certificates. *See* H.B. 2438, 57th Legis. 1st Reg. Sess. (2025) (proposing to add language stating that a "birth certificate for a person born in this state may be amended *only* in accordance with this section" to A.R.S. § 36-337(A)) (emphasis added). If the 1967 or 2004 Legislatures had intended for A.R.S. § 36-337(A) to foreclose any other path to amending the sex marker on an Arizona birth certificate, then those legislatures would have said so. *See Padilla v. Indus. Comm'n*, 546 P.2d 1135, 1137 (Ariz. 1976) (Arizona courts presume that "what the Legislature means, it will say").

## IV.    Defendant does not ask the Court to reconsider its summary judgment order at this time.

At oral argument, the Legislative Leaders also invited the Court to *sua sponte* reconsider its summary judgment order in light of *United States v. Skrmetti*, 145 S. Ct. 1816 (2025). In *Skrmetti*, the Supreme Court upheld a state law allowing healthcare providers to "administer puberty blockers or hormones to minors to treat certain conditions but not to treat gender dysphoria, gender identity disorder, or gender incongruence … regardless of the minor's sex." *Id.* at 1829. The Court held that the law classified based on age and "medical use," and not based on sex or transgender status. *Id.* at 1829-35. Therefore, the Court reviewed the law under rational basis review, rather than the heightened review applicable to sex-based classifications. *Id.* at 1835-37.

The Legislative Leaders suggest that this Court should revisit its summary judgment order in light of *Skrmetti*, but it is not clear why. Defendant does not read *Skrmetti* as proclaiming a broad rule that affects this case; rather, the Supreme Court focused specifically on the laws at issue and the classifications drawn by those laws. *See id.* at 1829-37. What's more, to the extent *Skrmetti* can be read to suggest that lower

**A101**

courts should assess whether laws impacting transgender persons classify based on "medical use" rather than sex or transgender status, Defendant already made those arguments in her summary judgment briefing.  *See* Doc. 230 at 17-19 (arguing that challenged statute and rule do not classify based on sex or transgender status); Doc. 243 at 8-11, 16.  The Court rejected them, and concluded that the statute and rule do not survive even rational basis scrutiny.  Doc. 279 at 7-12, 13 n.10.

The Legislative Leaders also point to the Supreme Court's subsequent decision to vacate and remand a birth certificate case to the Tenth Circuit in light of *Skrmetti*.  *See Stitt v. Fowler*, No. 24-801, 2025 WL 1787695, at *1 (U.S. June 30, 2025).  The Court did not issue a written opinion.

A few facts distinguish *Fowler* from this case.  There, the Tenth Circuit had decided that a state law banning amendments to the sex field on birth certificates violated the equal protection rights of transgender individuals living in that state.  *See Fowler v. Stitt*, 104 F.4th 770, 784-94 (10th Cir. 2024), cert. granted, judgment vacated, No. 24-801, 2025 WL 1787695 (U.S. June 30, 2025).  The court held the policy constituted discrimination based on sex and transgender status and applied heightened scrutiny review.  *Id.*  The law at issue in *Fowler* prohibited amendments to the sex field on birth certificates for everyone statewide.  Here, the Court held A.R.S. § 36-337(A)(3) prohibits amendment for only those transgender individuals who "choose not to, or are unable to undergo surgery."  Doc. 279 at 8.  And here, in contrast to *Fowler*, the Court also found a violation of the due process rights to privacy, individual liberty and autonomy, and the right to undergo a particular medical treatment.  *Id.* at 13.

As a general matter, Defendant does not dispute that there may be arguments to be made to challenge this Court's summary judgment order.  Indeed, Defendant reserves the right to raise any and all of those arguments on appeal.  But an appeal is the appropriate forum to make them.  At this stage, neither *Skrmetti* nor the Supreme Court's order vacating the judgment in *Fowler* control the outcome or warrant the Court taking up the Legislative Leaders' invitation to *sua sponte* reconsider its prior order.

**A102**

**CONCLUSION**

The Court should enter an injunction that complies with Rule 65. If the Court awards Plaintiffs' requested injunction, Defendant respectfully requests that the Court stay its injunction order pending appeal, or, in the alternative, stay its order for a period of 30 days to allow Defendant to seek a stay pending appeal from the Ninth Circuit.

RESPECTFULLY SUBMITTED this 29th day of August, 2025.

**KRISTIN K. MAYES**
**ATTORNEY GENERAL**


By  /s/ Nathan T. Arrowsmith
     Patricia Cracchiolo LaMagna
     Kelly L. Soldati
     Assistant Attorneys General
     Education and Health Section
     2005 N. Central Avenue
     Phoenix, Arizona 85004

     Nathan T. Arrowsmith
     Lauren A. Watford
     Office of the Arizona Attorney General
     2005 N. Central Avenue
     Phoenix, Arizona 85004-1592

     *Attorneys for Defendant*

**A104**

1
2
3
4                    **IN THE UNITED STATES DISTRICT COURT**
5                         **FOR THE DISTRICT OF ARIZONA**
6
7   Helen Roe, a minor, by and through her parent        No. CV-20-00484-TUC-JAS
    and next friend Megan Roe, et al.,
8                                                         **ORDER**
                         Plaintiffs,
9
    v.
10
    Sheila Sjolander, in her official capacity as
11  State Registrar of Vital Records and Director
    of the Arizona Department of Health
12  Services,
13                       Defendant.
14

15          Pending before the Court is Plaintiffs' Motion for Permanent Injunction and Final
16  Judgment. For the following reasons, the motion is granted.
17  **BACKGROUND**
18          Named Plaintiffs Helen Roe, James Poe, and Carl Voe are transgender minors born
19  in Arizona who experience gender dysphoria.[1] They were denied the ability to change the
20  gender marker on their birth certificates because they failed to satisfy the current sex
21  change operation requirement. The Named Plaintiffs are part of the much larger certified
22  class of both transgender adults (and minors) in Arizona who fail to satisfy the sex change
23  operation requirement when attempting to amend the gender marker on one's birth
24  certificate.
25  **Motion for Summary Judgment**
26          On August 20, 2024, the Court granted Plaintiffs' motion for summary judgment on all
27  _____
    [1] Gender dysphoria is a recognized health condition where an individual's gender identity
28  is inconsistent with one's biological sex. Treatment for gender dysphoria includes both
    medical and psychological methods, which may include seeking to change identification
    documents to align with their gender identity.

**A105**

four claims and denied Defendant's cross-motion for summary judgment. The parties agreed there was no dispute as to the case's material facts. The disagreement arose around the interpretation of A.R.S. § 36-337(A)(3) and how it related to the rights of transgender individuals born in Arizona. The Court determined that Arizona courts had imported a surgery requirement for transgender individuals to amend their birth certificates under subsection (A)(4). This Surgical Requirement necessitated either two options for transgender individuals: (1) involuntary disclosure of one's transgender status, or (2) undergo surgery. The Court held that subsection (A)(3) of § 36-337(A) violated (1) the Equal Protection Clause, (2) The Due Process Right to Privacy, (3) The Due Process Right to Individual Liberty and Autonomy, and (4) The Due Process Right to choose to undergo or forgo a particular medical treatment.

**<u>Request for Permanent Injunction and Final Judgment</u>**

Plaintiffs seek a permanent injunction enjoining Defendant from requiring a "sex change operation" as a prerequisite to changing the sex on a transgender individual's birth certificate via a private administrative process under § 36-337(A)(3) and its implementing regulation (Arizona Administrative Code R9-19-208(O)). Plaintiffs request that Defendant comply within 60 days of the Court's Order and that the Court retain jurisdiction to ensure Defendant complies with the Court's decisions. Plaintiffs argue that relief is warranted because they have shown that: (1) they have suffered a deprivation of constitutional rights and thus an irreparable injury; (2) constitutional violations cannot be adequately remedied through monetary damages; (3) the balance of hardships between the parties justifies an equitable remedy; and (4) a permanent injunction would serve the public interest.

Plaintiffs request the Court enter an injunction enjoining Defendant from requiring transgender individuals to undergo an "operation" to amend a birth certificate through the administrative process. Plaintiffs ask the Court to strike the word "operation" from the few places it appears in § 36-337(A)(3) and A.A.C R9-19-208(O).

In response, Defendant does not dispute that Plaintiffs are entitled to a permanent injunction, nor that final judgment be entered in Plaintiffs' favor. Instead, Defendant

**A106**

contends that Plaintiffs have failed to propose a permanent injunction that would allow the Court to craft a remedy in compliance with Rule 65, Fed. R. Civ. P. Defendant argues that Plaintiffs do not clearly articulate the requested relief and that the proposed injunction will not adequately provide Plaintiffs with the relief they are seeking. For the Court to rule in compliance with Rule 65, Defendant argues that Plaintiffs must propose an instruction that equates "undergone a sex change" to "undergone a gender transition." Defendant further argues that assuming that Plaintiffs are intending that Defendant amend birth certificates for those who have not "undergone a sex change operation," Plaintiffs' proposal to strike the word "operation" fails to provide adequate relief.[2]

**Amici Curiae**

On June 5, 2025, the Court granted the motion of Arizona Senate President Warren Petersen and Speaker of the Arizona House Steve Montenegro's motion to file a brief as amici curiae. Amici curiae argue that Plaintiffs' proposed injunction fails to conform with legislative intent and asks the Court to exceed its boundaries in rewriting a state statute. Departing from Defendant's requests, amici curiae ask that the permanent injunction be granted and nullify "sex change operation" language in its entirety.[3] Further, amici curiae ask the Court to reconsider its summary judgment ruling in light of recent Supreme Court authority.

Following oral arguments held on August 7, 2025, Defendant responded in opposition to amici curiae's proposed permanent injunction. Defendant argues that the current constitutional applications should be left alone, and that removing the "sex change operation" language in its entirety is inconsistent with legislative intent. Defendant also opposed amici curiae's request for reconsideration of this Court's summary judgment ruling, arguing that these issues could be raised on appeal.[4]

---

[2] The "proper remedy" argument has been made numerous times with the Court throughout this case, and the Court has consistently considered, discussed, and rejected this argument (*see generally* Docs. 83, 279); the Court again rejects Defendant's arguments as to the appropriate remedy.

[3] The explicit language asked for is "that permanent injunction should simply and straightforwardly provide: 'The Registrar shall not amend any birth certificate pursuant to A.R.S. § 36-337(A)(3) based on the applicant having undergone a sex change operation.'"

[4] The Court has reviewed *United States v. Skrmetti*, 145 S.Ct. 1816 (2025) as raised by

**A107**

1    **STANDARD FOR A PERMANENT INJUNCTION**

2         Rule 65(d) of the Federal Rules of Civil Procedure requires that an order granting

3    an injunction: (1) "state the reasons why it issued;" (2) "state its terms specifically; and"

4    (3) "describe in reasonable detail—and not by referring to the complaint or other

5    document—the act or acts restrained or required."  This Court can begin fashioning an

6    injunctive remedy "[o]nce plaintiffs establish they are entitled to injunctive relief."

7    *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 558 (9th Cir. 1990) (citing *Lemon v.*

8    *Kurtzman*, 411 U.S. 192, 200 (1973)).

9         This Court has considerable discretion in granting and tailoring suitable injunctive

10   relief.  *Lamb-Weston, Inc. v. McCain Foods*, Ltd., 941 F.2d 970, 974 (9th Cir. 1991); *see*

11   *also eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) ("The decision to grant

12   or deny permanent injunctive relief is an act of equitable discretion by the district court,

13   reviewable on appeal for abuse of discretion.").  Appellate review of the injunctive relief

14   "is correspondingly narrow."  *Coca-Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1256 n. 16

15   (9th Cir. 1982).

16   **DISCUSSION**

17   <u>Plaintiffs Have Established That They are Entitled to a Permanent Injunction</u>

18        Plaintiffs have met the applicable standard for granting injunctive relief.  Generally,

19   a permanent injunction is appropriate where: (1) a plaintiff has suffered an irreparable

20   injury; (2) remedies available at law are inadequate to compensate for that injury; (3)

21   considering the balance of the hardships between the parties, a remedy in equity is

22   warranted; and (4) "the public interest would not be disserved by a permanent injunction."

23   *eBay Inc.*, 547 U.S. at 391; *see also La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*,

24   762 F.3d 867, 879 (9th Cir. 2014).

25        As to the first factor, a deprivation of constitutional rights constitutes an irreparable

26   injury.  *See Melendres*, 695 F.3d 990, 1002 (9th Cir. 2022). These deprivations cannot be

27   remedied through monetary damages.  *See Edmo v. Corizon, Inc.*, 935 F.3d 757, 798 (9th

28   amici curiae, but agrees with both Defendant and Plaintiffs that this case is distinguishable
     and is inapplicable to the circumstances in this particular case.

**A108**

Cir. 2019). When the Government is the opposing party (as in this case), the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see Galvez v. Jaddou*, 52 F.4th 821, 831 (9th Cir. 2022). In the interest of the public, the Court should seek to prevent the violation of a party's constitutional rights. *Melendres*, 695 F.3d at 1002. Government officials "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).

Here, Plaintiffs have met all four factors and are entitled to injunctive relief. First, Plaintiffs have suffered an irreparable injury. The Court previously found several constitutional deprivations in § 36-337(A)(3) which violated Plaintiffs' constitutional rights. Thus, Plaintiffs' constitutional deprivations demonstrate an irreparable injury. Second, monetary damages fail to adequately provide a remedy in response to the Plaintiffs' constitutional deprivation. Finally, when considering the balance of hardships between the Defendant and the public interest, the scales tip towards the public. The Court seeks to prevent the violation of constitutional rights, and the Defendant in the case at bar suffers no harm from the remedy of these violations. Accordingly, Plaintiffs have met the standard for a permanent injunction and are entitled to injunctive relief.

Crafting an Appropriate Remedy

As Plaintiffs have established that they are entitled to injunctive relief, this Court has the discretion to craft an appropriate remedy under the unique circumstances of this particular case. When a statute is unconstitutional due to under-inclusion of a class benefit, the Court may consider two remedial alternatives. *See Sessions v. Morales-Santana*, 582 U.S. 47, 72–73 (2017). "[A] court may either declare [the statute] a nullity and order that its benefits not extend to the class that the legislature intended to benefit, or it may extend the coverage of the statute to include those who are aggrieved by exclusion." *Califano v. Westcott*, 443 U.S. 76, 89 (1979) (quoting *Welsh v. United States*, 398 U.S. 333, 361 (1970) (concurring in result)). "[W]hen the 'right invoked is that of equal treatment,' the appropriate remedy is a mandate of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the

**A109**

1    excluded class." *Sessions*, 582 U.S. at 73 (citing *Heckler v. Matthews*, 465 U.S. 728, 740

2    (1984)).

3        Generally, the preferred rule is to extend the favorable treatment, especially when

4    addressing a carved-out exception. *Sessions*, 582 U.S. at 77; *see also Califano*, 443 U.S.

5    at 89–90. When choosing between these two outcomes, the Court considers "the

6    legislature's intent, as revealed by the statute at hand." *Sessions*, 582 U.S. at 73.

7        Three principles generally guide a court in remedying an unconstitutional statute: (1)

8    avoid upsetting the legislature's work and only nullify what is necessary; (2) refrain from

9    rewriting the statute when trying to salvage its remains; and (3) use legislative intent as the

10   touchstone for a remedy. *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320,

11   329–330 (2006). Of these three principles, the key in determining a remedy is always

12   asking "'what the legislature would have willed had it been apprised of the constitutional

13   infirmity.'" *Sessions*, 582 U.S. at 74 (2017) (quoting *Levin v. Commerce Energy, Inc.*, 560

14   U.S. 413, 427 (2010)).

15       This Court must determine whether to extend the intended benefit this statute

16   provides to all transgender individuals (both adults and minors) within Arizona, or nullify

17   the statute in its entirety. Section 36-337(A)(3) clearly intends to extend a benefit to

18   transgender individuals.[5] But the statute currently extends the benefit of amending the

19   gender marker on one's birth certificate only to transgender Arizonan's who have

20   undergone a "sex change operation." Therefore, due to the word "operation," it under-

21   includes members of Plaintiffs' class who have not undergone a sex change operation.

22   However, as time has progressed along with a better understanding of gender dysphoria,

23   the definition of who is classified as a transgender individual has shifted.

24       When the language was initially added, the legislature clearly intended to provide a

25   carved-out exception for transgender Arizonans to amend their birth certificates. Unlike

26   non-transgender individuals, transgender persons often face negative consequences when

27

28   _____

     [5] This Court has discussed numerous times that "any logical reading of the statute and
     regulation reflects that it applies nearly exclusively to transgender people; who else is going
     to voluntarily seek out a 'sex change operation'?" (Doc. 279 at 9)

**A110**

forced to present a birth certificate whose sex marker fails to reflect their gender identity. The amici curiae urge the Court to nullify the benefit provided to transgender individuals in its entirety. However, Defendant previously conceded that the legislature intended to provide an avenue for transgender persons to access the private administrative process to amend the sex marker on their birth certificate and, therefore, was not the result of anti-trans bias. Precedent demands that the Court follow the legislature's intent based on the statute at hand, not the current legislative intent. The statute at hand presents a viable pathway for what, at the time, likely represented appropriate language in carving this exception for transgender individuals. Therefore, legislative intent reasonably guides this Court in extending the benefit rather than nullifying its coverage.

In crafting a remedy in this case, the Court agrees with Plaintiffs' proposed remedy by striking the singular word "operation" from both Arizona Revised Statutes § 36-337(A)(3) and its implementing regulation Arizona Administrative Code R9-19-208(O). By striking this single word, it avoids upsetting the rest of the statute and only nullifies what is absolutely necessary. Second, the rest of the statute is left unchanged, and thus is salvaged as best as possible in light of the constitutional violations at issue. Third, this remedy to strike the word "operation" aligns with legislative intent. It is reasonable to conclude that with today's understanding and treatment of transgender individuals and gender dysphoria, the language adopted within the statute would have included today's Named Plaintiffs and the larger class of both adults and minors. The elimination of this single word gives faculty to transgender adults and minors (and their parents and treating physicians) who are pursuing treatment for gender dysphoria. It places the decision of what constitutes a "sex change" in the appropriate hands: patients and their treating physicians.[6] Determining if a sex marker change on an individual's birth certificate is warranted because treatment for gender dysphoria is best left in the hands of the patient and their treating physician. It is outside this Court's appropriate purview to determine individual patient care, but today's remedy provides a necessary pathway for all

---

[6] And in the case of minors, of course, the patient (i.e., the minor), the minor's parents, and the treating physician will make the appropriate decision together.

**A111**

transgender Arizonans to obtain proper relief.

Plaintiffs' motion for permanent injunction and final judgment is granted. The Court hereby issues a permanent injunction enjoining (i.e., striking) the word "operation" from both Arizona Revised Statutes § 36-337(A)(3) and its implementing regulation Arizona Administrative Code R9-19-208(O).

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** as follows:

(1) The Motion is **GRANTED**. Defendant is permanently enjoined (as discussed above) from requiring that a transgender individual first undergo a sex change operation as a prerequisite to changing the sex on their birth certificate through the private administrative process under Arizona Revised Statutes § 36-337(A)(3) and its implementing regulation Arizona Administrative Code R9-19-208(O).

(2) Defendant shall have **120 days** from the date of this Order to comply with the Court's Order in this case.[7]

(3) A status conference with the parties is hereby scheduled for **February 10, 2026 at 1:30 p.m. in Courtroom 6A**.

(4) The Court **DIRECTS** the Clerk of Court to enter final judgment in Plaintiffs favor in accordance with this Order; the Court will retain jurisdiction over this case to ensure Defendant complies with the Court's Order.

Dated this 30th day of September, 2025.

Honorable James A. Soto
United States District Judge

---

[7] There has been no showing that a stay pending appeal is warranted in this case; the request to stay is therefore denied. *Nken v. Holder*, 556 U.S. 418, 434.

**A112**